**Tyrone Blackburn, ESQ**
**Attorney NJS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Counsel for Plaintiff,* Abuchi Raymond Wealth

---

ABUCHI RAYMOND WEALTH,

                        Plaintiff,

        -against-

FOX ROTHSCHILD LLP;
ALKA BAHAL;
KRISTEN M. AMABILE;
JOHN AND JANE DOES 1-10,
and ABC CORPS. 1-10;

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DOCKET NO. 23-3194
**Civil Action**

**JURY DEMAND**
.

Plaintiff, Abuchi Raymond Wealth ("Mr. Wealth" or "Plaintiff"), by way of Complaint against Defendant's, Fox Rothschild LLP ("Fox"), Alka Bahal ("Bahal"), and Kristen M. Amabile ("Amabile"), hereby alleges and says:

## PARTIES

1. Mr. Wealth is a black English-speaking African male. Mr. Wealth is domiciled in this District.

2. Defendant Fox is a law firm headquartered in Philadelphia, Pennsylvania, with a principal place of business located at 2000 Market Street, 20th Floor, Philadelphia, PA 19103-3222.

3. Defendant Amabile is a criminal domiciled in this District.

4. Defendant Bahal is a negligent attorney domiciled in this District.

5. During the relevant period, Defendants John and Jane Does 1-10 are unknown individuals and employees who aided and abetted in the commission of conduct complained of herein. They acted within the scope of their employment. Defendants ratified, embraced, and

1

added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

6. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities employed by Plaintiff or aided and abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## JURISDICTION AND VENUE

7. The venue is properly set in Essex County because Fox conducts business there.

8. This Court has personal jurisdiction over Defendants according to and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

    i.   The transaction of any business within the state;

    ii.  The making of any contract within the state;

    iii. The commission of a tortious act within this state; and

    iv.  The ownership, use, or possession of any real estate in this state.

9. From 2020 to the date of this filing, Fox has consistently and purposefully availed itself of the privilege of conducting activities within New Jersey, thus invoking the benefits and protections of New Jersey law.  In return for these benefits and protections, Fox must submit to the burdens of litigation in New Jersey.

10. This litigation arises from or relates to the legal malpractice Plaintiff experienced while living in this District. Fox aimed and directed this malpractice to this District when their authorized agents, Amabile and Bahal (who reside in this District), conspired to steal over $20,000 from Mr. Wealth and caused him to be detained by ICE for over 45 days. This tortious conduct violated United State Federal Rico, New Jersey State Rico, Pennsylvania Malpractice, and New Jersey Malpractice Laws.

11. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiff Wealth's claims arise from conduct occurring by Defendants in New Jersey.

## NATURE OF ACTION:

12. This is an action for monetary and declaratory relief to redress the Defendants' violation of the Plaintiffs' immigration rights.   Plaintiffs seek relief for Breach Of Contract; Negligence & Negligent Infliction Of Emotional Distress; Fraud; Violation Of The NJRICO; Breach of Fiduciary Duty; Legal Malpractice; and Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity (Violation of Racketeer Influenced and Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)(d)).

13. At all times relevant to this Complaint, Defendant Fox maintained a policy and practice of knowingly and willfully robbing their immigration clients out of their money by fooling them into thinking that they are required to open credit card accounts to establish good credit in order to secure a United States Visa.

## FACTUAL BACKGROUND

14. Mr. Wealth had the misfortune of retaining the service of Amabile, Bahal, and Fox on or about August 6, 2020.

15. Mr. Wealth first met Amabile on or about March 2020.

16. Amabile informed Mr. Wealth that she was an attorney with Fox.

17. Amabile offered to help Mr. Wealth with his 01 Visa application.

18. Amabile sent Mr. Wealth a retainer agreement from Fox.

19. The retainer agreement was a flat fee of $13,000.00.

20. Mr. Wealth signed the retainer agreement and paid the $13,000.00 flat rate.

21. Amabile requested Mr. Wealth send her all the required documents to complete the 01 Visa application.

22. Mr. Wealth obliged, and on or about August 26, 2020, Amabile informed Mr. Wealth that his application had been filed.

23. One year later, on or about August 2021, Mr. Wealth received a letter from the United States Immigration and Customs Enforcement ("ICE") informing him that his visa was denied because Defendant's failed to provide ICE with the correct information required for the Visa review process.

24. Upon information and belief, Amabile left Fox around January or February 2022.

25. Bahal, Amabile, and Fox failed to inform Mr. Wealth that Fox no longer employed Amabile.

26. Fox and Bahal failed to inform Mr. Wealth nor any of the other clients of Fox and Bahal that Fox no longer employed Amabile.

27. Fox and Bahal failed to inform Mr. Wealth, nor any of the other clients of Fox and Bahal, that Amabile was terminated because she is a **THIEF**!!!

28. Upon information and belief, Amabile stole over $80,000.00 from Bahal and Fox through her employee expense account.  Bahal is suing Amabile in the Superior Court of New Jersey Law Division, Morris County, Docket No. Mor-L-1117-22 to recover the $80,000.00 Amabile stole. (**See, Exhibit A**).

LOUIS H. MIRON (014861985)
Attorney at Law
123 North Union Avenue
Suite 103
Cranford, New Jersey 07016
(908) 233-9555
Attorney for Plaintiff Alka Bahal

|  |  |
|---|---|
| ALKA BAHAL,<br><br>               Plaintiff,<br><br>          vs.<br><br>KRISTEN M. AMABILE,<br><br>             Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. MOR-L-   -22<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

Plaintiff Alka Bahal, residing at 9 Sheldon Court, East Hanover, New Jersey, by way of Complaint against Defendant Kristen M. Amabile ("Amabile"), says:

    1.    Defendant Amabile is an individual, and upon information and belief, resides at 61 Nicole Drive, Denville, New Jersey.

    2.    At all relevant times, Plaintiff and Amabile worked together at a law firm in the State of New Jersey (the "Law Firm").

29. For starters, Mr. Wealth had a flat rate of $13,000.00 retainer with Fox and Bahal; due to Paradise, Bahal, and Fox being unethical, they attempted to finagle an additional $22,000.00 out-of-pocket Mr. Wealth.



**Kristen Amabile**
**Is A CRIMINAL**

30. Upon information and belief, on or about October 12, 2022, Amabile was arrested in Denville Township in New Jersey, for fraudulently obtaining prescription medication. (**See, Attachment B**).

    a. **GAVEL Case No**. 22001356, and

    b. **GAVEL Case No**. 22001459.

6

# Affidavit of Probable Cause

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1408** | **S** | **2022** | **000142** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

*THE STATE OF NEW JERSEY*
*VS.*
**KRISTEN M AMABILE**

DENVILLE TWP MUNICIPAL COURT
1 SAINT MARY'S PLACE
DENVILLE            NJ  07834-0000
973-625-8300      COUNTY OF: MORRIS

ADDRESS: **61 NICOLE DRIVE**

**DENVILLE            NJ  07834-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 1 | | 2022-23444 |

COMPLAINANT  DET      Z LANCASTER
NAME:      1 ST. MARY'S PLACE
           ATTN RECORD BUREAU
           DENVILLE              NJ  07834

DEFENDANT INFORMATION
SEX: **F**  EYE COLOR: **BROWN**      DOB: 12/11/1979
DRIVER'S LIC. #. **A57004377462792**          DL STATE:  **NJ**
SOCIAL SECURITY #: **xxx-xx-x377**   SBI #:
TELEPHONE #: **917-504-6533   ( C )**
LIVESCAN PCN #:

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed and (2) the defendant is the one who committed it:

On 9/28/22, Denville Police responded to 61 Nicole Drive for the report of an emotionally disturbed person, who was later identified as Kristen M. Amabile. During the on scene investigation, several prescription bill bottles belonging to Anthony Denoia and Kathleen Ancheta were turned over to police by Kristen's husband, George Amabile. The prescription bottles were for Adderall and Xanax and each had been prescribed by Dr. Jacob Leivent. While speaking with Kathleen and Anthony, they stated they were not patients of Dr. Leivent and had not given Kristen permission to use their personal information to obtain the medication. Anthony stated that Kristen had previously asked his permission to use his personal information to obtain Adderoll, however he stated he declined. The pill bottles with Kathleen's name had the address of 61 Nicole Drive, Denville, which was Kristen's address. Dr. Leivent provided screen shots from two phone number stating they were Anthony and Kathleen, asking for prescription refills. Each phone number was confirmed by Kristen's mother, Maria Smith to belong to Kristen. The phone number used to communicate with Dr. Leivent from an actor stating they were Anthony was used to contact Kristen directly. The two most recent Adderoll prescription that were filled for Anthony Denoia were picked up from the Denville CVS but a white BMW which appeared identical to a vehicle that is registered to Kristen and was observed parked in her driveway. Additionally, George stated that Kristen had stated that she was "pretending" to be Kathleen while seeing Dr. Leivent, in order to obtain medication.

| | |
|---|---|
| | **Affidavit of Probable Cause** |
| | **Page 5  of 7**                    1/1/2017 |

S-2022-000132-1435   10/28/2022 05:49:49 PM   Pg 5 of 7   Trans ID: MCS20221385888

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1435** | **S** | **2022** | **000132** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

*THE STATE OF NEW JERSEY*
*VS.*
**KRISTEN M AMABILE**

ROCKAWAY TWP MUNICIPAL COURT
65 MT HOPE RD
ROCKAWAY                    NJ  07866-0000
973-627-9000      COUNTY OF:  **MORRIS**

ADDRESS :  **61 NICOLE DR**

**DENVILLE          NJ  07834-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| **1** | | **2022-23241** |

COMPLAINANT **DET. T     TAFFIN**
NAME:       **65 MOUNT HOPE RD**
            **ATTN WARRANTS**
            **ROCKAWAY              NJ  07866**

DEFENDANT INFORMATION
SEX: **F** EYE COLOR: **BROWN**      DOB: **12/11/1979**
DRIVER'S LIC.#: **A57004377462792**      DL STATE:  **NJ**
SOCIAL SECURITY #: **xxx-xx-x377**  SBI #:  **688010H**
TELEPHONE #: **973-886-3827  ( C )**
LIVESCAN PCN #: **143501007548**

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed <u>and</u> (2) the defendant is the one who committed it:
On September 28, 2022 Denville Police Department Officers responded to 61 Nicole Drive in Denville NJ.  Denville PD met with defendant and family members on scene.  Family members on scene provided numerous prescription pill bottles made out to several other unknown people.  Through their investigation, it was determined that defendant utilized victim K.A.'s personal information to fraudulently obtain prescriptions from Dr. Jacob Leivent out of Brooklyn NY.  Defendant's phone number was utilized to contact Dr. Leivent to request prescriptions to be filled at Randolph Pharmacy.  An unknown female who identified herself as the victim K.A. called Randolph Pharmacy to allow a "driver" to pick up the prescriptions, and a white BMW sedan was observed picking up the prescriptions at the drive through pharmacy window.  A white BMW sedan is registered to defendant and is parked at 61 Nicole Drive in Denville NJ.  The prescription pill bottle with victim's name on it, and the address of 61 Nicole Drive in Denville was recovered by Denville Police Department.  Victim was a client of defendant's at a law firm, Fox Rothchild Law Firm in Morristown NJ which confirmed that defendant had access to victim and other clients personal identifying information.

**Affidavit of Probable Cause**

**Page 5  of 7**                    1/1/2017

31. Amabile's criminal activity did not begin or end with GAVEL Case No.'s: 22001356 and 22001459, Amabile, with the permission and assistance of Bahal, engaged in the illegal practice of Law in New Jersey.

32. Amabile told everyone associated with Mr. Wealth's immigration Visa renewal process that she was an Attorney assigned to Mr. Wealth's case.

33. Everyone associated with Mr. Wealth's immigration visa renewal process had no reason to believe that Amabile was not an attorney.  They **NEVER** spoke with nor heard from Bahal, or any other licensed attorney at Fox.

34. Upon information and belief, it is Bahal's pattern and practices to pass off their responsibilities as attorneys to unlicensed office staff.  They then sign off on the staff's work and fraudulently bill their clients for services they never rendered.

### In Addition to Stealing Prescription Drugs, Amabile Engaged In The Illegal Practice of Law

35. Under N.J.S.A. 2C:21-22, a person is guilty of a crime...if the person knowingly engages in the unauthorized practice of law.

   c.  For a defendant to be found guilty of the unauthorized practice of law, the State must prove beyond a reasonable doubt each of the following four elements:

      i.   The defendant engaged in the practice of law;

      ii.  The defendant knew they were engaged in the practice of law;

      iii. The defendant's conduct was not authorized by law;

      iv.  The defendant knew that their conduct was not authorized by law.

   d.  The fourth element that the State must prove beyond a reasonable doubt is that the defendant knew their conduct was not authorized by law.

36. Amabile informed Plaintiff and Plaintiff's friends and family that she was his attorney.

37. Amabile's claims were confirmed through Defendant Fox's billing statement, where it was clear that Amabile did upwards of 90% of the work on Mr. Wealth's case.

38. Amabile was the only representative Mr. Wealth spoke with. Bahal never spoke with Mr. Wealth.

39. Amabile knew she was engaged in the illegal practice of law, as evidenced by her statements to Mr. Wealth and his family and friends.

40. Amabile did not have the authority to practice law in New Jersey or Pennsylvania.

41. Amabile and Bahal knew or should have known that Amabile's unauthorized practice of law in New Jersey was illegal. Yet, Bahal allowed her greed and sheer laziness to turn a blind eye to her ethical duties as an officer of the court. Attorney in the State of New Jersey,

by allowing, and in many instances encouraging, Amabile to illegally practice law in New Jersey.

**Amabile Stole over 20,000 Thousand Dollars From Mr. Wealth**

42. On or about April 29, 2022, ICE detained Mr. Wealth for being out of status due to Amabile, Fox, and Bahal's *GROSS* negligence and Malpractice.

43. While ICE detained Mr. Wealth, Amabile broke into his apartment, stole over $11,000.00 in cash and three laptop computers, and used his social security number to open several credit accounts.  Ms. Amabile's monetary theft from Mr. Wealth exceeds $20,000.00.

44. During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, opened several credit cards with Mr. Wealth's Social Security number, and added herself as an authorized user.

45. During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, hack into his email account, add herself and her phone number to his account, and use that information to make unauthorized charges, changes, and withdrawals from Mr. Wealth's bank accounts.

**AMABILE PHONE NUMBER ENDING IN 4298 IS THE SAME NUMBER ADDED TO MR. WEALTH'S SECURITY VERIFICATION WHEN HE WAS IN PRISON**



46. During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, hack into his email account, add herself and her phone number to his investments account, and use that information to make unauthorized charges, changes, and withdrawals.



47. On or about May 10, 2022, while Mr. Wealth was in prison due to Amabile, Fox, and Bahal's gross negligence and malpractice, Amabile had an American Express credit card (ending in 1018) delivered to Mr. Wealth's residence located in Toms River, NJ, with her name on it. (*See* **Exhibit C**).

48. On or about May 10, 2022, while Mr. Wealth was in prison due to Amabile, Fox, and Bahal's gross negligence and malpractice, Amabile had an American Express credit card delivered to Mr. Wealth's residence located in Toms River, NJ, with her name on it. (***See* Exhibit D**).

49. On or about May 6, 2022, while Mr. Wealth was in prison due to Amabile, Fox, and Bahal's gross negligence and malpractice, Amabile applied for a Chase Sapphire Reserve credit card. Chase sent Mr. Wealth a letter informing him that he had been denied a Chase Sapphire Reserve credit card. (*See* **Exhibit E**).

50. On the same date, Amabile hacked into Mr. Wealth's email account and pretended to be him to access his apartment and mailbox. Amabile sent the following email to Mr. Wealth's building manager:



Please accept this email as my authorization to allow my representative, kristen amabile, enter my apartment she has my full authority to receive full access including a key. Also, she has my full and complete permission to my mailbox. Please make sure that this is noted for her and within your office. Ms amabile is the only person who has my permission and full authorization, no one else has permission but ms amabile. You may reach her at 973-886-3827. I really appreciate your cooperation.

Have a blessed day.

Thanks,
Raymond Wealth

51. On or about May 13, 2022, while Mr. Wealth was in prison due to Amabile, Fox, and Bahal's gross negligence and malpractice, Amabile applied for a Chase Freedom credit card. Chase sent Mr. Wealth a letter informing him that he had been denied a Chase Freedom credit card. (*See* **Exhibit F**).

52. On or about May 8, 2022, while Mr. Wealth was in prison due to Amabile, Fox, and Bahal's gross negligence and malpractice, Mr. Wealth received a letter from American Express informing him they had to speak with him regarding "security concerns." As a result, American Express declined new charges on Mr. Wealth's account. American Express also

advised Mr. Wealth to advise any additional card member that their new charges would be declined. (*See* **Exhibit G**).

53. On or about May 20, 2022, while Mr. Wealth was in prison due to Amabile, Fox, and Bahal's gross negligence and malpractice, Mr. Wealth received a letter from American Express National Bank informing him that there had been an attempt by someone to open additional deposit accounts in Mr. Wealth's name.  As a result, the bank canceled any applications. (*See* **Exhibit H**).

54. On or about June 10, 2022, Mr. Wealth was released from ICE Detention.  At that time, he learned that Amabile had been withdrawing money from Mr. Wealth's checking account to pay for her credit card usage.

**AMABILE IS AN OFFICE ADMINISTRATOR, YET SHE WAS ABLE TO PURCHASE A HOME IN MORRIS COUNTY, NEW JERSEY, FOR NEARLY 1,000,000 DOLLARS**



55. Upon information and belief, Amabile lives at 61 Nicole Dr. Denville, NJ 07834-9547. The exact address is listed on her criminal indictments mentioned above.

56. Upon information and belief, Amabile earned less than $60,000 a year while working as an administrator for Fox[1].

57. It is improbable that Amabile could afford a million-dollar home based solely on her $60,000-a-year office administrator salary.

58. Upon information and belief, Amabile and Bahal worked in concert to embezzle their clients' funds and property to fund their lavish lifestyle.

59. Despite Amabile's departure from Fox and Fox's knowledge of Amabile's criminal activity, they did not think it was necessary to warn or alert their clients who came in contact with Amabile that she was terminated for stealing over $80,000.00 from the Firm.



**Alka Bahal**
**AIDED AND ABETTED AMABILE'S**
**CRIMINAL ACTIVITIES**

60. Bahal is the Co-Chair of Fox's Corporate Immigration Practice at Fox Rothschild.

61. Bahal never met, spoke with, or engaged with Mr. Wealth throughout her representation of him.

---

[1] This assertion is made based on Fox's job posting for a similar role in Morristown, New Jersey, with a salary of $41.3k - $52.3k annually.

62. According to Mr. Wealth's itemized monthly billing from Fox, Bahal worked approximately 6.6 hours on Mr. Wealth's immigration application renewal.

63. In contrast, according to Mr. Wealth's itemized monthly billing from Fox, Amabile worked approximately 56.05 hours.

64. Bahal abandoned her responsibility as counsel to Mr. Wealth and placed Mr. Wealth's visa application, freedom, well-being, and finances at risk by allowing him to be victimized by her co-conspirator Amabile.

65. As was the case with her co-conspirator Amabile, Bahal also owns a million-dollar residence in Morris County, New Jersey. Upon information and belief, Bahal purchased this home located at 9 Sheldon Ct. East Hanover, NJ 07936-2406, on or about 2016, at a cost of $1,200.000.

66. Upon information and belief, Bahal and Amabile worked in concert to secure immigration clients for Defendant Fox and then steal or coerce those clients out of their money and possessions for their benefit.



**Thomas Paradise**

67. On or about April 12, 2022, Mr. Wealth emailed Thomas "Tom" Paradise ("Paradise") about the legal malpractice committed by Fox and Bahal.

68. Paradise blatantly ignored Mr. Wealth's concerns.

69. Upon information and belief, Paradise consciously decided not to inform or warn the Immigration Clients of Fox, to whom Bahal and Amabile provided legal services, about the theft and criminal enterprise Bahal and Amabile were running.

70. Paradise intentionally failed to terminate Bahal after discovering that Bahal intentionally failed her duty as "Co-Chair, Corporate Immigration Practice" for Fox when she never called, met with, or spoke with Mr. Wealth, who was supposed to be her "client," when Bahal failed to submit Mr. Wealth's immigration renewal application correctly and on time, and when Bahal failed to warn Mr. Wealth that Amabile was terminated from Fox for theft of over $80,000.00.

71. On or about April 12, 2022, Mr. Wealth sent the following email to Mr. Paradise:

"Good afternoon, sir. I am coming to you as I was told by someone in your accounting department you were the contact person who handles issues with attorneys' misconduct. In this case, that Attorney is Alka Bahal. She is the most unethical and worst attorney I have ever encountered; her behavior is unprecedented, and she needs to be stopped so she doesn't mishandle anyone else's case in the same manner in which she mishandled mine.

My name is Raymond Wealth, as it stands now, I am a client (your firm client # 321560) of the firm (although I have expressed my imminent desire to close out my file with Alka Bahal, as a result of her unethical and fraudulent representation (she failed to file my case before my visa expired and filed it late – this resulted in placing me 'out of status,' and then she maliciously tried to cover it up and lied about it, this is just a few examples of the misconduct at the hands of Ms. Bahal. Further to the case-related problems, she then also billed me for her mistakes and incorrectly charged me hourly time for my case, which was (as stated in the engagement letter) a FLAT FEE (not hourly billing). This is outrageous and unfair; I am at a loss for words and was told by your collections team to contact you with my situation, and I am hoping that we can resolve this amicably and without further contact or dealings with Ms. Bahal. I respectfully, sir, refuse to have any further contact with her as I do not trust her. The only reason I am giving you the opportunity to make this right is the team members that worked on my case (Kristen Amabile - the only one who knew what she was doing and who unfortunately was not the person who filed my case, and Angelica Flores-Valencia, a paralegal who was very nice) I highly regard and respect, but unfortunately, I learned they are no longer with Fox Rothschild.

Accordingly, I am asking for your assistance with 1) the invoices – Ms. Bahal continued to ignore my lack of visa status, which she created by not filing my case on time, and to add further insult, continued to threaten me on bills that were not correctly invoiced (despite the agreement on our arrangement). Her total disregard for my case and lack of

visa status, along with the major problems that she, in fact, created by making severe mistakes and mishandling and lied about it, then invoiced me erroneously for her poorly handled representation. This is unacceptable, and I am seeking to resolve this amicably with you first, however, if we cannot resolve this to which I am satisfied with a fair resolution, I will consider litigation and report her to the bar (which truthfully, I should do but out of fairness and my good nature, I am allowing your firm a chance to make this right).

Ms. Bahal to make a deal with me (dismissing the real issues here and not addressing the fact that she incorrectly billed me in the first place). Truly this has been an ongoing nightmare for me and for my prospective employer. Just to shed light on my case, I am considered a world-famous soccer player and have played on famous teams all over the world. I am highly educated and possess many degrees, along with having several sports teams and organizations in the United States, all who begged me to come and work for them. I state this to demonstrate that I have been treated like I am a nobody who does not deserve the time of day from Ms. Bahal, and its sad and unfortunate.

**<u>Issues with my case</u>**:
- I retained Fox Rothschild on August 1, 2020 (see engagement letter attached).
- My visa status was set to expire on August 26, 2020; I retained Ms. Bahal to prepare and file my new O-1 petition prior to my visa expiration 8/26/2020 so that there were no gaps in my visa status (and Ms. Bahal knew and was aware of this visa expiration).
- Ms. Bahal 'claimed' she timely filed my O-1 visa with USCIS prior to my visa expiration (prior to 8/26/2020) to avoid illegal presence in the U.S., but in fact, she did NOT file it timely, she filed my O-1 visa AFTER my visa expired.
- Ms. Bahal made several attempts to conceal and cover up the fact that she did not timely file my case by 'blaming' Fedex carrier, and on another occasion, she blamed the USCIS mailroom for 'misplacing' my case, but clearly, if she had tracked the original package which was as I understand sent via Fedex, wouldn't she have known if she did or did not timely file it and confirm that the case was in fact received? Unfortunately, she did not track it, and I have evidence to show that she clearly lied to cover up her tracks furthermore, it was never filed before the expiration to begin with.  This is unacceptable and misconduct. I retained fox/Alka to file my case by a deadline for which she did not and then lied about and tried to conceal.
- Ms. Bahal claimed she 'allegedly timely filed the petition" – taking no responsibility whatsoever and putting me OUT OF STATUS because of her failure to timely file my case.
- Her carelessness was even further revealed because she billed me incorrectly "hourly" seven (7) months later (see invoice Number 2706165 dated March 2021). Here is a time entry (in red below) of the Ms. Bahal's 9/02/20 invoice entry which CLEARLY CONFIRMS SHE 'FILED THE CASE LATE ON 9/2/20' (MY VISA EXPIRED ON 8/26/20) which resulted in putting me out of 'legal status' AND my entire immigration case in serious jeopardy.

<span style="color:red">09/02/20 BAHAL RECEIPT AND REVIEW OF SIGNED FORMS AND DOCUMENTS SUBMITTED TO SUPPORT PETITION; **<u>OVERSEE AND FINALIZE O-1 FILING</u>**/FINAL 0.6</span>

- Ms. Bahal had over a month from the time we retained her to the time my visa expired to prepare it and meet the deadline, which she promised was not an issue at the time. Clearly, she either forgot or just didn't care. Either way, she recklessly handled my case.

- Had her conduct and lack of timely filing my case (and poorly prepared petition itself) been handled by ANY OTHER immigration attorney, I am quite certain I would be in a very different boat right now. And to further fuel the fire, she did not take ownership or responsibility for it, she instead lied and blamed everyone else but herself (what type of attorney does this? What type of attorney makes it her practice of not tracking a visa petition delivery to confirm USCIS actually received the petition? What type of attorney bills the client for a severe mistake they made on the case and then haunts them to pay that bill? Would you pay a bill for time an attorney spent mishandling and lying to cover her tracks? Anyone with half a brain would know otherwise.

- Although your firm has a well-respected reputation, from my experience, which is why I retained Fox in the first place, Ms. Bahal should not be associated with Fox if they want to keep that good reputation because my situation alone speaks for itself.

- To add further insult, I only learned about this mistake because I received the incorrectly billed invoices, which is evidence to show she mishandled the entire matter, she is that careless, and although she tried to cover her tracks, she forgot to cover it entirely otherwise she would not have sent me the proof to show what I suspected, her lack of adherence to a deadline, one which puts my entire life in jeopardy.

**Billing Issues**:

1. The agreement (from August 2020) was for a one-time FLAT fee of 13,000 and was agreed to incorporate all legal fees (including an RFE, if issued) for the entire case). Ms. Bahal did not adhere to this arrangement and billed hourly for invoices.

2. I am not paying for mistakes your partner conducted and put me out of status as a result of, I am not paying for bills that were billed hourly instead of flat fee as agreed to in the engagement letter.

3. I am also disputing all invoices entirely (the case was denied) I will only pay for the filing fees which was already paid, and I am hereby requesting, as a show of good faith and to resolve this without further burden to me, a refund of any monies paid over and above the USCIS filing fees immediately. I think this is the least you can do, and it is fair and just given the above-described circumstances.

4. Additionally, I am asking for my file to be officially closed and transferred to me directly to my home address with a tracking number (and not sent by Ms Bahal as I **don't trust her to send anything ever again to me or for me)**.
   **Raymond Wealth**
   **160 James Street**
   **Building 14, Apt 8**
   **Toms River, NJ 08753**

5. Please also note that despite my several requests and the engagement letter written by your firm/Ms. Bahal, ALL my Bills were sent to the **wrong person at the wrong address**, they were to be sent as agreed in the engagement letter to me, Raymond Wealth. NOT TO Mike Turtle (see below in yellow of the engagement letter under "Fees Due Now"

It is our understanding that Mr. Raymond Wealth, the beneficiary, will be responsible for all legal fees and costs incurred per the Fee Schedule below. It is often our practice to require clients to make payments which are credited against fees and costs to be incurred. At this stage, we require a pre-payment of $13,000 towards the flat legal fee for the for O-1 visa; USCIS Filing fees, including Premium Processing Service (expedited USCIS processing), are separate and not included for the flat (Form I-129 & Form I-907) USCIS Filing. If you wish to pay by credit card, please follow this link: http://www.foxrothschild.com/payment-portal/. Refer to reference code: 999999.00003 to ensure proper application to your matter. If you have any questions about submitting your payment, contact Sandra Mordecai at 973-994-7802.

6.  It is incredibly appalling that Ms. Bahal had the nerve to deceive me and my potential employer, SST, and yet had the audacity to offer me 'a discount' at your firms fiscal year end in her snippy (one of many) emails (see below email from Ms. Bahal dated March 29, 2022).

Just to add one last item to the 'case issue list' to date she has not made any attempt to assist me with my case further, she did not even inform me it was denied or try to refer me in any direction to help me. In fact, I had to reach out to her to ask her what was going on. It is truly unbelievable. She is a liability and should not be allowed to hurt or represent anyone else because if she does to others what she did to me, that would be a tragic mistake.

I have never in my entire life endured such disgusting and unprofessional treatment especially at the hand of someone who was 'representing me'. Please help me resolve this so I can take my file and retain another attorney who hopefully God willing can undo what Ms. Bahal did. Thank you in advance for your anticipated cooperation and assistance. I appreciate your time and look forward to hearing from you soon."

72. Paradise responded to the email above with the following:

"Dear Mr. Wealth:

Thank you for bringing your concerns to me in the below email.  I will look into this and respond fully once I have conducted my review of the matter.  Please note that Ms. Bahal is out of the office this week and part of next week.  As such, it may be a few days before I can speak with her about your concerns.

On behalf of the Firm, I am sorry to hear that you are not satisfied with the legal services received, and we will endeavor to correct any shortcomings by our firm that are discovered during our review of your matter.

In the meantime, please direct all further communications to my attention.

I look forward to speaking with you."

**Paradise did not follow up with Mr. Wealth**.

73. Paradise did not "endeavor to correct any shortcomings" (and there were many) of Fox or Bahal.

74. Paradise did not conduct an investigation because if he had, he would have discovered that Bahal committed several acts of legal malpractice when she failed to monitor the actions of Amabile, resulting in over $80,000.00 of stolen funds. Amabile presented herself as an attorney to Fox's immigration clients.

75. Upon information and belief, within two weeks of sending this email, ICE was miraculously tipped off that Mr. Wealth was out of status, resulting in Mr. Wealth's arrest and detention.

76. The temper of proximity between Mr. Wealth sending this April 12, 2022, email to Paradise, and his arrest and detention by ICE, on April 29, 2022, are so close that it removes all doubt that Paradise, Fox, Bahal, and Amabile reported Mr. Wealth to ICE.

**Paradise INTENTIONALLY Turned A Blind Eye And Rubberstamped Bahal and Amabile's Criminal Enterprise**

77. Through counsel, Mr. Wealth informed Paradise about the criminal activities visited upon him by Amabile and Bahal.

78. Once again, Paradise chose to put profits over people and continued to put ALL of Fox's immigration clients at risk by maintaining Bahal's employment and failing to warn Fox's immigration clients about Amabile and Bahal's criminality.

79. This dereliction of duty is part of Paradise's modus operandi. Upon information and belief, since Paradise has been at the helm of Fox, his impotence and sheer weakness as a leader has exposed Fox to costly, embarrassing, and avoidable litigation.

80. Upon information and belief, the following sample of lawsuits was born and bred under Paradise's tenure:

   a. **Fox Rothschild Sued For Malpractice After $6 million Award Nixed**: https://news.bloomberglaw.com/business-and-practice/fox-rothschild-sued-for-malpractice-after-6-million-award-nixed

   b. **Fox Rothschild Lawyer Out After Sexual Harassment Complaint**: https://news.bloomberglaw.com/daily-labor-report/fox-rothschild-labor-attorney-accused-of-sexual-harassment

c. **Former BigLaw associate sues law firm for alleged pregnancy discrimination**: https://www.abajournal.com/news/article/former-fox-rothschild-associate-sues-firm-for-alleged-pregnancy-discrimination

81. Upon learning that Amabile, an individual employed on his watch, was illegally posing as a licensed attorney to Fox's immigration clients and had stolen $80,000.00 from Fox and over $20,000.00 from Mr. Wealth, Paradise chose NOT to do the decent and sensible thing, which would have been to reimburse Mr. Wealth for his losses, and to investigate and warn the other potential victims of Amabile and Bahal that Amabile is not a licensed attorney, and Amabile is a scamming thief.

82. Due to Fox, Amabile, and Bahal's malpractice, Mr. Wealth was out of state with ICE and was left exposed and susceptible to deportation.

## Mr. Wealth Was Arrested By Ice As A Direct Result Of Paradises Incompetence, Bahal's Malpractice, And Amabile's Criminality

83. On or about April 29, 2022, Mr. Wealth was arrested by ICE.

84. According to the Department of Homeland Security Notice to Appear, Mr. Wealth was arrested based on the following allegations:

a. not a citizen or national of the United States;

b. a native of NIGERIA and a citizen of MEXICO;

c. Were admitted to the United States in Los Angeles, CA, on or about March 14, 2019, as a nonimmigrant (Jl);

d. Remained in the United States beyond the duration of your stay without authorization from the Immigration and Naturalization Service or its successor, the Department of Homeland Security.

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: 11/14/1987

Event No: MLN2204000173

In removal proceedings under section 240 of the Immigration and Nationality Act:
Subject ID: 377082265

In the Matter of:

File No: 216 429 732

Respondent: ABUCHI RAYMOND WEALTH                                  currently residing at:

555 Geo Drive Phillipsburg,PENNSYLVANIA, 16866

(Number, street, city, state and ZIP code)                        (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of NIGERIA and a citizen of MEXICO;

3. You were admitted to the United States at Los Angeles, CA on or about March 14, 2019 as a nonimmigrant (J1);

4. You remained in the United States beyond the duration of your stay without authorization from the Immigration and Naturalization Service or its successor the Department of Homeland Security.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:   ☐ 8CFR 208.30   ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

801 W SUPERIOR AVE. SUITE 13-100 Cleveland OH 44113. EOIR Cleveland, OH

(Complete Address of Immigration Court, Including Room Number, if any)

on   May 13, 2022   at   9:00 AM   to show why you should not be removed from the United States based on the

(Date)                    (Time)

charge(s) set forth above.                    XB5 TSYPIS - SDDO

(Signature and Title of Issuing Officer) (Sign in ink)

Date:   April 29, 2022                    Mt. Laurel, New Jersey

(City and State)

85. Based on the preceding, it was charged that Mr. Wealth was subject to removal from the United States according to the following provision(s) of law:

   a.  Section 237(a) (1) (B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section l0l(al (15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

86. Mr. Wealth would NOT have been out of status but for the negligence of Paradise and the incompetent malpractice of Bahal and Fox.

## **FOX, PARADISE, and BAHAL HAVE THE NERVE TO CONTINUE TO PURSUE MR. WEALTH FOR A $20,000 IMMIGRATION LEGAL FEES**

87. After failing miserably to secure the relevant information from Mr. Wealth for his Visa renewal application, Fox, Paradise, and Bahal has the gall to continuously send Mr. Wealth a $22,000.00 invoice for legal services[2].

88. The first of these bills was sent to Mr. Wealth on or about March 18, 2022.

---

[2]As of the date of this filing, Fox, Paradise, and Bahal continues to send Mr. Wealth an invoice or $22,000.00 worth of legal services.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
T: 215.299.2000  F: 215.299.2150
www.foxrothschild.com

Jessica Grillone
Direct Dial: (215) 299-2165
Email Address: jgrillone@foxrothschild.com

March 18, 2022

RAYMOND WEALTH
160 JAMES ST.
BLDG 14-8
TOMS RIVER, NJ 08753

Via Mail and Email: rwealth27@gmail.com

Re:    SOCCER SPECIFIC TRAINING INC. (File No.  321560)
       Outstanding Balance in the Amount of $21,981.46

Dear Mr. Weatlh,

Our records indicate that payment of our fee in the amount of $21,981.46 for professional services
rendered in the above referenced file is seriously overdue.

I have enclosed a current summary of account and ask that you see that the sum is paid promptly.  For
your convenience, I have provided a self-addressed return envelope for you to remit your payment.

Please feel free to call me at (215) 299-2165 if you have any questions regarding this matter.  Otherwise,
I request that payment be received in our Accounts Receivable Department within one week of the date
of this letter.

Sincerely,

Jessica Grillone
Collections/Client Relations Coordinator

Enclosure(s)

cc:    Alka Bahal, Esq.
       Justine Botial, Director of Collections

A Pennsylvania Limited Liability Partnership

132008396.1

| California | Colorado | Connecticut | Delaware | District of Columbia | Florida | Illinois |
| Minnesota | Nevada | New Jersey | New York | Pennsylvania | Texas | Washington |

**FOX ROTHSCHILD**LLP
ATTORNEYS AT LAW
2000 MARKET STREET, 20TH FLOOR
PHILADELPHIA, PA 19103-3222

Summary of Account as of March 18, 2022

RAYMOND WEALTH
SOCCER SPECIFIC TRAINING (SST)
2903 NJ-138
WALL TOWNSHIP, NJ 07719

**Client: 321560 - SOCCER SPECIFIC TRAINING INC.**

In accordance with our firm's policy, all invoices are due upon presentation.  This is simply a summary of your account with respect to open invoices and is provided for payment of your account balance. If you need a copy of the invoice(s) referenced below, please contact Jessica Grillone at (215) 299-2165 or jgrillone@foxrothschild.com.

| Invoice | Date | 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | > 90 Days | Total |
|---|---|---|---|---|---|---|
| **Matter ID: 321560.00001   GENERAL IMMIGRATION COUNSELING - 2021** | | | | | | |
| 2706165 | 3/3/2021 | | | | $3,911.09 | $3,911.09 |
| **Matter Total** | | | | | | **$3,911.09** |
| | | | | | | |
| **Matter ID: 321560.00002   RAYMOND WEALTH (O-1)** | | | | | | |
| 2827638 | 9/17/2021 | | | | $51.00 | $51.00 |
| **Matter Total** | | | | | | **$51.00** |
| | | | | | | |
| **Matter ID: 321560.00003   RAYMOND WEALTH (RFE ON O-1)** | | | | | | |
| 2756301 | 5/20/2021 | | | | $2,425.00 | $2,425.00 |
| 2794833 | 7/29/2021 | | | | $15,594.37 | $15,594.37 |
| **Matter Total** | | | | | | **$18,019.37** |
| | | | | | | |
| **Total Due** | | | | | | **$21,981.46** |

We would appreciate if you would forward prompt payment of any invoice(s) that are outstanding.
Thank you for your prompt attention to this matter.

89. The most recent bill was sent to Mr. Wealth and his sponsor on or about March 3, 2023.



90. To say that this action on the part of the defendants is tone-deaf and disgraceful is an understatement. It is more reflective of Defendant Fox, Bahal, and Paradise's desire to put profits over people, to put dollars of decency, and to double down on their dirty deeds at the expense of their clients.

## COUNT ONE
## Breach Of Contract
## (All Defendants)

91. Plaintiff Wealth repeats and realleges the allegations outlined in all previous paragraphs of this Complaint as if they were outlined in full herein.

92. To establish a breach of contract claim, our law imposes on a plaintiff the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the Plaintiff [s]."v[*Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482, 139 A.3d 57 (2016) (alterations in original) (quoting *Model Jury Charges (Civil)* § 4.10A "The Contract Claim-Generally" (approved May 1998)).] <u>Carifi v. Barberio</u>, No. A-0597-17T1, 2020 N.J. Super.  Unpub. LEXIS 2393, at *22 (Super. Ct. App. Div. December 14, 2020).

93. Plaintiff was in contract with the defendant corporation to provide timely, effective immigration services.

94. Plaintiff fully executed his duties under the contract when he issued the retainer payment to the defendant corporation in the amount of $13,000.00.  Plaintiff further fully executed his duties under the contract when he fully cooperated with Defendants by providing them with supporting documents and any information, they requested of him with regard to his immigration application.

95. Defendant's failure to execute their obligations fully and faithfully under the contract when they intentionally filed Plaintiff's immigration renewal application late resulted in Plaintiff being out of status.  Due to Plaintiff being out of status, he was detained by ICE and held for 45 days.

96. Courts throughout the United States have routinely held that an attorney's failure to timely file documents or applications on behalf of their immigration clients is incompetent or negligent.  Here, Bahal, Amabile, and Fox are BOTH!

97. The failure of an attorney to file an application under § 212(c) of the Immigration and Nationality Act, 8 U.S.C.S. § 1182(c) (repealed 1996), where he is directed to do so by his client, is ***clear evidence of incompetence***.  Failure by an attorney to inform his client of the

availability of § 212(c) relief, where such relief may save his client from the harsh penalty of deportation, also evidences incompetence. *United States v. Etienne*, No. 3-03-cr-190 (JCH), 2005 U.S. Dist. LEXIS 976, at *1 (D. Conn. Jan. 14, 2005).

98. This Court again encountered a case involving both neglect and dishonesty in *In re Chisholm, supra. Chisholm* involved an attorney's neglect of a client's immigration matter. That neglect resulted in the client's "needless incarceration" by the Immigration and Naturalization Service. *Chisholm*, 679 A.2d at 503. *In re Lopes*, 770 A.2d 561, 571 (D.C. 2001).

99. Attorney's failure to timely file an application for suspension of deportation despite the fact that contrary representations to the client constituted ineffective assistance); *Rabiu v. INS,* 41 F.3d 879, 882 (2d Cir. 1994) (finding ineffective assistance of counsel where attorney failed to file an application for waiver of deportation timely; "In our view, a competent attorney would have filed [such a motion] after his or her client requested permission to do so at the deportation hearing."). *Singh v. Demore*, 150 F. App'x 639, 643 (9th Cir. 2005).

100. As a result of the defendant's negligence, Plaintiff has suffered the indignity of being incarcerated for 45 days, where he was faced with constant threats, physical attacks, and verbal and psychological abuse. Plaintiff also had his money stolen by the defendants and had to incur the additional expense of hiring a competent lawyer to correct the errors made by the defendants.

**WHEREFORE,** Mr. Wealth demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

b. Awarding compensatory damages;

c. Awarding punitive damages;

d. Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

e. Awarding prejudgment interest to the extent permitted by law; and

f. Awarding such other and further relief as to this Court may seem proper.

## **COUNT TWO**
## **Negligence & Negligent Infliction Of Emotional Distress**
## **(All Defendants)**

101.        Plaintiff Wealth repeats and realleges the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

102.        At all times relevant hereto, the defendants Amabile, Fox, and Bahal knew Mr. Wealth relied upon them.

103.        At all times relevant, Defendant Bahal and Defendant Amabile[3] were attorneys acting within the scope of their actual and apparent agency and were employed by Defendant Fox.  Individual Defendants provided legal services to Plaintiffs.

104.        Individual Defendants had an attorney-client relationship with Plaintiff.

105.        According to the attorney-client relationship, the Individual Defendants had a fiduciary duty to act in the Plaintiff's best interests.

106.        The Individual Defendants intentionally failed to act in the best interests of Plaintiff in the matters for which they were retained.

107.        Alternatively, the Individual Defendants negligently failed to act in the best interests of the Plaintiff in the matters for which they were retained.

108.        The Plaintiff was injured due to the Individual Defendants' failure to act in his best interests.

109.        The Individual Defendants' breaches of fiduciary duty entitle Plaintiff to disgorgement of attorneys' fees already paid to the individual Defendants and Defendant Fox.

**WHEREFORE,** Mr. Wealth demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

a.  Awarding compensatory damages;

b.  Awarding punitive damages;

c.  Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

d.  Awarding prejudgment interest to the extent permitted by law; and

e.  Awarding such other and further relief as to this Court may seem proper.

---

[3] Posed as an attorney to Plaintiff Wealth and to Plaintiff Wealth's Friends and Family.

## COUNT THREE
## Fraud
## (Amabile, Bahal, And Fox)

110.     Plaintiff Wealth repeats and realleges the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

111.     The elements of fraud in the inducement are a misrepresentation of material fact; knowledge or belief by the defendant of its falsity; intent that the other party relies on the misrepresentation; and reasonable reliance thereon by the other party. *Nolan v. Lee Ho*, 120 N.J. 465, 472, 577 A.2d 143 (1990). Fraud in the inducement does not differ materially from common-law fraud, as it provides a cognizable basis for equitable relief in the event a false promise induced reliance. *See Lipsit v. Leonard*, 64 N.J. 276, 283, 315 A.2d 25 (1974). *Longmuir v. Kickin' It*, No. A-0422-18T2, 2020 N.J. Super.  Unpub. LEXIS 707, at *6 (Super. Ct. App. Div. April 21, 2020).

Misrepresentation of Material Fact:

112.     Here, as detailed above, Amabile presented herself as a licensed attorney in the State of New Jersey.

113.     **Exhibit I** shows that Bahal and Fox allowed Amabile to operate mainly on Mr. Wealth's immigration renewal application.  At no time did Bahal or any other licensed attorney for Fox reach out to Mr. Wealth to inform him that Amabile was not a licensed attorney.

114.     An objectionably reasonable person in Mr. Wealth's position would believe the person that is presenting themselves as his attorney to Mr. Wealth as well as to Mr. Wealth's family, colleagues, and friends, is an actual attorney.


The Defendants Knew Their Representation That Amabile Was a Licensed Attorney In the State of New Jersey Was False:

115.     Here, Amabile knew that her representation as a licensed attorney in the State of New Jersey was false when it was made to Mr. Wealth.  Amabile is not a registered, licensed attorney in New Jersey.

116.     Amabile used the fact that Bahal and Fox allowed her to be client-facing and allowed her to execute the immigration applications as a way to defraud the unwitting immigration clients of the fact that she is NOT a licensed attorney.

117.     Bahal and Fox knew or should have known that Amabile was falsely presenting herself as a licensed attorney in the State of New Jersey.  As evidenced through text conversations between Mr. Wealth and Ms. Amabile on Fox's company-issued phone, emails, and other communications between Mr. Wealth and Amabile, it was clear that Amabile represented herself as a licensed attorney to Mr. Wealth.   Bahal and Fox could have easily discovered this and ended Amabile's fraudulent acts.

Plaintiff Detrimentally Relied On Defendants Promise:

118.     Here, Mr. Wealth is a citizen of Mexico and a National of Nigeria.

119.     Mr. Wealth is not accustomed to or aware of the requirements of being a licensed attorney in the State of New Jersey.

120.     Mr. Wealth detrimentally relied upon Amabile, Bahal, and Fox to be honest and truthful in their representations to him.  Bahal, Amabile, and Fox intentionally deceived Mr. Wealth for the sole purpose of getting him to pay more than $13,000.00 for sham legal services provided to him by a criminal who posed as a licensed attorney.

Plaintiff's Detrimental Reliance was Reasonable:

121.     Here, as previously stated, Mr. Wealth's detrimental reliance was reasonable because he was an unwitting client presented with a set of facts that were not corrected by Bahal or Fox when they knew or should have known about Amabile's actions.

**WHEREFORE,** Mr. Wealth demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

a.  Awarding compensatory damages;

b.  Awarding punitive damages;

c.  Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

d.  Awarding prejudgment interest to the extent permitted by law; and

e.  Awarding such other and further relief as to this Court may seem proper.

**COUNT FOUR**
**Violation Of The NJRICO**
**(Plaintiff, Individually Against All Defendants)**

122.     Plaintiff Wealth repeat and reallege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

123.     This claim alleging violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), which Mr. Wealth brings on behalf of himself is asserted against Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10.

124.     Chapter 41 of New Jersey's Criminal Code, Title 2C, is titled "Racketeering," commonly referred to as "NJRICO."

125.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 are each a "person," as that term is defined by N.J.S.A. § 2C:41-1(b) to include "any individual or entity or enterprise as defined herein holding or capable of holding a legal or beneficial interest in property."

126.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, acting together and individually, were engaged in "trade or commerce" as that term is defined by N.J.S.A. § 2C:41-1(h) to include "all economic activity involving or relating to any commodity or service."

127.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, acting together and collectively, comprised and continue to comprise an "enterprise," as that term is defined by N.J.S.A. § 2C:41-1(c) to include "any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities."

128.     In the alternative, Defendant Fox, which is a business entity, constituted an "enterprise" as that term is defined by N.J.S.A. § 2C:41-1(c) (quoted above).

129.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 violated N.J.S.A. § 2C:41-2(c) by engaging in the following prohibited activities: Defendants Amabile, and Bahal, being persons who were employed by or associated with Defendant Fox, an enterprise, conducted or participated,

directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity.

130.    In the alternative, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, all being persons who were employed by or associated with Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, which constituted an association-in-fact enterprise, conducted or participated, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity.

131.    At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 engaged in a pattern of racketeering activity, as defined by N.J.S.A. § 2C:41-1(d), by:

a.  Engaging in at least two incidents of racketeering conduct, both of which have occurred on an ongoing basis during the past ten years and will continue to occur; and

b.  Embracing in criminal conduct with the same or similar purposes, results, participants, victims, or methods of commission or is otherwise interrelated by distinguishing characteristics and is not isolated incidents.

132.    Precisely, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 committed the following racketeering activities, as enumerated in N.J.S.A. § 2C:41-1(a)(1):

a.  Theft and all crimes defined in Chapter 20 of Title 2C of the New Jersey Statutes, specifically Theft by Deception, in violation of N.J.S.A. § 2C:20-4, and Theft by Failure to Make a Required Disposition of Property Received, in violation of N.J.S.A. § 2C:20-9, by:

  i.  Stealing over $13,000.00 from Plaintiff Wealth for legal services that were never rendered.

  ii. Requiring Plaintiff Wealth to open credit card accounts in the name of Amabile for the sole benefit of Amabile, Bahal, and Fox.  Running up the charges on those credit cards and requiring Mr. Wealth to incur the cost without compensation or reimbursement for the sole benefit of Amabile, Bahal, and Fox.

    iii.  Purposely obtaining money by way of credit by deception or threat; specifically: (A) by deception, by purposely misinforming Mr. Wealth that he was required to establish "good credit" to secure the renewal of his O1 Visa, and/or (B) by threat, by retaliating against Mr. Wealth when he complained about the credit card fraud charges, as well as the legal malpractice committed by Bahal, Amabile, and Fox that resulted in an "anonymous" tip to ICE that Mr. Wealth was out of status.

b.  Forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes, specifically Money Laundering, in violation of <u>N.J.S.A.</u> § 2C:21-25(a), (b), and (c), by:

    i.  Transporting or possessing property known or which a reasonable person would believe to be derived from criminal activity, specifically forged credit card applications which were opened in Mr. Wealth's name by Amabile while Mr. Wealth was in prison (*see* **Exhibit's C-H**); and/or

    ii.  Engaging in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity, explicitly using stolen credit cards acquired in the name of Mr. Wealth by Amabile:

        1.  With the intent to facilitate or promote criminal activity; or

        2.  Knowing that the transaction is designed in whole or in part: (a) to conceal or disguise the nature, location, source, ownership, or control of the property derived from criminal activity; or (b) to avoid a transaction reporting requirement under the laws of this State or any other state or of the United States; and/or

    iii.  Directing, organizing, financing, planning, managing, supervising, or controlling the transportation of or transactions in property known or which a reasonable person would believe to be derived from criminal activity, explicitly applying for, securing, and using stolen credit cards in the name of Mr. Wealth and procured by Amabile;

    iv.  All of which laundered funds were re-invested into Fox, Amabile, and Bahal, concealed as legitimate revenue or profits, and/or extracted by Defendants for personal use.

133.     Additionally, Defendants committed the following racketeering activities, as enumerated under N.J.S.A. § 2C:41-1(a)(2), conduct defined as "racketeering activity" under Title 18, U.S.C. § 1961(1)(B), including:

a.  Mail Fraud, in violation of 18 U.S.C. § 1341, by having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to execute such scheme or artifice or attempt so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.  As alleged in this Complaint, Defendants and/or persons acting on their behalf used the mail to: (1) purposely submit records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth to which they were not entitled and/or to purposely not use those funds for their intended purpose,  and/or (2) causing Plaintiffs and Defendants to be mailed credit card bills and other credit-related records that misstated the intended beneficiary, debtor, and card user.

b.  Wire fraud, in violation of 18 U.S.C. § 1343, by having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.  As alleged in this Complaint, Defendants and/or persons acting on their behalf used interstate wire facilities, including the internet, to (1) purposely submit records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth to which they were not entitled and/or to purposely not use those funds for their intended purpose,  and/or (2) causing Plaintiffs and Defendants to be mailed

credit card bills and other credit-related records that misstated the intended beneficiary, debtor, and card user.

c. Bank fraud, in violation of 18 U.S.C. § 1344, by knowingly executing or attempting to execute a scheme to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.  As alleged in this Complaint, Defendants and/or persons acting on their behalf committed bank fraud by (1) purposely submitting records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth to which they were not entitled and/or to purposely not use those funds for their intended purpose, and/or (2) causing Plaintiffs and Defendants to be mailed credit card bills and other credit-related records that misstated the intended beneficiary, debtor, and card user.

134.    Plaintiff Wealth has been damaged in their business or property because Defendants violated <u>N.J.S.A.</u> § 2C:41-2, and, therefore, he is entitled to recover the damages and other remedies enumerated therein.

135.    Defendants' acts or omissions were actuated by actual malice and/or a willful and wanton disregard for the consequences suffered by the Plaintiffs and/or with knowledge of a high degree of probability of harm to the Plaintiffs and reckless indifference to the consequences of their acts or omissions.

136.    Compensatory damages alone will be insufficient to deter such conduct in the future.

137.    Plaintiffs and is therefore entitled to punitive and exemplary damages.

**WHEREFORE,** Mr. Wealth requests that the Court issue an Order and grant Judgment to the Plaintiff as follows:

a. Granting Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for their damages;[4]

b. Entering judgment according to the declaratory relief sought;

---

[4] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

    c.   Granting Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

    d.   Granting Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

### COUNT FIVE
### Breach of Fiduciary Duty
### Defendant Fox, Bahal, and Amabile

138.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

139.    At all times relevant, Defendant Bahal and Defendant Amabile[5] were attorneys acting within the scope of their actual and apparent agency and were employed by Defendant Fox.  Individual Defendants provided legal services to Plaintiffs.

140.    Individual Defendants had an attorney-client relationship with Plaintiff.

141.    According to the attorney-client relationship, the Individual Defendants had a fiduciary duty to act in the Plaintiff's best interests.

142.    The Individual Defendants intentionally failed to act in the best interests of Plaintiff in the matters for which they were retained.

143.    Alternatively, the Individual Defendants negligently failed to act in the best interests of the Plaintiff in the matters for which they were retained.

144.    The Plaintiff was injured due to the Individual Defendants' failure to act in his best interests.

145.    The Individual Defendants' breaches of fiduciary duty entitle Plaintiff to disgorgement of attorneys' fees already paid to the individual Defendants and Defendant Fox.

**WHEREFORE,** Mr. Wealth demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

    a.   Awarding compensatory damages;

    b.   Awarding punitive damages;

---

[5] Posed as an attorney to Plaintiff Wealth and to Plaintiff Wealth's Friends and Family.

   c.   Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

   d.   Awarding prejudgment interest to the extent permitted by law; and

   e.   Awarding such other and further relief as to this Court may seem proper.

**COUNT SIX**
**Legal Malpractice**
**(Legal Malpractice Defendant Fox Under Pennsylvania Law)**

146.      Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

147.      In Pennsylvania, missing a filing deadline has been found to be so outside the scope of the ordinary skill and knowledge of a legal professional that it constitutes professional negligence as a matter of law, even without an expert opinion establishing the relevant standard of care.  *See, e.g., Vadovsky*, 2010 U.S. Dist. LEXIS 99099, 2010 WL 2640156, at *5 (indicating an attorney is negligent as a matter of law where he misses a filing deadline or fails to file suit before the expiration of the statute of limitations); *see also Rizzo*, 520 Pa. at 502, 555 A.2d at 66 (finding attorney negligent as a matter of law for failing to investigate and communicate settlement offers or engaging in financial transactions with attorney's client).  *FCS Capital LLC v. Thomas*, 579 F. Supp.  3d 635, 654 (E.D. Pa. 2022).

148.      As detailed above, Defendants intentionally missed Plaintiff's immigration filing deadline resulting in his detention by ICE and his near deportation.

149.      Defendant employed two employees (Bahal and Amabile) who lied to, cheated, and stole from Plaintiff's Wealth.

150.      As of the date of this filing, Defendant Fox has made the conscious decision to place profits over people and continue the employment of Bahal despite the clear evidence that she committed malpractice and colluded with Amabile to defraud Mr. Wealth and possibly other immigration clients of Fox.

151.      As a result of the defendant's negligence, Plaintiff has suffered the indignity of being incarcerated for 45 days, where he was faced with constant threats, physical attacks, and verbal and psychological abuse.  Plaintiff also had his money stolen by the defendants and had to incur the additional expense of hiring a competent lawyer to correct the errors made by the defendants.

**WHEREFORE,** Mr. Wealth demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

a. Awarding compensatory damages;

b. Awarding punitive damages;

c. Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

d. Awarding prejudgment interest to the extent permitted by law; and

e. Awarding such other and further relief as to this Court may seem proper.

### COUNT SEVEN
### Legal Malpractice
### (Legal Malpractice Defendant Fox, Bahal
### Under New Jersey Common Knowledge Doctrine)

152. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

153. As the Supreme Court has explained, the "common knowledge" doctrine presents an exception to this requirement:

154. Under the common knowledge doctrine, however, a malpractice case against a licensed professional may present triable issues without resorting to the testimony of an expert.  In such a case, the jury itself is allowed to supply the applicable standard of care and thus obviate the necessity for expert testimony relative thereto.  The trial of such a case is essentially no different from an ordinary negligence case.  Nevertheless, it is the unusual professional malpractice case in which the common knowledge doctrine can be invoked.

155. The basic postulate for the application of the common knowledge doctrine in a malpractice action is that the issue of negligence is not related to a technical matter peculiarly within the knowledge of the licensed practitioner.  The most appropriate application of the common knowledge doctrine involves situations where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.

156. [*Rosenberg v. Cahill*, 99 N.J. 318, 325-26, 492 A.2d 371 (1985) (internal citations and quotation marks omitted).]

157. Expert testimony is therefore not required when the common knowledge of the jury "is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts." *Estate*

*of Chin v. St. Barnabas Med. Ctr.*, 160 N.J. 454, 469, 734 A.2d 778 (1999). "The effect of applying this doctrine is to allow the jury to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Sanzari v. Rosenfeld*, 34 N.J. 128, 141, 167 A.2d 625 (1961). "In other words, application of the doctrine transforms the case into an ordinary negligence case where . . . the jury, from its fund of common knowledge, assays the feasibility of possible precautions which the defendant might have taken to avoid injury to the plaintiff." *Id.* at 141-42. Application of the doctrine is limited to "'where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.'" *Kelly v. Berlin*, 300 N.J. Super. 256, 266, 692 A.2d 552 (App. Div. 1997) (quoting *Rosenberg, supra*, 99 N.J. at 325). *Atkin v. Bridgeway, Inc*., No. A-4272-12T1, 2014 N.J. Super. Unpub. LEXIS 2125, at *10-11 (Super. Ct. App. Div. August 29, 2014).

158.     New Jersey courts have found that no expert testimony and, therefore, no affidavit of merit was required when an attorney failed to cite any legal authority in support of his client's claim, failed to submit a brief, and misrepresented the State of the case, *Sommers v. McKinney,* 287 N.J. Super. 1, 670 A.2d 99, 104 (N.J. Super. Ct. App. Div. 1996), or when an attorney failed to file an action within the controlling statute of limitations, *see Brizak v. Needle,* 239 N.J. Super. 415, 571 A.2d 975, 983-84 (N.J. Super. Ct. App. Div.), *certif. denied,* 584 A.2d 230 (1990). *FTC v. Hope Now Modifications, LLC*, No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 75922, at *17-18 (D.N.J. July 27, 2010).

159.     As detailed above, Bahal and Fox's malpractice is evident and apparent. Bahal missed a filing deadline for Plaintiff Wealth.

160.     As a result, Plaintiff Wealth's immigration status was compromised, and ICE later detained him for being out of status.

161.     Mr. Wealth was forced to stay in prison against his will for 45 days, where he was physically assaulted, threatened, and psychologically traumatized.

162.     While in prison, Mr. Wealth was financially harmed by Bahal and Fox's authorized agent Amabile who, upon information and belief, was working in concert with Bahal.

**WHEREFORE,** Mr. Wealth demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

a. Awarding compensatory damages;

b. Awarding punitive damages;

c. Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

d. Awarding prejudgment interest to the extent permitted by law; and

e. Awarding such other and further relief as to this Court may seem proper.

## **COUNT EIGHT**

**Conduct and Participation in a RICO
Enterprise Through a Pattern of Racketeering Activity
(Violation of Racketeer Influenced and
Corrupt Organization Act, codified at
18 U.S.C. § 1962(a), (c)-(d))**

163.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

164.     Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10.

165.     Section 1962(a) makes it:

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

166.     Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. §1962(c).

167.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

168.     Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

169.     Beginning before the class period and continuing to this day, Defendants have unlawfully increased their profits by making fraudulent claims that undocumented immigrants in the United States can increase their chances of securing a Visa by opening credit card accounts (and adding individual defendants as authorized users) to establish good credit – when they do not.  The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other unnamed co-conspirators. That association, in fact, was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out a mail and wire fraud scheme to acquire a credit card, bank card, and retail store charge card accounts to help undocumented immigrants "establish good credit" in an effort to increase their chances to secure a Visa when their true goal was to deceive the undocumented immigrants into thinking good credit is necessary to secure an American Visa when, in fact, good credit is not a pre-requisite to secure a Visa, and requiring the defendant's undocumented immigrant clients to add defendants as an authorized user on said credit cards, was definitely not a pre-requisite to secure a Visa as well.

170.     The members of the RICO enterprise all share a common purpose: to enrich themselves at the expense of their immigration clients by maximizing Defendants' revenues through fraudulent means. As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiff Wealth, including by making false representations that claim that undocumented immigrants in the United States, such as Plaintiff Wealth, can increase their chances of securing a Visa by opening credit card accounts and adding individual defendants as authorized users to establish good credit, which Defendants would not have done but for the existence of the scheme.

171.     Upon information and belief, this RICO enterprise has existed for almost 15 years prior to Defendant Fox acquiring Defendant Bahal's solo practitioner immigration law practice and continues to expand and operate pursuant to agreements entered into between and amongst Defendants and other unnamed co-conspirators. The RICO enterprise has

functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

172.    The enterprise was characterized by Defendants' pattern of false representations and omissions, made by Bahal, Amabile, and other members of Defendants' immigration law team to Defendant's immigration law consumers/clients. These false representations and omissions were designed to induce Defendants' immigration clients to open credit cards, charge cards, bank cards, retail store charge cards, and bank accounts in order to establish "good credit" so they can qualify for a United States Visa.  As part of this scheme, Defendant's required the immigration clients to add them as authorized users to these credit accounts.  This pattern of false representations was disseminated to potential immigration clients of Defendants who reside in Pennsylvania, New Jersey, New York, and around the country, by Defendants based in New Jersey and Pennsylvania, under the direction and on behalf of Defendants in New Jersey.  The dissemination typically was done using interstate telephone wires and interstate electronic mail.

173.    The true nature of Defendants' scheme was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiff Wealth and other unwitting immigration clients.

174.    Defendants profited from the enterprise, and Plaintiff Wealth suffered because the enterprise significantly increased the cost of Plaintiff Wealth's immigration application by over $40,000.00, which was unnecessary.  It even resulted in Plaintiff Wealth spending 45 Days in prison after Defendants failed to timely submit Plaintiff Wealth's immigration application on time.  Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mail and interstate wires to sell the illusion that Bahal, Fox, and Amabile are competent, ethical, and honest immigration lawyers when nothing could be further from the truth. Defendants provided their immigration clients/consumers with this misrepresentative information, including via email all over interstate wireline communications systems, and obtaining retainer deposits, contingency fees, and hourly revenue via documents and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to Plaintiff, as described throughout.

175.     The defendants' scheme was reasonably calculated to deceive Plaintiff Wealth, a Nigerian and Mexican immigrant of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the effectiveness of worthless credit card purchases and charges that did not, would not, and could not lead to securing a United States Visa.  Plaintiff Wealth would not have opened over four credit cards, nor would he have given Defendant access to his bank accounts but for the illegal racketeering scheme operated by Defendants.

176.     Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff and each participated in the enterprise as follows:

177.     Defendant Fox directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing and marketing scores of immigration services that are marketed to innocent, unassuming undocumented immigrants who are vulnerable and in seek of a United States Visa. Throughout the relevant period, Defendant Fox oversaw the activities of Defendant Bahal and Defendant Amabile (collectively, "Individual Defendants").  Defendant Fox has an ethical obligation as respondent superior to supervise the actions and activities of the individual defendants.  Defendant Fox failed miserably to do so. Individual defendants relied on the mail to distribute advertisements to secure immigration clients whom they would promise United States Visa.  These advertisements originated from and were sent from Defendant Fox's offices in the state of New Jersey to consumers in Pennsylvania, New York, and around the country, relying on the mail to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from the immigration clients.

178.     In connection with Defendants acting from Pennsylvania and or New Jersey, these Defendants used the mail and interstate wires to disseminate immigration marketing materials, immigration VISA applicants, and to use those immigration clients' private protected information to apply for American Express, Chase Sapphire, retail store credit card accounts, and to open bank accounts.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

179.     Defendant Amabile directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as the administrator of the immigration department of Fox to exercise complete dominion and control over Fox's immigration legal department such that Fox's immigration legal department are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form of Fox's immigration legal department, including with response to the United States Department of Immigration Enforcement, Plaintiff Wealth, Plaintiff Wealth's family and friends, and through the marketing, advertisement, promotion, and distribution of marketing materials for Fox's immigration legal department. Throughout the relevant period, Amabile oversaw the dissemination of Defendants' fraudulent advertising from their offices in New Jersey to potential consumers in Pennsylvania, New York, New Jersey, and around the country, relying on the mail to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from any new immigration client which may come of it.  Amabile, acting from New Jersey, used the mail and interstate wires to apply for American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further her goals of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

180.     Defendant Bahal directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as the co-chair of the immigration department of Fox to exercise complete dominion and control over Fox's immigration legal department such that Fox's immigration legal department are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form of Fox's immigration legal department, including with response to the United States Department of Immigration Enforcement, Plaintiff Wealth, Plaintiff Wealth's family and friends, and through the marketing, advertisement, promotion, and distribution of marketing materials for Fox's immigration legal department. Throughout the relevant period, Bahal oversaw the dissemination of Defendants' fraudulent advertising from their offices in New Jersey to potential consumers

in Pennsylvania, New York, New Jersey, and around the country, relying on the mail to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from any new immigration client which may come of it. Amabile, acting from New Jersey, used the mail and interstate wires to apply for American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further her goals of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

181.    Defendant Fox, directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including as the employer and respondent superior of Amabile and Bahal and all employees of Defendant Fox's immigration law department. Throughout the relevant period, Fox's Management, spearheaded by Tom Paradise, oversaw the marketing and soliciting of potential immigration clients from Fox's Headquarters in Pennsylvania to consumers in New Jersey, Pennsylvania, New York, and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the credit card fraud and theft visited upon Plaintiff, as well as, other immigration clients of Fox.  Acting from Pennsylvania, Fox's Management used the mail and interstate wires to apply for American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

182.    During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

183.    Beginning at an exact date unknown to Plaintiffs, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

184.    The acts set below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiff for the benefit of Defendants.  Each Racketeering Act involved the same or similar methods of commission and participants.

185.    Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, the Defendants' business would not have succeeded.

186.    The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiff to retain them as immigration counsel and to open credit cards and bank accounts in the Plaintiff's name and add defendant's as authorized users.

187.    The defendants' wrongful conduct has caused injury to Plaintiff, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiff, and the general public.

188.    Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

189.    To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud and wire fraud.

190.    Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiff.  The defendants' pattern of mail fraud and wire fraud was the proximate cause of the injuries suffered by Plaintiff.

    **a.** **Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

191.    Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money, in reliance on the mail. Defendants committed these acts with the intent to defraud Plaintiff.

192.    Defendants used the mail for the purpose of executing the fraudulent scheme herein.

193.    Specifically, Defendants agreed to each of the acts of mail fraud described throughout this Complaint. In addition, Defendants agreed to rely on the mail to secure American Express, Chase Sapphire, and retail store credit card accounts and to open bank

accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff and Fox's immigration clients out of their money.

194.     In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed credit card applications, letters, marketing materials, advertisements, agreements and other matters in depositories and by removing or causing to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

195.     Defendants could not have furthered their fraud without the use of the mail. For example, Defendants sought to acquire American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff and Fox's immigration clients out of their money.  To accomplish these acts, Defendants relied on the mail to deliver the credit cards and bank cards described herein.  Defendants also required the mail to distribute misleading advertisements to various states, including New Jersey. For these reasons, the use of mail to conduct fraudulent activity was necessary and inevitable.

**a.  Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

196.     Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money in reliance on interstate wires.  Defendants committed these acts with the intent to defraud Plaintiff.

197.     Specifically, Defendants agreed to each of the acts of wire fraud described throughout this Complaint. In addition, Defendants agreed to rely on interstate wires to disseminate funds and to make purchases with the fraudulently acquired credit cards and bank cards via search engines and other online platforms to further their collective goal of robbing Plaintiff and Defendant Fox's other immigration clients. Defendants knew that these online purchases were illegally made.

198.     Additionally, Defendants agreed that Defendants should facilitate these fraudulent purchases over interstate wires in furtherance of the fraud. Retailers nationwide executed Defendants' orders and purchases via their online platforms.

199.    In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

200.    Defendants could not have furthered their fraud without the ability to use telecommunications to share information with clients and retailers nationwide. Because Defendants needed to communicate with clients and retailers around the country, the use of interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

201.    Plaintiff Wealth has been damaged in their business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, he is entitled to recover the damages and other remedies enumerated therein.

202.    Defendants' acts or omissions were actuated by actual malice and/or a willful and wanton disregard for the consequences suffered by the Plaintiffs and/or with knowledge of a high degree of probability of harm to the Plaintiffs and reckless indifference to the consequences of their acts or omissions.

203.    Compensatory damages alone will be insufficient to deter such conduct in the future.

204.    Plaintiffs and is therefore entitled to punitive and exemplary damages.

**WHEREFORE,** Mr. Wealth request that the Court issue an Order and grant Judgment to the Plaintiff as follows:

e.    Granting Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for their damages;[6]

f.    Entering judgment according to the declaratory relief sought;

g.    Granting Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

h.    Granting Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results

---

[6] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

a) For past, present, and future general damages in an amount to be determined at trial;

b) For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

c) Any appropriate statutory damages;

d) For costs of suit;

e) For interest as allowed by law;

f) For attorney's fees; and

g) For such other and further relief as the Court may deem proper.

Dated: June 12, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## **JURY DEMAND**

According to <u>R</u>. 4:35-1, Plaintiff hereby demands a trial by jury as to all issues.

Dated: June 12, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## **DEMAND FOR INSURANCE**

According to <u>R</u>. 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in their action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: June 12, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## DESIGNATION OF TRIAL COUNSEL

According to R. 4:25-4, TYRONE A. BLACKBURN, ESQ. is hereby designated trial counsel.

Dated: June 12, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## CERTIFICATION

According to R. 4:5-1, the undersigned certifies that the matter in controversy is not the subject of any other action pending in any other court or a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, and all known, necessary parties have been joined in their action.

Dated: June 12, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

53

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents, and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors.  You are directed from this point forward to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed.  Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses.  This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information.  You are further directed to preserve

all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

<u>Paper Information</u>:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this letter's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: June 12, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com