**Tyrone Blackburn, ESQ**
**Attorney NJS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Counsel for Plaintiff,* Abuchi Raymond Wealth and Markevich

---

ABUCHI RAYMOND WEALTH, and
STANISLAV MARKEVICH

                                Plaintiffs,

       -against-

FOX ROTHSCHILD LLP;
ALKA BAHAL;
KRISTEN M. AMABILE;
JOHN AND JANE DOES 1-10,
and ABC CORPS. 1-10;

                                Defendants

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DOCKET NO. 23-3194
<u>**Civil Action**</u>
**SECOND AMENDED COMPLAINT**
**JURY DEMAND**
.

Plaintiff, Abuchi Raymond Wealth ("Mr. Wealth" or "Plaintiff Wealth"), and Stanislav Markevich ("Mr. Markevich" or "Plaintiff Markevich") by way of Complaint against Defendant's, Fox Rothschild LLP ("Fox"), Alka Bahal ("Bahal"), and Kristen M. Amabile ("Amabile"), hereby alleges and says:

## <u>PARTIES</u>

1. Mr. Wealth is a black, English-speaking African male. Mr. Wealth is domiciled in this District.

2. Mr. Markevich is a Caucasian English-speaking male. Mr. Markevich is domiciled at 12840 Moorpark Str, Apt. 104, Studio City CA 91604.

3. Defendant Fox is a law firm headquartered in Philadelphia, Pennsylvania, with a principal place of business located at 2000 Market Street, 20th Floor, Philadelphia, PA 19103-3222.

4. Defendant Amabile is a criminal domiciled in this District.

5. Defendant Bahal is domiciled in this District.

6. During the relevant period, Defendants John and Jane Does 1-10 are unknown individuals and employees who aided and abetted in the commission of conduct complained of herein. They acted within the scope of their employment. Defendants ratified, embraced, and added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

7. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities employed by Plaintiff or aided and abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## JURISDICTION AND VENUE

8. The venue is properly set in Essex County because Fox conducts business there.

9. This Court has personal jurisdiction over Defendants according to and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

      i. The transaction of any business within the state;

      ii. The making of any contract within the state;

      iii. The commission of a tortious act within this state; and

      iv. The ownership, use, or possession of any real estate in this state.

10. From 2020 to the date of this filing, Fox has consistently and purposefully availed itself of the privilege of conducting activities within New Jersey, thus invoking the benefits and protections of New Jersey law.  In return for these benefits and protections, Fox must submit to the burdens of litigation in New Jersey.

11. This litigation arises from or relates to the legal malpractice Plaintiff experienced while living in this District. Fox aimed and directed this malpractice to this District when their authorized agents, Amabile and Bahal (who reside in this District), conspired to steal over $20,000 from Mr. Wealth and caused him to be detained by ICE for over 45 days. This tortious conduct violated United State Federal Rico, New Jersey State Rico, Fraud, and New Jersey Malpractice Laws.

12. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from conduct occurring by Defendants in New Jersey.

## NATURE OF ACTION:

13. This is an action for monetary and declaratory relief to redress the Defendants' violation of the Plaintiffs' immigration rights.  Plaintiffs seek relief for Breach of Contract, Negligence and negligent Infliction of Emotional Distress, Fraud, Violation Of The NJRICO, Breach of Fiduciary Duty, Legal Malpractice, and Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity (Violation of Racketeer Influenced and Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)(d)).

14. At all times relevant to this Complaint, Defendant Fox maintained a policy and practice of knowingly and willfully robbing their immigration clients out of their money by fooling them into thinking that their office manager, Kristen Amabile was a licensed attorney.

15. Plaintiff Wealth was required to open credit card accounts to establish good credit to secure a United States Visa under false pretenses.

16. Plaintiffs were encouraged to engage in a fake marriage to secure a United States Visa.

17. Plaintiffs were required to turn over thousands of dollars to Defendant in an effort to secure a United States Visa under false pretenses.

## FACTUAL BACKGROUND

### *Plaintiff Wealth*

**Raymond Wealth O-Visa Application and Fox:**

18. Mr. Wealth had the misfortune of retaining the service of Amabile, Bahal, and Fox on or about August 6, 2020.  He was listed as sole client on a retainer issued by the defendants on or about August 10, 2020.  Mr. Wealth was slated to pay the fees and costs associated with his O-Visa application. This is in violation of the O-Visa application requirements.

19. Initially, Mr. Wealth's employer, Soccer Specific Training by way for its owner, Mike Turtle, was also listed on the August 6, 2020, retainer agreement issued by Fox, Amabile, and Bahal.

20. The August 6, 2020, retainer agreement was issued to Mr. Turtle and his company to, "(1) prepare and file an O-1 nonimmigrant visa petition **for Company** on behalf of one prospective employee, Raymond Wealth, and (2) general immigration-related counseling, as requested."

3

21. On August 6, 2020, retainer Defendants acknowledged that Mr. Wealth's Visa expires on August 26, 2020, yet the defendants filed his Form I-129O petition for Nonimmigration Worker: O Classification on January 15, 2021 (5 months after the expiration of Mr. Wealth's visa).

22. At the time Defendants filed Mr. Wealth's **LATE** Form I-129O, Mr. Wealth was not suffering from an "emergency or unforeseen circumstance" as defined by the United States Citizenship and Immigration Services (USCIS), which would have afforded him a grace period to submit his Form I-120O **LATE**.  Missed deadlines equals malpractice.  Upon information and belief, Defendants did not provide USCIS with the requisite documents or make the required request to excuse Mr. Wealth's late submission of the **LATE** Form I-129O.          https://www.uscis.gov/newsroom/immigration-relief-in-emergencies-or-unforeseen-circumstances.

23. Upon information and belief, only an employer can file an O-1 petition.  There is no self-petition option for the O-1 classification.  However, self-employment is possible.  Self-employment in the O-1 category is available by using an agent petitioner or a beneficiary-owned entity as a petitioner.  This should not be confused with self-petitioning (which exists in the EB-1A and EB-2 NIW context).

24. Mr. Wealth is not and was never self-employed at the time the defendants submitted his O-1 visa application.

25. On or about August 10, 2020, Amabile and Bahal issued a new retainer agreement to Mr. Wealth and Mr. Turtle, where Mr. Turtle and his company, Soccer Specific Training, were **<u>removed</u>** as signatories that were responsible for paying the cost of Mr. Wealth's Visa and ceased being clients of Fox, Amabile, and Bahal.  This is evidenced by an email from Amabile (From her Fox Rothschild email account) to Mr. Wealth and Mr. Turtle dated August 10, 2020.  (**See, Wealth Exhibit A**).

26. Upon information and belief, Amabile, Bahal, and Fox were required to inform Mr. Wealth of his options now that they could no longer file for his O-1 visa under Soccer Specific Training or Mr. Turtle.  As Mr. turtle and soccer specific training refused to foot the cost for the Visa which is a requirement to obtain this specific visa.

4

27. Amabile, Bahal, and Fox never explained to Mr. Wealth that he no longer qualified for the O-1 Visa as he needed to either be self-employed, or required the sponsorship of a company, an individual who represents a company, or a company's agent.

28. Plaintiff Wealth respectfully directs the court to the USCIS website, which can be accessed through this link:https://www.uscis.gov/working-in-the-united-states/temporary-workers/o-1-individuals-with-extraordinary-ability-or-achievement/o-nonimmigrant-classifications-question-and-answers.

29. At the imbedded link above, the Court will find the requirements for the O Nonimmigrant Visa Classifications, and the Court will see that once Mr. Turtle and Soccer Specific Training ceased being a client of the defendants, Mr. Wealth was no longer qualified to apply for the O nonimmigrant visa.

30. Defendants knew or should have known that Mr. Wealth did not qualify for the O Nonimmigrant Visa at the time they submitted Mr. Wealth's **LATE** O-1 Visa application to USCIS.

31. Upon information and belief, Fox, Bahal, and Amabile knowingly committed malpractice against Mr. Wealth, Mr. Turtle, Soccer Specific Training, and USCIS when they:

    a. Knew and failed to inform Mr. Wealth that he was no longer qualified for an O-Nonimmigrant Visa after Mr. Turtle and Soccer Specific Training ceased to be Defendant clients. Upon information and belief, they committed this fraudulent act for the sole purpose of pocketing Mr. Wealth's $13,000.

    b. Knew and failed to inform Mr. Wealth that he needed to be self-employed or have a sponsorship from a company or an agent of a company to be qualified for an O-Nonimmigrant Visa. Upon information and belief, they committed this fraudulent act for the sole purpose of pocketing Mr. Wealth's $13,000.

    c. Used Mr. Turtle, and Mr. Turtle's company, Soccer Specific Training, as the O-1 sponsor for Mr. Wealth's **LATE** O-1 visa application, knowing that Mr. Turtle specifically requested to have his name removed from the retainer agreement, as evidenced by Exhibit A when Defendants emailed Mr. Turtle informing him that Mr. Wealth would be solely responsible for the retainer. Upon information and belief, the defendants committed this fraudulent act for the sole purpose of wrongly billing Mr. Turtle and Soccer Specific Training over $20,000 in legal fees.

d. Knowingly submitted a **<u>LATE</u>** O-1 visa application for Mr. Wealth to USCIS where they presented to USCIS a Form I-129O, Petition for a Nonimmigrant Worker: O Classification on behalf of Mr. Wealth, Mr. Turtle, and Mr. Turtles company Soccer Specific Training without Mr. Turtle and Soccer Specific Training's consent.  Upon information and belief, the defendants knew or should have known that Mr. Wealth would not have qualified for the O-1 visa as he did not have the requisite sponsorships, yet they used USCIS to process this sham application for the sole purpose of fulfilling their contractual duties to Mr. Wealth to retain Mr. Wealth's $13,000.

32. Bahal filled out the Department of Homeland Security Form G-28 identifying Bahal as the attorney and Mr. Turtle and Soccer Specific Training as the defendant's client when she knew that Mr. Turtle and Soccer Specific Training or a representative of Mr. Turtles company, Soccer Specific Training, were not funding Mr. Wealth's visa application process.

**Mr. Wealth and Amabile**:

33. Mr. Wealth first met Amabile on or about March 2020.

34. Amabile informed Mr. Wealth that she was an attorney with Fox.

35. Upon information and belief, throughout the duration of his involvement with Fox, Amabile, and Bahal, Mr. Wealth and the following individuals were informed by Amabile that Amabile is a licensed attorney:

1. Jamie Simcoe,
2. Mike Turtle,
3. Chinedu Nwankwo,
4. Sam Monks,
5. Brendan Madu,
6. Steven Muller,
7. Dave Franco, and
8. Mr. Wealth's former landlord, Carolina.

36. Amabile offered to help Mr. Wealth with his Visa application.

37. Amabile introduced Mr. Wealth to Bahal, and they both advised Mr. Wealth that he should pursue an O-1 Visa through an employer.

38. Unbeknownst to Mr. Wealth, he was not qualified to apply for the O-1 Visa, and Amabile, Bahal, and Fox never informed him of that fact.

39. As detailed above, Amabile sent Mr. Wealth two retainer agreements (August 6, 2020, and August 10, 2020) from Fox and Bahal.

40. Mr. Wealth signed the retainer agreement and paid the $13,000 flat rate.

41. Amabile requested Mr. Wealth send her all the required documents to complete the O-1 Visa application.

42. Mr. Wealth obliged, and on or about August 26, 2020, Amabile informed Mr. Wealth that his application had been filed.

43. Mr. Wealth later learned through his USCIS decision letter that Amabile, Bahal, and Fox filed his O-1 application on January 15, 2021.  Five months later.

44. On or about June 24, 2021, Mr. Wealth received a letter from the USCIS informing him that his visa was denied because Defendant failed to provide USCIS with the correct information required for the Visa review process:

   a. Defendants should have summitted the correct visa application timely.

   b. Defendants should have followed up with USCIS to challenge the rejection and then provide USCIS with the correct or missing information necessary to supplement Plaintiffs application.

   c. Bahal should have spent more than 6 hours working on Plaintiffs visa application process.  If she did, then the errors committed by nonlawyer Amabile probably would have been avoided and Plaintiffs visa would not have been rejected.

**Amabile is being investigated by the Committee On The Unauthorized Practice Of Law**

## COMMITTEE ON THE UNAUTHORIZED PRACTICE OF LAW
### *Appointed by the Supreme Court of New Jersey*



ADRIENNE C. ROGOVE
CHAIR
NANCY GIACUMBO
VICE CHAIR

PART A:
HANI KHOURY, CHAIR
TRACY A. ARMSTRONG
SEAMUS BOYLE
DIANA N. FREDERICKS
JEFFREY S. MANDEL
ESTHER TANEZ

PART B:
ADRIENNE C. ROGOVE,
CHAIR
JOEL A. DAVIES
PETER JACOBSON
BHAVEEN R. JANI
NICHOLAS KANT
ROBERT S. POPESCU
BRIAN E. SHEA

PART C:
ANNE M. MOHAN, CHAIR
DAVID M. DUGAN
WILLIAM HURLIN
ERIKA M. LOPES-McLEMAN
SETH PTASIEWICZ
JOHN PAUL VELEZ

PART D:
NANCY GIACUMBO, CHAIR
JUDITH E. COLLINS
STEPHEN V. FALANGA
CAROL J. KOBAK
BOLANLE MAYOWA
SAMUEL "SKIP" REALE, JR.

CAROL JOHNSTON
SECRETARY

—————
(609) 815-2900 ext. 54965
Fax (609) 815-2913

Richard J. Hughes
Justice Complex
P.O. Box 970
Trenton, NJ 08625-0970

November 13, 2023

Abuetti Raymond Wealth

Re:   Kristen Amabile

Dear Abuetti Raymond Wealth:

The Supreme Court Committee on the Unauthorized Practice of Law received your grievance regarding the conduct of Kristen Amabile, a nonlawyer who worked at Fox Rothschild LLP. You noted on your grievance form that there is a pending action in federal court that could affect the interests of parties in the matter. As such, the Unauthorized Practice of Law Committee is without jurisdiction to conduct an investigation at this point in time. See R. 1:22-4(e). Once the matter is concluded, if you still want to pursue a complaint before the Committee on the Unauthorized Practice of Law, please let me know.

Very truly yours,

Carol Johnston
Committee Secretary

c:   Adrienne C. Rogove, Committee Chair (via email)

8

**Amabile engages in criminal activity**:

45. Upon information and belief, Amabile left Fox around January 2022.

46. Fox and Bahal failed to inform Mr. Wealth or any of the other clients of Fox and Bahal that Fox no longer employed Amabile.

   a. Plaintiff Markevich was never informed by Fox and Bahal that Amabile was no longer employed with Fox.

47. Fox and Bahal failed to inform Mr. Wealth, Mr. Markevich, or any of the other clients of Fox and Bahal, that Amabile was terminated because she is a **THIEF**!!!

48. Upon information and belief, Amabile stole over $80,000.00 from Bahal and Fox through her employee expense account.  Bahal is suing Amabile in the Superior Court of New Jersey Law Division, Morris County, Docket No. Mor-L-1117-22 to recover the $80,000.00 Amabile stole. (**See, Wealth Exhibit B**).

49. As further evidence of Bahal's intention to hide Amabile's thievery from the public and from Fox clients, Bahal failed to name the "law firm" in the state of New Jersey, as evidenced in Exhibit B.

LOUIS H. MIRON (014861985)
Attorney at Law
123 North Union Avenue
Suite 103
Cranford, New Jersey 07016
(908) 233-9555
Attorney for Plaintiff Alka Bahal

| | |
|---|---|
| ALKA BAHAL,<br><br>                    Plaintiff,<br><br>              vs.<br><br>KRISTEN M. AMABILE,<br><br>                    Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. MOR-L-     -22<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

Plaintiff Alka Bahal, residing at 9 Sheldon Court, East Hanover, New Jersey, by way of Complaint against Defendant Kristen M. Amabile ("Amabile"), says:

1. Defendant Amabile is an individual, and upon information and belief, resides at 61 Nicole Drive, Denville, New Jersey.

2. At all relevant times, Plaintiff and Amabile worked together at a law firm in the State of New Jersey (the "Law Firm").

1



**<u>Kristen Amabile</u>**
**<u>Is A CRIMINAL</u>**

50. Upon information and belief, on or about October 12, 2022, Amabile was arrested in Denville Township in New Jersey, for fraudulently obtaining prescription medication. (See**, Wealth Exhibit C**).  This reflects a pattern and practice of Amabile engaging in acts of theft and fraud.

   a.  **GAVEL Case No**. 22001356, and

   b.  **GAVEL Case No**. 22001459.

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1408** | **S** | **2022** | **000142** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

### THE STATE OF NEW JERSEY
### VS.
**KRISTEN M AMABILE**

DENVILLE TWP MUNICIPAL COURT
1 SAINT MARY'S PLACE
DENVILLE              NJ  07834-0000
973-625-8300      COUNTY OF: **MORRIS**

ADDRESS :
**61 NICOLE DRIVE**

**DENVILLE**          **NJ  07834-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 1 | | 2022-23444 |

COMPLAINANT **DET          Z LANCASTER**
NAME:        1 ST. MARY'S PLACE
             ATTN RECORD BUREAU
             DENVILLE              NJ   07834

DEFENDANT INFORMATION
SEX:  **F**  EYE COLOR:  **BROWN**      DOB: **12/11/1979**
DRIVER'S LIC. #. **A57004377462792**          DL STATE:  **NJ**
SOCIAL SECURITY #: **xxx-xx-x377**      SBI #:
TELEPHONE #: **917-504-6533** ( **C** )
LIVESCAN PCN #:

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed and (2) the defendant is the one who committed it:

On 9/28/22, Denville Police responded to 61 Nicole Drive for the report of an emotionally disturbed person, who was later identified as Kristen M. Amabile. During the on scene investigation, several prescription bill bottles belonging to Anthony Denoia and Kathleen Ancheta were turned over to police by Kristen's husband, George Amabile. The prescription bottles were for Adderall and Xanax and each had been prescribed by Dr. Jacob Leivent. While speaking with Kathleen and Anthony, they stated they were not patients of Dr. Leivent and had not given Kristen permission to use their personal information to obtain the medication. Anthony stated that Kristen had previously asked his permission to use his personal information to obtain Adderoll, however he stated he declined. The pill bottles with Kathleen's name had the address of 61 Nicole Drive, Denville, which was Kristen's address. Dr. Leivent provided screen shots from two phone number stating they were Anthony and Kathleen, asking for prescription refills. Each phone number was confirmed by Kristen's mother, Maria Smith to belong to Kristen. The phone number used to communicate with Dr. Leivent from an actor stating they were Anthony was used to contact Kristen directly. The two most recent Adderoll prescription that were filled for Anthony Denoia were picked up from the Denville CVS but a white BMW which appeared identical to a vehicle that is registered to Kristen and was observed parked in her driveway. Additionally, George stated that Kristen had stated that she was "pretending" to be Kathleen while seeing Dr. Leivent, in order to obtain medication.

| | |
|---|---|
| | **Affidavit of Probable Cause** |
| | **Page 5  of 7**                    1/1/2017 |



S-2022-000132-1435   10/28/2022 05:49:49 PM   Pg 5 of 7   Trans ID: MCS20221385888

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1435** | **S** | **2022** | **000132** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

*THE STATE OF NEW JERSEY*
*VS.*
**KRISTEN M AMABILE**

ROCKAWAY TWP MUNICIPAL COURT
65 MT HOPE RD
ROCKAWAY                         NJ  07866-0000
973-627-9000     COUNTY OF: MORRIS

ADDRESS: **61 NICOLE DR**

**DENVILLE**                **NJ  07834-0000**

| # OF CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 1 | | 2022-23241 |

COMPLAINANT **DET. T     TAFFIN**
NAME:    **65 MOUNT HOPE RD**
          **ATTN WARRANTS**
          **ROCKAWAY          NJ  07866**

DEFENDANT INFORMATION
SEX: **F** EYE COLOR: **BROWN**    DOB: **12/11/1979**
DRIVER'S LIC. #. **A57004377462792**           DL STATE:  **NJ**
SOCIAL SECURITY #: xxx-xx-x**377**   SBI#: **688010H**
TELEPHONE #: **973-886-3827** ( **C** )
LIVESCAN PCN #: **143501007548**

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed <u>and</u> (2) the defendant is the one who committed it:

On September 28, 2022 Denville Police Department Officers responded to 61 Nicole Drive in Denville NJ.  Denville PD met with defendant and family members on scene.  Family members on scene provided numerous prescription pill bottles made out to several other unknown people.  Through their investigation, it was determined that defendant utilized victim K.A.'s personal information to fraudulently obtain prescriptions from Dr. Jacob Leivent out of Brooklyn NY.  Defendant's phone number was utilized to contact Dr. Leivent to request prescriptions to be filled at Randolph Pharmacy.  An unknown female who identified herself as the victim K.A. called Randolph Pharmacy to allow a "driver" to pick up the prescriptions, and a white BMW sedan was observed picking up the prescriptions at the drive through pharmacy window.  A white BMW sedan is registered to defendant and is parked at 61 Nicole Drive in Denville NJ.  The prescription pill bottle with victim's name on it, and the address of 61 Nicole Drive in Denville was recovered by Denville Police Department.  Victim was a client of defendant's at a law firm, Fox Rothchild Law Firm in Morristown NJ which confirmed that defendant had access to victim and other clients personal identifying information.

**Affidavit of Probable Cause**

**Page 5  of 7**                                    1/1/2017

51. Amabile's criminal activity did not begin or end with GAVEL Case No.'s: 22001356 and 22001459, Amabile, with the permission and assistance of Bahal, engaged in the illegal practice of Law in New Jersey.

52. As previously stated, Amabile told everyone associated with Mr. Wealth's O-1 immigration Visa process that she was an Attorney assigned to Mr. Wealth's case.

53. Everyone associated with Mr. Wealth's immigration visa renewal process had no reason to believe that Amabile was not an attorney.  They **NEVER** spoke with nor heard from Bahal, or any other licensed attorney at Fox.

54. Upon information and belief, it is Bahal's pattern and practices to pass off her responsibilities as an attorney to unlicensed office staff.  She then sign off on the staff's work and fraudulently bill her clients for services she never rendered.  This is evidenced by Exhibit B.

### In Addition to Stealing Prescription Drugs,
### Amabile Engaged In The Illegal Practice of Law

55. Under N.J.S.A. 2C:21-22, a person is guilty of a crime...if the person knowingly engages in the unauthorized practice of law.

    c.  For a defendant to be found guilty of the unauthorized practice of law, the State must prove beyond a reasonable doubt each of the following four elements:

        i.  The defendant engaged in the practice of law;

        ii.  The defendant knew they were engaged in the practice of law;

        iii.  The defendant's conduct was not authorized by law;

        iv.  The defendant knew that their conduct was not authorized by law.

    d.  The fourth element that the State must prove beyond a reasonable doubt is that the defendant knew their conduct was not authorized by law.

56. Amabile informed Plaintiff and Plaintiff's friends and family that she was his attorney.

57. Amabile's claims were confirmed through Defendant Fox's billing statement, where it was clear that Amabile did upwards of 90% of the work on Mr. Wealth's case.

58. Amabile was the only representative Mr. Wealth spoke with. Bahal never spoke with Mr. Wealth.

59. Amabile knew she was engaged in the illegal practice of law, as evidenced by her statements to Mr. Wealth and his family and friends.

60. Amabile did not have the authority to practice law in New Jersey.

61. Amabile and Bahal knew or should have known that Amabile's unauthorized practice of law in New Jersey was illegal. Yet, Bahal allowed her greed and sheer laziness to turn a

14

blind eye to her ethical duties as an officer of the court and an attorney in the State of New Jersey, by allowing, and in many instances encouraging, Amabile to illegally practice law in New Jersey.

### Amabile Stole over 20,000 thousand Dollars From Mr. Wealth

62. On or about April 29, 2022, ICE detained Mr. Wealth for being out of status due to Amabile, Fox, and Bahal's ***GROSS*** negligence and Malpractice.

63. While ICE detained Mr. Wealth, Amabile broke into his apartment, stole over $11,000.00 in cash and three laptop computers, and used his social security number to open several credit accounts. Amabile's monetary theft from Mr. Wealth exceeds $20,000.00.

64. During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, opened several credit cards with Mr. Wealth's Social Security number, and added herself as an authorized user.

65. During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, hack into his email account, add herself and her phone number to his account, and use that information to make unauthorized charges, changes, and withdrawals from Mr. Wealth's bank accounts.

**AMABILE PHONE NUMBER ENDING IN 4298 IS THE SAME NUMBER ADDED TO MR. WEALTH'S SECURITY VERIFICATION WHEN HE WAS IN PRISON**



66. During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, hack into his email account, add herself and her phone number to his investments account, and use that information to make unauthorized charges, changes, and withdrawals.



67. On or about May 10, 2022, while Mr. Wealth was in prison, Amabile had an American Express credit card (ending in 1018) delivered to Mr. Wealth's residence located in Toms River, NJ, with her name on it. (See, **Wealth Exhibit D**).

68. On or about May 10, 2022, while Mr. Wealth was in prison, Amabile had an American Express credit card delivered to Mr. Wealth's residence located in Toms River, NJ, with her name on it. (See, **Wealth Exhibit E**).

69. On or about May 6, 2022, while Mr. Wealth was in prison, Amabile applied for a Chase Sapphire Reserve credit card. Chase sent Mr. Wealth a letter informing him that he had been denied a Chase Sapphire Reserve credit card. (See, **Wealth Exhibit F**).

70. On the same date, Amabile hacked into Mr. Wealth's email account and pretended to be him to access his apartment and mailbox. Amabile sent the following email to Mr. Wealth's building manager:



Please accept this email as my authorization to allow my representative, kristen amabile, enter my apartment she has my full authority to receive full access including a key. Also, she has my full and complete permission to my mailbox. Please make sure that this is noted for her and within your office. Ms amabile is the only person who has my permission and full authorization, no one else has permission but ms amabile. You may reach her at 973-886-3827. I really appreciate your cooperation.

Have a blessed day.

Thanks,
Raymond Wealth

71. On or about May 13, 2022, while Mr. Wealth was in prison Amabile applied for a Chase Freedom credit card. Chase sent Mr. Wealth a letter informing him that he had been denied a Chase Freedom credit card. (See, **Wealth Exhibit G**).

72. On or about May 8, 2022, while Mr. Wealth was in prison Mr. Wealth received a letter from American Express informing him they had to speak with him regarding "security concerns."  As a result, American Express declined new charges on Mr. Wealth's account. American Express also advised Mr. Wealth to advise any additional card member that their new charges would be declined. (See, **Wealth Exhibit H**).

73. On or about May 20, 2022, while Mr. Wealth was in prison, Mr. Wealth received a letter from American Express National Bank informing him that there had been an attempt by someone to open additional deposit accounts in Mr. Wealth's name.  As a result, the bank canceled any applications. (See**, Wealth Exhibit I**).

74. On or about June 10, 2022, Mr. Wealth was released from ICE Detention.  At that time, he learned that Amabile had been withdrawing money from his checking account to pay for her credit card usage.

**Fox and Bahal Continues To Bill Mr. Turtle and Mr. Turtles Company Even though Mr. Turtle Was Not Responsible For Paying Fox**:

75. Fox has consistently sent, Mr. Turtle and the Soccer Specific Training emails and bills for services they never provided.  As evidenced from Exhibit A, Mr. Turtle and the Soccer Specific Training were never clients of, or beneficiaries of services provided by the defendants.

**Amabile Accuses Bahal Of Stealing Clients Funds**

76. As part of her cross complaint in the Superior Court of New Jersey Law Division, Morris County, Docket No. Mor-L-1117-22, Amabile accuses Bahal of:

1. Plaintiff (Bahal) had a practice of failing to reimburse Fox Rothschild clients for overpayments made by said clients.

2. Instead of reimbursing overpayments made by clients, Plaintiff would retain the payment and create bogus invoices at or near the end of the billing year for a flat fee amount equal to the amount of the overpayments.

3. The zero balance invoice would not be sent to the client, but the funds being held by Plaintiff/Fox Rothschild would be applied to the fictitious/fraudulent invoices.

4. Plaintiff and Third-Party Defendant Fox Rothschild were the sole beneficiaries of the fraudulent invoicing scheme.

5. The result of the improper practice was to inflate Plaintiff's client originations/provide more revenue for Fox Rothschild thereby making Plaintiff eligible for an even larger year-end bonus and more equity shares.

6. Plaintiff advised Defendant Amabile that this was standard practice at Fox Rothschild.

7. Plaintiff also had a practice of obtaining reimbursement for fraudulent expenses.

8. Under Fox Rothschild's policy, certain attorneys are permitted to write off client expenses (costs/disbursements) up to a certain dollar amount ("write off authority").

9. Plaintiff was one of the individuals with such write off authority.

10. Amabile did not have such write off authority and gained no benefit from the fraudulent practice.

11. Plaintiff used her write off authority to charge her personal expenses to Fox Rothschild clients, obtain reimbursement from Fox Rothschild for the expenditures and then write off the expenses so the clients would not see the fraudulent expense entries.

12. Because of Plaintiff's comments and prior conduct, Amabile knew that any complaint regarding Bahal's conduct would be futile.

77. (See**, Wealth Exhibit J**).


*Plaintiff Markevich*

78. Plaintiff Markevich is a musician, artist, and performer.

79. On or about, December 2016 Plaintiff Markevich was hired to perform at a New Year's party where Amabile was in attendance.

80. Amabile befriended Plaintiff Markevich at this New Year's party and learned that Plaintiff Markevich was looking to file for a Visa.

81. On or about, January 2017 Amabile contacted Plaintiff Markevich informing him that she was an attorney at Fox and advised him that he may want to consider applying for an O1-B Visa and would be able to help him with his O1-B visa through Fox if he was interested.

82. On or about May 2017, Plaintiff Markevich was notified by USCIS that he was approved for an O1-B visa which Plaintiff Markevich filed for himself.

83. From 2017 to 2019, Amabile developed and maintained a "friendship" with Plaintiff Markevich, hiring him to perform at her parties.

84. On or about November 2019 Plaintiff Markevich filed for a I-485 + i-140 EB-1A Visa.

85. On or about June 2020, Plaintiff Markevich was notified that he was denied the EB-1A visa.

86. On or about June 2020, Plaintiff Markevich called Amabile to seek advice on his immigration status, Visa applications and the next steps he should take to secure a Visa.

87. Amabile promises Plaintiff Markevich that her law firm, Fox, and her colleague Bahal would help him secure a Visa.

88. Bahal sets up teleconference call with Plaintiff Markevich from her Fox account:



**Bahal and Amabile Encourage Plaintiff Markevich**
**To Commit Immigration Marriage Fraud**

89. Bahal and Amabile advised Plaintiff Markevich to find a citizen, get married, and apply for a visa through marriage.  They informed him that marriage is the "Only Way" for Plaintiff Markevich to get a Visa.

**Pursuant to a Pamphlet From the USCIS, Marriage Fraud is a CRIME!!!**



## Marriage fraud is not a victimless, innocent crime.

Marriage fraud is a serious crime that weakens our nation's security and makes us less safe. Participating in marriage fraud can result in imprisonment of up to five years for those involved.

### U.S. CITIZENSHIP IS NOT FOR SALE

**Background**
Marriage fraud is a threat to U.S. national security, financial institutions and the integrity of the immigration system.

Marriage fraud investigations conducted by U.S. Immigration and Customs Enforcement's (ICE) Homeland Security Investigations (HSI) have revealed massive schemes that involve complex criminal organizations.

Neither victimless nor limited in scope, the crime of marriage fraud is anything but a trivial matter. Engaging in this fraud and trading America's security for financial gain is a felony with serious criminal penalties and consequences.

**Types of Marriage Fraud**
- A U.S. citizen is paid, or asked to perform a favor, to marry a foreign national already residing in the United States;
- "Mail-order" marriage where either the U.S. citizen or alien knows it is a fraud; and,
- A foreign national defrauds a U.S. citizen who believes the marriage is legitimate.

**Penalties**
An individual will be charged with marriage fraud if they entered into a marriage for the purpose of evading U.S. immigration law. This felony offense carries a prison sentence of up to five years and a fine of up to $250,000, and applies to both foreign nationals and U.S. citizens who perpetrate this crime.

Those charged with marriage fraud may also be charged with visa fraud, harboring an alien, conspiracy and making false statements; each charge carries additional prison sentences and financial penalties.

**Further Consequences**
U.S. citizens who enter into fraudulent marriages assume great personal liability. The foreign spouse may gain access to sensitive, personal information including, but not limited to, bank accounts, safe deposit boxes, retirement and investment accounts, personal identity information, and family heirlooms.

Terrorists and other criminals can use marriage fraud as a vehicle to enter the United States, often due to the willingness of U.S. citizens to participate in marriage fraud schemes. They can then hide their identity, gain unlawful employment, access government buildings, and open bank accounts and businesses to conduct further criminal activity.

Participants in marriage fraud may, knowingly or unknowingly, be aiding terrorists, foreign intelligence or other criminal organizations, and will be held accountable.

**Vigilance**
To combat marriage fraud and other similar crimes, HSI created the Document and Benefit Fraud Task Forces (DBFTF) in 2006. Led by HSI, the DBFTFs build upon existing partnerships with other federal and state law enforcement investigators with document and benefit fraud expertise. The Task Forces also ally themselves with U.S. Attorneys, to use a comprehensive approach against the criminal organizations and beneficiaries behind these fraudulent schemes.

90. Bahal and Amabile committed malpractice by failing to inform Plaintiff Markevich that he was eligible for 245(i) adjustment which enables certain individuals who are present in the United States who would not normally qualify to apply for adjustment of status in the United States to obtain lawful permanent residence (get a Green Card) regardless of:

    a. The manner they entered the United States;

    b. Working in the United States without authorization; or

    c. Failing to continuously maintain lawful status since entry.

91. To qualify for this provision, you must be the beneficiary of a labor certification application (Form ETA 750) or immigrant visa petition (Forms I-130, Petition for Alien Relative, or I-140, Immigrant Petition for Alien Worker) filed on or before April 30, 2001. https://www.uscis.gov/green-card/green-card-eligibility/green-card-through-ina-245i-adjustment.

92. Plaintiff Markevich could have applied for the 245(i) adjustment which he qualified for.

93. After meeting with Bahal, Amabile and his then girlfriend (at the urging of Amabile and Bahal) Plaintiff Markevich did not feel comfortable with the undertone of marrying a United States citizen for the sole purpose of filing for a visa. He felt uncomfortable with Amabile and Bahals insistence on the fake marriage and felt that he would be in legal jeopardy if he had listened to them.  Therefore, he did not go through with Amabile and Bahal's suggestion when they emailed him a document detailing the criteria.  (See, **Markevich Exhibit A**).



Fox Rothschild LLP
ATTORNEYS AT LAW

75 Eisenhower Parkway, Suite 200
Roseland, NJ 07068-1600
Tel 973.992.4800  Fax 973.992.9125
www.foxrothschild.com

**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

## ADJUSTMENT OF STATUS: DOCUMENT CHECKLIST
### PLEASE READ CAREFULLY
### U.S. Citizen Sponsoring Foreign National Spouse

The following evidence is required for a foreign national spouse's application for permanent residency via marriage to a U.S. Citizen.

These documents must be provided for each applicant, as indicated.  If the foreign national spouse has children who are applying with him/her, contact us for an appropriate Document Checklist.

All documentation must be provided with a translation, if the original is in a foreign language. (See the last page of this document for information on Translations.)

Check off each item as enclosed.  Mark 'N/A' next to the items that do not apply.  Any items already marked with a check mark are already on file; you do not need to submit an additional copy.

**A.  Questionnaire:**  Submit the following completed questionnaire:

1. Adjustment of Status Questionnaire
   - ✓ *Please ensure you have answered ALL questions completely and accurately.*
   - ✓ *Once the questionnaire is completed, be sure to click on "Inform Firm" so that we are notified that you have completed it.*
     - ☐ Petitioner (USC)
     - ☐ Beneficiary (Foreign National Spouse)

**B.  Birth Certificate(s):**

1. Submit a copy of birth certificate(s) or other record(s) of birth.
   - ✓ *Birth certificates must be issued by a hospital or government agency.*
   - ✓ *If you are unable to provide a birth certificate (i.e. it is unavailable), you will need to provide secondary evidence and/or two notarized affidavits (from individuals who were competent at the time) confirming parentage and date of birth.  Send an email to 'immigration@FoxRothschild.com' for additional instructions.*
     - ☐ Petitioner (USC)
     - ☐ Beneficiary (Foreign National Spouse)

**C.  Marriage Certificate:**

1. Submit a copy of properly registered marriage certificate.
   - ☐ Marriage Certificate
2. If either of you were married before, include copies of
   - ☐ (Previous)  Marriage Certificate(s)
     - ☐ Petitioner (USC)
     - ☐ Beneficiary (Foreign National Spouse)
   - ☐ Divorce Decree(s) (if applicable)
     - ☐ Petitioner (USC)
     - ☐ Beneficiary (Foreign National Spouse)

Copyright © 1999-2012, Alka Bahal, Esq., All Rights Reserved          CONFIDENTIAL/Not for distribution
Any form of unauthorized reproduction, dissemination, copying, disclosure, modification, distribution and/or publication of information contained in this document is unlawful and strictly prohibited.



**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

☐ Death Certificate(s) of previous spouse (if applicable)
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse)

**D.** <u>Evidence of Status:</u>

1. Submit a copy of passport.  (Only pages with writing or stamps need to be copied.)
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse)
2. Submit a copy of Foreign National spouse's Form I-94, Nonimmigrant Arrival/Departure Record, showing admission to the U.S. and current nonimmigrant status.  (*i.e.* the actual white card in passport).
    ☐ Beneficiary (Foreign National Spouse)
3. Submit copies of all of Foreign National spouse's approval notices (including any later withdrawn).
    ☐ Beneficiary (Foreign National Spouse)
4. Submit a copy of USC spouse's Naturalization Certificate
    ● *A naturalization certificate is not necessary if you were born in the U.S.*
    ☐ Petitioner (USC)

**E.** <u>Evidence of Financial Ability:</u>

1. Submit copies of tax returns for the most recent filing year and two previous filing years, if filed.
    ✓ Either submit one set of returns, filed jointly OR
    ✓ Two sets of returns filed separately, but showing filing status as married OR
    ✓ Two sets of returns, filed individually (if you were not married during the last tax year)
    ☐ Tax Returns for recent filing year (2015)
    ☐ Tax Return for prior year (2014)
    ☐ Tax Return for previous year (2013)
    ☐ Tax Return for previous year (2012/if 2015 not yet filed)
2. Include a copy of all W-2s for the most recent tax year.
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse) (if authorized for employment)
3. Include a copy of any 1099 Forms for the most recent tax year.
    ☐ Form 1099 (Number of forms enclosed: _____ )
4. Submit copies of pay stubs for last three pay periods.
    ✓ *Most recent pay stub must not be more than 30 days old at time of filing.*
    ✓ *Copies of direct deposit statements are acceptable.*
    ☐ Petitioner (USC)
5. Submit copies of bank account statements for previous three months.
    ✓ *This should be a joint account; if not joint, please submit a letter explaining why in conjunction with evidence of all bank accounts.*
    ☐ Bank account statements (if not joint, state why: _____
    _____.)

    ☐ If any financial items are not enclosed, please state why: _____
    _____.

Copyright © 1999-2016, Alka Bahal, Esq., All Rights Reserved     **CONFIDENTIAL/Not for distribution**

27



**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

**F.** <u>Evidence of Genuine Marriage</u>

1. Documents proving the truthful nature of your marriage
   ✓ This includes any items that prove that you are truly a married couple and hold yourselves out to others as such.  PLEASE NOTE THAT ANY ITEMS YOU SUBMIT TO USCIS IN ORIGINAL WILL BE RETAINED BY USCIS.  If you wish for us to photocopy original documents, please note this on any original items submitted to our office; if not so noted, the original items will be sent to USCIS.
   ✓ Examples of items include:
      ☐ Photographs
      ☐ Photocopies of documents which bear both your names (such a mail addressed to you both at your address, letters or cards addressed to the two of you, etc.)
      ☐ Documents showing joint assets or finances (such as joint credit card statements, joint property ownership, etc.)

**G.** <u>Photographs</u>**✦†**:

1. Petition for Foreign National Relative:  one (1) each
      ☐ Petitioner (USC) (one)
      ☐ Beneficiary (Foreign National Spouse) (one)
2. Adjustment of Status Form:  two (2)
      ☐ Beneficiary (Foreign National Spouse) (two)
3. Employment Authorization Document: *(Work Permit)* two (2)
      ☐ Beneficiary (Foreign National Spouse) (two)
4. Advanced Parole: *(Travel Document)* two (2)
      ☐ Beneficiary (Foreign National Spouse) (two)

✦ Photographs must be passport style, color photographs taken <u>within 30 days of the filing of your application</u>.  Pictures must be identical, natural color pictures with a plain white or off-white background, be glossy, un-mounted, and un-retouched, showing a full frontal facial position.  Your head should be bare unless you are wearing a headdress as required by a religious order to which you belong.  The photos must be exactly 2x2 inches, with the distance from the top of the head to just below the chin between 1 inch and 1 and 1/8 inches.  The head should be centered in the photo, not be tilted up, down or to the side and it should cover about 50% of the area of the photo.

**H.** <u>Medical Examination</u>**✦**:

1. Submit a medical examination report.
   ✓ *The medical examination must be performed within 30 days of the filing your application(s) by an USCIS authorized physician.*
   ✓ *Contact USCIS' National Customer Service Center's automated system to obtain a list of physician's in your area: 1-800-375-5283* or
      https://egov.uscis.gov/crisgwi/go?action-offices.type&OfficeLocator.office_type-CIV
   ✓ If you cannot find a qualified physician authorized to perform immigration examinations in your area, please contact us.
      ☐ Beneficiary (Foreign National Spouse)

✦ We will advise you of the appropriate time to obtain your medical exam(s) and photographs.  *These are time sensitive items; if you do not consult us before obtaining them, you may be required to do them again.*



**Fox Rothschild LLP**
ATTORNEYS AT LAW

**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

I.   **Filing Fees:**

☐   If you (or your spouse) are responsible for the legal or filing fees related to this application, please submit your payment for the filing fees to Fox Rothschild at this time (if you have not done so already).  (If you were required to sign a Fee & Disclosure Agreement in connection with your AOS matters, this may apply to you.)

✓   Contact the Corporate Immigration Billing Coordinator at immigration@foxrothschild.com to make payment arrangements (credit cards are accepted).

➤**ADVISORY ON TRAVEL OUTSIDE THE U.S.:** If you or your spouse plans to leave the U.S. to go to any other country, including Canada or Mexico, before a decision is made on your application, it is in your best interest to contact our office before you make plans to leave.

o   You must be physically present in the United States at the time the AOS application is submitted to USCIS.

o   **In many cases, leaving the U.S. without advance written permission (advanced parole) will result in automatic termination of your application.  This may be true even if you have a valid nonimmigrant visa (such as an H-1B or H-4) in your passport.  Once you are granted an EAD (Employment Authorization Document), you may be taken out of visa status.**

o   Also, you and your spouse may experience difficulty upon returning to the U.S. if you do not have written permission to reenter after the application has been submitted.  We will not be responsible for the invalidation of a pending application resulting from your or your spouse's unauthorized departure from the United States.

*✱If you have failed to maintain non-immigrant status at any time while in the US, even through no fault of your own or due to a technicality, please inform our office immediately.*

It is your responsibility to notify our offices **immediately** *in writing* **of any changes in address, work location, phone number(s), etc.** (You may email your updated contact information [and status inquiries] to: immigration@foxrothschild.com.)

### Information on English Translations

ALL foreign language documents should be submitted with certified translations.  Anyone not a party to the instant applications who is competent in reading and writing both the foreign language and English may perform the translation of foreign language documents.  If you are unable to locate an individual to perform the translations for you, please contact the Firm to arrange for a professional translation (at an additional cost).

The translator must certify that she/he is competent to translate and that the translation is accurate.  The certification format should include the certifier's name, signature, address, and date of certification.  The certification statement should appear on translated document, usually in the lower right hand corner; two suggested formats are:

**Translator Certification**

I, _____, hereby affirm that I can read and write in English and _____.  I swear that the above

translation is a true and accurate representation of the attached foreign language document entitled

_____.

Signature: _____ Date: _____

Print Name: _____

Address: _____

**Certification by Translator**

I, _____, certify that I am fluent (conversant) in the English and _____ language(s), and that the

above/attached document is an accurate _____ translation of the document attached entitled _____.

Signature _____ Date _____

Typed Name _____

Address: _____

AOS Checklist                    Copyright © 1999-2016, Alka Bahal, Esq., All Rights Reserved        **CONFIDENTIAL/Not for distribution**
Page 4 of 4   Any form of unauthorized reproduction, dissemination, copying, disclosure, modification, distribution and/or publication of information contained in this document is unlawful and strictly prohibited.

94. On or about October 2021, Amabile called Plaintiff Markevich and informed him that she had a "special connect" named Alan.

95. Amabile said she can file O1-B "reinstatement" and EB1-A together "for free" and all Plaintiff Markevich needed was the filing fees of 1400 + 700 + 460.

96. Amabile made this demand with a sense of immediate urgency saying, "send money to me TODAY, I drop off at FedEx, it's urgent."

97. Plaintiff Markevich borrowed the money and sent it to Amabile via Zelle.

Oct 15, 2021 at 3:54 PM

BofA: Kristen Amabile requests $460.00 for "O1" View in Zelle

Oct 15, 2021 at 9:29 AM

BofA: Kristen Amabile requests $1,465.00 for "Filingfees" View in Zelle

98. Plaintiff Markevich was under the impression that Zelle and cash were appropriate platforms and modes of payment for Defendants legal representation, as Amabile was still employed with Fox, Bahal never informed him of any other way to compensate Defendants for their services, and Fox negligently failed to provide the necessary oversite of the actions of Amabile and Bahal.

**Plaintiff Markevich Discovers That Amabile, Bahal and Fox Scammed Him**

99. On or about March 2022, Russia invades Ukraine, Plaintiff Markevich's dad is in Ukraine.

100.     Plaintiff Markevich expresses his concerns to Amabile, and Amabile promised that she could easily get Plaintiff Markevich's father to safety.

101.     Amabile claimed that she, Fox, and Bahal could help Plaintiff Markevich's father to enter the US without a visa through that same "special contact, named Alan."

102.     At the time, Plaintiff Markevich was desperate and would do anything.

103.     Plaintiff Markevich believed Amabile so much so that he purchased his dad a ticket to JFK, after having his dad flee Ukraine via Poland.

104.     Plaintiff Markevich's father went to the airport in Warsaw, Poland.  Plaintiff Markevich called Amabile.

105.     Of course, Amabile failed to answer her phone.  Out of desperation, Plaintiff Markevich called Amabile's friend in hopes of her friend getting in touch with Amabile.

106.     Ultimately Amabile never called or answered. Plaintiff Markevich's father is rejected at the airport and not allowed to board the plane to JFK.

107.     At that point, Plaintiff Markevich began to suspect that Defendants were complete frauds.

108.     On or about March 2022, Plaintiff Markevich confronted Amabile, and demanded to receive his case number for the applications the defendants allegedly "filed" with USCIS.

109.     Amabile becomes "outraged" by Plaintiff Markevich's demand and refuses to give any info.

110.     Amabile kept repeating that she was not home, she was depressed, and she needed to find the documents Plaintiff Markevich requested.

111.     On or about May 2022, Amabile said her former assistant "Yun" filed all his documents with USCIS.

112.     Plaintiff Markevich was initially confused but recalled Fox employee Yun Pearson emailed him previously concerning his O1-b and Eb-1A Visa applications.







113.      Plaintiff Markevich called Yun Pearson at her new job and asked her if anything
was ever filed on his behalf. Yun confirmed nothing was ever filed.

114.      Plaintiff Markevich confronts Amabile again with specific request to either give
him all his money back or admit that Defendants fraudulently stole it.  Amabile refused.



**Alka Bahal**
**AIDED AND ABETTED AMABILE'S**
**CRIMINAL ACTIVITIES**

115.     Bahal is the Co-Chair of Fox's Corporate Immigration Practice at Fox Rothschild.

116.     Bahal never met, spoke with, or engaged with Mr. Wealth throughout her representation of him.

117.     As evidenced above, Bahal engaged with Plaintiff Markevich via zoom and allowed Amabile to manage the relationship and represent him.

118.     Bahal rarely and or never checked in with Plaintiff Markevich and allowed Amabile and Yun to manage Plaintiff Markevich's immigration filing process.

119.     According to Mr. Wealth's itemized monthly billing from Fox, Bahal worked approximately 6.6 hours on Mr. Wealth's immigration application renewal.

120.     In contrast, according to Mr. Wealth's itemized monthly billing from Fox, Amabile worked approximately 56.05 hours.

121.     Plaintiff Markevich never received a bill from Bahal, but he was required to issue payments to the defendants via Zelle transfers and through thousands of dollars in wired payments.

122.     Bahal abandoned her responsibility as counsel to Plaintiff Markevich, and Plaintiff Wealth and placed Plaintiff Markevich, and Plaintiff Wealth's visa application, freedom,

well-being, and finances at risk by allowing them to be victimized by her co-conspirator Amabile.

123.    Upon information and belief, Bahal and Amabile worked in concert to secure immigration clients for Defendant Fox and then defraud those clients out of their money and possessions for their personal benefit.

124.    Upon information and belief, Bahal and Amabile used their positions at Fox, a national law firm with over 900 attorneys to fool unwitting immigration clients into trusting them.

125.    Upon information and belief, Amabile and Bahal used Fox's letter head, email accounts, documents, and support staff (paralegals and secretaries) to carry out their criminal enterprise of securing and defrauding immigration clients out of their assets in exchange for phantom immigration services.

126.    Upon information and belief, Fox and its senior management, Thomas Paradise knew or should have known of Bahal and Amabile's criminal enterprise, yet Paradise intentionally turned a blind eye to them.

127.    As a result of Paradise's negligence, Bahal and Amabile were allowed to use Fox resources such as, paralegal Yun Pearson, and telecommunication resources such as, teleconferences, to defraud Plaintiffs.

**Thomas Paradise**

128.    On or about April 12, 2022, Mr. Wealth emailed Thomas "Tom" Paradise ("Paradise") about the legal malpractice committed by Fox, Amabile, and Bahal.

129.    Paradise blatantly ignored Mr. Wealth's concerns.

130.    Upon information and belief, Paradise consciously decided not to inform or warn the Immigration clients of Fox, to whom Bahal and Amabile provided legal services, about the theft and criminal enterprise Bahal and Amabile were running.

131.    In fact, Plaintiff Markevich NEVER received a call or notice from Tom Paradise or any member of Fox's management warning him of Amabile and Bahal's criminal activities.

132.    By June 29, 2022, Tom Paradise knew or should have known that Bahal had sued Amabile in New Jersey state court for stealing $80,000 from Bahal and Fox. *Alka Bahal v. Kristen M. Amabile*, Docket No. MRS-L-001117-22.

133.    At that point, Tom Paradise, as General Counsel of Fox, had a duty and obligation to complete an audit of all the client files that Amabile worked on, notify them of Amabile's criminal activities, and warn them to monitor their finances, and immigration status and applications, and to inquire if any of them experienced any suspicious activity from Amabile or Bahal.  As it pertains to Plaintiff Markevich, Paradise failed his duty to warn.

134.    Paradise intentionally failed to terminate Bahal after discovering that Bahal intentionally failed her duty as "Co-Chair, Corporate Immigration Practice" for Fox when she never called, met with, or spoke with Mr. Wealth, who was supposed to be her "client," when Bahal failed to submit Mr. Wealth's immigration renewal application correctly and on time, and when Bahal failed to warn Mr. Wealth that Amabile was terminated from Fox for theft of over $80,000.00.

135.    Paradise intentionally failed to terminate Bahal after discovering that Bahal intentionally failed her duty as "Co-Chair, Corporate Immigration Practice" for Fox when she knowingly allowed Amabile to pretend to be an attorney, use Fox's human capital and resources to aid Amabile in her fraudulent practices, and upon information and belief personally profited and pocketed the monies paid to Amabile via Zelle, wire transfer, and cash by immigration clients, such as Plaintiff Markevich.

136.    On or about April 12, 2022, Mr. Wealth sent the following email to Mr. Paradise:

"Good afternoon, sir. I am coming to you as I was told by someone in your accounting department you were the contact person who handles issues with attorneys' misconduct. In this case, that Attorney is Alka Bahal. She is the most unethical and worst attorney I have ever encountered; her behavior is unprecedented, and she needs to be stopped so she doesn't mishandle anyone else's case in the same manner in which she mishandled mine.

My name is Raymond Wealth, as it stands now, I am a client (your firm client # 321560) of the firm (although I have expressed my imminent desire to close out my file with Alka Bahal, as a result of her unethical and fraudulent representation (she failed to file my case before my visa expired and filed it late – this resulted in placing me 'out of status,' and then she maliciously tried to cover it up and lied about it, this is just a few examples of the misconduct at the hands of Ms. Bahal. Further to the case-related problems, she then also billed me for her mistakes and incorrectly charged me hourly time for my case, which was (as stated in the engagement letter) a FLAT FEE (not hourly billing). This is outrageous and unfair; I am at a loss for words and was told by your collections team to contact you with my situation, and I am hoping that we can resolve this amicably and without further contact or dealings with Ms. Bahal. I respectfully, sir, refuse to have any further contact with her as I do not trust her. The only reason I am giving you the opportunity to make this right is the team members that worked on my case (Kristen Amabile - the only one who

knew what she was doing and who unfortunately was not the person who filed my case, and Angelica Flores-Valencia, a paralegal who was very nice) I highly regard and respect, but unfortunately, I learned they are no longer with Fox Rothschild.

Accordingly, I am asking for your assistance with 1) the invoices – Ms. Bahal continued to ignore my lack of visa status, which she created by not filing my case on time, and to add further insult, continued to threaten me on bills that were not correctly invoiced (despite the agreement on our arrangement). Her total disregard for my case and lack of visa status, along with the major problems that she, in fact, created by making severe mistakes and mishandling and lied about it, then invoiced me erroneously for her poorly handled representation. This is unacceptable, and I am seeking to resolve this amicably with you first, however, if we cannot resolve this to which I am satisfied with a fair resolution, I will consider litigation and report her to the bar (which truthfully, I should do but out of fairness and my good nature, I am allowing your firm a chance to make this right).

Ms. Bahal to make a deal with me (dismissing the real issues here and not addressing the fact that she incorrectly billed me in the first place). Truly this has been an ongoing nightmare for me and for my prospective employer. Just to shed light on my case, I am considered a world-famous soccer player and have played on famous teams all over the world. I am highly educated and possess many degrees, along with having several sports teams and organizations in the United States, all who begged me to come and work for them. I state this to demonstrate that I have been treated like I am a nobody who does not deserve the time of day from Ms. Bahal, and its sad and unfortunate.

**Issues with my case**:
- I retained Fox Rothschild on August 1, 2020 (see engagement letter attached).
- My visa status was set to expire on August 26, 2020; I retained Ms. Bahal to prepare and file my new O-1 petition prior to my visa expiration 8/26/2020 so that there were no gaps in my visa status (and Ms. Bahal knew and was aware of this visa expiration).
- Ms. Bahal 'claimed' she timely filed my O-1 visa with USCIS prior to my visa expiration (prior to 8/26/2020) to avoid illegal presence in the U.S., but in fact, she did NOT file it timely, she filed my O-1 visa AFTER my visa expired.
- Ms. Bahal made several attempts to conceal and cover up the fact that she did not timely file my case by 'blaming' Fedex carrier, and on another occasion, she blamed the USCIS mailroom for 'misplacing' my case, but clearly, if she had tracked the original package which was as I understand sent via Fedex, wouldn't she have known if she did or did not timely file it and confirm that the case was in fact received? Unfortunately, she did not track it, and I have evidence to show that she clearly lied to cover up her tracks furthermore, it was never filed before the expiration to begin with.  This is unacceptable and misconduct. I retained fox/Alka to file my case by a deadline for which she did not and then lied about and tried to conceal.
- Ms. Bahal claimed she 'allegedly timely filed the petition" – taking no responsibility whatsoever and putting me OUT OF STATUS because of her failure to timely file my case.

Her carelessness was even further revealed because she billed me incorrectly "hourly" seven (7) months later (see invoice Number 2706165 dated March 2021). Here is a time entry (in red below) of the Ms. Bahal's 9/02/20 invoice entry which CLEARLY CONFIRMS SHE 'FILED THE CASE LATE ON 9/2/20' (MY VISA EXPIRED ON 8/26/20) which resulted in putting me out of 'legal status' AND my entire immigration case in serious jeopardy.

09/02/20 BAHAL RECEIPT AND REVIEW OF SIGNED FORMS AND DOCUMENTS SUBMITTED TO SUPPORT PETITION; **OVERSEE AND FINALIZE O-1 FILING**/FINAL 0.6

- Ms. Bahal had over a month from the time we retained her to the time my visa expired to prepare it and meet the deadline, which she promised was not an issue at the time. Clearly, she either forgot or just didn't care. Either way, she recklessly handled my case.
- Had her conduct and lack of timely filing my case (and poorly prepared petition itself) been handled by ANY OTHER immigration attorney, I am quite certain I would be in a very different boat right now. And to further fuel the fire, she did not take ownership or responsibility for it, she instead lied and blamed everyone else but herself (what type of attorney does this? What type of attorney makes it her practice of not tracking a visa petition delivery to confirm USCIS actually received the petition? What type of attorney bills the client for a severe mistake they made on the case and then haunts them to pay that bill? Would you pay a bill for time an attorney spent mishandling and lying to cover her tracks? Anyone with half a brain would know otherwise.
- Although your firm has a well-respected reputation, from my experience, which is why I retained Fox in the first place, Ms. Bahal should not be associated with Fox if they want to keep that good reputation because my situation alone speaks for itself.
- To add further insult, I only learned about this mistake because I received the incorrectly billed invoices, which is evidence to show she mishandled the entire matter, she is that careless, and although she tried to cover her tracks, she forgot to cover it entirely otherwise she would not have sent me the proof to show what I suspected, her lack of adherence to a deadline, one which puts my entire life in jeopardy.

**Billing Issues**:

a. The agreement (from August 2020) was for a one-time FLAT fee of 13,000 and was agreed to incorporate all legal fees (including an RFE, if issued) for the entire case). Ms. Bahal did not adhere to this arrangement and billed hourly for invoices.
b. I am not paying for mistakes your partner conducted and put me out of status as a result of, I am not paying for bills that were billed hourly instead of flat fee as agreed to in the engagement letter.
c. I am also disputing all invoices entirely (the case was denied) I will only pay for the filing fees which was already paid, and I am hereby requesting, as a show of good faith and to resolve this without any further burden to me, a refund of any monies paid over and above the USCIS filing fees immediately. I think this is the least you can do, and it is fair and just given the above-described circumstances.

d.  Additionally, I am asking for my file to be officially closed and transferred to me directly to my home address with a tracking number (and not sent by Ms Bahal as I **don't trust her to send anything ever again to me or for me**).

**Raymond Wealth**
**160 James Street Building 14, Apt 8**
**Toms River, NJ 08753**

Please also note that despite my several requests and the engagement letter written by your firm/Ms. Bahal, ALL my Bills were sent to the **wrong person at the wrong address**, they were to be sent as agreed in the engagement letter to me, Raymond Wealth. NOT TO Mike Turtle (see below in yellow of the engagement letter under "Fees Due Now"

It is our understanding that Mr. Raymond Wealth, the beneficiary, will be responsible for all legal fees and costs incurred per the Fee Schedule below. It is often our practice to require clients to make payments which are credited against fees and costs to be incurred. At this stage, we require a pre-payment of $13,000 towards the flat legal fee for the for O-1 visa; USCIS Filing fees, including Premium Processing Service (expedited USCIS processing), are separate and not included for the flat (Form I-129 & Form I-907) USCIS Filing. If you wish to pay by credit card, please follow this link: http://www.foxrothschild.com/payment-portal/. Refer to reference code: 999999.00003 to ensure proper application to your matter. If you have any questions about submitting your payment, contact Sandra Mordecai at 973-994-7802.

It is incredibly appalling that Ms. Bahal had the nerve to deceive me and my potential employer, SST, and yet had the audacity to offer me 'a discount' at your firms fiscal year end in her snippy (one of many) emails (see below email from Ms. Bahal dated March 29, 2022).

Just to add one last item to the 'case issue list' to date she has not made any attempt to assist me with my case further, she did not even inform me it was denied or try to refer me in any direction to help me. In fact, I had to reach out to her to ask her what was going on. It is truly unbelievable. She is a liability and should not be allowed to hurt or represent anyone else because if she does to others what she did to me, that would be a tragic mistake.
I have never in my entire life endured such disgusting and unprofessional treatment especially at the hand of someone who was 'representing me'. Please help me resolve this so I can take my file and retain another attorney who hopefully God willing can undo what Ms. Bahal did. Thank you in advance for your anticipated cooperation and assistance. I appreciate your time and look forward to hearing from you soon."

137.     Paradise responded to the email above with the following:

"Dear Mr. Wealth:
Thank you for bringing your concerns to me in the below email.  I will look into this and respond fully once I have conducted my review of the matter.  Please note that Ms. Bahal

is out of the office this week and part of next week.  As such, it may be a few days before I can speak with her about your concerns.

On behalf of the Firm, I am sorry to hear that you are not satisfied with the legal services received, and we will endeavor to correct any shortcomings by our firm that are discovered during our review of your matter.

In the meantime, please direct all further communications to my attention.

I look forward to speaking with you."

### Paradise did not follow up with Mr. Wealth.

138.    Paradise did not "endeavor to correct any shortcomings" (and there were many) of Fox or Bahal.

139.    Paradise did not investigate Mr. Wealth's concerns because if he had, he would have discovered that Bahal committed several acts of legal malpractice when she failed to monitor the actions of Amabile, resulting in over $80,000.00 of stolen funds.  According to Amabiles cross complaint detailed above, Bahal would overbill clients in order not to pay the back the balance of their retainer.

140.    He would have discovered that Bahal allowed Amabile to present herself as an attorney to Fox's immigration clients.

141.    Upon information and belief, within two weeks of sending this email, ICE was miraculously tipped off that Mr. Wealth was out of status, resulting in Mr. Wealth's arrest and detention.

142.    The temper of proximity between Mr. Wealth sending this April 12, 2022, email to Paradise, and his arrest and detention by ICE, on April 29, 2022, are so close that it removes all doubt that Paradise, Fox, Bahal, and Amabile reported Mr. Wealth to ICE.

### Paradise INTENTIONALLY Turned A Blind Eye And Rubberstamped Bahal and Amabile's Criminal Enterprise

143.    Through counsel, Mr. Wealth informed Paradise about the criminal activities visited upon him by Amabile and Bahal.

144.    Once again, Paradise chose to put profits over people and continued to put ALL of Fox's immigration clients at risk by maintaining Bahal's employment and failing to warn Fox's immigration clients about Amabile and Bahal's criminality.

145.     Upon learning that Amabile, an individual employed on his watch, was illegally posing as a licensed attorney to Fox's immigration clients and had stolen $80,000.00 from Fox, over $10,000 from Plaintiff Markevich, and over $20,000.00 from Plaintiff Wealth, Paradise chose NOT to do the decent and sensible thing, which would have been to reimburse Mr. Wealth for his losses, and to investigate and warn the other potential victims of Amabile and Bahal that Amabile is not a licensed attorney, and Amabile is a scamming thief.

146.     Due to Fox, Amabile, and Bahal's malpractice, Mr. Wealth was out of status with USCIS and was left exposed and susceptible to deportation.

**Mr. Wealth Was Arrested By Ice As A Direct Result Of
Bahal and Amabiles Malpractice, Criminality**

147.     On or about April 29, 2022, Mr. Wealth was arrested by ICE.

148.     According to the Department of Homeland Security Notice to Appear, Mr. Wealth was arrested based on the following allegations:

149.     not a citizen or national of the United States;

150.     a native of NIGERIA and a citizen of MEXICO;

151.     Were admitted to the United States in Los Angeles, CA, on or about March 14, 2019, as a nonimmigrant (Jl);

152.     Remained in the United States beyond the duration of your stay without authorization from the Immigration and Naturalization Service or its successor, the Department of Homeland Security.

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB: 11/14/1987

Event No: MLN2204000173

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 377082265

File No: 216 429 732

In the Matter of:

Respondent: ABUCHI RAYMOND WEALTH                                    currently residing at:

555 Geo Drive Phillipsburg,PENNSYLVANIA, 16866

(Number, street, city, state and ZIP code)                (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of NIGERIA and a citizen of MEXICO;

3. You were admitted to the United States at Los Angeles, CA on or about March 14, 2019 as a nonimmigrant (J1);

4. You remained in the United States beyond the duration of your stay without authorization from the Immigration and Naturalization Service or its successor the Department of Homeland Security.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

801 W SUPERIOR AVE. SUITE 13-100 Cleveland OH 44113. EOIR Cleveland, OH

(Complete Address of Immigration Court, including Room Number, if any)

on   May 13, 2022   at   9:00 AM   to show why you should not be removed from the United States based on the

(Date)                (Time)

charge(s) set forth above.

R85 TSYPIS - SDDO

(Signature and Title of Issuing Officer) (Sign in ink)

Date:   April 29, 2022                    Mt. Laurel, New Jersey

(City and State)

153.     Based on the preceding, it was charged that Mr. Wealth was subject to removal from the United States according to the following provision(s) of law:

  a. Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section l0l(al(15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

154.     Bahal could have filed an emergency application for Mr. Wealth after receiving his rejection letter. Bahal could have requested or petitioned for a reconsideration of the decision.    Bahal could have supplemented her later filing and provided additional information that USCIS required.  Finally, Bahal could have refiled using the proper visa application.

## FOX, PARADISE, and BAHAL HAVE THE NERVE TO CONTINUE TO PURSUE MR. WEALTH FOR A $20,000 IMMIGRATION LEGAL FEES

155.     After failing miserably to secure the relevant information from Mr. Wealth for his Visa renewal application, Fox, Paradise, and Bahal has the gall to continuously send Mr. Wealth a $22,000.00 invoice for legal services[1].

156.     The first of these bills was sent to Mr. Wealth on or about March 18, 2022.

---

[1] As of the date of this filing, Fox, Paradise, and Bahal continues to send Mr. Wealth an invoice or $22,000.00 worth of legal services.


Fox Rothschild LLP
ATTORNEYS AT LAW

2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
T: 215.299.2000  F: 215.299.2150
www.foxrothschild.com

Jessica Grillone
Direct Dial: (215) 299-2165
Email Address: jgrillone@foxrothschild.com

March 18, 2022

RAYMOND WEALTH

Via Mail and Email: rwealth27@gmail.com

Re:    SOCCER SPECIFIC TRAINING INC. (File No.  321560)
       Outstanding Balance in the Amount of $21,981.46

Dear Mr. Weatlh,

Our records indicate that payment of our fee in the amount of $21,981.46 for professional services
rendered in the above referenced file is seriously overdue.

I have enclosed a current summary of account and ask that you see that the sum is paid promptly.  For
your convenience, I have provided a self-addressed return envelope for you to remit your payment.

Please feel free to call me at (215) 299-2165 if you have any questions regarding this matter.  Otherwise,
I request that payment be received in our Accounts Receivable Department within one week of the date
of this letter.

Sincerely,

Jessica Grillone
Collections/Client Relations Coordinator

Enclosure(s)

cc:    Alka Bahal, Esq.
       Justine Botial, Director of Collections

A Pennsylvania Limited Liability Partnership

132008396.1

| California | Colorado | Connecticut | Delaware | District of Columbia | Florida | Illinois |
| Minnesota | Nevada | New Jersey | New York | Pennsylvania | Texas | Washington |

**FOX ROTHSCHILD** LLP
ATTORNEYS AT LAW
2000 MARKET STREET, 20ᵀᴴ FLOOR
PHILADELPHIA, PA 19103-3222

Summary of Account as of March 18, 2022

RAYMOND WEALTH
SOCCER SPECIFIC TRAINING (SST)

**Client: 321560 - SOCCER SPECIFIC TRAINING INC.**

In accordance with our firm's policy, all invoices are due upon presentation.  This is simply a summary of your account with respect to open invoices and is provided for payment of your account balance. If you need a copy of the invoice(s) referenced below, please contact Jessica Grillone at (215) 299-2165 or jgrillone@foxrothschild.com.

| Invoice | Date | 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | > 90 Days | Total |
|---------|------|-------------|--------------|--------------|-----------|-------|
| **Matter ID: 321560.00001   GENERAL IMMIGRATION COUNSELING - 2021** | | | | | | |
| 2706165 | 3/3/2021 | | | | $3,911.09 | $3,911.09 |
| **Matter Total** | | | | | | **$3,911.09** |
| | | | | | | |
| **Matter ID: 321560.00002   RAYMOND WEALTH (O-1)** | | | | | | |
| 2827638 | 9/17/2021 | | | | $51.00 | $51.00 |
| **Matter Total** | | | | | | **$51.00** |
| | | | | | | |
| **Matter ID: 321560.00003   RAYMOND WEALTH (RFE ON O-1)** | | | | | | |
| 2756301 | 5/20/2021 | | | | $2,425.00 | $2,425.00 |
| 2794833 | 7/29/2021 | | | | $15,594.37 | $15,594.37 |
| **Matter Total** | | | | | | **$18,019.37** |
| | | | | | | |
| **Total Due** | | | | | | **$21,981.46** |

We would appreciate if you would forward prompt payment of any invoice(s) that are outstanding.
Thank you for your prompt attention to this matter.

Client #321560 - Page 1 of 2

13. The most recent bill was sent to Mr. Wealth and his sponsor on or about March 3,
2023.



157.     To say that this action on the part of the defendants is tone-deaf and disgraceful is an understatement.  It is more reflective of Defendant Fox, Bahal, and Paradise's desire to put profits over people, to put dollars of decency, and to double down on their dirty deeds at the expense of their clients.

### Fox Is Vicariously Liable For the Actions of their Agents Amabile and Bahal

158.     [T]he doctrine of respondent superior recognizes a vicarious liability principle pursuant to which a master will be held liable in certain cases for the wrongful acts of his servants or employees." *Carter v. Reynolds*, 175 N.J. 402, 408, 815 A.2d 460 (2003). "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment. " *Meyer v. Holley*, 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003). The *Restatement (Second) of Agency* §219(1) (Am. Law. Inst. 1958), which our Court has cited favorably, *Carter*, 175 N.J. at 408-09, states that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Russo v. Creations by Stefano*, No. A-0663-18T1, 2020 N.J. Super. Unpub. LEXIS 1615, at *12-13 (Super. Ct. App. Div. Aug. 20, 2020).

159.     Here, there is no doubt, as evidenced by the email messages and text messages, in the Plaintiff's possession that Bahal and Amabile were acting in the scope of their authority and employment when they harmed Plaintiffs.

160.     According to the counter suit filed by Amabile against Bahal, there has been many clients within Fox's immigration unit who Bahal stole money from.


### COUNT ONE
### Breach Of Contract
### (All Defendants)

161.     Plaintiffs repeat the allegations outlined in all previous paragraphs of this Complaint as if they were outlined in full herein.

162.     As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.  Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

163.     To establish a breach of contract claim, our law imposes on a plaintiff the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract

required, caused a loss to the Plaintiff [s]."v[*Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482, 139 A.3d 57 (2016) (alterations in original) (quoting *Model Jury Charges (Civil)* § 4.10A "The Contract Claim-Generally" (approved May 1998)).] <u>Carifi v. Barberio</u>, No. A-0597-17T1, 2020 N.J. Super.   Unpub. LEXIS 2393, at *22 (Super. Ct. App. Div. December 14, 2020).

164.     The plaintiffs were in contract with the defendants to provide timely, effective immigration services.

165.     This is evidenced by Bahals abrupt resignation email she sent to Plaintiffs on December 8, 2023.



--------- Forwarded message ---------
From: **Alka Bahal, Esq. - immigration@FoxRothschild.com ((On INSZoom)** <notifications@inszoom.net>
Date: Fri, Dec 8, 2023 at 5:04 PM
Subject: Alka Bahal's Change of Contact Information
To:

Dear Clients:

Please be reminded that my last day at Fox Rothschild will be 12/8 and as of 2/11 I will be joining the law firm of Santomassimo Davis LLP (d/b/a CGC Solutions) as a Partner and the Chair of the Corporate Immigration Services practice, situated in their New Jersey office at 1 Gatehall Drive, Suite 100, Parsippany, NJ 07054. My new email address will be abahal@cgcsolutions.com and my number will be 201-712-1516.

If you need to speak with an attorney at Fox Rothschild.com, please contact immigration@foxrothschild.com or bzotti@foxrothschild.com to be connected with someone.

Thank you,

Alka Bahal, Esq.


Sincerely,
**Alka Bahal, Esq.**
**Partner & Co-Chair, Corporate Immigration Practice**
**Fox Rothschild LLP**
49 Market Street
Morristown, NJ 07960-5122
Phone: (973) 994-7800
Fax: (973) 992-1653


This email message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of this e-mail and/or any attachment(s) or linked items is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 973-992-4800 or by replying to this email and deleting the message and any attachment(s) from your system.

166.   The plaintiffs fully executed their duties under the contract when they issued payments to the defendants in the amount of $13,000 and $20,000, respectively.  Plaintiffs further fully executed their duties under the contract when they cooperated with Defendants by providing them with supporting documents and any information, they requested of them regarding their immigration application.

167.   Defendant's failed to execute their obligations fully and faithfully under the contract when they filed the Plaintiff's immigration applications late.  This resulted in the Plaintiffs being out of status.

168.   As detailed above, Defendants also failed to inform Plaintiffs of the option of applying for alternative visas which may have resulted in them being granted a visa.

169.   Defendants failed to contact ICE and request extensions for their time to stay in this United States, as they await a reconsideration of ICE's determination.

170.   Defendants never filed Plaintiff Markevich Visa application even though he paid thousands of dollars to do so.

171.   Due to Plaintiff Wealth being out of status, he was detained by ICE and held for 45 days.

172.   Courts throughout the United States have routinely held that an attorney's failure to timely file documents or applications on behalf of their immigration clients is incompetent or negligent.  Here, Bahal, Amabile, and Fox are BOTH!

173.   The failure of an attorney to file an application under § 212(c) of the Immigration and Nationality Act, 8 U.S.C.S. § 1182(c) (repealed 1996), where he is directed to do so by his client, is ***clear evidence of incompetence***.  Failure by an attorney to inform his client of the availability of § 212(c) relief, where such relief may save his client from the harsh penalty of deportation, also ***evidences incompetence***.  *United States v. Etienne*, No. 3-03-cr-190 (JCH), 2005 U.S. Dist. LEXIS 976, at *1 (D. Conn. Jan. 14, 2005).  This Court again encountered a case involving both neglect and dishonesty in *In re Chisholm*, *supra*.  *Chisholm* involved an attorney's neglect of a client's immigration matter.  That neglect resulted in the client's "needless incarceration" by the Immigration and Naturalization Service. *Chisholm*, 679 A.2d at 503. *In re Lopes*, 770 A.2d 561, 571 (D.C. 2001).

174.   Attorney's failure to timely file an application for suspension of deportation despite the fact that contrary representations to the client constituted ineffective assistance); *Rabiu*

*v. INS,* 41 F.3d 879, 882 (2d Cir. 1994) (finding ineffective assistance of counsel where attorney failed to file an application for waiver of deportation timely; "In our view, a competent attorney would have filed [such a motion] after his or her client requested permission to do so at the deportation hearing."). *Singh v. Demore*, 150 F. App'x 639, 643 (9th Cir. 2005).

175.     As a result of the defendant's negligence, Plaintiff Wealth has suffered the indignity of being incarcerated for 45 days, where he was faced with constant threats, physical attacks, and verbal and psychological abuse.  The plaintiff Wealth also had his money stolen by the defendants and had to incur the additional expense of hiring a competent lawyer to correct the errors made by the defendants.

176.     As a result of the defendant's negligence, Plaintiff Markevich has suffered the indignity of being out of status.  Plaintiff Markevich and his father had to suffer severe emotional distress while plaintiff Markevich was trying to help his farther flee a war-torn country. The plaintiff Markevich had his money stolen by the defendants and had to incur the additional expense of hiring a competent lawyer to correct the errors made by the defendants.

**WHEREFORE,** Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

   a.  Awarding compensatory damages;
   b.  Awarding punitive damages;
   c.  Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;
   d.  Awarding prejudgment interest to the extent permitted by law; and
   e.  Awarding such other and further relief as to this Court may seem proper.

### COUNT TWO
### Negligence & Negligent Infliction of Emotional Distress
### (All Defendants)

177.     Plaintiffs repeat the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

178.     As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.  Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

179.     At all times relevant hereto, the defendants Amabile, Fox, and Bahal knew or should have known that the Plaintiffs relied upon them to execute their immigration visa applications.

180.     At all times relevant, Defendant Bahal and Defendant Amabile[2] were attorneys acting within the scope of their actual and apparent agency and were employed by Defendant Fox.  Individual Defendants provided legal services to Plaintiffs.

181.     Defendants had an attorney-client relationship with Plaintiffs.

182.     According to the attorney-client relationship, the Defendants had a fiduciary duty to act in the Plaintiffs' best interest.

183.     The Individual Defendants intentionally failed to act in the best interests of Plaintiff in the matters for which they were retained.  Specifically, Defendants received and pocketed Plaintiff's money and failed to process Plaintiff's immigration visa applications correctly, timely, and in the case of Plaintiff Markevich they did not file his application at all.

184.     Alternatively, the Individual Defendants negligently failed to act in the best interests of the Plaintiffs in the matters for which they were retained.

185.     The Plaintiffs were injured due to the Individual Defendants' failure to act in their best interests.

186.     The Individual Defendants' breaches of fiduciary duty entitle Plaintiffs to disgorgement of attorneys' fees already paid to the Defendants.

**WHEREFORE,** Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

    a.  Awarding compensatory damages;

    b.  Awarding punitive damages;

    c.  Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

    d.  Awarding prejudgment interest to the extent permitted by law; and

    e.  Awarding such other and further relief as to this Court may seem proper.

### COUNT THREE
### Fraud
### (Amabile, Bahal, and Fox)

187.     Plaintiffs repeat the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

---

[2] Posed as an attorney to Plaintiff Wealth and to Plaintiff Wealth's Friends and Family.

188.     As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.  Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

189.     The elements of fraud in the inducement are a misrepresentation of material fact; knowledge, or belief by the defendant of its falsity, intent that the other party relies on the misrepresentation, and reasonable reliance thereon by the other party. *Nolan v. Lee Ho*, 120 N.J. 465, 472, 577 A.2d 143 (1990). Fraud in the inducement does not differ materially from common-law fraud, as it provides a cognizable basis for equitable relief in the event a false promise induced reliance. *See Lipsit v. Leonard*, 64 N.J. 276, 283, 315 A.2d 25 (1974). *Longmuir v. Kickin' It*, No. A-0422-18T2, 2020 N.J. Super.  Unpub. LEXIS 707, at *6 (Super. Ct. App. Div. April 21, 2020).

Misrepresentation of Material Fact:

190.     Here, as detailed above, Amabile presented herself as a licensed attorney in the State of New Jersey.

191.     As detailed above, Bahal and Fox allowed Amabile to operate mainly on Mr. Wealth's immigration renewal application.  At no time did Bahal or any other licensed attorney for Fox reach out to Mr. Wealth to inform him that Amabile was not a licensed attorney.

192.     As detailed above, Bahal and Fox allowed Amabile to operate mainly on Mr. Markevich's immigration application.  At no time did Bahal or any other licensed attorney for Fox reach out to Mr. Markevich to inform him that Amabile was not a licensed attorney.

193.     An objectionably reasonable person in the Plaintiff's position would believe the person that is presenting themselves as their attorney is an actual attorney.

The Defendants Knew Their Representation That Amabile Was a Licensed Attorney In the State of New Jersey Was False:

194.     Here, Amabile knew that her representation as a licensed attorney in the State of New Jersey was false when it was made to Plaintiffs.  Amabile is not a registered, licensed attorney in New Jersey.

195.     This is even more true by the mere fact that Plaintiffs received letters from the Committee On The Unauthorized Practice Of Law informing them that an investigation of Amabile had been opened for her illegal practice of law.

196.     Amabile used the fact that Bahal and Fox allowed her to be client-facing and allowed her to execute the immigration applications to defraud the unwitting immigration clients of the fact that she is NOT a licensed attorney.

197.     Bahal and Fox knew or should have known that Amabile was falsely presenting herself as a licensed attorney in the State of New Jersey. Amabile used Fox and Amabiles Zoom and email platforms to set up meetings and to transact business with Plaintiffs.

198.     As evidenced through text conversations between the Plaintiffs and Ms. Amabile on Fox's company-issued phone, emails, and other communications between the Plaintiffs and Amabile, it was clear that Amabile represented herself as a licensed attorney to the Plaintiffs.

199.     Bahal and Fox could have easily discovered this by checking their email sent folders and the zoom call logs and ended Amabile's fraudulent acts.

Plaintiffs Detrimentally Relied On Defendant Promise:

200.     Here, the Plaintiffs are citizens of foreign countries.

201.     Plaintiffs are not accustomed to or aware of the requirements of being a licensed attorney in the State of New Jersey.

202.     The Plaintiffs detrimentally relied upon Fox's representation through Amabile, Bahal that Fox is a reputable, responsible law firm that would protect Plaintiffs interest and apply for their Visa applications. Plaintiffs relied on Bahal, Amabile, and Fox to be honest and truthful in their representations to them. Bahal, Amabile, and Fox intentionally deceived the Plaintiffs for the sole purpose of getting them to pay more than $13,000.00 and $25,000, respectively, for sham legal services provided to them by a criminal who posed as a licensed attorney.

203.     The plaintiff's Detrimental Reliance was Reasonable.

204.     Here, as previously stated, Plaintiff's detrimental reliance was reasonable because they were unwitting clients presented with a set of facts that were not corrected by Bahal or Fox when they knew or should have known about Amabile's actions.

205.     Plaintiffs were harmed in that they lost thousands of dollars, and either had an inadequate visa application submitted on their behalf, or never had a visa application submitted at all.

206.     Plaintiffs request damages as required for fraud under the new jersey statute.

**WHEREFORE,** the Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.
   a. Awarding compensatory damages;
   b. Awarding punitive damages;
   c. Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;
   d. Awarding prejudgment interest to the extent permitted by law; and
   e. Awarding such other and further relief as to this Court may seem proper.

**COUNT FOUR**
**Violation Of The NJRICO**
**(Plaintiffs Against All Defendants)**

207.     Plaintiffs repeat the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

208.     As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.  Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

209.     This claim alleging violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), which Plaintiffs bring on behalf of themselves, are asserted against Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10.

210.     Chapter 41 of New Jersey's Criminal Code, Title 2C, is titled "Racketeering," commonly referred to as "NJRICO."

211.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 are each a "person," as that term is defined by N.J.S.A. § 2C:41-1(b) to include "any individual or entity or enterprise as defined herein holding or capable of holding a legal or beneficial interest in property."

212.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, acting together and individually, were engaged

in "trade or commerce" as that term is defined by <u>N.J.S.A.</u> § 2C:41-1(h) to include "all economic activity involving or relating to any commodity or ***service***."

213.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, acting together and collectively, comprised and continue to comprise an "enterprise," as that term is defined by <u>N.J.S.A.</u> § 2C:41-1(c) to include "any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities."

214.     In the alternative, Defendant Fox, which is a business entity, constituted an "enterprise" as that term is defined by <u>N.J.S.A.</u> § 2C:41-1(c) (quoted above).

215.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 violated <u>N.J.S.A.</u> § 2C:41-2(c) by engaging in the following prohibited activities: Defendants Amabile, and Bahal, being persons who were employed by or associated with Defendant Fox, an enterprise, conducted or participated, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity.

216.     In the alternative, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, all being persons who were employed by or associated with Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, which constituted an association-in-fact enterprise, conducted, or participated, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity.

217.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 engaged in a pattern of racketeering activity, as defined by <u>N.J.S.A.</u> § 2C:41-1(d), by:

218.     Engaging in at least two incidents of racketeering conduct, both of which have occurred on an ongoing basis during the past ten years and will continue to occur and

219.     Embracing in criminal conduct with the same or similar purposes, results, participants, victims, or methods of commission or is otherwise interrelated by distinguishing characteristics and is not isolated incidents.

220.     Precisely, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 committed the following racketeering activities, as enumerated in N.J.S.A. § 2C:41-1(a)(1):

a.   Theft and all crimes defined in Chapter 20 of Title 2C of the New Jersey Statutes, specifically Theft by Deception, in violation of N.J.S.A. § 2C:20-4, and Theft by Failure to Make a Required Disposition of Property Received, in violation of N.J.S.A. § 2C:20-9, by:

    i.   Stealing over $20,000.00 from Plaintiff Wealth for legal services that were never rendered.

    ii.   Stealing over $20,000.00 from Plaintiff Markevich for legal services that were never rendered.

    iii.   Requiring Plaintiff Wealth to open credit card accounts in the name of Amabile for the sole benefit of Amabile, Bahal, and Fox.  Running up the charges on those credit cards and requiring Plaintiffs to incur the cost without compensation or reimbursement for the sole benefit of Amabile, Bahal, and Fox.

    iv.   Purposely obtaining money by way of credit by deception or threat; specifically: (A) by deception, by purposely misinforming Plaintiffs that they were required to establish "good credit" to secure the renewal of their  Visa, and/or (B) by threat, by retaliating against Plaintiffs when they complained about the credit card fraud charges, as well as the legal malpractice committed by Bahal, Amabile, and Fox that resulted in an "anonymous" tip to ICE that Plaintiff was out of status.

    v.   Purposely obtaining money by way of CashApp, Venmo and wire transfers by deception or threat; specifically: (A) by deception, by purposely misinforming Plaintiffs that they were required to "Pay Now" to secure the renewal of their  Visa because Amabile and Bahal has a contact that would get their visa fast, and/or (B) by threat, by retaliating against Plaintiffs when they complained about the fraud, as well as the legal malpractice committed by Bahal, Amabile, and Fox that resulted in Plaintiffs being out of status.  In

the case of Plaintiff Markevich, they encouraged him to enter into a fake marriage in order to secure a green card or visa.

b. Forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes, specifically Money Laundering, in violation of <u>N.J.S.A.</u> § 2C:21-25(a), (b), and (c), by:

 i. Transporting or possessing property known or which a reasonable person would believe to be derived from criminal activity, specifically forged credit card applications which were opened in Mr. Wealth's name by Amabile while Mr. Wealth was in prison; fake filing deadlines and emergencies expressed to Mr. Markevich which required him to make instant deposits and wire transfers of thousands of dollars at a time into the accounts of Amabile, and/or

 ii. Engaging in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity, explicitly using stolen credit cards acquired in the name of Mr. Wealth by Amabile; or using stolen funds that were wired to Amabile, but were earmarked for Mr. Markevichs visa applications and to get his father to the United States:

  1. With the intent to facilitate or promote criminal activity or

  2. Knowing that the transaction is designed in whole or in part: (a) to conceal or disguise the nature, location, source, ownership, or control of the property derived from criminal activity; or (b) to avoid a transaction reporting requirement under the laws of this State or any other state or of the United States; and/or

  3. Directing, organizing, financing, planning, managing, supervising, or controlling the transportation of or transactions in the property known or which a reasonable person would believe to be derived from criminal activity, explicitly applying for, securing, and using stolen credit cards in the name of Mr. Wealth, and misusing wired funds sent by Mr. Markevich and procured by Amabile;

  4. All of which laundered funds were re-invested into Fox, Amabile, and Bahal, concealed as legitimate revenue or profits, and/or extracted by Defendants for personal use.

221.    This is emblematic of Fox and Bahal's modus operandi.  As stated above Bahal would run up the bill on her clients so as to not refund unused retainers.

222.    Additionally, Defendants committed the following racketeering activities, as enumerated under N.J.S.A. § 2C:41-1(a)(2), conduct defined as "racketeering activity" under Title 18, U.S.C. § 1961(1)(B), including:

   a.   Mail Fraud, in violation of 18 U.S.C. § 1341, by having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to execute such scheme or artifice or attempt so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.  As alleged in this Complaint, Defendants and/or persons acting on their behalf used the mail to: (1) purposely submit records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth to which they were not entitled and/or to purposely not use those funds for their intended purpose,  and/or (2) causing Plaintiffs and Defendants to be mailed credit card bills and other credit-related records that misstated the intended beneficiary, debtor, and card user.

   b.   Wire fraud, in violation of 18 U.S.C. § 1343, by having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.  As alleged in this Complaint, Defendants and/or persons acting on their behalf used interstate wire facilities, including the internet, to (1) purposely submit records containing false statements

and certifications to financial institutions and/or credit card companies to fraudulently obtain funds from and in the name of Mr. Markevich to which they were not entitled and/or to purposely not use those funds for their intended purpose, and/or (2) causing Plaintiffs and Defendants to be mailed checks, cash, and other records that misstated the intended beneficiary, debtor, and user.

c. Bank fraud, in violation of 18 U.S.C. § 1344, by knowingly executing or attempting to execute a scheme to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.  As alleged in this Complaint, Defendants and/or persons acting on their behalf committed bank fraud by (1) purposely submitting records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth, and by frequently procuring wire transfers across state lines from Mr. Markevich whom lived in California, to which they were not entitled and/or to purposely not use those funds for their intended purpose,   and/or (2) causing Plaintiffs and Defendants to be mailed cash, credit card bills and other records that misstated the intended beneficiary, debtor, and user.

223.    Plaintiffs have been damaged in their business or property because Defendants violated N.J.S.A. § 2C:41-2, and, therefore, they are entitled to recover the damages and other remedies enumerated therein.

224.    Defendants' acts or omissions were actuated by actual malice and/or a willful and wanton disregard for the consequences suffered by the Plaintiffs and/or with knowledge of a high degree of probability of harm to the Plaintiffs and reckless indifference to the consequences of their acts or omissions.

225.    Compensatory damages alone will be insufficient to deter such conduct in the future.

226.    Plaintiffs and is therefore entitled to punitive and exemplary damages.

**WHEREFORE,** Plaintiffs request that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

a. Granting Plaintiffs statutory, common law, and punitive damages, and applicable pre-and post-judgment interest, in full recompense for their damages;[3]

b. Entering judgment according to the declaratory relief sought;

c. Granting Plaintiffs such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

d. Granting Plaintiffs an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, considering the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

## COUNT FIVE
## Breach of Fiduciary Duty
## Defendants

227.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

228.    As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.  Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

229.    At all times relevant, Defendants[4] were attorneys acting within the scope of their actual and apparent agency and were employed by Defendant Fox.  Individual Defendants provided legal services to Plaintiffs.

230.    Individual Defendants had an attorney-client relationship with Plaintiffs.

231.    According to the attorney-client relationship, the Individual Defendants had a fiduciary duty to act in the Plaintiff's best interests.

232.    The Individual Defendants intentionally failed to act in the best interests of Plaintiff in the matters for which they were retained.

233.    Alternatively, the Individual Defendants negligently failed to act in the best interests of the Plaintiffs in the matters for which they were retained.

234.    The Plaintiffs were injured due to the Individual Defendants' failure to act in their best interests.

---

[3] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

[4] Posed as an attorney to Plaintiff Wealth and to Plaintiff Wealth's Friends and Family.

235.      The Individual Defendants' breaches of fiduciary duty entitle Plaintiffs to disgorgement of attorneys' fees already paid to the individual Defendants and Defendant Fox.

236.      Defendants failed to:

   a.   Timely and correctly file Plaintiff Wealth's visa application,

   b.   Timely request reconsideration of Mr. Wealth's visa renewal decision,

   c.   Apply for or to inform Plaintiffs of a more feasible visa option,

   d.   To submit Visa application for Plaintiff Markevich, and

   e.   Recklessly exposed Plaintiff Markevich to criminal liability for getting in a fake marriage.

**WHEREFORE,** Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

   a.   Awarding compensatory damages;
   b.   Awarding punitive damages;
   c.   Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;
   d.   Awarding prejudgment interest to the extent permitted by law; and
   e.   Awarding such other and further relief as to this Court may seem proper.

## COUNT SIX
### Legal Malpractice
### (Legal Malpractice Defendant Fox, Bahal
### Under New Jersey Common Knowledge Doctrine)

237.      Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

238.      As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.   Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

239.      As the Supreme Court has explained, the "common knowledge" doctrine presents an exception to this requirement:

240.      Under the common knowledge doctrine, however, a malpractice case against a licensed professional may present triable issues without resorting to the testimony of an expert.   In such a case, the jury itself is allowed to supply the applicable standard of care and thus obviate the necessity for expert testimony relative thereto.   The trial of such a case

is essentially no different from an ordinary negligence case.  Nevertheless, it is an unusual professional malpractice case in which the common knowledge doctrine can be invoked.

241.     The basic postulate for the application of the common knowledge doctrine in a malpractice action is that the issue of negligence is not related to a technical matter peculiarly within the knowledge of the licensed practitioner.  The most appropriate application of the common knowledge doctrine involves situations where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.

242.     [*Rosenberg v. Cahill*, 99 N.J. 318, 325-26, 492 A.2d 371 (1985) (internal citations and quotation marks omitted).]

243.     Expert testimony is therefore not required when the common knowledge of the jury "is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts." *Estate of Chin v. St. Barnabas Med.  Ctr.*, 160 N.J. 454, 469, 734 A.2d 778 (1999).  "The effect of applying this doctrine is to allow the jury to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Sanzari v. Rosenfeld*, 34 N.J. 128, 141, 167 A.2d 625 (1961). "In other words, application of the doctrine transforms the case into an ordinary negligence case where . . . the jury, from its fund of common knowledge, assays the feasibility of possible precautions which the defendant might have taken to avoid injury to the plaintiff." *Id.* at 141-42.  Application of the doctrine is limited to "'where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.'" *Kelly v. Berlin*, 300 N.J. Super. 256, 266, 692 A.2d 552 (App. Div. 1997) (quoting *Rosenberg, supra*, 99 N.J. at 325).  *Atkin v. Bridgeway, Inc*., No. A-4272-12T1, 2014 N.J. Super.  Unpub. LEXIS 2125, at *10-11 (Super. Ct. App. Div. August 29, 2014).

244.     New Jersey courts have found that no expert testimony and, therefore, no affidavit of merit was required when an attorney failed to cite any legal authority in support of his client's claim, failed to submit a brief, and misrepresented the State of the case, *Sommers v. McKinney,* 287 N.J. Super. 1, 670 A.2d 99, 104 (N.J. Super. Ct. App. Div. 1996), or when an attorney failed to file an action within the controlling statute of limitations, *see Brizak v. Needle,* 239 N.J. Super. 415, 571 A.2d 975, 983-84 (N.J. Super.

Ct. App. Div.), *certif. denied,* 584 A.2d 230 (1990). *FTC v. Hope Now Modifications, LLC*, No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 75922, at *17-18 (D.N.J. July 27, 2010).

245.     As detailed above, Bahal and Fox's malpractice is evident and apparent. Bahal missed a filing deadline for Plaintiff Wealth and allowed Amabile to use her Fox Zoom account and Fox email account to collect money from Mr. Markevich, never informing him that Amabile was not an actual attorney and never ensuring that his Visa applications were processed.

246.     Bahal and Fox also failed to file Plaintiff Wealth's visa application accurately and timely. They lied on Plaintiff Wealth's visa application when they knew that Plaintiff Wealth was not being financially sponsored for the Visa.

247.     As a result, the plaintiff's immigration status was compromised, and ICE later detained Plaintiff Wealth for being out of status, and Mr. Markevich's immigration status is still unsettled.

248.     Mr. Wealth was forced to stay in prison against his will for 45 days, where he was physically assaulted, threatened, and psychologically traumatized.

249.     While in prison, Mr. Wealth was financially harmed by Bahal and Fox's authorized agent Amabile, who, upon information and belief, was working in concert with Bahal.

250.     While engaged with Amabile, Mr. Markevich sent her thousands of dollars to aid him and his father with visa applications that were never submitted. Upon information and belief, Bahal and Amabile pocketed Mr. Markevich's money.

**WHEREFORE,** Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.
   a. Awarding compensatory damages;
   b. Awarding punitive damages;
   c. Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;
   d. Awarding prejudgment interest to the extent permitted by law; and
   e. Awarding such other and further relief as to this Court may seem proper.

## COUNT SEVEN
### Conduct and participate in a
### RICO Enterprise Through a Pattern of Racketeering Activity
### (Violation of Racketeer Influenced and
### Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)-(d))

251.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

252.	As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.  Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

253.	Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10.

254.	Section 1962(a) makes it:

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.
18 U.S.C. § 1962(a).

255.	Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. §1962(c).

256.	Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

257.	Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

258.	Beginning before the class period and continuing to this day, Defendants have unlawfully increased their profits by making fraudulent claims that undocumented immigrants in the United States can increase their chances of securing a Visa by opening credit card accounts (and adding individual defendants as authorized users) to establish good credit – when they do not.

259.	Beginning before the class period and continuing to this day, Defendants have unlawfully increased their profits by making fraudulent claims to undocumented immigrants in the United States that wire transferring thousands of dollars to them would increase their chances of obtaining a visa for them and their loved ones overseas.  By

informing them that the quickest way to secure a visa or green card is to engage in a fake marriage – when it is illegal.

260.     The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other unnamed co-conspirators. That association, in fact, was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out a mail and wire fraud scheme to acquire a credit card, bank card, and retail store charge card accounts, to help undocumented immigrants "establish good credit" in an effort to increase their chances to secure a Visa when their true goal was to deceive the undocumented immigrants into thinking good credit is necessary to secure an American Visa when, in fact, good credit is not a pre-requisite to secure a Visa, and requiring the defendant's undocumented immigrant clients to add defendants as an authorized user on said credit cards, was definitely not a pre-requisite to secure a Visa as well.

261.     The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other unnamed co-conspirators. That association, in fact, was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out mail and wire fraud schemes to acquire money from undocumented immigrants in an effort to increase their chances of securing a Visa when their true goal was to deceive the undocumented immigrants into thinking it was necessary to wire thousands of dollars to defendants in order to secure an American Visa when, in fact, spending thousands of dollars is not a pre-requisite to secure a Visa.

262.     The members of the RICO enterprise all share a common purpose: to enrich themselves at the expense of their immigration clients by maximizing Defendants' revenues through fraudulent means. As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiffs, including by making false representations that claim that undocumented immigrants in the United States, such as Plaintiffs, can increase their chances of securing a Visa by opening credit card accounts and adding individual

defendants as authorized users to establish good credit, which Defendants would not have done but for the existence of the scheme.

263.     The members of the RICO enterprise all share a common purpose: to enrich themselves at the expense of their immigration clients by maximizing Defendants' revenues through fraudulent means. As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiffs, including by making false representations that claim that undocumented immigrants in the United States, such as Plaintiffs, can increase their chances of securing a Visa by paying an American citizen to marry them for the sole purpose of securing a visa or a green card, also plaintiffs can increase their chances of securing a Visa by wiring thousands of dollars to defendants, which Defendants would not have done but for the existence of the scheme.

264.     Upon information and belief, this RICO enterprise has existed for almost 15 years prior to Defendant Fox acquiring Defendant Bahal's solo practitioner immigration law practice and continues to expand and operate pursuant to agreements entered between and amongst Defendants and other unnamed co-conspirators. The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

265.     The enterprise was characterized by the Defendants' pattern of false representations and omissions made by Bahal, Amabile, and other current and former members of the Defendants' immigration law team to Defendant's immigration law consumers/clients. These false representations and omissions were designed to induce Defendants' immigration clients to open credit cards, charge cards, bank cards, retail store charge cards, and bank accounts to establish "good credit" so they can qualify for a United States Visa. As part of this scheme, Defendants required the immigration clients to add them as authorized users to these credit accounts.  Encouraging immigration clients to pay American citizens to marry them so they could acquire a visa through a fake marriage. Force immigration clients to pay defendants thousands of dollars through wire transfers for Visa applications that Defendants never submitted.  This pattern of false representations was disseminated to potential immigration clients of Defendants who reside in New Jersey and around the country by Defendants based in New Jersey under the direction and on

67

behalf of Defendants in New Jersey.  The dissemination typically was done using interstate telephone wires and interstate electronic mail.

266.     The true nature of Defendants' scheme was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiffs and other unwitting immigration clients.

267.     Defendants profited from the enterprise, and the Plaintiffs suffered because the enterprise significantly increased the cost of the Plaintiff's immigration application by over $40,000.00, which was unnecessary.  It even resulted in Plaintiff Wealth spending 45 Days in prison after Defendants failed to submit Plaintiff Wealth's immigration application on time.  Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mail and interstate wires to sell the illusion that Bahal, Fox, and Amabile are competent, ethical, and honest immigration lawyers when nothing could be further from the truth. Defendants provided their immigration clients/consumers with this misrepresentative information, including via email all over interstate wireline communications systems, and obtaining retainer deposits, contingency fees, and hourly revenue via wire transfers, documents, and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to Plaintiffs, as described throughout.

268.     The defendants' scheme was reasonably calculated to deceive the Plaintiffs, international immigrants of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the effectiveness of worthless credit card purchases, charges, and wire transfers that did not, would not, and could not lead to securing a United States Visa.  Plaintiffs would not have opened over four credit cards, wired thousands of dollars, nor would he have given Defendant access to his bank accounts but for the illegal racketeering scheme operated by Defendants.

269.     Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiffs and each participated in the enterprise as follows:

270.     Defendant Fox directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing and marketing scores of immigration services that are marketed to innocent, unassuming

undocumented immigrants who are vulnerable and in seek of a United States Visa. Throughout the relevant period, Defendant Fox oversaw the activities of Defendant Bahal and Defendant Amabile (collectively, "Individual Defendants"). Defendant Fox has an ethical obligation as respondent superior to supervise the actions and activities of the individual defendants. Defendant Fox failed miserably to do so. Individual defendants relied on the mail to distribute advertisements to secure immigration clients whom they would promise United States Visa. These advertisements originated from and were sent from Defendant Fox's offices in the state of New Jersey to consumers in New Jersey and around the country, relying on the mail to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from the immigration clients.

271.    In connection with Defendants acting from New Jersey, these Defendants used the mail and interstate wires to disseminate immigration marketing materials, immigration VISA applicants, and to use those immigration clients' private protected information to apply for American Express, Chase Sapphire, retail store credit card accounts, and to open bank accounts. Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

272.    Defendant Amabile directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as the administrator of the immigration department of Fox to exercise complete dominion and control over Fox's immigration legal department such that Fox's immigration legal department are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form of Fox's immigration legal department, including with response to the United States Department of Immigration Enforcement, Plaintiffs, Plaintiff's family and friends, and through the marketing, advertisement, promotion, and distribution of marketing materials for Fox's immigration legal department. Throughout the relevant period, Amabile oversaw the dissemination of Defendants' fraudulent advertising from their offices in New Jersey to potential consumers in New Jersey and around the country, relying on the mail, email, and phone calls to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from any new immigration client which may come of it.

Amabile, acting from New Jersey, used the mail, email, phone calls, and interstate wires to acquire thousands of dollars, apply for American Express, Chase Sapphire, and retail store credit card accounts, and open bank accounts in the name of Plaintiffs and other Fox immigration clients to further her goals of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

273.     Defendant Bahal directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as the co-chair of the immigration department of Fox to exercise complete dominion and control over Fox's immigration legal department such that Fox's immigration legal department are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form of Fox's immigration legal department, including with response to the United States Department of Immigration Enforcement, Plaintiffs, Plaintiff's family, and friends, and through the marketing, advertisement, promotion, and distribution of marketing materials for Fox's immigration legal department. Throughout the relevant period, Bahal oversaw the dissemination of Defendants' fraudulent advertising from their offices in New Jersey to potential consumers in New Jersey, and around the country, relying on the mail, email, and phone calls to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from any new immigration client which may come of it.  Bahal, acting from New Jersey, used the mail, email, phone calls, and interstate wires to acquire thousands of dollars, apply for American Express, Chase Sapphire, and retail store credit card accounts, and open bank accounts in the name of Plaintiffs and other Fox immigration clients to further her goals of robbing Plaintiff and Fox's immigration clients out of their money. Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

274.     Defendant Fox, directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including as the employer and respondent superior of Amabile and Bahal and all employees of Defendant Fox's immigration law department. Throughout the relevant period, Fox's Management, spearheaded by Tom Paradise, oversaw the marketing and soliciting of potential immigration clients from Fox's

Headquarters in Pennsylvania to consumers in New Jersey, Pennsylvania, New York, and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the credit card fraud and theft visited upon Plaintiffs, as well as, other immigration clients of Fox.  Acting from Pennsylvania, Fox's Management used the mail and interstate wires to apply for American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

275.     During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

276.     Beginning at an exact date unknown to Plaintiffs, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

277.     The acts set below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs for the benefit of Defendants.  Each Racketeering Act involved the same or similar methods of commission and participants.

278.     Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, the Defendants' business would not have succeeded.

279.     The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiffs to retain them as immigration counsel and to open credit cards and bank accounts in the Plaintiff's name and add defendant's as authorized users.

280.     The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiffs to retain them as immigration

counsel and to have them wire thousands of dollars to in an effort to secure Visas when in fact no visa applications were ever submitted.

281.     The defendants' wrongful conduct has caused injury to Plaintiffs, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiffs and the public.

282.     Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

283.     To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud and wire fraud.

284.     Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiff.  The defendants' pattern of mail fraud and wire fraud was the proximate cause of the injuries suffered by Plaintiffs.

## Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise

285.     Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs out of money, in reliance on the mail.  Defendants committed these acts with the intent to defraud Plaintiffs.

286.     Defendants used the mail for the purpose of executing the fraudulent scheme herein.

287.     Specifically, Defendants agreed to each of the acts of mail fraud described throughout this Complaint. In addition, Defendants agreed to rely on the mail to secure wire frauds, cash payments from Plaintiff Markevich, who lives in California, American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff and Fox's immigration clients out of their money.

288.     In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed credit card applications, letters, marketing materials, advertisements, agreements and other matters in depositories and by removing or causing

to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

289. Defendants could not have furthered their fraud without the use of the mail. For example, Defendants sought to acquire wire transfers, cash payments, American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiffs and Fox's immigration clients out of their money. To accomplish these acts, Defendants relied on the mail to deliver the credit cards and bank cards described herein. Defendants also required the mail to distribute misleading advertisements to various states, including New Jersey. For these reasons, the use of mail to conduct fraudulent activity was necessary and inevitable.

## Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise

290. Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs out of money in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiffs.

291. Specifically, Defendants agreed to each of the acts of wire fraud described throughout this Complaint. In addition, Defendants agreed to rely on interstate wires to disseminate funds and to make purchases with the fraudulently acquired wire transfers, money transfers, credit cards, and bank cards via search engines and other online platforms to further their collective goal of robbing Plaintiffs and Defendant Fox's other immigration clients. Defendants knew that these online purchases were illegally made.

292. Additionally, Defendants agreed that Defendants should facilitate these fraudulent purchases over interstate wires in furtherance of the fraud. sRetailers nationwide executed Defendants' orders and purchases via their online platforms.

293. In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

294.     Defendants could not have furthered their fraud without the ability to use telecommunications to share information with clients and retailers nationwide. Because Defendants needed to communicate with clients and retailers around the country, the use of interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

295.     Plaintiffs have been damaged in their business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, he is entitled to recover the damages and other remedies enumerated therein.

296.     Defendants' acts or omissions were actuated by actual malice and/or a willful and wanton disregard for the consequences suffered by the Plaintiffs and/or with knowledge of a high degree of probability of harm to the Plaintiffs and reckless indifference to the consequences of their acts or omissions.

297.     As detailed above, according to Amabile's counter complaint about Bahal and Fox, there are a number of other victims of Fox's Rico enterprise, as Bahal had a pattern and practice of over billing and illegally retaining the retainer agreements for client they owed.

298.     Compensatory damages alone will be insufficient to deter such conduct in the future.

299.     Plaintiffs and is therefore entitled to punitive and exemplary damages.

**WHEREFORE,** Plaintiffs requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

    a. Granting Plaintiffs statutory, common law, and punitive damages, and applicable pre-and post-judgment interest, in full recompense for their damages;[5]

    b. Entering judgment according to the declaratory relief sought;

    c. Granting Plaintiffs such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

    d. Granting Plaintiffs an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

---

[5] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

     a. For past, present, and future general damages in an amount to be determined at trial;

     b. For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

     c. Any appropriate statutory damages;

     d. For costs of suit;

     e. For interest as allowed by law;

     f. For attorney's fees; and

     g. For such other and further relief as the Court may deem proper.

Dated: December 21, 2023

Brooklyn, New York

*Tyrone Blackburn, Esq.*

Tyrone A. Blackburn, Esq.

## JURY DEMAND

According to R. 4:35-1, Plaintiff hereby demands a trial by jury as to all issues.

Dated: December 21, 2023

Brooklyn, New York

*Tyrone Blackburn, Esq.*

Tyrone A. Blackburn, Esq.

## DEMAND FOR INSURANCE

According to R. 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in their action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: December 21, 2023

Brooklyn, New York

*Tyrone Blackburn, Esq.*

Tyrone A. Blackburn, Esq.

## DESIGNATION OF TRIAL COUNSEL

According to R. 4:25-4, TYRONE A. BLACKBURN, ESQ. is hereby designated trial counsel.

Dated: December 21, 2023
Brooklyn, New York

*Tyrone Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## CERTIFICATION

According to R. 4:5-1, the undersigned certifies that the matter in controversy is not the subject of any other action pending in any other court or a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, and all known, necessary parties have been joined in their action.

Dated: December 21, 2023
Brooklyn, New York

*Tyrone Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

### PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents, and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. You are directed from this point forward to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile

76

files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this letter's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: December 21, 2023

Brooklyn, New York

*Tyrone Blackburn, Esq.*
Tyrone A. Blackburn, Esq.