## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

----------------------------------------------X
                              :

ABUCHI RAYMOND WEALTH     :
and STANISLAV MARKEVICH,     :
                              :

      Plaintiffs,            :

                              :

v.                               :

                              :

FOX ROTHSCHILD LLP, ALKA     :
BAHAL, KRISTEN M. AMABILE,     :
JOHN AND JANE DOES 1-10 and     :
ABC CORPS. 1-10,           :
                              :

      Defendants.       :
----------------------------------------------X

Civil Action No. 2:23-cv-03194

**DECLARATION OF
BRIAN J. MOLLOY IN
SUPPORT OF DEFENDANT
FOX ROTHSCHILD LLP'S
MOTION FOR A
PROTECTIVE ORDER**

BRIAN J. MOLLOY, of full age, hereby declares as follows:

1.    I am an attorney-at-law of the State of New Jersey, and I am a shareholder of the law firm of Wilentz, Goldman & Spitzer P.A., attorneys for Defendant Fox Rothschild LLP in the above-captioned matter.

2.    Attached hereto as **Exhibit A** is a true and correct copy of a press release entitled "Big Law, Big Problems: Fox Rothschild LLP Current and Former Employees Face Serious Allegations of Malpractice and Criminal Activity," dated June 12, 2023.

1

3.     Attached hereto as **Exhibit B** is a true and correct copy of an article published by Law360 entitled "Fox Rothschild Slams Ex-Client's 'Frivolous' Malpractice Suit," dated August 21, 2023.

4.     Attached hereto as **Exhibit C** is a true and correct copy of an article published by Law360 entitled "Fox Rothschild Must Face Visa Malpractice Suit, Court Told," dated February 7, 2024.

5.     Attached hereto as **Exhibit D** is a true and correct copy of an article published by the New York Post entitled "Ian Siminoff, Fox Rothschild Lawyer, tried to rape colleague: suit," dated December 18, 2019.

6.     Attached hereto as **Exhibit E** is a true and correct copy of a Certification of Service for a Notice of Motion for Reconsideration filed by the plaintiff in the matter captioned Jones v. Fox Rothschild LLP, et al., Case No. 2:20-cv-06312, filed on October 28, 2020.

7.     Attached hereto as **Exhibit F** is a true and correct copy of an article published by Law360 article entitled "Ex-Fox Rothschild Aide Says NJ Law Boosts Sex Abuse Case," dated October 28, 2020.

8.     Attached hereto as **Exhibit G** is a true and correct copy of an article published by Law360 entitled "Ex-Fox Rothschild Aide Plans To Appeal Loss In Sex Bias Suit," dated November 20, 2020.

#14303611.1

9.     Attached hereto as **Exhibit H** is a true and correct copy of the complaint filed in the matter captioned <u>Hough v. Maraj, et al.,</u> Case No. 1:21-cv-04568, filed on August 13, 2021.

10.    Attached hereto as **Exhibit I** is a true and correct copy of a letter from Tyrone Blackburn, Esq. to the Honorable Eric N. Vitaliano, U.S.D.J., dated January 21, 2022.

11.    Attached hereto as **Exhibit J** is a true and correct copy of an article published by All Hip Hop article entitled "Nicki Minaj Member of Ruthless NY Gang Lawyer Says," dated November 7, 2021.

12.    Attached hereto as **Exhibit K** is a true and correct copy of an article published by Music Times entitled "Nicki Minaj Part of Big New York Gang Involved in Guns, Drugs, and Rap," dated November 8, 2021.

13.    Attached hereto as **Exhibit L** is a true and correct copy of an article published by Showbiz Cheat Sheet entitled "Nicki Minaj Allegedly Hired Gang Members to Threaten Husband's Accuser," dated November 9, 2021.

14.    Attached hereto as **Exhibit M** is a true and correct copy of an article published by All Hip Hop entitled "Nicki Minaj 'Creepy' Lawyer Accused Of Cyberstalking Rival Attorney's Wife," dated January 23, 2022.

15.    Attached hereto as **Exhibit N** is a true and correct copy of an article published by All Hip Hop entitled "Nicki Minaj Fans Made Jennifer Hough's Ex-

Lawyer Cry As Legal War EXPLODES Between Rival Attorneys," dated April 13, 2022.

16.     Attached hereto as **Exhibit O** is a true and correct copy of a letter from Steven Gordon, Esq. to the Honorable James R. Cho, U.S.M.J., dated January 27, 2022.

17.     Attached hereto as **Exhibit P** is a true and correct copy of an e-mail from Steven Gordon, Esq. to Judd Burstein, Esq., dated January 28, 2022.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of the Court's Memorandum and Order in the matter captioned Hough v. Maraj, et al., Case No. 1:21-cv-04568, filed on March 30, 2023.

19.     Attached hereto as **Exhibit R** is a true and correct copy of excerpts of the website of T.A. Blackburn Law, PLLC, available at http://www.tablackburnlaw.com (last accessed February 27, 2024).

Pursuant to 28 U.S.C. § 1746, I hereby certify that the foregoing statements made by me are true and correct.  I am aware that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.


                                        */s/ Brian J. Molloy*
                                        BRIAN J. MOLLOY

Dated: February 29, 2024

4

# Exhibit "A"

Case 2:23-cv-03384-JKS-JBC   Document 59-2   Filed 02/29/24   Page 6 of 136 PageID: 1219



# DataBreaches.net

The Office of Inadequate Security

BREACH LAWS     ABOUT     DONATE     CONTACT     PRIVACY

TRANSPARENCY REPORTS

# Big Law, Big Problems: Fox Rothschild LLP Employees Face Serious Allegations of Malpractice and Criminal Activity

Posted on June 14, 2023 by Dissent

*The following is a law firm-generated press release about a case they have filed. Keeping in mind that a complaint is allegations that have yet to be proven or disproven, DataBreaches has included this item on this site because if true, it would be a case of insider-wrongdoing via misuse of a client's information.*

NEWS PROVIDED BY

T. A. BLACKBURN LAW, PLLC.

June 12, 2023, 19:36 GMT

*Partner and Officer Administrator collude to steal over $20,000 from vulnerable immigration client. The duo then turned client into ICE after being confronted*

NEWARK, NEW JERSEY, UNITED STATES, June 12, 2023/EINPresswire.com/ — New York, June 12, 2023. Prominent law firm Fox Rothschild LLP faces serious allegations of malpractice and criminal activity, according to a lawsuit filed by Mr. Raymond Wealth. The lawsuit accuses the firm's attorney, Alka Bahal, and office administrator, Kristen Amabile, of engaging in unethical and illegal practices, including unauthorized practice of law, theft, and identity theft.

The lawsuit claims that Amabile falsely represented herself as an attorney assigned to Mr. Wealth's immigration visa renewal process. Everyone associated with the process, including Mr. Wealth, had no reason to doubt Amabile's credentials as an attorney, as they never had any contact with Bahal or any other licensed attorney at Fox Rothschild. The lawsuit further alleges that it is Bahal's pattern and practice to delegate her responsibilities as an attorney to unlicensed office staff and fraudulently bill clients for services not rendered.

In addition to the unauthorized practice of law, Amabile is accused of theft and identity theft. While ICE detained Mr. Wealth, Amabile allegedly broke into his apartment, stealing over $11,000 in cash and three laptop computers. She also used his social security number to open credit accounts, made unauthorized charges and withdrawals from his bank accounts, and hacked into his email and investment accounts. The total amount stolen by Amabile is estimated to exceed $20,000.

Bahal, the Co-Chair of Fox Rothschild's Corporate Immigration Practice, is accused of aiding and abetting Amabile's criminal activities. She allegedly failed to fulfill her responsibilities as counsel to Mr. Wealth, putting his visa application, freedom, well-being, and finances at risk.

The lawsuit further implicates Thomas Paradise, a representative of Fox Rothschild LLP, for allegedly ignoring Mr. Wealth's concerns regarding the malpractice and criminal activities of Bahal and Amabile. Paradise is accused of consciously deciding not to inform or warn other clients of Fox Rothschild about the theft and criminal enterprise carried out by Bahal and Amabile.

Mr. Wealth, represented by attorney Tyrone Blackburn, Esq. of T. A. Blackburn Law, PLLC, has filed the lawsuit against Fox Rothschild LLP. Mr. Blackburn stated about the situation, "Litigation was the only option because Fox Rothschild declined the opportunity to address and correct their error." This decision to file reflects the seriousness of the situation and the firm's commitment to holding responsible parties accountable for their actions.

The lawsuit seeks compensation for the damages suffered due to Fox Rothschild's negligence and malpractice. "Given the gross lack of oversight, we wonder who else has been harmed," added Mr. Blackburn. The lawsuit also highlights the need for the legal profession to ensure attorneys' ethical conduct and protect clients from the unlicensed practice of law and fraudulent activities.

Fox Rothschild LLP has refused to take responsibility for the harm visited upon Mr. Wealth. They have consistently overbilled Mr. Weatlh, although their employees have stolen over $20,000.00 from Mr. Wealth. The case is expected to proceed to trial, where the allegations will be further examined and evaluated.

[...]
CASE FILED:
Federal District Court, District of New Jersey
Case Name: WEALTH v. FOX ROTHSCHILD LLP et al.
Case Number: 2:23-cv-03194
Seen at EIN News.

## Related Posts:

- Pa. Firm Claims Ex-Partner Used Portable Drives to…
- Attorney Claims Firm Swiped Asbestos Files (updated)
- Case May Impact Role of Lawyers in Data Breaches and IR
- Covington Client Intervenes in SEC Battle, Objecting…
- Unhappy Third Birthday to My Experian Complaint?

| ← The "reincarnation" of BreachForums: A cyberdrama in three acts | Understanding Ransomware Threat Actors: LockBit → |
|---|---|

SPONSORED OR PAID POSTS

SPONSORED OR PAID POSTS

This site doesn't accept sponsored posts and doesn't respond to requests about them.

Search ...

## HAVE A NEWS TIP?

Email:

Breaches[at]Protonmail.ch
Tips[at]DataBreaches.net

Signal: +1 516-776-7756

Telegram: @DissentDoe

## BROWSE BY NEWS SECTION

Select Category

## LATEST POSTS

Yes, Change Healthcare breach was us — BlackCat

loanDepot notifying 17 million customers after ransomware attack in January

School cyber incidents on Long Island: Reported cases rose sharply in 2023

Zalkin law firm settles suit by clients whose sex abuse details were hacked by BlackCat

As expected, LockBit is back already

NIST Publishes Final "Cybersecurity Resource Guide" on Implementing the HIPAA Security Rul

Lockbit takedown accompanied by some arrests and indictments

True or false, Friday law enforcement edition

---

## PLEASE DONATE

If you can, please donate XMR to our Monero wallet because the entities whose breaches we expose are definitely not supporting our work and are generally trying to chill our speech!

  [Donate!](#)

---

## SOCIAL MEDIA

Find me on [Infosec.Exchange](#).

I am also on Telegram [@DissentDoe](#).

---

### RSS

Grab the RSS Feed

### COPYRIGHT

© 2009 – 2024 DataBreaches.net and DataBreaches LLC. All rights reserved.

### HIGH PRAISE, INDEED!

"You translate "Nerd" into understandable "English" — Victor Gevers of GDI Foundation, talking about DataBreaches.net

©2024 DataBreaches.net

Exhibit "B"



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Fox Rothschild Slams Ex-Client's 'Frivolous' Malpractice Suit

By **Rose Krebs**

Law360 (August 21, 2023, 7:27 PM EDT) -- Fox Rothschild LLP is urging a New Jersey federal judge to throw out a legal malpractice suit alleging the firm provided shoddy advice in an immigration case that led to the client being detained, arguing the action is "frivolous" and littered with "impertinent" and "scandalous" allegations.

In a motion to dismiss and accompanying brief filed Monday, the Philadelphia-headquartered firm asked U.S. District Judge Kevin McNulty to either toss the suit filed by Abuchi Raymond Wealth or at least "strike all impertinent, scandalous and immaterial allegations from the complaint."

In its filing, Fox Rothschild took aim **at the suit** launched in June by former client Wealth, a New Jersey resident and Nigerian-born immigrant who also has citizenship in Mexico. Wealth accused the law firm and Alka Bahal, a partner who co-chairs its immigration practice group, of negligently allowing Bahal's former office administrator Kristen Amabile to do most of the work on Wealth's visa renewal case and pretend that she was a licensed lawyer. Amabile is also named as a defendant in the suit.

Less than two weeks after Wealth complained to the firm about Bahal's alleged misconduct in allowing Amabile to do "upwards of 90% of the work" on his case despite not being permitted to practice law and the $22,000 bill he had been sent despite an earlier agreement he would pay a $13,000 flat rate, Wealth was arrested by U.S. Immigration and Customs Enforcement because his visa was "out of status," according to the suit. That is the same problem he had sought to avoid by hiring the law firm to begin with, the complaint said.

Amabile had told Wealth that his visa renewal was filed on time when that was not the case, the suit contends. Wealth says he was detained by ICE for more than 45 days and released in June 2022, according to the complaint.

The suit says that Amabile no longer works at Fox Rothschild and that she and Bahal are currently engaged in litigation in New Jersey state court after Bahal filed a complaint last year accusing Amabile of using Bahal's personal credit card to rack up $44,000 in personal expenses without permission. The New Jersey state court suit is included as an exhibit with Wealth's suit.

Wealth previously told Law360 that he only learned Amabile was not an attorney during his first appearance before a judge after his arrest and that the whole ordeal was deeply upsetting and confusing.

But Fox Rothschild took aim at Wealth's version of events in Monday's filing and urged the court to "dismiss the frivolous complaint," or, in the alternative, strike "allegations having no relation whatsoever to the alleged claims."

The firm contends its representation of Wealth in connection with his attempt to extend his visa was "proper" and that Bahal, with assistance from Amabile, prepared and filed a petition with the U.S. Citizenship and Immigration Services and "provided other related advice."

His petition was denied "not because of any alleged untimely filing" but because Wealth didn't meet the criteria for approval, Fox Rothschild said. The firm contends the petition was filed within an allowed "grace period."

After being directed to leave the country "or face repercussions for failing to do so," Wealth remained in the U.S. and was detained by ICE nearly a year after the USCIS had denied his petition, Fox Rothschild's filing said. His detention was based, in part, on his disregard of "USCIS' express warning to leave the country," Fox Rothschild asserts.

The firm also contends that Wealth was notified within days of Amabile's termination. Fox Rothschild said it can't be held responsible for claims against her that relate to her post-employment conduct and argued that Wealth's allegations that she had misrepresented herself as being a lawyer are "vague" and unsubstantiated.

The firm also argues that "many impertinent and scandalous allegations" were included in Wealth's complaint "solely to harass and embarrass" defendants, such as including photos of Bahal, Amabile and Amabile's residence and the addresses and the purported value of both Bahal's and Amabile's homes.

In an email to Law360 on Monday, Wealth's attorney Tyrone A. Blackburn called Fox Rothschild's motion to dismiss "baseless" and "a weak attempt" by the firm "to escape responsibility for the actions of Kristen Amabile and Alka Bahal."

When contacted by phone, Blackburn told Law360 that Wealth is in the U.S. "legally after receiving assistance from competent counsel."

Amabile and counsel for the other parties didn't immediately respond to requests for comment.

Wealth is represented by Tyrone A. Blackburn of T.A. Blackburn Law PLLC.

Fox Rothschild LLP is represented by Brian J. Molloy, Daniel J. Kluska and Immanuel O. Adeola of Wilentz Goldman & Spitzer PA.

Bahal is represented by Ronald L. Israel and Brigitte M. Gladis of Chiesa Shahinian & Giantomasi PC.

Counsel information for Amabile wasn't immediately available.

The case is Wealth v. Fox Rothschild LLP et al., case number 2:23-cv-03194, in the U.S. District Court for the District of New Jersey.

--Additional reporting by Ryan Harroff. Editing by Jill Coffey.

---

All Content © 2003-2024, Portfolio Media, Inc.

**Exhibit "C"**



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Fox Rothschild Must Face Visa Malpractice Suit, Court Told

By **Ryan Boysen**

Law360 (February 7, 2024, 4:45 PM EST) -- Two men who claim they were scammed after hiring Fox Rothschild LLP for immigration work have asked a New Jersey federal court to reject the firm's dismissal bid, saying their racketeering suit should proceed because the firm's "culture of corruption" allegedly led to such brazen fraud that it may even merit criminal prosecution.

In a 28-page **brief** filed Tuesday opposing three separate motions to dismiss, plaintiffs Abuchi Raymond Wealth and Stanislav Markevich rejected arguments that their racketeering, malpractice and other claims aren't backed by evidence and rest on shaky legal ground. They urged U.S. District Judge Jamel K. Semper to let their suit proceed to the discovery phase.

Fox Rothschild "owed a duty to plaintiffs Wealth and Markevich to protect them from the scheme defendant [Alka Bahal] implemented," the brief said. "This gave defendant [Kristen Amabile] the power to pretend to be an attorney and defraud plaintiffs out of thousands of dollars."

Bahal was formerly the co-head of Fox Rothschild's immigration department, while Amabile was her office administrator. Both women have left the firm.

Wealth and Markevich claim Amabile stole tens of thousands of dollars from them while Bahal turned a blind eye. Amabile left Fox Rothschild in 2022 amid claims that she had stolen more than $80,000 from the firm as well, and the firm paid Amabile $150,000 to settle a subsequent lawsuit, according to Tuesday's motion. Wealth and Markevich claim this is because Amabile threatened to expose even more widespread wrongdoing by the firm.

Citing that state court litigation, Tyrone A. Blackburn of T.A. Blackburn Law PLLC told Law360 Pulse on Tuesday that he plans to refer Fox Rothschild for criminal prosecution "next week" over some of the allegations in the suit. Blackburn represents the two plaintiffs.

"Fox Rothschild is a corrupt organization and it is evident that they steal from their clients," Blackburn said.

Counsel for Fox Rothschild did not respond Wednesday to requests for comment.

Wealth and Markevich are suing Fox Rothschild, Bahal and Amabile on racketeering charges, as well as charges of legal malpractice, breach of fiduciary duty and fraud, among other things.

Wealth, a New Jersey resident and Nigerian-born immigrant who also has citizenship in Mexico, **sued** Fox Rothschild in June. He retained Bahal and Fox Rothschild in 2020 to handle his visa renewal case, and claims Bahal then negligently allowed Amabile to do most of the legal work on his case. Amabile repeatedly told Wealth's friends and family that she herself was his licensed attorney, according to the complaint.

Wealth's visa renewal was denied. Wealth was later arrested by U.S. Immigration and Customs Enforcement, and he claims he was billed for legal services that were never actually provided. Wealth also claims Amabile assumed Wealth's identity, stole over $20,000 from him, took out credit cards in his name, withdrew money from his accounts and entered his apartment unlawfully while he was incarcerated to steal cash and laptops.

Amabile left Fox Rothschild in 2022, apparently amid accusations that she stole tens of thousands of dollars from the firm, according to court documents. Both Bahal and Fox Rothschild were later involved in lawsuits with Amabile. The suit between Fox Rothschild and Amabile appears to have been settled, while the suit between Bahal and Amabile appears to be ongoing, according to court documents.

Markevich was added to the suit in an amended complaint filed in December. Described as a "musician, artist and performer," Markevich claims he became friends with Amabile at a party in 2016 at which he was performing. After a few earlier discussions about his immigration status, things got serious in 2020 after an attempt to obtain a visa failed, and Markevich asked Amabile how he should proceed, according to the complaint.

Markevich claims Bahal and Amabile then told him the only way to settle his immigration woes was to marry a U.S. citizen. Markevich, "uncomfortable" with "insistence on the fake marriage," declined, but the next year Amabile told him she had a "special contact" and asked him to send her several thousand dollars over Zelle, which Markevich did. Markevich said Amabile then went dark, and nothing was ever filed. Markevich claims he ultimately lost more than $10,000.

Nonetheless, Wealth and Markevich said in Tuesday's brief that Amabile "is as much a victim of defendant Bahal and [Fox Rothschild] as the plaintiffs are, claiming the firm's leadership "peer pressured, brainwashed and bullied" Amabile into "engaging in practices that she organically would not have dreamed of."

Amabile's attorney, Mary Toscano of Greenbaum Rowe Smith & Davis LLP, told Law360 Pulse on Wednesday she looks forward to seeing the case dismissed "either by a judge or a jury."

"As plaintiffs concede in the opposition, Ms. Amabile is the 'victim' here," Toscano said.

Fox Rothschild, Bahal and Amabile have all filed motions to dismiss the charges against them.

Among other things, Fox Rothschild claims Wealth and Markevich's racketeering claims must fail, because the men haven't "set forth any specifics" of the alleged "pattern of racketeering" that they claim is widespread within the firm's immigration department. In particular, the firm said the complaint's claims all hinge on actions allegedly taken by Amabile, with little connection to the firm itself.

Fox Rothschild also said it never breached a duty to Wealth because his visa application was submitted properly, and it's therefore not the firm's fault that it was rejected. The firm also claims it never had an attorney-client relationship with Markevich, and therefore can't be held liable for anything Amabile allegedly did to him. Previously the firm **has called** Wealth's claims "frivolous."

In response, Wealth said in Monday's brief that Bahal and Amabile guided him toward applying for citizenship on a so-called Einstein visa, for those with "extraordinary ability" in certain fields, such as star athletes and famous musicians. Wealth said it was entirely foreseeable when his own application was denied, describing himself as a little league soccer coach.

"Defendants forced plaintiff Wealth to apply for a visa, for which they knew he would not qualify, for the sole purpose of overbilling him for the application process," the brief said.

Markevich, meanwhile, appeared to concede Fox Rothschild's argument that there was no signed retainer agreement between him and the firm, but said nevertheless "an attorney-client privilege does not need to rest on an express contract."

"An attorney-client relationship may be implied when 'a person seeks advice from an attorney … and the attorney expressly or impliedly agrees to give or actually gives the desired advice," Markevich said, adding that Bahal "went as far as to author a multipage document with instructions" on the alleged "illegal marriage."

Bahal echoes Fox Rothschild's claims that Wealth's visa was handled properly and was denied for reasons outside her control, and claims she never had enough involvement with Markevich to owe him any duty whatsoever.

Amabile claims Wealth and Markevich's suit fails due to lack of jurisdiction, because the amount in controversy is less than $75,000 and all the parties reside in New Jersey, which would usually make it impossible for one person to sue another in federal court, as opposed to state court.

She also said the complaint "fails to establish a pattern of racketeering," and therefore those claims should be tossed.

Wealth and Markevich are represented by Tyrone A. Blackburn of T.A. Blackburn Law PLLC.

Fox Rothschild LLP is represented by Brian J. Molloy, Daniel J. Kluska and Immanuel O. Adeola of Wilentz Goldman & Spitzer PA.

Bahal is represented by Ronald L. Israel and Brigitte M. Gladis of Chiesa Shahinian & Giantomasi PC.

Amabile is represented by Mary Elissa Toscano of Greenbaum Rowe Smith & Davis LLP.

The case is Wealth v. Fox Rothschild LLP et al., case number 2:23-cv-03194, in the U.S. District Court for the District of New Jersey.

--Editing by Robert Rudinger.

---

All Content © 2003-2024, Portfolio Media, Inc.

**Exhibit "D"**

  

**METRO**

# Ian Siminoff, Fox Rothschild lawyer, tried to rape colleague: suit

By Emily Saul

Published Dec. 18, 2019 | Updated Dec. 18, 2019, 3:33 p.m. ET

SHARE THIS
ARTICLE:



The Fox Rothschild LLP office in Morristown, New Jersey
Google Maps

**EXPLORE MORE**

Andy Cohen slams Leah
McSweeney's cocaine, alcohol-
abuse claims as 'RHONY' alum

A top New Jersey lawyer who's worked on sexual
harassment cases is accused of trying to rape a female
colleague — and inundating her with unwanted sexts and
pictures of his penis while his white-shoe law firm allegedly
looked the other way, according to new court papers.

## EXPLORE MORE

**Andy Cohen slams Leah McSweeney's cocaine, alcohol-abuse claims as 'RHONY' alum labels him 'diabolical'**

**Disney restaurant where NYU doc dined before death now asks about food allergies up front**

**Ian Siminoff, Fox Rothschild lawyer, tried to rape colleague: suit**

A top New Jersey lawyer who's worked on sexual harassment cases is accused of trying to rape a female colleague — and inundating her with unwanted sexts and pictures of his penis while his white-shoe law firm allegedly looked the other way, according to new court papers.

Ian Siminoff, a former senior associate at Fox Rothschild, terrorized Stephanie Jones in person and over the phone between 2013 and 2017, she claims in her Manhattan employment discrimination federal suit filed Wednesday.

"It almost seemed like I became fair game in terms of verbal abuse, emotional abuse, and sexual harassment," Jones told The Post.

The 58-year-old California resident said she'd worked with Siminoff before the abuse started but that his conduct escalated when she switched from being a paralegal to a legal assistant at the firm's office in Morristown, New Jersey.

Siminoff — whose online bio says he's represented employers in cases involving sexual harassment — began sending raunchy texts to Jones in January 2014, fondled her breasts while she sat at her desk, grabbed her vagina while she stood at the coffee machine, and even attempted to rape her in January 2015, the complaint says.

AD



available at    Shop PediaSure Powder

"Ms. Jones found herself nearly alone on the 4th floor of the NJ office with Siminoff," the court papers read. "During this encounter, Siminoff pushed Ms. Jones into a deserted bathroom and tried to have sexual intercourse with her."

She managed to fight him off, the lawsuit says, yet the alleged abuse continued.

"From March 30, 2017 through July 12, 2017, Siminoff sent over 100 unsolicited sexually harassing text messages to Ms. Jones," reads the lawsuit, noting that some of them were sent while Siminoff was with clients and conducting depositions.

"We should f–k in MB's office," reads one text from March 30, 2017, referencing their boss Michael Barabander.



Stephanie Jones
Courtesy of Stephanie Jones

Siminoff allegedly sent her four more texts that night, telling her she looked "like Cindy Crawford," and writing at 1:15 a.m. "don't mind me, I'm just laying here at 3 am thinking about kissing your breasts."

writing at 1:16 a.m.: Get behind me, I'm just laying here at 3 am thinking about kissing your breasts.

On May 30, 2017, he sent her a photo of his erect penis, with the message "took a new pic this evening."

Jones explained she was in the middle of a messy divorce and couldn't afford to leave her job and still support her family.

Jones blocked Siminoff's number — but he'd simply write her on her company email, complaining about being in the "abyss" and asking to be "abyss free."

Jones said she complained repeatedly to New Jersey office assistant Elli Albert about Siminoff and Barabander, but Albert never conducted an investigation, and in another instance allegedly told her there were "plenty of other places to work."

"I was told by my boss Michael Barabander that bullying wasn't against the law," claimed Jones, who now runs her own online business selling items on eBay. "They're well aware of certain boundaries."

"They know what they can get away with when they're in that area of law," she added.

Jones said she was terminated from her position in 2017 after higher-ups concocted false claims she'd accessed confidential information.

Fox Rothschild has previously been cited for protecting N. Ari Weisbrot, a former partner who was forced to resign in 2017 after multiple female attorneys accused him of sexual harassment and discrimination, according to Jones' complaint.

"The discrimination, harassment and intimidation apparently rampant at Fox Rothschild epitomize precisely the hallmarks of sexual abuse that the #MeToo movement has chronicled and seeks to combat," Jones' attorney Tyrone Blackburn said in a statement. "That Ms. Jones suffered not just the indignity of harassing behavior but also her employer's failure to act when she reported it is as appalling as it is illegal."

The suit, filed against Siminoff and Fox Rothschild, cites negligent infliction of emotional distress, civil assault and battery, violations of the New Jersey law against discrimination and other counts.

Siminoff was terminated Wednesday morning, a rep for Fox Rothschild told The Post.

"We are disturbed by the details alleged in the complaint," said the firm's lawyer Tom Paradise.

The statement also said that Fox Rothschild — which boasts more than 950 attorneys in 27 offices across the country — takes harassment allegations seriously and conducts thorough investigations of any

illegal."

The suit, filed against Siminoff and Fox Rothschild, cites negligent infliction of emotional distress, civil assault and battery, violations of the New Jersey law against discrimination and other counts.

Siminoff was terminated Wednesday morning, a rep for Fox Rothschild told The Post.

"We are disturbed by the details alleged in the complaint," said the firm's lawyer Tom Paradise.

The statement also said that Fox Rothschild — which boasts more than 950 attorneys in 27 offices across the country — takes harassment allegations seriously and conducts thorough investigations of any reported misconduct.

"At no time prior to Ms. Jones' termination from the firm did she report any incidents of harassment by Ian Siminoff as detailed in her complaint," Paradise said.

Siminoff did not respond to a request for comment.

**FILED UNDER**   LAWSUITS,  LAWYERS,  RAPE,  SEXUAL ABUSE,  SEXUAL HARASSMENT,  12/18/19

---

**READ NEXT**   Cops looking for two knife-wielding Morningside Park mugge...

---

## SPONSORED STORIES

Outbrain |▷







**Custom No Parking Signs**

Create Custom No Parking Signs for a great price! Using our online design tool you can crea...

**Game shows what the world without US military interventions would look like**

**Exhibit "E"**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

STEPHANIE JONES,

               Plaintiff,

    -against

FOX ROTHSCHILD LLP, and
IAN W. SIMINOFF.

                 Defendants.

Civil Action No.
2:20-cv-06312-SDW-LDW

**CERTIFICATION OF
SERVICE**

TYRONE A. BLACKBURN, of full age, hereby certifies as follows:

1. I am an attorney duly admitted to practice before this Court. I am the founder of the law firm T. A. Blackburn Law, PLLC., attorney for Plaintiff Stephanie Jones in the above matter. In that capacity, I have personal knowledge of the facts set forth in this Certification.

2. On October 27, 2020, I caused Plaintiff Stephanie Jones's Notice of Motion for Reconsideration and Rescinding of the October 21, 2020 Order dismissing Count's Four, Five, Six and Eight Under Federal Rule of Civil Procedure 59(E) and Local Civil Rule 7.1(I), and the documents listed therein, to be filed via the Court's ECF system, thereby serving Meredith Cavallaro, Esq., of Paduano & Weintraub LLP, attorneys for Defendant Ian W. Siminoff; and Rosemary S. Gousman, Esq., of Fisher & Phillips LLP, attorneys for Defendant Fox Rothschild LLP.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2020.

*Tyrone A. Blackburn*

                          Tyrone A. Blackburn

1

**Exhibit "F"**



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Ex-Fox Rothschild Aide Says NJ Law Boosts Sex Abuse Case

By **Amanda Ottaway**

Law360 (October 28, 2020, 6:36 PM EDT) -- A former legal aide who sued Fox Rothschild LLP alleging she was sexually assaulted by one of its former attorneys asked a New Jersey federal judge Wednesday to reconsider gutting her suit, saying a 2019 law giving sex abuse victims more time to sue saves her claims.

Stephanie Jones urged U.S. District Judge Susan D. Wigenton to reconsider her Oct. 21 decision to **toss the bulk of her case** for being time-barred, claiming that the New Jersey **state statute** gave her a two-year look-back window in which to file suit.

"The plain language of SB477 evidences the Legislature's clear intent for the statute to apply to acts that occurred prior to enactment and revive claims that would otherwise have been time-barred," Jones said.

Jones sued Fox Rothschild and employment attorney Ian Siminoff in December 2019, just over two weeks after the state law's effective date. She says that then-counsel Siminoff, who was **fired after she filed suit**, sexually harassed and assaulted her between 2014 and 2017. Siminoff sent Jones explicit text messages and a photo of his penis, groped her and tried to rape her in a bathroom, according to her lawsuit.

When Judge Wigenton threw out most of Jones' case, including New Jersey Law Against Discrimination, assault and battery, and intentional infliction of emotional distress claims, she ruled that Jones had filed those claims outside the two-year statute of limitations.

But Jones said Wednesday that Judge Wigenton's opinion "did not consider" the look-back law or other relevant provisions.

The law gives new life to expired child sex abuse claims "for individuals until they are age 55 or for those abused as adults up to seven years after they discover that their current problems were caused by the assault," and applies retroactively, Jones said.

While the law, and a similar one in New York state known as the Child Victims Act, notably extends statutes of limitations for former child victims of sexual abuse, the New Jersey law also applies to survivors over 18, the 59-year-old Jones said.

In a filing related to his motion to dismiss, Siminoff "misleadingly" characterized the law as applying only to minors, Jones said, while Fox Rothschild called the new statutes of limitations "irrelevant."

Tyrone A. Blackburn of T.A. Blackburn Law, counsel for Jones, said he hadn't even heard of S.B. 477 when he filed her original suit 17 days after it went into effect, which is why he didn't cite it then.

"I don't understand how this court could ever say that Stephanie's claims would not attach to" the look-back law, he told Law360 on Wednesday, pointing to a lack of precedent on the new law and speculating that perhaps the judge might feel reluctant to be first.

"It literally has given an opportunity for adult and child victims of unwanted sexual contact and sexual abuse a two-year window to bring any and all claims," he said of the law.

In a footnote, Jones noted that she is "entitled to raise" multiple criminal offenses, which Blackburn also mentioned to Law360. He added that his side is laying the groundwork for an appeal, though he said he hoped it wouldn't come to that.

Counsel for Fox and for Siminoff did not immediately respond to requests for comment Wednesday.

Jones is represented by Tyrone Anthony Blackburn of T.A. Blackburn Law PLLC and Robert T. Vance Jr. of the Law Offices of Robert T. Vance Jr.

Fox Rothschild is represented by Rosemary Gousman of Fisher & Phillips LLP.

Siminoff is represented by Meredith Cavallaro of Paduano & Weintraub LLP.

The case is Jones v. Fox Rothschild LLP et al., case number 2:20-cv-6312, in the U.S. District Court for the District of New Jersey.

--Additional reporting by Vin Gurrieri and Jeannie O'Sullivan. Editing by Bruce Goldman.

---

All Content © 2003-2024, Portfolio Media, Inc.

**Exhibit "G"**



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Ex-Fox Rothschild Aide Plans To Appeal Loss In Sex Bias Suit

By **Hailey Konnath**

Law360 (November 20, 2020, 10:31 PM EST) -- A former Fox Rothschild LLP legal aide told a New Jersey federal court Friday that she planned to appeal its October decision dismissing most of her suit alleging that a former lawyer for the firm sexually assaulted her and that Fox Rothschild brushed aside her complaints.

Stephanie Jones is alleging that Ian Siminoff sexually harassed and tried to rape her. Meanwhile, according to her suit, Fox Rothschild maintained a work environment that was rife with gender bias and harassment.

Late last month, U.S. District Judge Susan D. Wigenton granted **motions to dismiss** from the firm and Siminoff, finding that Jones had filed her New Jersey claims **outside the state's two-year statute of limitations.**

Now Jones will take the matter to the Third Circuit, according to the notice of appeal.

Tyrone Blackburn, counsel for Jones, told Law360 on Friday that New Jersey law provides women like his client "the right to hold sexual deviants like Ian Siminoff, and enabling companies like Fox Rothschild, accountable for their actions."

"It is a shame that the district court could not see that, and now we have to waste time and resources on appeal," Blackburn said.

Jones, who was fired in June 2017, hit the firm and Siminoff with a suit **in December 2019** in New York federal court. Specifically, she alleged that Siminoff engaged in a wide range of sexual misconduct that included sending her obscene texts and that he once tried to rape her in a bathroom. She said the firm brushed her off when she complained about him.

Siminoff was fired hours after Jones' suit was filed.

The case was **later transferred to New Jersey** after a federal judge in the Empire State concluded that it was "bereft of meaningful reference to New York."

In last month's order, Judge Wigenton tossed Jones' claims alleging the defendants violated the New Jersey Law Against Discrimination, the New York State Human Rights Law and the New York City Human Rights Law.

With respect to her claims under New York law, the judge said Jones didn't adequately show that the firm's purportedly unlawful conduct impacted her in New York state and New York City.

Jones doesn't reside in New York and worked out of a Fox Rothschild office in New Jersey, and her allegations that Siminoff sent her harassing text messages while he was in New York were "insufficient to create the connection" required by the city and state statutes, Judge Wigenton held.

As part of the order, the judge gave Jones 30 days to file an amended complaint pertaining to three counts in her initial suit — her Title VII claim against the firm and claims under New York city and state law against both defendants.

Jones hasn't filed a new complaint, but lodged a motion for reconsideration earlier this month. A hearing on the motion is set for December.

Counsel for Fox Rothschild and Siminoff did not immediately return requests for comment late Friday.

Jones is represented by Tyrone A. Blackburn of T.A. Blackburn Law PLLC.

Fox Rothschild is represented by Rosemary Gousman of Fisher Phillips.

Siminoff is represented by Meredith Cavallaro of Paduano & Weintraub LLP.

The case is Jones v. Fox Rothschild LLP et al., case number 2:20-cv-6312, in the U.S. District Court for the District of New Jersey.

--Additional reporting by Vin Gurrieri Danielle Nichole Smith, Braden Campbell and Bill Wichert. Editing by Abbie Sarfo.

All Content © 2003-2024, Portfolio Media, Inc.

# Exhibit "H"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JENNIFER HOUGH,<br>                    Plaintiff,<br><br>          -against<br><br><br>ONIKA TANYA MARAJ, AKA<br>("NICKI MINAJ")<br>an individual,<br>KENNETH PETTY, AKA ("ZOO"),<br>an individual<br>                    Defendants. | **COMPLAINT**<br>Civil Action No. 21-4568<br><br>**JURY DEMANDED** |

Plaintiff Jennifer Hough ("Hough" or "Plaintiff") brings claims for witness intimidation, intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, assault, battery, sexual assault, and sexual harassment against Defendant Kenneth Petty ("Petty," "Defendant Petty" or "Defendant"), and Defendant Nicki Minaj ("Defendant Minaj") (collectively "Defendants"), and now alleges as follows:

1. Plaintiff's claims include, but are not limited to, witness intimidation, intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, assault, battery, sexual assault, and sexual harassment by Defendants.

2. Plaintiff seeks to hold Defendants liable under various legal doctrines, including without limitation, vicarious liability, strict liability, respondeat superior, aiding and abetting liability, and other grounds.

<u>JURISDICTION AND VENUE</u>

3. This Court has personal jurisdiction over Defendants under and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

    i.    The transaction of any business within the state;

    ii.    The making of any contract within the state;

   iii.    The commission of a tortious act within this district[1]; and

   iv.    The ownership, use, or possession of any real estate situated within this state.

   v.    The Court has supplemental jurisdiction over Plaintiff's related claims under state and local law under 28 USC § 1367(a).

   vi.    Plaintiff is a resident of Florida, while Defendant's are both residents of California.

   vii.    Plaintiff felt the bulk of Defendant's action in the states of Georgia and New York.

   viii.    Damages far exceed the $75,000.00 threshold for diversity jurisdiction.

## PARTIES

4. Hough is a resident of Florida and was a resident of the State of New York at sixteen years old when raped by Petty. Hough is currently 43 years old.

5. Petty is a rapist, a registered sex offender, a level-two sex offender, and pled guilty to 1st-degree manslaughter following gunfire that resulted in the unnecessary death of a young man. According to Petty's sex offender registry, he was born April 7, 1978, and is currently 43.

6. Defendant Onika Tanya Maraj-Petty ("Nicki Minaj") is a Trinidadian-born rapper, singer, songwriter, and American actress.

7. Defendant Minaj and Petty were married on October 22, 2019, as reported on Defendant Minaj's online social media.

8. Defendant Minaj and Petty are both residents of California.

## FACTS COMMON TO ALL CAUSES OF ACTION

9. Plaintiff knew Petty from their childhood neighborhood of Jamaica, Queens, New York. Plaintiff was never in a relationship with Petty and simply knew him from the neighborhood.

10. Plaintiff has never personally known Defendant Minaj.

11. In violation of his 1994 plea deal, Defendant Petty failed to register as a sex offender in California. Defendant Petty faced criminal charges in California for failure to register as a sex offender and has since taken a plea deal for failing to register as a sex offender.

12. In violation of his 1994 plea deal, Defendant Petty directly and indirectly intimidated Plaintiff not to speak out concerning the rape she experienced at the hands of Defendant Petty.

---

[1] Defendant raped Plaintiff in the borough of Queens, which falls within the EDNY.

2

13. In violation of his 1994 plea deal, Defendant Petty, directly and indirectly, threatened Plaintiff not to speak out concerning the rape she experienced at the hands of Defendant Petty.

14. In violation of his 1994 plea deal, Defendant <u>Petty</u>, directly and indirectly, harassed Plaintiff not to speak out concerning the rape she experienced at the hands of Defendant Petty.

15. In violation of his 1994 plea deal, Defendant Petty, directly and indirectly, reached out to Plaintiff Hough's family members to ensure Plaintiff would not speak out concerning the rape she experienced at the hands of Defendant Petty.

16. Defendant Nicki Minaj directly and indirectly intimidated Plaintiff to recant her legitimate claim that Defendant Petty raped her.

17. Defendant Nicki Minaj, directly and indirectly, harassed Plaintiff to recant her legitimate claim that Defendant Petty raped her.

18. Defendant Nicki Minaj, directly and indirectly, threatened Plaintiff to recant her legitimate claim that Defendant Petty raped her.

19. Defendant Nicki Minaj, directly and indirectly, reached out to Plaintiff Hough's family members to ensure Plaintiff would recant her legitimate claim that Defendant Petty raped her.

20. Defendant Minaj lied to her social media followers and "Queen Radio" listeners about what transpired when her spouse Kenneth Petty raped Plaintiff to prevent her rapist spouse from registering as a sex offender in California.

21. As a direct result of the actions of Defendant Minaj and Defendant Petty, Plaintiff has been traumatized her entire life.

22. Plaintiff has been abused and manipulated her entire life. Plaintiff has been harassed and intimidated her entire life.

23. Plaintiff has never felt safe since being raped by Defendant.

24. Plaintiff has moved to multiple states to avoid intimidation and harassment by Defendant Minaj, Defendant, and their allies, legal teams, and fans.

3

## TIMELINESS UNDER THE CHILD VICTIMS ACT[2]

25. This action is timely because it falls within CPLR 214-g and is brought during the period outlined in that section. The claims brought herein allege intentional and negligent acts and omissions for physical, psychological, and other injury suffered because of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and omissions were committed against Ms. Hough when she was less than eighteen years of age.

---

[2] The opening paragraph of section 208 of the civil practice law and rules is designated subdivision (a), and a new subdivision (b) is added to read as follows:

(b) Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or particular proceeding, with respect to all civil claims or causes of action brought by any person for physical, psychological or other injury or condition suffered by such person as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was less than eighteen years of age, incest as defined in section 255.27, 255.26 or 255.25 of the penal law committed against such person who was less than eighteen years of age, or the use of such person in a sexual performance as defined in section 263.05 of the penal law, or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against such person who was less than eighteen years of age, such action may be commenced, against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of said conduct, on or before the Plaintiff or infant plaintiff reaches the age of fifty-five years. In any such claim or action, in addition to any other defense and an affirmative defense that may be available under the law, rule, or the common law, to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal law shall apply.

The civil practice law and rules are amended by adding section 214-g to read: § 214-g—certain child sexual abuse cases. Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or particular special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, incest as defined in section 255.27, 255.26 or 255.25 of the penal law committed against a child less than eighteen years of age, or the use of a child in a sexual performance as defined in section 263.05 of the penal law, or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against a child less than eighteen years of age, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the Plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section. In any such claim or action: (a) in addition to any other defense and an affirmative defense that may be available under the law, rule, or the common law, to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal law shall apply; and (b) dismissal of a previous action, ordered before the effective date of this section, because such previous action was time-barred, and for the failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action under this section.

4

26. Specifically, the conduct that gives rise to Ms. Hough's claims herein would constitute a violation of, among other things, New York Penal Law, 130.35 (rape in the first degree), 130.52 (forcible touching) (collectively, the "Child Sex Crimes").

## FACTUAL ALLEGATIONS
## KENNETH PETTY VIOLENTLY RAPED PLAINTIFF HOUGH

27. September 16, 1994, is a date now burned into Plaintiff Hough's memory and soul forever. Plaintiff Hough, a sixteen-year-old girl, left her grandmother's house in Jamaica, Queens, and was headed to the Q7 MTA bus stop on 145th street and Rockaway Blvd. to catch the bus for school.

28. Defendant Petty was standing at the bus stop when Plaintiff got there. Defendant Petty was known as a delinquent that opted not to go to school, instead choosing to spend his days scouring the streets of Jamaica Queens.

29. On September 16, 1994, when Plaintiff arrived at the bus stop, she was taken aback at the site of Defendant Petty waiting at the bus stop. Defendant Petty's custom is to stand outside the store across the street from the bus stop, not the bus stop itself.

30. Plaintiff stood at the bus stop but did not address Defendant Petty. Defendant Petty asked Plaintiff Hough, "where are you going" to which Plaintiff responded, "to school, where are you going?" to which Defendant Petty answered, "I am going to school also."

31. Plaintiff did not believe him because she knew Defendant Petty never went to school, so she responded, "yeah, right."

32. After that brief exchange Plaintiff, Hough turned her back to Defendant Petty to look to see if the Q7 bus or a dollar van[3] was coming.

33. As she turned her back, Defendant Petty approached her from behind. Defendant Petty grabbed the back of Plaintiff Hough's jacket firmly and pressed a knife into her back, and told her to "start walking."

34. Plaintiff tried to turn around, but Defendant Petty would not let her go, nor would he take the

---

[3] A dollar van is a mode of transportation that transports to short distances for only a dollar. Plaintiff Hough's school was located twenty city blocks away from the bus stop.

knife from her back.

35. Plaintiff began pleading for her life; "Kenny, where are we going?" "Kenny, please just let me go." Defendant Petty did not let her go. He already made up in his depraved mind that he was going to rape Plaintiff Hough.

36. Defendant Petty walked Plaintiff to a house around the corner from the bus stop, not letting go of his grip of her clothing, and with the knife still pressed firmly to her back.

37. Defendant Petty kicked the door to the house open, pushed Plaintiff inside, and walked her upstairs, still at knifepoint.

38. Plaintiff was crying the whole way up the stairs, pleading for her life, absolutely terrified of what will happen to her.

39. Plaintiff pled to Defendant, "what do you want from me?", "Why am I here?"

40. Defendant Petty replied to her as she pled through her tears, only stating, "you know what I want." Plaintiff ensues in a struggle with Defendant Petty, fighting for her life to get this rapist off her.

41. Defendant Petty held her down with his bodyweight and used his hands to forcibly rip off her pants, prying them off her small sixteen-year-old frame.

42. Plaintiff was fighting back with all the strength she had. Then Defendant Petty grabs the knife again, presses it into her stomach, causing a small cut, and threatens to use it further.

43. Defendant Petty begins to squeeze Plaintiff Hough's sides to force her to let go of her pants.

44. After being threatened with a knife cut on her stomach, Plaintiff had no fight left in her. Seeing no escape in sight, Plaintiff did the only thing she could do to save her life, and that was to give in and hope her rape would be over quickly.

45. Once Defendant Petty got off Plaintiff Hough, he stood in the mirror and beat on his chest, stating, "I am the man, I am the man" repeatedly.

## THE ESCAPE

46. Plaintiff mustered all her strength and courage to get back up once again and asked Defendant Petty, "can I please leave."

47. Plaintiff attempted to walk towards the door and was blocked by Defendant, who would not

6

allow her to leave.

48. All Plaintiff could do at this point was to beg and plead to her rapist for her freedom, "please let me go," "I promise I won't say anything," saying anything to get out of that house.

49. Defendant Petty is still admiring himself after the violent rape in the mirror and attempts to light a cigarette to celebrate his depravity.

50. Quickly thinking, Plaintiff said, "let me light it for you," she lights the match and attempts to throw the lit flame towards a roll of toilet paper on the dresser in front of her in hopes of setting the toilet paper ablaze. The flame goes out before it reaches the toilet paper roll.

51. She then grabbed a contact solution container on the dresser. She threw it with whatever strength she had left at Defendant's head.

52. As Defendant Petty ducked from the contact solution, Plaintiff pushed him with all her might, he fell, and she sprinted down the stairs.

## NOBODY IS GOING TO BELIEVE YOU

53. Defendant Petty quickly gets up and yells down the stairs, as Plaintiff is running, a sentence that followed her for the rest of her life "NOBODY IS GOING TO BELIEVE YOU."

## SIXTEEN-YEAR-OLD PLAINTIFF
## IMMEDIATELY REPORTS THE RAPE

54. Plaintiff did not stop running, and she sprinted at least 20 blocks until she reached John Adams High School.

55. Once there, she informed the school security guards of what happened, and they immediately contacted the police.

56. Once the police arrived, they questioned Plaintiff Hough. They placed her in a van to go to the house to confirm the location of her rape and to arrest Defendant Petty.

57. Defendant Petty was still in the house where he raped Plaintiff Hough, and he was arrested on the spot. Plaintiff confirmed his identity, and then the police took Defendants to the police station and took Plaintiff to the hospital to be checked out.

## **VICTIM BLAMING**

58. Plaintiff Hough's "friend" brought her home from the hospital, and this was the first of many people who victim-blamed her. Hours after being violently raped, Plaintiff Hough's friend said, "I am sorry you got raped, but you should have screamed."

59. The day after their son raped Ms. Hough, Defendant's parents showed up at victim Hough's house, beginning the chain of never-ending lies and harassment Plaintiff has had to face.

60. In a clueless delusional rant, the parents of Defendant stated that Ms. Hough was only accusing Defendant of rape out of anger. Defendants' parents claimed that Defendant did not want to date Ms. Hough anymore.

61. Ms. Hough <u>NEVER</u> dated Kenneth Petty, nor even knew him aside from seeing him in the neighborhood and hearing about him via word of mouth. They were never romantic in any way before Defendant Petty raped her.

62. Defendant Petty's parents even took Plaintiff to the District Attorney. They pretended to be Plaintiff's aunt and uncle to get Plaintiff to drop the charges against Defendant.

## **PLAINTIFF IS VICTIM-BLAMED BY HER FAMILY**

63. Shortly after the visit from Defendant's parents, Plaintiff's household began receiving death threats. Rumors circulated in the neighborhood that something would happen to Plaintiff if she did not drop the charges. Jamaica Queens is a tough neighborhood, and threats of that nature are not taken lightly.

64. At this point, the Plaintiffs' family is beginning to turn on her because they did not want any violence from Defendant Petty and his associates brought to their doorstep.

65. Plaintiff, a sixteen-year-old girl, felt more alone than ever before. She had just been brutally raped; she could not go outside without the fear of being retaliated against for telling the police, and now she is afraid to be home because she was being threatened by outsiders for telling the police and by her family for bringing violence to their home.

66. Plaintiff was constantly beaten and verbally abused both outside her home and in her home because everyone wanted her to drop the charges against Defendant Petty.

8

## PLAINTIFF SUFFERS PHYSICAL VIOLENCE AS A
## RESULT OF DEFENDANT PETTYS PLEA

67. On the day of Defendant Petty's criminal proceeding, Plaintiff's family forced her to go to the hearing even though she did not have to be there. She was not testifying because Defendant Petty had already taken a plea deal. Plaintiff hid in the stairwell the whole time mentally in shambles.

68. The District Attorney happened to take the stairs that day and ran into the Plaintiff sitting in the stairs and asked what she was doing there. Plaintiff told the truth and said, "They are forcing me to drop the charges." The DA responded that she would handle it.

69. When everyone was in Court, the Judge asked if anyone had anything to say, and the Plaintiff stood up and stated that she wanted to drop the charges. The Judge did not find that statement very convincing and stated, "take that up with the District Attorney."

70. Plaintiff was beaten at home that day because she was not convincing enough for the Judge. The family was afraid of what would happen because Defendant Petty was now facing prison time.

## PLAINTIFF IS CHASED OUT OF NYC

71. Due to the mental trauma from the ordeal, the constant beating, and verbal abuse at home, Plaintiff ran away from New York City, her home for 16 years, and moved to Florida with her uncle, whom she thought would protect her.

72. Her uncle ended up raping her shortly after her arrival. Plaintiff left her uncles home in Florida and has been on her own ever since.

## THE ENSUING YEARS

73. Plaintiff was mentally and emotionally destroyed and attempted to find value and kindness in anything she could—Partying, drugs, living in the streets, in and out of shelters. The plaintiffs' self-worth was at zero, her emotions were empty, and she was lost.

74. Plaintiff moved around a lot because she was too afraid to go back to New York for fear of someone recognizing her. Plaintiff had four children, numerous failed relationships, and never knew a true home in her entire life.

9

## KENNETH PETTY AND NICKI MINAJ INTIMIDATE AND HARRASS PLAINTIFF

75. In 2016, Plaintiff moved to Atlanta, Georgia, where she met her husband, whom she wed in 2018. She was finally beginning to learn to be happy and love herself.

76. In 2018, Defendant Minaj posted that she was doing a turkey giveaway in Queens, New York, on Rockaway Blvd. and 147th street. This attracted much attention giving how big of a star Defendant Minaj is, and Queens was her hometown.

77. On November 25, 2018, Defendant Minaj posted a picture of her and Defendant Petty, the man who raped Plaintiff at knifepoint. It appeared that they were dating, and in the photo, they were throwing up gang signs.

78. Toward the end of November, Defendant Minaj posted another picture of her and Defendant Petty and replied to a comment stating, "Kenny was 15, she was 16 and, in a relationship, but go awf Internet." (**Exhibit A**). This was picked up by every publication, tabloid, iheartradio, USA today, bloggers and YouTubers, etc.

79. As a result of Defendant Minaj's post, Plaintiff was sought after for comment. Seeing no choice than to defend the truth, Plaintiff recorded an interview with a YouTube blogger, giving her side of the story. Plaintiff thought that would be the end of it.

## DEFENDANT MINAJ USES HER CELEBRITY
## PLATFORM TO BASH PLAINTIFF

80. In November 2019, Defendant Minaj did a show called "shade no shade" on Queen radio. She repeated the same comment that Defendant Petty was 15 years old but now added that he was "wrongly accused," "he did not have bail money," and said that Plaintiff had "written a letter recanting her statement" but would face 90 days in jail if Plaintiff had done so – which was all false.

81. Defendant Minaj also stated, "but white is right," because Plaintiff is biracial.

82. These statements by Defendant Minaj put social media in a frenzy trying to figure out who Plaintiff was, if she was a white woman, and where she currently lived.

10

## DEFENDANT PETTY IS ARRESTED FOR
## FAILURE TO REGISTER AS A SEX OFFENDER

83. In March 2020, Defendant Petty was arrested for failure to register as a sex offender in the state of California[4].

84. A few days after the arrest the Plaintiff was contacted by an old childhood friend, Black. They caught up, and the topic of Plaintiff's rape came up, to which Plaintiff stated, "she wished it could all just go away forever." Black responded, "I can make that happen."

85. A few days later, Black called her and informed her that Defendant Minaj asked for Plaintiff's phone number and that he had given it to her. Shortly after that, Defendant Minaj called Plaintiff.

86. During the call, Defendant Minaj stated that she heard Plaintiff was willing to "help out" their situation and stated that she would fly Plaintiff and her family to Los Angeles. Plaintiff declined this offer.

87. Defendant Minaj then stated that she would send her publicist to meet with Plaintiff to craft a statement recanting Plaintiff's rape charge. Plaintiff denied this offer as well.

88. Before they got off the phone, Plaintiff said to Defendant Minaj, "I need you to know woman to woman, that this happened." Defendant Minaj hung up the phone. Within days of this conversation, Plaintiff and her family suffered an onslaught of harassing calls and unsolicited visits.

## DEFENDANT MINAJ SENDS HER ASSOCIATES AND ATTORNEYS
## TO HARASS AND INTIMIDATE PLAINTIFF

89. A few days after Defendant Minaj called Plaintiff, Plaintiff's brother called her. He stated that two people reached out to a family member stating an offer of $500,000.00 from Defendant Minaj if Plaintiff wrote a letter recanting her rape claim against Defendant Petty. Plaintiff hung up, distraught that Defendant Minaj's instructed her associates to contact her brother, and her brother would even relay such a message.

90. This act by Defendant Minaj and her associates caused Plaintiff to panic because Black, who

---

[4] Upon information and belief, as of the date of this filing, Defendant Petty accepted a plea deal for this criminal case.

11

was in contact with Defendant Minaj, now knew where Plaintiff lived, where Plaintiff worked, and what Plaintiff's kids looked like.

## DEFENDANT MINAJ SENDS LAWYERS AND
## INVESTIGATORS TO PLAINTIFF'S HOUSE

91. In April 2020, on behalf of Defendant's, factfinder/investigator Charles Mittlestalt from Georgia contacted Plaintiff and put her in contact with an attorney named Ian Wallach ("Attorney Wallach") from New York.

92. Defendant's legal team hired Attorney Wallach to give Plaintiff "legal advice" about recanting her statement.

93. Attorney Wallach stated he was the Plaintiffs' lawyer, and anything said to him was protected under attorney-client privilege. Plaintiff did not know Attorney Wallach and had not reached out to him for legal services.

94. Plaintiff told Attorney Wallach Defendant Minaj and Defendant Petty were sending people to her home and to the homes of her loved ones to get her to recant her true statement that Defendant Petty violently raped her.

95. Plaintiff told Attorney Wallach that the Defendants were harassing her. Attorney Wallach promised to "help her," but his efforts were lackluster at best.

## DEFENDANT MINAJ SENT BLACK TO PLAINTIFF'S HOUSE

96. Black continues to receive and relay messages from the defendants to Plaintiff. For a while, Plaintiff ignored Black's calls. Plaintiff finally answered, and he tells her that he had good news. Black stated that nothing would happen to Plaintiff if she signed and notarized some papers in his possession.

97. Shortly after the call, Black appeared in front of Plaintiff's home. To protect her children in her home, Plaintiff met Black in front of her house in his car. While in his car, Black pulled out a green-colored folder that had a document inside. This document was a written recanted statement prepared for Plaintiff to sign.

98. Black then pulls twenty thousand dollars out of the armrest and places it on the Plaintiff's lap. Plaintiff took the money off her lap and placed it on the floor. Plaintiff could not believe that

12

Defendant Minaj would go this far to bribe her.

99. Black even said that Defendant Minaj would also send happy birthday videos to Plaintiff's Daughter for her sweet 16 as a bonus.

## PLAINTIFF SUFFERS

100. During these unsolicited calls, contacts, and communications, Plaintiff is having nightmares. The memories begin to flood back from the day of her rape. She begins to experience anger, pain, sorrow, anxiety, and trust issues. The Plaintiff starts having crying fits and thoughts of paranoia.

101. At the end of May 2020, Plaintiff received a call from her brother where he was speaking frantically. The brother stated that they know where she lived, what her daughter does, and threatened to have someone else show up at the Plaintiff's house.

102. After receiving this threat, Plaintiff moved in June of 2020. She changed her phone number, registering her new number under her husband's name. These efforts by Plaintiff were unsuccessful in curbing the harassment and unwanted contact. Shortly after changing her number, Plaintiff was contacted by a lawyer who was instructed to reach out to her by Defendant Minaj.

103. Plaintiff became so paranoid that she moved again in August 2020.

## THE UNITED STATES MARSHALLS
## CONTACTS PLAINTIFF HOUGH

104. Three days after moving in August 2020, the U.S. Marshalls showed up at the Plaintiff's husband's job. She called the U.S. Marshalls, and they stated that someone had called them to report that Plaintiff was being harassed and they were worried about her safety.

105. The Marshalls offered Plaintiff witness protection. The Marshalls also confirmed with Plaintiff that the call she received from California was indeed Defendant Minaj.

## PLAINTIFF IS CONTACTED BY
## DEFENDANT PETTYS LEGAL COUNSEL

106. In September 2020, while visiting her brother in South Carolina, Plaintiff is once again harassed. Plaintiff gets a call from a New York Attorney stating that they represent Defendant

13

Petty.

107.    The attorney states they were trying to go to Court to get Defendant Petty off the sex offenders registry and asked about the recantment letter and if she wrote it.

### PLAINTIFF MOVES TO FLORIDA
### TO PROTECT HER FAMILY

108.    In October of 2020, Plaintiff Hough's daughter was at an event in Atlanta, Georgia. At the end of the night, Plaintiff's daughter and her friend group were approached by a man. The man asked, "do you know Zoo?" (Zoo is Defendant Petty's Street name). Plaintiff's daughter yelled at the man and left with her friends. Not even Plaintiff's daughter was safe from the intimidation tactics and harassment by Defendant Minaj.

109.    After this incident the Plaintiff again feared for her and her family's safety, so she moved again, this time to Florida. She was afraid her child would be killed or kidnapped due to the threats from Defendant Minaj and Defendant Petty.

110.    In November of 2020, Plaintiff put a YouTube video out speaking about everything she had been going through in hopes of creating a digital footprint just in case something was to happen to her.

111.    Bloggers caught wind of the YouTube video and began victim-shaming her, telling their audiences that Plaintiff was lying, that she was just a white woman trying to make a quick dollar out of the limelight. Defendant Minaj's fans claimed, "Nicki said it was a lie, so it is a lie."

112.    Plaintiff has not worked since May of 2020 due to severe depression, paranoia, constant moving, harassment, and threats from the Defendants and their associates. She is currently living in isolation out of fear of retaliation.

14

## COUNT I
### Against Defendant Petty
### Intentional Infliction of Emotional Distress
### (New York)

113.        Plaintiff repeats and realleges by reference all paragraphs above as though fully set forth herein.

114.    To state a claim for intentional infliction of emotional distress, a plaintiff must plead: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993); see Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158 (2d Cir. 2014) (outlining test for intentional infliction of emotional distress). Frederick v. City of N.Y., No. 13-CV-897 (MKB), 2016 U.S. Dist. LEXIS 39828, at *81 (E.D.N.Y. Mar. 25, 2016).

115.    Defendant Petty's extreme and outrageous conduct alleged in this Complaint, including but not limited to sexual assault, Rape, Harassment, and intimidation, was intentionally and maliciously committed with intent to deliberately inflict humiliation, mental anguish, and emotional and physical distress upon Plaintiff Hough, and done in wanton and reckless disregard of such consequences to Plaintiff.

116.    As a direct and proximate result of said extreme and outrageous conduct by Defendant Petty, Plaintiff did suffer humiliation, mental anguish, disassociation, suicidal ideation, and emotional and physical distress, and have been hurt and injured in her health, both mentally and physically, strength, activity, and her ability to lead an everyday life without mental anguish. All of which have caused, continue to cause and will continue to cause Plaintiff great mental and physical pain and suffering for the rest of her life.

117.    As a result of such severe emotional and mental distress, Plaintiff has been generally, especially, and consequentially damaged in an amount to be established according to evidence.

118.    Defendant Petty's behavior toward Plaintiff was so outrageous as to exceed all reasonable bounds of decency. Defendant Petty knew with substantial certainty or should have known that his behavior would cause Plaintiff to be a victim of sexual assault, sexual abuse, and sexual

contact.

119.   Defendant Petty knew with substantial certainty or should have known that his behavior would cause severe emotional distress to Plaintiff Hough.

120.   Defendant Petty committed the infliction of emotional, physical, and mental distress willfully and intentionally and by means of coercion, oppression, fraud, and malice and in conscious disregard of Plaintiff Hough's rights. Therefore, Plaintiff is entitled to an award of exemplary or punitive damages in an amount to be established at trial to meaningfully punish Defendant Petty, thereby deterring similar conduct in the future.

## COUNT II
## Against Defendant Petty
## Assault & Battery
## (New York)

121.        Plaintiff repeats and realleges by reference all paragraphs above as though fully set forth herein.

122.   Defendant Petty through the conduct described further herein, created an unwarranted threat of violence against Plaintiff. Defendant Petty's conduct was made with the intent to provoke observation of the threat and cause a reasonable observation of the immediate danger. Defendant has and possesses the present capacity to bring about the violence.

123.   As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life. Defendants' actions and omissions warrant an award of punitive damages.

124.   Recovering damages for an assault requires proof of physical conduct, placing the Plaintiff in imminent apprehension of harmful contact. To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the Defendant intended to make contact without the Plaintiff's consent (see Holtz v Wildenstein & Co., 261

16

A.D.2d 336, 693 N.Y.S.2d 516; <u>Roe v Barad</u>, 230 A.D.2d 839, 647 N.Y.S.2d 14). <u>Bastein v. Sotto</u>, 299 A.D.2d 432, 433, 749 N.Y.S.2d 538, 539 (App. Div. 2002).

125.    Defendant Petty committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person. Here, Defendant Petty committed several acts of battery:

    i.    Defendant Petty grabbed Plaintiff from behind and placed a knife behind her back,

    ii.    Defendant Petty cut Plaintiff with the knife on her stomach as he wrestled with her to remove her pants,

    iii.    Defendant Petty grabbed Plaintiff by her sides to inflict pain to cause Plaintiff to release her pants,

    iv.    Defendant Petty forcibly inserted his erected penis into Plaintiff Hough's vagina.

126.    As a result of Defendant Petty's conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, paranoia, depression, anxiety, economic harm, and other consequential damages.

127.    The conduct of Defendant Petty described above was willful, wanton, and malicious.  At all relevant times, Defendant Petty acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and humiliation to Plaintiff Hough, and intended to cause fear, physical injury and pain, and suffering to Plaintiff Hough. By the preceding, Plaintiff is entitled to recover punitive and exemplary damages from Defendant Petty.

128.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

## COUNT III
### Against Defendant Petty
### Sexual Assault
### (New York)

129.          Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

130.          Allegations of sexual intercourse by forcible compulsion, if proven, potentially constitute criminal rape under New York law. See New York Penal Law § 130.35(1) ("A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion."). "In the civil context, the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." See Girden, 262 F.3d at 203 (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993) and citing 6A N.Y. Jur. 2d Assault—Civil Aspects § 2). Rape indisputably encompasses civil assault and battery under New York law. United Nat'l Ins. Co., 994 F.2d at 108. Antoine v. Brooklyn Maids 26, Inc., 489 F. Supp. 3d 68, 106 (E.D.N.Y. 2020).

131.    Defendant Petty, in doing the things herein alleged, including intending to subject Plaintiff to sexual abuse and harassment by Defendant Petty during Plaintiff's time as a sixteen-year-old High School student.  Defendant Petty intended to cause harmful or offensive contact with Plaintiff's person or intended to put Plaintiff in imminent apprehension of such contact.

132.    In doing the things herein alleged, Plaintiff was put in imminent apprehension of a harmful or offensive contact by Defendant Petty, and Defendant Petty made harmful or offensive contact with Plaintiff's person.

133.    Plaintiff did not consent to Defendant Petty's intended harmful or offensive contact with Plaintiff's person or intent to put Plaintiff in imminent apprehension of such contact. Additionally, because Plaintiff was a minor during the time herein alleged, she could not consent to sexual contact with any person.

134.    In doing the things herein alleged, Defendant Petty violated Plaintiff's rights under Civil Code section 43 of protection from bodily restraint or harm and personal assault.

135.    As a result of the above-described conduct, the Plaintiff suffered and continues to suffer

great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life. Plaintiff has sustained loss of earnings and earning capacity.

136.    In subjecting the minor Plaintiff to the wrongful treatment herein described, Defendant Petty acted willfully and maliciously with intent to harm both Plaintiffs and in conscious disregard of both Plaintiffs rights, to constitute malice and oppression.  Therefore, the Plaintiffs are entitled to the recovery of punitive damages, in an amount to be determined by the Court, against Defendant Petty, in a sum to be shown according to proof.

137.    Defendant's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

### COUNT IV
### Against Defendant Petty
### Negligent Infliction of Emotional Distress
### (New York and California)

138.            Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

139.    Negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress. Simpson v. Uniondale Union Free Sch. Dist., 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010); see Higgins, 318 F.3d 422, 425 n.1 (2d Cir. 2003) (stating that to be actionable, intentional and negligent infliction of emotional distress claims must "be based on conduct that is extreme and outrageous."); Naughright v. Weiss, No. 10 Civ. 8451, 826 F. Supp. 2d 676, 2011 U.S. Dist. LEXIS 133742, at *45-46 (S.D.N.Y. November 18, 2011) ("A cause of action for either intentional or negligent infliction of emotional distress must allege that the defendants' conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Romero v. City of N.Y., 839 F. Supp. 2d 588, 631 (E.D.N.Y. 2012)

19

140.  Here, the actions of Defendant Petty rise beyond the threshold of extreme and outrageous. As previously mentioned, Defendant Petty viciously raped Plaintiff and admitted doing so within hours of committing the act.

141.  In the days, months, and years proceeding his criminal act, Defendant Petty, his enabling parents, associates, legal team, gang affiliates, agents, and servants worked in concert and engaged in conduct that rise beyond the threshold of extreme and outrageous. The extreme and outrageous conduct are as follows:

  i.    Stalking Plaintiff Hough,

  ii.   Stalked Plaintiff Hough's twenty-two-year-old daughter,

  iii.  Stalking Plaintiff Hough's family members,

  iv.   Causing Plaintiff to move residents on multiple occasions throughout the years,

  v.    Bribing Plaintiff into recanting her rape claim,

  vi.   Threatening Plaintiff with physical bodily harm if she did not recant her rape claim, and

  vii.  Threatening Plaintiff with death via social media posts.

142.  Under California law, NIED has the following elements: (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the Plaintiff's injury." Keen v. American Home Mortg. Servicing Inc., 664 F. Supp. 2d 1086, 1096 (E.D. Cal. 2009) (quoting Mendoza v. City of Los Angeles, 66 Cal. App. 4th 1333, 1339, 78 Cal. Rptr. 2d 525 (1998)). Mountjoy v. Bank of Am. N.A., No. 2:15-cv-02204-TLN-DB, 2018 U.S. Dist. LEXIS 3216, at *28 (E.D. Cal. January 8, 2018).

143.  Here, in 1994 Defendant Petty accepted a plea deal after savagely raping Plaintiff Hough. As part of that plea deal, Defendant Petty was prohibited from directly or indirectly contacting Plaintiff Hough. The purpose of that plea agreement provision is to protect Plaintiff from experiencing a further injury that direct or indirect contact from Defendant Petty may cause. As a result of this agreement, Defendant Petty assumed a duty to prevent Plaintiff from experiencing any such harm. On multiple occasions, Defendant Petty negligently violated the duty he owed Plaintiff Hough.

20

144. Defendant Petty's actions endangered Plaintiff's safety and caused her to fear for her and her family's safety.

145. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

## COUNT V
### Against Defendant Petty and Defendant Minaj
### Harassment and Witness Intimidation[5]
### (California and Georgia)

146. Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

147. Code Civ. Proc., § 527.6, defines "harassment" as follows: "harassment" is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. Under § 527.6, subd. (b), the course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and cause substantial emotional distress to the Plaintiff. Krell v. Gray, 126 Cal. App. 4th 1208.

148. Regarding Georgia's harassment statute, Defendant Petty and Defendant Minaj directed their tortious activities at Plaintiff Hough. At the same time, Plaintiff was a resident of the state of Georgia. Plaintiff felt the impact of Defendant's Petty and Minaj's action in the state of Georgia. Defendants executed their harassing communication directly (Defendant Minaj) and indirectly (both Defendant's) through their intermediaries.

149. As a result of the above-described conduct, Plaintiff has suffered, and continue to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

---

[5] There is no civil cause of action for witness intimidation. It is mentioned here to reference the intentions of Defendants.

21

humiliation, loss of enjoyment of life; Plaintiff has been prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life.

150. Beginning in March 2020, in violation of his 1994 plea deal, Defendant Petty and Defendant Minaj intentionally and repeatedly harassed and contacted Plaintiff through their intermediaries. Defendant and Defendant Minaj engaged in courses of conduct, which alarmed and seriously annoyed Plaintiff and served no legitimate purpose.

151. Defendants attempted to compel Plaintiff not to communicate truthful information regarding Defendant Petty's conduct[6] and recant her statement through intermediaries. Defendants created fear of physical injury by finding Plaintiff's whereabouts after Plaintiff moved several times. Defendant's associates approached Plaintiff's family members in New York; approached Plaintiff's twenty-two-year-old Daughter in Georgia; and approached Plaintiff herself.

152. In summary, Defendants engaged in constant phone calls, resident pop-ups, family member reach outs, unsolicited contacts, bribing, and attempted coercion. Defendants knew or reasonably should have known that such communication would cause Plaintiff to fear harm to Plaintiff's physical safety and property and a member of Plaintiff's family.

153. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

---

[6] Conduct which he admitted to doing within hours of raping Plaintiff and conduct which he admitted to in open Court which served as the basis of his plea deal and reduced jail sentence. Plaintiff recanting her rape claim would not prevent Defendant Petty from having to register as a sex offender for a crime that he willingly admitted to committing. Therefore, Defendant's harassment of Plaintiff served no legitimate purpose.

22

## COUNT VI
### Against Defendant Minaj
### Aiding and Abetting
### (California and Georgia)

154.        Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

155.    In California, liability for aiding and abetting the commission of an intentional tort may be imposed upon a person who "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's conduct, separately considered, constitutes a breach of duty to the third person." Neilson v. Union Bank of California, N.A., 290 F.Supp.2d 1101, 1118 (2003) quoting Saunders v. Superior Court, 27 Cal.App.4th 832, 846, 33 Cal. Rptr. 2d 438 (1994). "[W]hile aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in a tortious activity to assist another in performing a wrongful act." Howard v. Superior Court, 2 Cal.App.4th 745, 749, 3 Cal. Rptr. 2d 575 (1992). "[L]iability [for aiding and abetting] attaches because the aider and abettor behave in a manner that enables the primary violator to commit the underlying tort." Neilson, 290 F.Supp.2d at 1134.

156.    Similarly, the eleventh circuit held, "A defendant is liable for aiding and abetting a tortious act if the Defendant: (a) does a tortious act in concert with the other or pursuant to a common design with him; or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (c) gives substantial assistance to the other in accomplishing a tortious result and his conduct, separately considered, constitutes a breach of duty to the third person. Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown, 619 F. App'x 923, 924 (11th Cir. 2015).

157.    Defendant Minaj knew that Plaintiff possessed information relating to a criminal occurrence. Here, her rape by Defendant Minaj's spouse Defendant Petty. Defendant Minaj knew that Defendant Petty was required to register as a sex offender in the state of California.

23

Defendant Minaj knew or should have known that Defendant Petty's 1994 plea deal prevented him from directly or indirectly communicating with Plaintiff Hough.

158.    Despite this, Defendant Minaj engaged in acts of bribery, harassment, stalking, and intimidation by calling Plaintiff and instructing her attorneys, associates, and affiliates to stalk, intimidate, harass, and bribe Plaintiff into recanting her 1994 rape charge against Defendant Petty. As previously stated, Defendant Minaj's actions served no legitimate purpose other than to aide her husband's acts of harassment, stalking, bribery, and witness intimidation.

159.    Additionally, Defendant Minaj created fear of physical injury by finding Plaintiff's whereabouts after Plaintiff moved and changed her phone number several times. Defendant Minaj's associates approached Plaintiff's family members in New York, approached Plaintiff's twenty-two-year-old Daughter in Georgia, and approached Plaintiff herself.

160.    In summary, Defendant Minaj engaged in constant phone calls, address pop-ups, family member reach outs, unsolicited contacts, bribing, and attempted coercion.

161.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

### COUNT VII
### Against Defendant Minaj and Defendant Petty
### Intentional Infliction of Emotional Distress
### (California and Georgia)

162.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

163.    In California, to state a cause of action for intentional infliction of emotional distress, a plaintiff must show (1) outrageous conduct by the Defendant; (2) the Defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the Plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the

emotional distress by the Defendant's outrageous conduct.'" '"Conduct, to be '"outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." <u>Yau v. Allen</u>, 229 Cal. App. 4th 144, 160, 176 Cal. Rptr. 3d 824, 836 (2014).

164.    In Georgia, a claim of intentional infliction of emotional distress requires proof of the following elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." <u>Moore</u>, 238 Ga. App. at 377. The standard for establishing an intentional infliction of emotional distress claim is very high. The burden on Plaintiff to prove such a claim is stringent. <u>Humphrey v. PennyMac Loan Corp.</u>, No. 4:16-CV-00043-HLM-WEJ, 2016 WL 11573629, at *6 (N.D. Ga. May 2, 2016), *adopted by* 2016 U.S. Dist. LEXIS 196711, 2016 WL 11573953, at *1 (N.D. Ga. May 20, 2016). <u>Futrell v. Southeastrans, Inc.</u>, No. 1:20-cv-04674-WMR-RDC, 2021 U.S. Dist. LEXIS 117597, at *11 (N.D. Ga. April 1, 2021)

165.    In violation of California and Georgia Law, Defendant Minaj and Defendant Petty have satisfied the elements of intentional infliction of emotional distress. Defendants were residents of the state of California when they engaged in their tortious and criminal acts. Furthermore, Defendants aimed and directed their tortious and criminal acts towards Plaintiff, a resident of the State of Georgia at the time.

166.    In summary, Defendant's Minaj and Petty's intentional conduct included, but was not limited to:

    i.    Bribery of Plaintiff by sending their associate Black, to Plaintiff's residents with $20,000.00 and offering to have Defendant Minaj record a birthday video for Plaintiff's daughter,

    ii.    Bribery of Plaintiff by approaching the Plaintiff's family members in New York, offering $500,000.00 in exchange for Plaintiff recanting her 1994 rape claim against Defendant,

    iii.    Stalking and Harassing Plaintiff's twenty-two-year-old daughter while her daughter was out with friends in Georgia,

25

iv.      Stalking and Harassing Plaintiff by calling and showing up at Plaintiff's home after Plaintiff changed her phone number and residents on multiple occasions,

v.      Intimidating Plaintiff's family in New York with threats of physical bodily harm if Plaintiff did not recant her 1994 rape claim. These threats resulted in Plaintiff's moving out of Georgia to a remote location in the State of Florida, and

vi.      Through their associates, they are threatening to kill Plaintiff on social media.

167.     Defendant's actions were intentional, and the conduct was extreme and outrageous. Undoubtedly there was a clear causal connection between the conduct and Plaintiff's emotional distress. Plaintiff's emotional distress is persistent and severe. So much so, Plaintiff has not worked since having to move over three times within twelve months as she has been in fear for her life and safety.

168.     As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life; Plaintiff has been prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, as follows:

a.      For past, present, and future general damages in an amount to be determined at trial;

b.      For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

c.      Any appropriate statutory damages;

d.      For costs of suit;

26

e.  For interest as allowed by law;

f.  For attorney's fees;

g.  The cause of action authorized any appropriate punitive or exemplary damages against Defendants Petty and Minaj;

h.  For such other and further relief as the Court may deem proper.

Dated: August 13, 2021

_Tyrone A. Blackburn, Esq._
Tyrone A. Blackburn, Esq.
T.A. Blackburn Law, PLLC
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Tel: 347-342-7432
TBlackburn@TABlackburnlaw.com

27

**Exhibit "I"**



# T. A. BLACKBURN LAW

### TYRONE A. BLACKBURN

---

MEMBER OF
NY & NJ BAR

---

FEDERAL MEMBERSHIP
EDNY, SDNY, NDNY & DNJ

---

1242 East 80th Street, 3rd Floor
Brooklyn, New York 11236

January 21, 2022

VIA PACER
Honorable Eric N. Vitaliano
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: Jennifer Hough v. Onika Tanya Maraj AKA ("Nicki Minaj") and
Kenneth Petty AKA ("Zoo"); Case No. 1:21-cv-04568-ENV-JRC**

Dear Judge Vitaliano:

We are counsel to Plaintiff Jennifer Hough in the above-referenced matter. I am writing in response to the Defense counsel's docket entry #54. On or about January 12, 2022, this writer informed Mr. Burstein that he has a scheduling conflict for February due to several pre-planned trips. This writer informed Mr. Burstein that the initial filing of his motion should be moved to March. Mr. Burstein agreed and suggested the following briefing schedule: March 4 for the motion, March 25 for the answer, and April 3 for the reply. (**Exhibit A**).

The dates offered by Mr. Burstein work with this writer's schedule. Unfortunately, this writers co-counsel and former co-counsels may have conflicts with their schedules that have to be taken into consideration; however, Mr. Burstein has not been willing to sort through the scheduling conflicts collegially.

I want to bring to the court's attention the glaringly hypocritical claim by Mr. Burstein that the legitimate issues raised in docket entry #53 were outrageous. Throughout these proceedings, Mr. Burstein has taken residency in the sewers of the legal profession. He has behaved antithetical to the model rules of professional conduct. But this should come as no surprise since he has been on the receiving end of over ten sanction motions dating back to the early 1990s and as recent as 2018.

An example of his deplorable behavior stems from his sick obsession with Mr. Gordon's wife. Mr. Burstein went scrummaging through the comments section of youtube posts in search of comments

 347-342-7432     tblackburn@tablackburnlaw.com    TABlackburnlaw.com



# T. A. BLACKBURN LAW

posted by Mrs. Gordon.  Not only was his act of cyberstalking Mrs. Gordon creepy, but it was also weird, and beneath the dignity of this profession.

Finally, this proposed motion is nothing more than a billing exercise that serves no legitimate purpose.  Due to the secondhand embarrassment Plaintiff feels from this misguided abuse of process, Plaintiff would like to apologize to the Court in advance for defendant wasting the Courts time.

Respectfully Submitted,

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.



Exhibit "J"

# EXCLUSIVE: Nicki Minaj Is A Gangbanger With Ruthless NY Gang According To Lawyers In $20 Million Lawsuit



By: Nolan Strong    •    Category: News    •    November 7, 2021

Case 2:23-cv-03194-JKS-JBC   Document 50-2   Filed 02/29/24   Page 65 of 136 PageID: 1278

2/28/24, Case 2:23-cv-03194-JKS-JBC   Nicki Minaj Member Of Violent Gang, Lawyer Says Filed In...

The lawyers representing Kenneth "Zoo" Petty's sexual assault victim have made some shocking allegations against the world-famous rapper and business mogul Nicki Minaj.



**Play Nicki Minaj**
on Amazon Music Unlimited (ad)

According to Tyrone Blackburn Esq., Nicki Minaj, born Onika Maraj, is a member of the violent New York-based gang known as the Makk Balla Brims.



**The gang's umbrella organization, known as the Mac Baller Brims, has been labeled the most dangerous criminal organization in New York.**

The Makk Balla Brims are a subset of Brims operating in Queens, New York. The gang is said to be very organized and is said to be heavily involved in drugs, guns, and the rap business.

The court documents complained that Kenneth and Nicki Minaj are part of the gang – and they pointed to her recent trip to Queens, New York as evidence submitted to judge Eric Vitaliano, who is presiding over a $20 million civil suit filed by Jennifer Hough.



"[Kenneth] Petty and Maraj were both in this district, in Jamaica Queens, New York. As seen on an Instagram live video currently up on Maraj's Instagram page, both Maraj and Petty were seen associating with members of the Makk Ballers set of the Bloods Gang. Petty and Maraj are both members of this gang," Tyrone Blackburn told Judge Vitaliano.

• • •

"Shortly after Petty and Maraj are spotted with their gangster colleagues, a member of the gang posted a death threat to Ms. Hough on Twitter, stating: "Jennifer if you see this, the Makks are coming to get you.'"

. . .



**nickiminaj**
Sydney, Australia

View profile



View more on Instagram

2/28/24, 9:35 AM                    Nicki Minaj Member Of Brims Gang Says Lawyer In $20 Million...

Heavy on the MAKK SAUCE!!!! Heavy on it!!!!! 😩💘😂🤕🔫🖤🔫🅱️🆎

View all 28,547 comments

Add a comment...

**Hough insists the couple supposedly unleashed a campaign of terror starting in early 2020.** They wanted Hough to retract her allegations so that Kenneth could get off the National Sex Offender Registry.

Hough's lawsuit claims Kenneth and Nicki offered up $500,000 to recant her story claiming he raped her at knife-point in 1994. Kenneth copped a plea to the crime in 1995 and was sentenced to four years in prison.

The campaign of harassment intensified after Kenneth was arrested for failing to register as a sex offender in California. **He pleaded guilty to that crime and is awaiting sentencing in January of 2021.**

**Hough and her lawyers claim an associate of the couple known as Black threatened her life on social media after refusing his offer of $20,000 in cash.** Most recently, members of the Makk Balla gang have been promising retaliation against Hough.

According to Jennifer Hough's lawsuit, she has not been able to work since May of 2020. She has also had to relocate to different states and suffers from severe depression and paranoia.



Posted in News Tagged Hip-Hop News, Jennifer Hough, Kenneth "Zoo" Petty, Middle school, Nicki Minaj

Advertise    The Ill Community    About Us    DMCA    Privacy Policy    Certified MBE
Contact Us

Copyright © 2024 AllHipHop.com LLC 2024-Infinity

**Exhibit "K"**

NEWS

# Nicki Minaj Part of Big New York Gang Involved in Guns, Drugs and Rap, Victim Claims in $20 Million Lawsuit

By *Emma Winters*    Nov 08, 2021 08:39 AM EST



(Photo : HECTOR RETAMAL/AFP via Getty Images)

Lawyers for Kenneth Petty's alleged sexual assault victim recently made some surprising allegations about his wife, Nicki Minaj.

The "Superbass" hitmaker, whose real name is Onika Maraj, is a member of a violent gang known as Makk Balla Brims, according to lawyer Tyrone Blackburn, Esq.

According to reports, the gang is based in New York, with a subsection of Brims operating in Queens.

They are said to be well-organized and largely reliant on narcotics, firearms, and the rap industry.

2/28/24, 3:58 PM    Nicki Minaj Part of Big New York Gang Involved in Guns, Drugs, Claims in $20 Million Lawsuit : Music Times

Case 1:23-cv-08194-JKS-JBC    Document 50-2    Filed 02/20/24    Page 76 of 136 PageID: 289

Jennifer Hough, the alleged victim, claims that Petty and Minaj are members of the group in court records obtained by AllHipHop. They've provided evidence to judge Eric Vitaliano of their recent journey to Queens.

The duo was spotted in Jamaica, Queens, New York, according to the tabloid, and they were even seen in an Instagram Live video.

"Maraj and Petty were both observed socializing with members of the Bloods Gang's Makk Ballers set, of which Petty and Maraj are both members."

"Shortly after Petty and Maraj are seen with their gangster comrades, a member of the gang posts a death threat to Ms. Hough on Twitter, stating: 'Jennifer, if you see this, the Makks are coming to get you,'" the report continued.



READ ALSO: **Travis Scott Astroworld Festival Tragedy NOT The First Time Where Fans Died; Rapper 'Never Learned His Lesson'**

# Kenneth Petty, Nicki Minaj Lawsuit

Jennifer Hough, who is suing Petty for $20 million, claims that he and Minaj launched a terror campaign that began last year.

Her lawyers also alleged that after she refused a man named Black's offer of $20,000, he threatened her life on social media.

They wanted her to retract her allegations so that the celebrity husband might be removed from the National Sex Offender Registry, she claims.

Petty and Minaj allegedly promised her $500,000 in exchange for recanting her testimony about being raped and held at knifepoint in 1994.

Petty pleaded guilty to the offence in 1995 and was sentenced to four years in prison.

The harassment, however, increased after Petty was jailed for the second time for failing to register as a sex offender in California.

Petty later admitted to the crime and is currently awaiting punishment.

The Makk Balla gang is said to be planning a vengeance on Hough, who hasn't worked since May 2020 and has moved to several states.

Hough is also suffering from extreme sadness and paranoia at the moment.

**READ MORE: Kanye West New Meltdown Coming Up, Kim Kardashian Anticipates Amid Pete Davidson Romance Rumors**

**See More Nicki Minaj**

2/28/24, 2:45 PM    Nicki Minaj Part of Big New York Gang Involved in Guns, Drugs, and More, Villain Claims in $200 Million Lawsuit | Music Times

Case 9:23-cv-08194-JKS-JBC   Document 50-2   Filed 02/20/24   Page 79 of 136 PageID: 892

## YOU MAY ALSO LIKE



**Eminem Dating History After Divorce: Nicki Minaj, Britney Spears, Mariah Carey + Selena Gomez Too?!**



**Why is Nicki Minaj Blackballed At The Grammys? Ken Erlich Feud Explained**



**Megan Thee Stallion 'HISS' Slithered To No. 1 After Nicki Minaj Dig**

2/28/24, 8:38 PM    Nicki Minaj Part of Big New York Gang Involved in Guns, Drugs, and More, Revealed in $20 Million Lawsuit : Music Times

Case 0:23-cv-08194-JKS-JBC    Document 50-2    Filed 02/20/24    Page 80 of 136 PageID: 1398

**DAILY DISH    GENRES    REVIEWS    EXCLUSIVES    TRENDING**

**ARCHIVES**

**About Us    Contact Us    Privacy Policy    Terms of Service**

Copyright © 2024 Music Times. All rights reserved. Reproduction in whole or in part without permission is prohibited.

**Exhibit "L"**



ENTERTAINMENT    EXCLUSIVES    TV    THANKS, I HATE IT    WHAT TO WATCH    CELEBRITY    ROYAL FAMILY    MUSIC

in **MUSIC**

# Nicki Minaj Allegedly Hired Gang Members to Threaten Her Husband's Accuser

Nicki Minaj has supported her husband, Kenneth Petty, as he faces allegations of rape and other charges. Minaj has been accused of hiring people to intimidate his victim. Now, Minaj is being accused with associating with Blood gang members

by **CHRIS MALONE**    Published on November 9, 2021    🕐 3 min read

SHARE:          





MSG+ · Sponsored

**Stream Live Games with MSG+**

Sut



Nicki Minaj | Getty Images

## Kenneth Petty was accused of rape by Jennifer Hough

In September 1994, Kenneth Petty was charged with attempted rape, when both he and a woman named Jennifer Hough were teenagers. In an September 2021, Hough described in detail the horrific events of that day nearly three decades prior. She claimed that he held her at gunpoint and forced her to walk to his house, where he attempted to rape her before she freed herself. Petty was convicted and served four years in prison.

Custom No Parking Signs

Design Now

Hough also alleged that Minaj tried to get her to recant her story. "In March of 2020, [Minaj] called me and said she got word I was willing to help them out in the situation," Hough said. "I didn't understand what she was referring to, and she offered to fly me and my family to L.A. I turned it down. I told her, woman-to-woman, this really happened and I haven't spoken to her since."

Hough claimed that Minaj sent associates to pay her large sums of money to help change her mind. "[They were] sending people to negotiate numbers as far as money is concerned with family members, and Nicki is the one who personally reached out to me in regard to helping her, helping them in this situation," she said. "And then the threats that I received because I kept saying no to every offer, to every suggestion. The last incident was when one of their associates put $20,000 on my lap, and I still kept saying no. The last message I received was that I should have taken the money 'cause they're going to take that money to put on my head."





Kenneth ⬚'Zoo⬚' Petty (L) and Nicki Minaj | Johnny Nuñez/Getty Images

## Nicki Minaj and Kenneth Petty allegedly worked with the Bloods gang





Custom No Parking Signs

Design Now

Hough and her lawyers are suing Minaj and Petty for $20 million. In court documents obtained by All Hip Hop, Hough's lawyer, Tyrone Blackburn, cited a recent trip to Queens, New York as evidence of Minaj and Petty's continued threats.

Hough and her lawyers claimed a man named Black associated with Minaj and Petty threatened her life on social media after refusing his offer of $20,000 in cash. They said members of the Makk Balla Brims gang — part of the Bloods gang in New York — have been threatening to retaliate against Hough, to the point she was forced to move to another state.

"[Kenneth] Petty and [Nicki] Maraj were both in this district, in Jamaica, Queens, New York," Blackburn told the judge. "As seen on an Instagram Live video currently up on Maraj's Instagram page, both Maraj and Petty were seen ass
the Makk Ballers set of the Bloods Gang. Petty and Maraj are both members of this gang."



2/28/24, 3:05 PM
Case 2:23-cv-03194-JKS-JBC    Document 59-2    Filed 02/20/24    Page 87 of 136 PageID: 1300
Nicki Minaj Allegedly Hired Gang Members to Threaten Husband's Accuser



"Shortly after Petty and Maraj are spotted with their gangster colleagues, a member of the gang posted a death threat to Ms. Hough on Twitter, stating: 'Jennifer, if you see this, the Makks are coming to get you.'"



Case 1:23-cv-03194-JKS-JBC    Document 59-2    Filed 02/20/24    Page 88 of 136 PageID: 1301

RELATED

[What Is Nicki Minaj's Husband Kenneth 'Zoo' Petty's Net Worth?](#)

# Nicki Minaj and Kenneth Petty's court cases



Petty first reemerged in the spotlight in 2018 when he started dating Minaj. The two were childhood sweethearts. In 2020, he was arrested for failing to register as a sex offender in California.

Minaj herself hasn't spoken publicly about the allegations against herself or her husband. But she's still courted controversy regardless: in October 2021, for example, she defended [Little Mix star Jesy Nelson](#) for blackfishing and called out her former groupmates.



## The self-righteous Left's refusal to condemn Hamas terror is a disgrace

**IGAA** | Sponsored

**Read More**

---

## Edison, Selected To Host LEGO Festival, Get Presale Now!

New Jersey Convention & Expo Center on April 20 & 21, 2024

**Awesome Family Events** | Sponsored

**Learn More**

---

## I Tried the $0.87 Generic Viagra and Here's What Happened!

**Public Health Forum by Friday Plans** | Sponsored

---

## Why the Left's refuse to condemn Hamas?

**IGAA** | Sponsored

**Read More**

---

## Amazon Hates When You Do This, But They Can't Stop You (It's Genius)

This simple trick can save tons of money on Amazon, but most Prime

**Coupon Code Finder** | Sponsored

---

## Reignite Intimacy: 95% Off Little Blue Pill, No In Person Visit

Get sildenafil or tadalafil for up to 95% off, plus a $100 in store credit 

**ED Meds 95% Off** | Sponsored

**Learn More**



**Chris Malone**
Writer

Marathon runner and child at heart who's in a serious relationship with their air fryer. When I'm not covering entertainment news, you can usually find me listening to Donna Summer, laying out on the beach, or reading about prison abolition — sometimes all at the same time.

Contact at chris.m@cheatsheet.com

About Us

Contact Us

Careers

Ethics

Fact checking commitment

Corrections commitment

Ownership funding advertising info

© Copyright 2024 Showbiz Cheatsheet LLC. All Rights Reserved.

Terms of Service  |  Privacy Policy  |  Web Accessibility

Information from your device can be used to personalize your ad experience.

Do not sell or share my personal information.

A RAPTIVE PARTNER SITE

 

Exhibit "M"

# Nicki Minaj "Creepy" Lawyer Accused Of Cyberstalking Rival Attorney's Wife



By: Grouchy Greg Watkins (@GrouchyGreg)    •    Category: Exclusives    •    January 23, 2022



The lawyers representing Nicki Minaj and Kenneth Petty have leveled some wild accusations at each other as their clients fight a sexual assault accuser!

Nicki Minaj and Kenneth Petty's $20 million battle with his sexual assault accuser is quickly turning into a dog fight between their attorneys.

• • •



lawsuit against Nicki Minaj.

The legal wrangling was just a formality because **Hough is moving her lawsuit from New York to California, where Nicki and Kenneth Petty reside.**

Hough claims Nicki and Kenneth have been terrorizing her, and she's been living in fear of her life for refusing to recant her 1994 rape allegations against the rap star's husband.

•  •  •



FULL INTERVIEW: Jennifer Hough On Nicki Minaj & Kenneth Petty: 'I'...

When Hough refused, the celebrity couple allegedly tried to pay her $500,000. **When the bribe did not work, Nicki and Kenneth supposedly ordered gang members to threaten Hough's life.**

. . .

a "frivolous" lawsuit.



. . .

Judd Burstein said "even his Labradoodle Gracie" could see Hough's lawsuit was simply a money grab, and he **vowed to sanction Hough and her attorneys Steven Gordon and Tyrone Blackburn for claiming Nicki and Kenneth are members of a Bloods subset called The Makk Baller Brims.**

Blackburn and Steven Gordon sent a letter to Judge Eric Vitaliano, and they made some shocking allegations against Judd Burstein.

Gordon said he was almost forced to resign from the case because Burstein began targeting his wife and harassing her.

. . .

"As a young attorney, I could have never fathomed the types of harassment and threats that Mr. Burstein has employed against me, personally," Steven Gordon complained to Judge Vitaliano.

"Mr. Burstein baselessly attempted to threaten that my wife had waived our

safety and privacy, I was almost forced to withdraw from this motion," Gordon revealed.

According to Tyrone Blackburn, Judd Burstein "has taken residency in the sewers of the legal profession" throughout the proceedings.

Blackburn said the court has sanctioned Burstein at least ten times since the early 1990s, the most recent in 2018.

However, the most damning accusation against Burstein was revealed when Blackburn accused him of cyberstalking Steven Gordon's wife.

"An example of his deplorable behavior stems from his sick obsession with Mr. Gordon's wife," Blackburn said. "Mr. Burstein went scrummaging through the comments section of youtube posts in search of comments posted by Mrs. Gordon.

Vitaliano.

Blackburn said Burstein's antics are simply an "exercise in billing" to run up Nicki Minaj's legal costs.

Tyrone Blackburn also apologized for Jennifer Hough's "second-hand embarrassment" due to Burstein's "misguided abuse" of the legal proceedings and wasting the court's time.

Posted in Exclusives, News Tagged Hip-Hop News, Jennifer Hough, Middle school, Nicki Minaj

Advertise     The Ill Community     About Us     DMCA     Privacy Policy     Certified MBE
Contact Us

Copyright © 2024 AllHipHop.com LLC 2024-Infinity

Exhibit "N"

# Nicki Minaj Fans Made Jennifer Hough's Ex-Lawyer Cry As Legal War EXPLODES Between Rival Attorneys



By: Grouchy Greg Watkins (@GrouchyGreg)   •   Category: Exclusives   •   April 13, 2022

A separate legal drama is unfolding between Nicki Minaj's lawyer, and the counsel for the woman who claims she was harassed by the rapper and her husband!

A nasty legal battle has erupted between Nicki Minaj's lawyer and the attorney representing her husband's sexual assault accuser, Jennifer Hough.

• • •





Nicki's lawyer Judd Burstein is attempting to sanction Jennifer Hough's lawyer Tyrone Blackburn over claims he made about the rap star.

Blackburn represents Jennifer Hough, who filed a $20 million lawsuit against Nicki Minaj and her husband, Kenneth Petty.

Hough claims the pair was bullying her and intimidating her to get her to recant rape claims against the rap star's husband so he could get off the National Sex Offender Registry list.

In addition to the threatened violence, Tyrone Blackburn and former co-counsel Steven Gordon filed documents claiming Nicki Minaj was a member of a New York gang called The Makk Ballers.

The lawyers claimed Nicki used her street clout to have gang members intimidate Jennifer Hough.

• • •

In January, Tyrone Blackburn voluntarily dismissed Nicki Minaj from the lawsuit – after she had racked up almost $300,000 in legal fees.

**<u>Nicki Minaj vowed to sue Tyrone Blackburn to recover the money she shelled out to defend herself,</u>** and she made good on her claims on Monday (April 11th).

Her attorney Judd Burstein asked a judge to sanction Tyrone Blackburn, calling his conduct in the case disgraceful.

Burstein accused Blackburn of intentionally attempting to smear Nicki's reputation by arguing she supported the sexual abuse of children simply because she helped her brother Jelani Maraj's defense in his rape case.

Jelani Maraj is serving 25-years-to-life after he was convicted of endangering the welfare of a child under the age of 13.

"If ever there were a case for imposing sanctions... this is that case. From the beginning of this case, when [Jennifer Hough's] attorney, Mr. Blackburn, filed a complaint which was nonsensical in its factual allegations against [Nicki Minaj] and plainly motivated solely to prey upon her wealth and fame," Judd Burstein snapped.

**Burstein also blasted Blackburn's claims that he was involved in a conspiracy with Jennifer Hough's former lawyer, Steven Gordon,** who was supposedly working as a "double agent" to help Nicki Minaj win the case.

Tyrone Blackburn denied Burstein's allegations.

Tyrone Blackburn submitted various images of Nicki surrounded by Kenneth Petty and other men in court filings, supposedly making gang signs to support his allegations that she was tied to the notorious gang.

Blackburn also submitted the lyrics to Nicki Minaj's song "Yikes" to justify her alleged involvement with gangs.

**Tyrone Blackburn said Steven Gordon communicated with Burstein behind his back, which resulted in Gordon being dismissed from representing Jennifer Hough.**

Tyrone Blackburn eventually had to fire Steven Gordon, claiming he was a drug addict.

Gordon is addicted to, as well as graphically detailed accounts of the impact Gordon's addiction has had on Gordon's family," Tyrone Blackburn said.

Blackburn said he had no clue Gordon was addicted to drugs when he hired him as co-counsel, or he "would have never allowed him onto the case."

"Partnering with Steven Gordon is by far the biggest regret I have in my career," who accused the lawyer of harassing his own client.

Tyrone Blackburn said that in addition to being traumatized by Nicki Minaj and Kenneth Petty's actions, Jennifer Hough also suffered at the hands of her former lawyer, who called her non-stop.

"Gordon called Hough incessantly, Monday through Sunday, crying and complaining about the harassing messages he was receiving from [Nicki Minaj's] fans. Gordon's calls were not limited to complaints concerning his hurt feelings; Gordon also disclosed unsolicited graphic details of his acts of adultery," Tyrone Blackburn claimed.

"Gordon's incessant calls were even more problematic because Gordon was aware of the vulnerable mental and emotional state [Jennifer Hough] is in because of the actions of Defendant [Kenneth Petty] and [Nicki Minaj].," Tyrone Blackburn said of his former co-counsel.

The legal drama for Jennifer Hough is far from over.

In addition to fighting off Nicki Minaj's quest to get $300,000 from her lawyer, Hough is still pursuing a separate lawsuit against Kenneth Petty.

A judge has yet to rule.

Advertise     The Ill Community     About Us     DMCA     Privacy Policy     Certified MBE
Contact Us

Copyright © 2024 AllHipHop.com LLC 2024-Infinity

**Exhibit "O"**

# Tsyngauz
## & Associates, P.C.

**114 Mulberry Street**
**Ground Floor**
**New York, NY 10013**
(212) 337 – 9770 telephone
(212) 337 – 3375 facsimile

Yevgeny Tsyngauz, Esq.
Mikhail Litt, Esq.
Ryan Banich, Esq.
Steven N. Gordon, Esq.
Anna Buzhor, Esq.

January 27, 2022

**VIA PACER & FEDERAL EXPRESS**

The Honorable James R. Cho, U.S.M.J.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    Jennifer Hough v. Kenneth Petty AKA ("Zoo"); Case No. 1:21-cv-04568-ENV-JRC

Dear Judge Cho:

My firm and I, Steven N. Gordon, Esq., are currently co-counsel representing Plaintiff Jennifer Hough ("Plaintiff") in the above-referenced action. Pursuant to F.2 of Your Honor's Individual Practice Rules, we write to the Court to advise of our withdrawal as counsel for Plaintiff.

On January 27, 2022, I was advised by written letter from Lead Counsel for Plaintiff, Tyrone A. Blackburn, and signed by Plaintiff, that my representation is being terminated. The basis for my firm and I's withdrawal is also supported by N.Y. Rules of Prof. Con. Rule 1.16(c)(8) and (11). Simply put, without revealing attorney client privileged communications, Lead Counsel and I irreconcilably disagree with respect to legal strategy moving forward. This is by no means a reflection of any views concerning the merits of this action or any future related actions.

Because I was terminated in writing by Plaintiff, and given that the remaining Defendant in this action has not Answered the Amended Complaint, I have not sought consent from same. Should the Court seek to review Plaintiff's letter, I ask permission to file it under seal for *in camera* review and consideration in order to preserve the confidentiality of the attorney-client relationship. *See e.g., Thekkek v. LaserSculpt, Inc.*, No. 11-cv-4426(HB)(JLC), 2012 WL 225924, at *3 (S.D.N.Y Jan. 23, 2012) (granting motion to withdraw upon in camera review, explaining: "documents in support of motions to withdraw as counsel are routinely filed under seal where necessary to preserve the confidentiality of the attorney-client relationship between a party and its counsel, and… this method is viewed favorably by the courts") (internal quotations and citations omitted).

Finally, given the amount of time spent working on this case, my firm and I are entitled to attorneys for our representation to date. If, or when, judgment or settlement is entered, I seek that fees are properly apportioned for our representation to date. It is my understanding that this will be amicably worked out between Lead Counsel and I at the appropriate time. If no agreement can be reached, we **reserve** all rights to pursue collection of such fees.

Respectfully submitted,

Honorable James R. Cho
January 27, 2021

Steven N. Gordon, Esq.

cc:

Steven D. Isser, Esq. (Via Pacer)
Tyrone A. Blackburn, Esq. (Via Pacer)

**Exhibit "P"**

| | |
|---|---|
| **From:** | Steven Gordon |
| **To:** | Judd Burstein |
| **Subject:** | Hough v. Petty et al. |
| **Date:** | Friday, January 28, 2022 2:48:23 PM |

Dear Judd:

As we have discussed:

Tyrone Blackburn sent a letter to the Court on January 22, 2022 in which he stated:

"An example of [Mr. Burstein's] deplorable behavior stems from his sick obsession with Mr. Gordon's wife. Mr. Burstein went scrummaging through the comments section of youtube posts in search of comments posted by Mrs. Gordon. Not only was his act of cyberstalking Mrs. Gordon creepy, but it was also weird, and beneath the dignity of this profession."

I write to confirm the following:

1. **I did not see Mr. Blackburn's letter before he sent it;**
2. **I would have objected to these comments if I had seen the letter before it was sent (**although I had no control over anything which Mr. Blackburn ultimately filed with the Court);
3. **I do not in any way agree with them; and**
4. **I never at any time said anything to Mr. Blackburn even to suggest that I agreed with the views as expressed in his letter;**

As we have also discussed, I was not lead counsel in the case against Ms. Maraj and I had no control over statements of facts ultimately submitted in Mr. Blackburn's filings.

I appreciate the fact that you and your client have accepted my explanations as set forth above and have acknowledged that, in my role as Mr. Blackburn's co-counsel, I never acted in bad faith and that I had a good faith belief in the truth of Ms. Hough's factual allegations.


Respectfully,


Steven


--
Steven N. Gordon, Esq.
Tsyngauz & Associates, P.C.
114 Mulberry Street, Ground Floor
New York, NY 10013
Telephone: (212) 337-9770
Facsimile: (212) 337-3375
Email: sg@nytlaw.com

# Exhibit "Q"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
 JENNIFER HOUGH,

                                                                    MEMORANDUM AND
                                                                    ORDER

                                      Plaintiff,
                                                                    No. 21-CV-4568-ENV-JRC
             -against-

ONIKA TANYA MARAJ (a/k/a NICKI MINAJ) and
KENNETH PETTY (a/k/a ZOO),

                                      Defendants.
--------------------------------------------------------------------x
JAMES R. CHO, United States Magistrate Judge:

## Introduction

Plaintiff Jennifer Hough ("plaintiff") commenced this action against Onika Tanya Maraj

(a/k/a Nicki Minaj) ("Maraj")[1] and Kenneth Petty (a/k/a Zoo) ("Petty" and collectively,

"defendants") on August 13, 2021. *See* Compl., Dkt. 1. On September 2, 2021, plaintiff

amended her complaint. *See* First Am. Compl. ("FAC"), Dkt. 8. In her FAC, plaintiff alleges,

*inter alia*, witness intimidation, negligent and intentional infliction of emotional distress,

harassment, and assault and battery against defendants. *See id*. at ¶ 1. Plaintiff seeks damages,

as well as attorney's fees and costs. *Id*. at Prayer for Relief.

Currently pending before this Court[2] is a motion filed on behalf of Maraj and her counsel

---

[1] On January 12, 2022, plaintiff filed a notice of voluntary dismissal against Maraj, Dkt. 46, which the court granted on January 19, 2022, Dkt. 49. Maraj is no longer a defendant in this case.

[2] This Court issues this decision as an Order, rather than a Report and Recommendation, because Maraj's motion for sanctions is non-dispositive in nature. *See* Fed. R. Civ. P. 72(a). "Magistrate judges have the power to issue sanctions without referral from a district judge." *Schuler v. Liberty Consulting Servs., Ltd.*, No. 20-CV-5779, 2022 WL 1552039, at *8 n.17 (citing *Meyer Corp. U.S. v. Alfay Designs, Inc.*, No. 10-CV-3647, 2017 WL 5515938, at *2 (E.D.N.Y. Mar. 6, 2017) (discussing monetary sanctions as "non-dispositive" and reviewing issuance of sanctions for clear error)). "A magistrate judge to whom a district judge has referred pre-trial matters may

Judd Burstein ("Burstein") for sanctions against plaintiff's counsel, Tyrone Blackburn ("Blackburn"), pursuant to 28 U.S.C. § 1927, and the Court's inherent power.  *See* Maraj Mem. of Law in Supp. of Mot. for Sanctions ("Maraj Mem."), Dkt. 69-18.  For the reasons set forth below, the Court denies the motion for sanctions.

## Background

The Court recounts the events of this case that are relevant to the instant motion for sanctions.  Blackburn has appeared as counsel for plaintiff from the beginning of this action.  *See* Compl. filed by Blackburn, Dkt. 1.  On September 13, 2021, Maraj was served with the summons and complaint.  *See* Dkt. 14.  On October 11, 2021, plaintiff requested a certificate of default as to defendants Petty and Maraj.  *See* Dkt. 15.  On October 14, 2021, Burstein filed a notice of appearance on behalf of Maraj.  Dkt. 16.  On October 18, 2021, Steven Gordon ("Gordon") filed an appearance as co-counsel on behalf of plaintiff.[3]  *See* Dkt. 18.

On October 19, 2021, the Clerk of Court denied plaintiff's request for a certificate of default as to Maraj since a notice of appearance had been filed by Burstein.  *See* Denial of Request for Cert. of Def. dated October 19, 2021.  On October 19, 2021, following the Clerk's denial, plaintiff filed a motion for reconsideration, and Maraj filed a response in opposition that same day.  *See* Dkts. 20, 21.  On December 8, 2021, the Court held a hearing on plaintiff's motion for reconsideration of the Clerk's denial of a certificate of default against Maraj.  *See* Minute Entry dated December 8, 2021.  At the hearing, the Court entered a briefing schedule on plaintiff's motion for default judgment against Maraj.  *Id*.  On December 17, 2021, plaintiff filed

---

decide non-dispositive motions by issuing a memorandum and order, which is reviewable by the district judge for clear error."  *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 16 n.1 (S.D.N.Y. 2010).
[3] On January 31, 2022, the Court granted Gordon's motion to withdraw as counsel.  *See* Minute Order dated January 31, 2022.

her motion for default, Dkt. 41; on December 31, 2021, Maraj filed her opposition, Dkt. 43.  On

January 12, 2022, plaintiff voluntarily dismissed the claims against Maraj without prejudice.[4]

*See* Notice of Voluntary Dismissal, Dkt. 46.

On January 20, 2022, Maraj requested a briefing schedule with respect to her anticipated

motion for sanctions against plaintiff and her counsel, Blackburn.  *See* Maraj letter, Dkt. 50.

Also in the letter, Maraj accused plaintiff and her counsel of dismissing the claims against Maraj

in an attempt to evade sanctions under Rule 11 of the Federal Rules of Civil Procedure.  *Id*.

In response, Gordon, then co-counsel for plaintiff, filed a letter accusing Burstein of "*in

terrorem* litigation tactics."  *See* letter dated January 21, 2022, Dkt. 53.  Gordon noted that he

had received five purported motions for sanctions by email from Burstein.  *See id*.  In response,

Burstein stated that Gordon had made "multiple outrageous and demonstrably false accusations"

and, renewed the request for a briefing schedule.  *See* letter dated January 21, 2022, Dkt. 54.

On January 21, 2022, Blackburn, counsel for plaintiff, filed a separate letter stating that

with respect to the briefing schedule, Burstein did not appear to be "willing to sort through the

scheduling conflicts collegially."  *See* letter dated January 21, 2022, Dkt. 55.  Blackburn's letter

went on to accuse Burstein of "deplorable behavior," having a "sick obsession" with Gordon's

wife, and "scrummaging through" YouTube for comments made by Gordon's wife.  *Id*.

On January 24, 2022, Gordon filed a letter in which he characterized Burstein's request to

file a motion for sanctions as "an attempt to delay Plaintiff's re-filing" her claims against Maraj

in another district located in California.  *See* letter dated January 24, 2022, Dkt. 56.  In this letter,

plaintiff requested leave to file a cross motion for sanctions against Maraj and her counsel for

---

[4] On May 19, 2022, in light of plaintiff's voluntary dismissal of Maraj from this case (Dkt. 46),
the Honorable Eric Vitaliano denied the motion for default judgment against Maraj (Dkt. 41) as
moot.  *See* Order finding as moot Mot. for Def. Judgment dated May 19, 2022.

"vexatiously multiplying and delaying proceedings and for frivolously seeking sanctions based on an improper purpose; to harass and intimidate." *See id*. Three days later, on January 27, 2022, Gordon filed a motion to withdraw as counsel.[5] *See* letter withdrawing as counsel, Dkt. 59. On January 28, 2022, Maraj filed a letter informing that court that she was no longer seeking sanctions against Gordon. *See* letter dated January 28, 2022, Dkt. 62.

On January 30, 2022, Blackburn filed a motion to withdraw his January 21, 2022 letter (Dkt. 55), which the Court granted. *See* Mot. to Withdraw Dkt. 55, Dkt. 63; Order granting Mot. to Withdraw Dkt. 55 dated May 19, 2022. Also in the withdrawal motion, Blackburn asserts that "the claims made in docket entry #55 concerning Mrs. Gordon" were requested to be included in the letter by Gordon. Dkt. 63. Blackburn further explains that he came to know that Burstein had discovered the YouTube video and comment made by Gordon's wife when Burstein received "a random email to his law firm." *Id*. The withdrawal motion accuses Burstein and Gordon of having private conversations, in which Burstein promised not to pursue sanctions against Gordon if plaintiff dropped the motion for default judgment against Maraj. *Id*.

The fully-briefed motion for sanctions was filed on April 11, 2022. *See* Maraj Mot. for Sanctions, Dkt. 69; Mem. of Law in Opposition to Maraj and her counsel Judd Burstein's Motion for Sanctions ("Pl.'s Opp."), Dkt. 70; and Maraj Reply in Supp. of Mot. for Sanctions ("Maraj Reply"), Dkt. 71.

---

[5] On January 31, 2022, the Court held a hearing on Gordon's motion to withdraw as co-counsel for plaintiff, and the Court granted Gordon's motion. *See* Minute Order dated January 31, 2022.

## Discussion

### I.       Inherent Power to Sanction and 28 U.S.C. § 1927

"Under § 1927, a court may impose sanctions on any attorney who so multiplies the proceedings in any case unreasonably and vexatiously." *Morales v. Constr. Directions LLC*, No. 19-CV-6493, 2021 WL 8317096, at \*5 (E.D.N.Y. Aug. 27, 2021) (quoting 28 U.S.C. § 1927) (internal quotation marks omitted).  The purpose of Section 1927 is "to deter unnecessary delays in litigation." *Id*. (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)).  To rule in favor of the moving party under Section 1927, the movant must provide "clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith -- that is, motivated by improper purposes such as harassment or delay." *Tropp v. Conair*, 845 F. Supp. 2d 485, 490 (E.D.N.Y. 2012).

A party's conduct is considered meritless or without color when "it lacks any legal or factual basis," and conduct "is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Dong Hui Chen v. Thai Greenleaf Rest. Corp.*, No. 21-CV-1382, 2022 WL 18859066, at \*3 (E.D.N.Y. Dec. 22, 2022) (internal quotation marks and citation omitted).  The bad faith standard of the second prong is interpreted "restrictively" by the Second Circuit and requires a clear showing of bad faith with a high degree of factual specificity in most cases." *Id*.  Courts "may infer bad faith when a party undertakes frivolous actions that are completely without merit." *Prescott v. Nationwide Mut. Ins. Co.*, No. 17-CV-6508, 2019 WL 7842538, at \*17 (E.D.N.Y. Aug. 27, 2019) (internal quotation marks and citation omitted).  "Accordingly, courts have assessed whether to impose 28 U.S.C. § 1927 sanctions under the same standard as inherent power

5

sanctions, and they may be considered together." *Alcon Vision, LLC v. Lens.com, Inc.*, No. 18-CV-407, 2022 WL 17685501, at *7 (E.D.N.Y. July 7, 2022) (citations omitted).

District courts have the inherent "power to police the conduct of attorneys as officers of the court, and to sanction attorneys for conduct not inherent to client representation." *Chen*, 2022 WL 18859066, at *3.  Examples of conduct considered sanctionable under the court's inherent power are "violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom." *Id*.  A court need not make a finding of bad faith before sanctioning an attorney when the attorney "violates a court order or engages in other misconduct that is not undertaken for the client's benefit." *Id*.  However, "[b]ecause of the potency of the court's inherent power, courts must take pains to exercise restraint and discretion when wielding it." *Alcon*, 2022 WL 17685501, at *6 (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)).

## II.  Default Judgment against Maraj

Maraj seeks sanctions against Blackburn for filing a "frivolous" motion for default judgment on the grounds that (1) "the Amended Complaint's theories of jurisdiction under CPLR 301 were facially deficient," and (2) "the Amended Complaint alleged that Ms. Maraj is both a [domiciliary and resident of California], thereby precluding a claim of jurisdiction under CPLR 301." Maraj Mem., Dkt. 69-18, at 25-26.  Maraj further argues that the motion for default judgment was frivolous because plaintiff had no chance to prevail on the motion where, as here, Maraj missed the deadline to respond to the amended complaint by seven days. *Id*. at 26.  As further evidence of bad faith, Maraj directs the Court's attention to a list of actions undertaken by plaintiff, including baseless claims made by plaintiff against Maraj in the FAC as part of a media campaign; plaintiff's counsel's failure to investigate truth of claims made in the FAC; and

plaintiff's persistence in proceeding with litigation despite lack of personal jurisdiction.  *Id*. at 26-27.  Maraj's motion for sanctions against Blackburn stems largely from plaintiff's decision to pursue a motion for default judgment that Maraj considered "frivolous."  In support of Maraj's argument, Maraj states, *inter alia*, that plaintiff only filed claims against Maraj because she is "wealthy and famous" and has "deep pockets."  Maraj Mem. at 7-9.

The Court finds Maraj's arguments in support of sanctions unavailing.  *See Prescott*, 2019 WL 7842538, at *17.  Under Section 1927, a claim that fails as a matter of law is not necessarily lacking any basis at all.  *See Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999).  Maraj argues that she put plaintiff on notice that the motion for default judgment was frivolous; Maraj's pre-motion letter noted that plaintiff sought default judgment in connection with claims in the FAC that lacked merit.  *See* Maraj Mem. at 12; *see also*, Mot. for Leave to File Document, Dkt. 17.  In response, plaintiff states that it is "[t]he court that determines the outcome of the motion for Default Judgment, **NOT** Burstein."  Pl.'s Opp. at 11-12 (emphasis in original).

The Court does not find plaintiff's decision to pursue a motion for default judgment against Maraj sanctionable, notwithstanding Maraj's claim that the motion lacked merit.  Here, plaintiff did not have an obligation to withdraw her motion for default judgment against Maraj simply because counsel for Maraj considered the motion "frivolous."  Notwithstanding Maraj's belief that a motion for default judgment lacked merit, the Court allowed plaintiff to move forward with the motion for default judgment and entered a briefing schedule in connection with plaintiff's motion.  *See* Minute Entry Order dated December 8, 2021.

Even assuming the Court were to agree with Maraj that plaintiff's claims in the FAC lacked merit, in part, based on the absence of personal jurisdiction, plaintiff's efforts to obtain a

default judgment against Maraj does not warrant imposing sanctions. Notably, the purported weakness of plaintiff's claims would have made the FAC "relatively straightforward to dispose of" at the motion to dismiss stage. *See Prescott*, 2019 WL 7842538, at \*17. More important, the Court does not find that plaintiff was motivated by an improper purpose by refusing to withdraw her claims or the motion for default against Maraj, even if those claims were weak. *Id*.

Notwithstanding Maraj's argument that plaintiff's motion for default judgment lacked merit, plaintiff arguably had at least some legal and factual support for the claims. *See Tropp*, 845 F. Supp. at 491 (citing *Schlaifer Nance & Co.*, 194 F.3d at 337 ("a claim that fails as a matter of law is not necessarily lacking *any* basis at all") (emphasis in original)). Plaintiff argues that she had a genuine belief that Maraj was subject to this Court's jurisdiction through Maraj's ownership of a residence and business located in New York. *See* Decl. of Tyrone A. Blackburn, Dkt. 70 at ¶¶ 46, 47. However, when plaintiff learned that the property in question was the residence of Maraj's mother, plaintiff withdrew the claims against Maraj. *Id*. at ¶ 50.

Maraj further argues in favor of sanctions because of Blackburn's "bad faith" conduct during the three-month period between the time Maraj's counsel, Burstein, first filed his appearance on October 14, 2021, and plaintiff voluntarily dismissed the claims against Maraj on January 12, 2022. According to Maraj, Blackburn denied Maraj's "reasonable requests" for an extension of time for her to respond to the FAC. *See* Maraj Mem. at 11. Further, Maraj argues that Blackburn used the request for an extension of time, and plaintiff's refusal, to garner media attention. *Id*. Maraj cites an article from the *Daily Beast*, which quotes Blackburn. *Id*. Maraj, however, concedes that, standing alone, Blackburn's actions do not warrant sanctions, but rather

they are probative of whether Blackburn was acting in "good faith."[6] *Id.* In response, Blackburn argues that he was not required by law "to extend any courtesies to the opposing side," and that the quote from the *Daily Beast* was merely "an answer to a reporter's question." *See* Pl.'s Opp., Dkt. 70-14, at 11.

While it may be a matter of professional courtesy to consent to an extension of a deadline, here, Blackburn's actions did not rise to the level of a sanctionable offense, nor does the Court read bad faith into Blackburn's refusal to consent to such a request. Blackburn was under no obligation to consent to Maraj's extension request. Further, and more important, regardless of whether Blackburn consented to the request, ultimately the Court, not Blackburn, decides whether to grant extension requests.

Maraj further points to alleged factual discrepancies in the FAC as evidence of "bad faith" (*e.g.*, alleged gang affiliation and claims that plaintiff had to change her residence and her telephone number). Maraj Mem. at 15, 18. However, plaintiff voluntarily dismissed the claims against Maraj shortly after the parties had completed briefing on the motion for default judgment. *See* Notice of Voluntary Dismissal, Dkt. 46. Maraj's efforts, if any, to address those discrepancies did not unduly multiply these proceedings. Maraj did not have to address those allegations in a motion to dismiss nor engage in any discovery in connection with those allegations.

---

[6] Maraj sets forth a series of allegations as evidence of Blackburn's "bad faith." However, Maraj makes clear that she is not seeking sanctions based on those facts. *See, e.*g., Maraj Mem. at 7 ("Maraj does not seek sanctions based upon the filing of the Complaint and the Amended Complaint . . . ."); *id.* at 11 ("Maraj does not contend that Mr. Blackburn should be sanctioned specifically for this conduct [referring to Blackburn's objection to Maraj's extension request]"); *id.* at 12 ("Maraj does not seek sanctions for Mr. Blackburn's refusal of counsel's request [referring to Burstein's request for an extension to respond to the complaint]").

The Court finds that Maraj has not met her burden to demonstrate "by clear evidence that [Blackburn] acted in bad faith" to multiply these proceedings unreasonably and vexatiously as required by Section 1927 during the three-month period Maraj had to defend against this action. *See Intelli-Check, Inc. v. Tricom Card Techs., Inc.*, No. 03-CV-3706, 2005 WL 3533153, at *10 (E.D.N.Y. Dec. 22, 2005). The Court denies Maraj's motion for sanctions against Blackburn in connection with plaintiff's motion for default judgment.

## III.   Personal Attacks on Burstein

Maraj further asks the Court to impose sanctions against Blackburn pursuant to its inherent power for his "false and insulting claims about Mr. Burstein's supposed 'sick obsession' with, and 'creepy' 'cyberstalking'" of Gordon's wife. Maraj Mem. at 28. Maraj states in her motion that "the only explanation for Mr. Blackburn's accusation" was to "embarrass and upset" Burstein. *Id*. at 22.

Courts have the inherent "power to police the conduct of attorneys as officers of the court, and to sanction attorneys for conduct not inherent to client representation, such as, violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom without a finding of bad faith." *Chen*, 2022 WL 18859066, at *3 (quoting *Seltzer*, 227 F.3d at 41) (internal quotation marks and citations omitted). "Sanctions are inappropriate absent clear evidence that the challenged actions are entirely without color . . . and are taken for reasons of harassment or delay or for other improper purposes." *Brewer v. Strillacci*, No. 03-CV-127, 2003 WL 23511730, at *2 (D. Conn. June 4, 2003) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (internal quotation marks and brackets omitted)). As an initial matter, the parties do not argue that Blackburn and plaintiff violated a

court order that would warrant sanctions. Thus, the Court will analyze whether Blackburn has engaged in sanctionable conduct "not inherent to client representation." *Id*.

The offending conduct stems from a letter filed by Blackburn, in which he states:

> An example of [Burstein's] deplorable behavior stems from his sick obsession with Mr. Gordon's wife. Mr. Burstein went scrummaging through the comments section of youtube posts in search of comments posted by Mrs. Gordon. Not only was his act of cyberstalking Mrs. Gordon creepy, but it was also weird, and beneath the dignity of this profession.

*See* letter dated January 21, 2022, Dkt. 55.

In addition to the January 21, 2022 letter, plaintiff and Maraj, through their attorneys, filed a series of letters in connection with a briefing schedule for Maraj's anticipated sanctions motion. The attorneys openly displayed their disdain for each other in those letters. *See, e.g.,* Dkts. 50, 53-57. Given the circumstances surrounding the filing of the parties' multiple letters, it cannot be said that these exchanges were "completely without color." *See Brewer*, 2003 WL 23511730, at *2. Although Blackburn's comments regarding Burstein were likely inflammatory, in the same letter, Blackburn attempted to draw the Court's attention to Burstein's alleged lack of collegiality. Dkt. 55 ("Mr. Burstein has not been willing to sort through the scheduling conflicts collegially.").

Ultimately, the Court need not decide whether the purportedly offensive comments made by Blackburn in his January 21, 2022 letter were "inherent to client representation" because Blackburn's conduct does not rise to the level of conduct that "interferes with the court's power to manage its calendar and the courtroom." *Chen*, 2022 WL 18859066, at *3. While the conduct displayed by Blackburn might be described as antagonistic, his alleged conduct does not compare to other attorney conduct that courts have found sanctionable. *See, e.g., Ransmeier v. Mariani*, 718 F.3d 64, 69 n.2 (2d Cir. 2013) (imposing sanctions on appellant and appellant's

attorney for making requests that were "devoid of legal merit" and filing letters that "devolved into personal attacks" on the court and the clerk of court); *Scott-Iverson v. Indep. Health Ass'n*, No. 13-CV-451, 2017 WL 35453 (W.D.N.Y. Jan. 4, 2017) (granting sanctions against plaintiff for repeated remarks during depositions that defense counsel was a "racist" and averring that defense counsel was a "racist" in an affidavit in support of plaintiff's opposition); *Hart v. Blanchette*, No. 13-CV-6458, 2019 WL 1416632, at *33 (W.D.N.Y. Mar. 29, 2019) (imposing sanctions for misrepresentations to the court demonstrating subjective bad faith); *Azkour v. Rest.*, No. 10-CV-4132, 2014 WL 12779561, at *3 (S.D.N.Y. June 2, 2014) (awarding sanctions where *pro se* plaintiff had been "repeatedly instructed [] that he may not make offensive statements about Defendant's counsel").

Notwithstanding the language used, the Court recognizes that Blackburn took steps to rectify the issue. Blackburn subsequently moved to withdraw the January 21, 2022 letter (Dkt. 55) when he learned that, in fact, Burstein had not culled through the online comments himself. Dkt. 63. The Court granted plaintiff's motion to withdraw the January 21, 2022 letter. *See* Dkt. entry dated May 19, 2022; *see also* Pl.'s Mem. at 28.

The Second Circuit has described the determination as to whether to impose sanctions as "one of the most difficult and unenviable tasks for a court." *Schlaifer Nance & Co.*, 194 F.3d at 341. "On the one hand, a court should discipline those who harass their opponents and waste judicial resources by abusing the legal process. On the other hand, in our adversarial system, we expect a litigant and his or her attorney to pursue a claim zealously within the boundaries of the law and ethical rules." *Id.* "It is in keeping with the high bar disfavoring the award of sanctions" that this Court denies Maraj's motion for sanctions against Blackburn. *Morales*, 2021 WL 8317096, at *6. However, Blackburn "should not take the denial of the motion for sanctions as

in any way endorsing his behavior." *Brewer*, 2003 WL 23511730, at *2. The Court reminds

Blackburn that, as an attorney, he is "held to a higher standard of conduct in the course of these

proceedings." *Id*. (citation omitted).

## Conclusion

For the reasons set forth above, this Court denies the motion for sanctions against

Blackburn.

**SO ORDERED**

Dated: Brooklyn, New York
      March 30, 2023

                                s/ James R. Cho
                                James R. Cho
                                United States Magistrate Judge

Exhibit "R"

ATTORNEY. AUTHORITY. ADVOCATE.

Call To Discuss Your Case! **(347) 427-5999**

SCHEDULE A FREE CONSULTATION



| Home | About Us | Practice Areas | In The News | Contact Us |



# TYRONE A. BLACKBURN

Home   /   Staff Profiles   /   Tyrone A. Blackburn



## Bio

Tyrone Blackburn is a skilled plaintiffs' attorney and tireless advocate who puts people first. Mr. Blackburn's practice focuses on employment and discrimination law, sexual assault and harassment, and medical malpractice.

Mr. Blackburn seeks justice for clients who feel victimized by unlawful workplace practices, including misconduct, discrimination, or harassment based on age, disability, gender, pregnancy, or sexual orientation.

## Bio

Tyrone Blackburn is a skilled plaintiffs' attorney and tireless advocate who puts people first. Mr. Blackburn's practice focuses on employment and discrimination law, sexual assault and harassment, and medical malpractice.

Mr. Blackburn seeks justice for clients who feel victimized by unlawful workplace practices, including misconduct, discrimination, or harassment based on age, disability, gender, pregnancy, or sexual orientation.

## Education

Mr. Blackburn received his undergraduate degree from Brooklyn College, City University of New York, and his Juris Doctor from Seton Hall University School of Law in Newark, NJ.

**Admissions:**

- New York State
- New Jersey State
- Eastern District of New York
- Southern District of New York
- District of New Jersey

## Some of Mr. Blackburn's Notable Representations

**Gender discrimination, sexual harassment, or sexual assault claims against:**

- Hip-hop mogul Clifford Harris ("TI") and his wife, Tameka Harris ("Tiny")
- Fox Rothschild LLP
- Airbnb



**Tyrone A. Blackburn**
Founding Attorney

Top





# MEET TYRONE A. BLACKBURN

## ATTORNEY. AUTHORITY. ADVOCATE.

Tyrone Blackburn, an experienced plaintiff's attorney in New York and New Jersey, specializes in employment, discrimination, sexual assault, and medical malpractice cases through T. A. Blackburn Law. He's a dedicated advocate for justice, fearlessly taking on influential companies and public figures, such as Clifford "T.I." Harris, Tameka "Tiny" Harris, Fox Rothschild LLP, Airbnb, UPS, and more. With his holistic approach, Tyrone seeks to transform lives, offering clients closure and tools to avoid repeating history.

ATTORNEY PROFILE →

Top

ATTORNEY. AUTHORITY. ADVOCATE.

Call To Discuss Your Case!  (347) 427-5999

SCHEDULE A FREE CONSULTATION →



Home     About Us     Practice Areas     In The News     Contact Us



# IN THE NEWS

Home   /   In The News





Top

### NICKI MINAJ AND HUSBAND SUED, ACCUSED OF HARASSING SEXUAL ASSAULT VICTIM

Oct 04 2022

The New York Times

### EX-EXEC CLAIMS MORGAN STANLEY PUSHED HIM OUT, LAUNCHED PERSONAL CYBER ASSAULTS

Sep 28 2022

Financial Advisor

### AN EX-MORGAN STANLEY EMPLOYEE HAS BEEN REPPING STAFFERS WITH BIAS CLAIMS AGAINST THE BANK. IN A NEW SUIT, A TOP EXEC IS ACCUSED

Sep 27 2022

Insider

### NICKI MINAJ'S HUSBAND KENNETH PETTY SENTENCED FOR FAILING TO REGISTER AS SEX OFFENDER

Jul 07 2022

The Root

### SEXTING PHOTO ADMITTED: FOX

### NICKI MINAJ'S LAWYER THREATENS

### FIRED LEGAL ASSISTANT DERIDES

### SEXUAL-ASSAULT VICTIM SUING NICKI

**FULL INTERVIEW: JENNIFER HOUGH ON NICKI MINAJ & KENNETH PETTY: 'I'M TIRED OF BEING AFRAID'**

Sep 23 2021

The Real

**KENNETH PETTY'S SEXUAL ASSAULT VICTIM WANTS YOU (AND NICKI MINAJ) TO KNOW ONE THING: 'THIS HAPPENED'**

Aug 18 2021

Daily Beast

**JENNIFER HOUGH'S LAWYERS FIRE BACK AT 'VICTIM-SHAMING' NICKI MINAJ AND TMZ**

Aug 13 2021

Daily Beast

**T.I. AND TINY UNDER INVESTIGATION BY LOS ANGELES POLICE**

May 18 2021

The New York Times

◄ 1 / 2 ►

Home    About Us    Practice Areas    In The News    Contact Us



**Address**

1242 E. 80th St 3rd Floor
Brooklyn, NY 11236

Map & Directions

**Request Your Consultation**

**(347) 427-5999**

**Follow Us**

