**Tyrone Blackburn, ESQ**
**Attorney NJS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Counsel for Plaintiff,* Abuchi Raymond Wealth and Markevich

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABUCHI RAYMOND WEALTH, and STANISLAV MARKEVICH<br><br>                             Plaintiffs,<br><br>~against~<br><br>FOX ROTHSCHILD LLP;<br>ALKA BAHAL;<br>KRISTEN M. AMABILE;<br>JOHN AND JANE DOES 1-10,<br>and ABC CORPS. 1-10;<br>                          Defendants. | DOCKET NO. 23-3194<br><u>Civil Action</u><br><br>**Opposition to Defendants Motion For A Protective Order to Enjoin Plaintiffs' Counsel From Making Additional Extrajudicial Statements About Fox Rothschild** |

## OPPOSITION TO DEFENDANTS MOTION FOR A PROTECTIVE ORDER TO ENJOIN PLAINTIFFS' COUNSEL FROM MAKING ADDITIONAL EXTRAJUDICIAL STATEMENTS ABOUT FOX ROTHSCHILD

By:
Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.

1

## SUMMARY

Fox Rothschild ("Fox") failed to monitor the actions of their employees, Kristina Amabile and Alka Bahal.  As a result, Ms. Amabile and Ms. Bahal were allowed to engage in nefarious activities, which resulted in the Plaintiffs losing thousands of dollars and facing deportation.  The plaintiffs notified Fox of this for over a year before filing this litigation.  Fox, through its representative Rachelle M. Bin, rejected Plaintiff's concerns and refused to engage with Plaintiff to resolve this privately.  While Rachelle Bin rejected an opportunity for a private resolution, Ms. Bahal sued Ms. Amabile in New Jersey State Court for $80,000 in stolen cash.  Ms. Amabile filed a countersuit for NJ CEPA violations and threatened to expose Fox's pattern and practice of stealing from their clients by creating fake invoices and expense charges to their client accounts.  In addition to the Bahal and Amabile lawsuit, during this time, Fox, through its representative Thomas D. Paradise, was negotiating a hush money settlement with Ms. Amabile for $150,000 to prevent her from publicly naming the current and former Fox clients who Fox and Bahal knowingly defrauded.  After attempting to resolve this case in good faith, Plaintiffs moved forward and filed suit.  Before filing, the Plaintiffs reported Fox, Bahal, and Amabile to the NJ States Bar and law enforcement.

Procedurally, the Plaintiffs amended their pleadings to plead the RICO claims with more specificity.  Defendants filed a motion to dismiss, and Plaintiffs filed their opposition.  On February 7, 2024, a journalist from Law360.com, an online subscription-based publication specifically targeted to the legal community, requested a comment concerning the Plaintiff's opposition.  The plaintiffs' counsel provided a comment that reflected his opinion and information concerning criminal referrals that were made.  This was in response to a specific question regarding the civil Rico claims.  This writer's one-off comment is constitutionally protected speech.

///

**THIS WRITER'S HISTORY WITH FOX**

It is clear to any reader of Fox's Motion for Protective Order that Fox is having a temper tantrum.  The fact that Fox, through their counsel, used more than 50% of their motion to somehow paint this writer's zealous advocacy in other unrelated matters as evidencing some pattern and practice is evidence that they filed this motion for a protective order in bad faith.  The cases Fox cites to support its motion for a protective order are all unrelated to the facts of this case.  This is another example that Fox filed this motion for a protective order in bad faith.

There is no question that this writer's history of suing Fox on behalf of several former employees and his prior contentious dealings with Fox representatives Rachelle M. Bin and Thomas D. Paradise are the motivating force behind this temper tantrum.  This writer was involved in contentious litigation against Fox for nearly four years in *Jones v. Fox Rothschild LLP, et al*., 2:20-cv-06312.

Many motions were filed, and Fox was thoroughly embarrassed when they had to bend a knee and settle the Jones case for more money than they had intended (Rachelle Bins words, not mine).  The embarrassment of Fox, a global law firm with over 1,000 attorneys, losing to a black solo practitioner from Brooklyn, NY, has clearly stuck a nerve and clouded their judgment regarding this case.

This writer has been approached by many potential clients (former employees and former clients of Fox) regarding litigation against Fox.  Litigating against Fox in another matter is imminent.

I am a zealous advocate, and I take my role as counsel to some of the most vulnerable members of society seriously.  I am also a child of immigrants.  The issues in this case hit close to home for me.  The way Fox, Amabile, and Bahal took advantage of two desperate immigrants, yet hopeful; overly trusting, yet naïve was disgusting.  The Plaintiff's story reflected the stories of my

family members.  Many immigrants who come to this country place their lives and futures in the hands of immigration attorneys or law firms, hoping those individuals will do right by them.  These individuals are left with little to no recourse when they don't.  They are often deported back to their home countries, discouraged, depressed, and in a worse position than when they first left.

The dismissive nature that Fox and its representatives have taken towards my clients and other vulnerable individuals whom they've harmed in the immigrant community is infuriating.  Plaintiffs, as well as other victims of Fox whom my firm has spoken to, would be justified and well within their rights to stand on the tallest mountain and tell the world what Fox has done to them.

**THIS MOTION**

In this motion, Fox attempts to distract the Court from its pattern and practice of engaging in ethically flawed behavior.  Fox is not upset or concerned by this writer's February 7, 2024, answer to a Law360 journalist's question concerning a filed opposition to Fox's motion to dismiss.  Fox is concerned that this writer exposed in its motion papers that Fox paid a former administrator, Kristina Amabile, $150,000 in exchange for her silence concerning a NJ CEPA whistleblower claim she filed in New Jersey State Court.  Fox is embarrassed that their $150,000 payment to Ms. Amabile, a person whom they accused of stealing $160,000 worth of cash and goods from Fox, was discovered and disclosed in Plaintiffs' pleadings.  This is evident from the fact that the New Jersey State Court, Bahal v. Amabile lawsuit, did not mention Fox.  ***That was not by accident***.

Before filing this litigation, this writer sent several letters to the New Jersey State Attorney General's Office and the United States Justice Department in Washington, D.C.  In those letters, which are attached, this writer highlighted the actions of Fox and Fox's former Partner, Alka Bahal, and Ms. Amabile.  (***See***, **Exhibit A, Criminal Referrals**).  This writer did not inform Defendants

4

of the criminal referrals.  Defendants first learned of the criminal referrals in February 2024.  This writer did not want Defendants to try to raise a bogus extortion claim.

This writer requested a criminal investigation because it is evident to any person with a modicum of common sense that you do not pay someone you are accusing of stealing $160,000 in goods and cash an additional $150,000 unless they know something you do not want to be disclosed.  For Fox to essentially give Ms. Amabile $310,000 ($160k allegedly stolen cash and goods + $150k hush money payment) worth of cash and goods, Ms. Amabile possesses information that could cost Fox millions.

In her pleadings, Ms. Amabile also outlined what I genuinely believed was a disturbing pattern and practice of Fox defrauding its clients through sham audits and overbilling them to steal unearned retainer balances.  As a 20+ year employee of Fox, Ms. Amabile outlined the actions she was forced to implement against her will, and she detailed the environment Fox and her former boss, Alka Bahal, created, which made it impossible for her to say no.  All of these facts, plus the eerily similar complaints my clients Raymond Wealth, Stanislav Markevich, and two additional former Fox immigration clients raised, led me to believe that it was necessary to report this to law enforcement and that Fox was engaging in RICO activities.

My February 7, 2024, comment to Law360 regarding plaintiffs' opposition to Fox's motion to dismiss was a response to a question concerning the NJ Rico claim and if I thought there would be a criminal investigation.  I responded that I've already made several criminal referrals due to the many concerns I detailed above.  Hindsight is 20/20, and although it was my constitutionally protected right to do so, I could have refrained from disclosing to Law360 that I referred this matter to law enforcement.

Moving forward, I will not provide any comments to any other publications about this case that are not already in the public domain.  In all honesty, I have no interest or desire to talk about Fox because the record speaks for itself.

### GAG ORDER

The Court should deny Fox's motion for an order prohibiting statements to the media and public because Fox has not shown that "there is a substantial likelihood that extrajudicial statements by counsel, in light of the circumstances of the case, will materially prejudice the pending proceedings." *Constand v. Cosby*, 229 F.R.D. 472, 475 (E.D. Pa. 2005) *amended in part* (June 24, 2005) (Robreno, J.).   Furthermore, the defendants have not demonstrated that their proposed order, which bars this writer from making any statement to the public and the media, is narrowly tailored and the least restrictive means of ensuring a fair trial.  *United States v. Scarfo*, 263 F.3d 80, 93 (3d Cir.2001).


I.   **Gag Orders Are Prior Restraints On Speech, And They Are Presumptively Unconstitutional:**
In the United States, all speech "is presumptively protected under the First Amendment unless it falls within 'certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem.'" *In re White*, No. 2:07cv342, 2013 U.S. Dist. LEXIS 133148, 2013 WL 5295652, at *38 (E.D. Va. September 13, 2013) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)).

"These categorial exceptions from First Amendment protection include 'the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those by which their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.*   (quoting *Chaplinsky*, 315 U.S. at 572).  "They also include 'true threats'" of physical violence "and speech

that incites imminent lawless action." *Id.; see* Mem. Op. & Order of May 29, 2020, at 4-12 (denying Plaintiffs' motion to enjoin pro se Defendant from making certain remarks about Plaintiffs' counsel because Defendant's past comments, "while reprehensible," did not rise to the level of a "true threat"), ECF No. 747.

Defendants seek a gag order prohibiting this writer from publicly discussing this case until the matter is over, even if the matter is no longer under this Court Jurisdiction.  "Even among first amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two "presumptively unconstitutional" forms of expressive limitations:  prior restraints and content-based restrictions." *In re Murphy-Brown, LLC*, 907 F.3d 788, 796-97 (4th Cir. 2018).  "In light of these twin presumptions, gag orders must survive strict scrutiny." *Id.* at 797.  This means that such orders must *both* "serve a 'compelling' public interest," *id., and* "be 'narrowly tailored' to serve their intended purpose," *id.* at 799 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015)).  *Sines v. Kessler*, Civil Action No. 3:17-cv-00072, 2021 U.S. Dist. LEXIS 207697, at *9 (W.D. Va. October 28, 2021).  Defendant Fox's proposed Gag Order is overly broad and does not serve a compelling public interest.

Defendants request constitutes "a prior restraint on speech that "raises rights under the First Amendment of the United States Constitution." *United States v. Scarfo,* 263 F.3d 80, 92 (3d Cir. 2001).  A gag order also carries with it "a heavy presumption against its constitutional validity." *Bailey v. Sys. Innovation, Inc.,* 852 F.2d 93, 98 (3d Cir. 1988) (quoting *New York Times Co. v. United States,* 403 U.S. 713, 714, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971)).  As such, the party moving for the gag order must present evidence that demonstrates the need for prior restraint on both the lawyer and the litigants.  *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 562, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976); *Bailey,* 852 F.2d at 99.  The moving party must also demonstrate

that the order is narrowly tailored and that other measures short of prior restraint cannot effectively address the perceived danger.  *See Nebraska Press,* 427 U.S. at 564-65.  "If any method other than a prior restraint can effectively be employed to further the governmental or private interest threatened . . . then the order is invalid." *Bailey,* 852 F.2d at 99.  Defendant Fox has failed to show how their request for a gag order fits within this analytical framework.

A gag order imposed by a trial court must be supported by an adequate factual record and reasoning "specific enough to enable the reviewing court to determine whether the order survives rigorous scrutiny." *Id.* at 797; *see, e.g., id.* at 798 ("The district court—without adequate factual findings or development of a record—found that a 'significant increase in trial publicity' supported the gag order.  But the fact of publicity is hardly dispositive.  Publicity often accompanies trials, including trials in which the public has a keen and understandable interest.  The judicial process does not run and hide at those moments when public appraisal of its workings is most intense."). While "[o]ur system of justice properly requires that civil litigants be assured the right to a fair trial," using a gag order to ensure that right could serve "a compelling public interest . . . only when there is a 'reasonable likelihood' that a party would be denied a fair trial without [an] order" restricting extrajudicial speech about the litigation.  *Id.* at 797 (quoting *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984)).  And, "[e]ven when a gag order furthers a compelling interest, it must be the least restrictive means of furthering that interest." *Id.* at 799 (internal quotation marks omitted).  Generally, the trial court must "explain if and why [less restrictive] alternatives had proven ineffective" before resorting to a gag order.  *Id.; see also id.* at 800 ("Gag orders should be a last resort, not a first impulse.").  *Sines v. Kessler*, Civil Action No. 3:17-cv-00072, 2021 U.S. Dist. LEXIS 207697, at *11-12 (W.D. Va. October 28, 2021).

Here, this case is far from trial. As detailed below, this writer's one-off sixteen-word comment to an online subscription-based new outlet, Law360.com, is not enough to sway public opinion or to be prejudicial to a prospective Jury. If a gag order is imposed, it does nothing to stop Law360.com or any other media outlet from reporting on a case that is squarely in the public domain.

II.   **Defendants Have Not Shown A Substantial Likelihood Of Material Prejudice**:

Defendants claim that any statements about this case by plaintiffs' attorneys or witnesses "*may* prejudice Defendants' right to a fair trial" and their constitutional right "to an impartial jury." Mot., ECF No. 59 (emphasis added).  Putting aside that the Sixth Amendment applies to criminal and not civil cases, defendants' mere suspicion that statements to the media "*may* prejudice Defendants' right to a fair trial" is not sufficient to warrant a gag order.  The standard for a gag order is clear: "the Court must be convinced, not merely suspect." *Constand* 229 F.R.D. at 475. To convince the Court, the defendants must present *convincing evidence* to this Court that there is "a substantial likelihood that extrajudicial statements by counsel, in light of the circumstances of the case, will materially prejudice the pending proceedings." Id.

Defendants' motion lacks any evidentiary basis that could convince the Court that there is a substantial likelihood of material prejudice.  The defendants identified a one-off comment, which was all of sixteen words, made to a subscription-based online publication that is targeted at the legal community that the defendants find prejudicial.  Defendants then attempt to bolster their fragile position by claiming that this writer has made similar comments in unrelated cases, one of which Fox was a defendant.  Ironically, Fox did not file a similar motion, or even as much as a simple letter on the docket concerning this writer's comments in the Jones v. Fox Rothschild case.

Fox's selective outrage is quite rich and signals that they have deeper concerns unrelated to this writer confirming that he made a criminal referral before filing this case.

Furthermore, defendant Fox struggles to explain how this writer's sixteen-word statement will cause a *substantial* likelihood of *material* prejudice to the Defendant.  They simply leave everyone guessing as to what is prejudicial.  That is hardly convincing.  Still, there is no vice with attorneys making statements to the media or issuing press releases, especially in cases like this one, that questions public policy against committing immigration fraud and the public policy against law firms engaging in deceptive business practices.  *See* Pa.R.P.C. 3.6, cmt 1.  ("The subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy."); *Coleman- Hill v. Governor Mifflin School Dist., 2010 WL 5014352 at *3 (E.D.Pa. 2010).*

Defendants' principal concern about the impartiality of a future jury pool is also speculative at this stage of the proceeding.  Defendants are far from having this case tried before a jury.  Defendants have filed a motion to dismiss the Complaint and there is a probability that the Court will resolve most—if not all—of the issues in this case on summary judgment.  These factors further dilute the defendants' claim of material prejudice.

Intense publicity surrounding a proceeding poses significant and well-known dangers to a fair trial.  *United States v. Brown,* 218 F.3d 415, 423 (5th Cir. 2000).  These dangers include the potential that pretrial publicity may prejudice the jury pool, as well as the actual outcome of a trial by, for example, disseminating to the press inadmissible evidence.  *See, e.g., Gentile,* 501 U.S. 1030, 1075, 115 L. Ed. 2d 888, 111 S. Ct. 2720 (1990); *Scarfo,* 263 F.3d at 94; *Brown,* 218 F.3d at 423 (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966)).  Under Third Circuit case law, the Court must examine the record to determine whether a gag order

would prevent a "substantial likelihood of material prejudice" to the judicial proceeding. *See Scarfo,* 263 F.3d at 93-94 (applying the "substantial likelihood of material prejudice" standard that the Supreme Court held constitutionally permissible to balance an attorney's interest in free speech against the state's interest in fair judicial determinations in *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 115 L. Ed. 2d 888, 111 S. Ct. 2720 (1990)).  If the Court determines that an order limiting extrajudicial communications proper, the "limitation [that the court imposes] on the . . . speech must be narrow and necessary, carefully aimed at comments likely to influence the trial or judicial determination." *Scarfo,* 263 F.3d at 93.  *Conley v. Chaffinch*, No. 04-1394-GMS, 2005 U.S. Dist. LEXIS 3279, at *2-5 (D. Del. March 2, 2005).

For starters, the publicity in this case is far from intense.  There has been a total of 3 articles, all from Law360.com, reviewing filings in this case.  1.  June 12, 2023, an article titled, "Fired Fox Rothschild Staffer Used Personal Information to Steal Client's Identity, suit alleges," 2.  February 7, 2024, an article titled "Fox Rothschild Must Face Visa Malpractice Suit, Court Told," and 3. February 29, 2024, an article titled, "Fox Rothschild Wants Atty Gag Order In NJ Malpractice Suit."  The public cannot read any of these articles unless they have subscribed to Law360.com. It is hard to describe this coverage as intense.  Fox will be hard-pressed to show how the articles mentioned above on a subscription-based online website will lead to prejudicing the Jury.  There has been no dissemination of inadmissible evidence.

In sum, it is not enough for Fox to point to media coverage of the case and declare the risk of prejudice.  To carry their heavy burden to obtain a gag order, defendants must present convincing evidence that the statements will materially prejudice defendants.  They must show that prejudice will be substantial, likely, and materially prejudicial.  Simply put, the defendants

offer no explanation and no evidence on how a singular one-off sixteen-word statement could meet

such a heavy burden.  Accordingly, the Court should deny the motion.

III.    **Defendants Do Not Request Narrowly Tailored Relief**:
Even if the defendants did present convincing evidence that there was a substantial

likelihood of material prejudice, the defendants' requested relief is not narrowly tailored.  *Scarfo*,

263 F.3d at 93.  Defendants never explain how their order fits within that definition.  It does not.

Defendants have requested that this Court enter an order barring this writer from making "*any*

*statements to the media, press or any other news organization, or making any other extrajudicial*

*or public statement, about Fox Rothschild while this lawsuit remains pending before this Court or*

*any other court.*" (emphasis added).  The defendants' proposed order essentially prevents the

discussion of this case with anyone, even if this case is dismissed and refiled in State Court, where

this Court does not have jurisdiction.

"[L]imiting parties and witnesses from making extrajudicial statements during a pending

civil proceeding raises constitutional questions where similar limitations upon lawyers do not."

*Constand*, 229 F.R.D. at 475.  This overly broad gag order would also prohibit Plaintiff from

answering the public's questions about this case or the subject matter of this case.  Thus, the

defendants' proposed gag order is hardly narrowly tailored and "carefully aimed at comments

likely to influence the trial or judicial determination." *Scarfo*, 263 F.3d at 93.  Accordingly, the

Court should deny the motion.

IV.    **Defendants Case law is flawed and not analogous to the one-off comment that is the
basis of this motion**:
Other than offering conclusory assertions and invoking a handful of district-court cases,

defendants offer no meaningful argument favoring the adoption of their position.  English v. Eisai,

Inc., No. 1:21-CV-923, 2022 U.S. Dist. LEXIS 44977, at *10-11 (M.D. Pa. March 14, 2022).

"Counsel has an ethical obligation to cite controlling authority that is directly on point, even (and

especially) when that authority is adverse to his client's position and opposing counsel fails to cite it." *Taylor v. Client Services, Inc.*, Case No. 17-CV-05704, 2018 U.S. Dist. LEXIS 155796, 2018 WL 4355819 at *3, (N.D. Ill. September 12, 2018).   Here, Defendants rely on non-analogous cases to support their motion:

*Kramer v. Tribe, 156 F.R.D. 96 (D.N.J. 1994)*:  In Kramer, the attorney filed a lawsuit to extort a share of Appellate Counsel's fee and to embarrass the Defendants, specifically Laurence Tribe.  Kramer launched a campaign against Tribe by sending copies of his Complaint to newspapers, law journals, and other publications while concomitantly distributing copies to members of the legal community. That campaign was designed to force Appellate Counsel to reduce their requested fee.  Additionally, Kramer was a case for sanctions, not a gag order.  Here, this writer responded to a reporter's question and did not provide any materials or documents to the media or any member of the legal community.

*In Re Sawyer, 360 U.S. 622 (1959)*: in Sawyer, The United States Supreme Court reversed the Court of Appeals' decision, which affirmed the suspension of the attorney's practice of law for one year.  The attorney made a speech six weeks after a trial began in which she served as defense counsel to several defendants indicted for conspiracy under the Smith Act.  Another charge related to interviews that the attorney had with one of the jurors after the trial had concluded.  Here, this writer responded to a reporter's question.  He did not give a speech and has not spoken to any jurors.

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976):  In Stuart, the United States Supreme Court reversed the state supreme court's decision to affirm the order of the respondent state district judge to restrain petitioners, members of the press from publishing facts implicative of the accused in a murder.  The Court held that the order for prior restraint did not overcome the presumption

against its validity.   The lower Court failed to determine whether there were other methods of securing the accused's right to a fair trial.   Here, this case involves freedom of the press claims. This writer is not a member of the press.

*Republic of Philippines v. Westinghouse Elec. Corp*., 43 F.3d 65 (3d Cir. 1994): The appellate Court reversed the injunctive order enjoining the appellant foreign republic from harassing witnesses.   The appellant took curative action to end retaliatory action against the witnesses for their adverse testimony, and the trial court improperly interposed itself into the appellant's law enforcement functions as they applied to the appellant's citizens.   Here, this case involves the harassment of foreign witnesses.   This writer has not harassed foreign witnesses.

*Sheppard v. Maxwell*, 384 U.S. 333 (1966): The Court reversed the denial of the petitioner's habeas petition. The case was remanded to the federal district court with instructions to issue the writ and order that the petitioner be released from custody unless the State put him to its charges again within a reasonable time. Here, this case is a habeas corpus case and is clearly not analogue to this case.

*State v. Carter*, 143 N.J. Super. 405 (App. Div. 1977): The Court reversed the part of the order from the trial court that restrained pretrial public speech of defendants' attorneys and their employees.   The Court remanded for a new hearing, specific findings of fact, conclusions of law, and the entry of an order consistent with the findings.   The New Jersey Appellate Court reversed the lower Court's pretrial gag order.   This has nothing to do with a one-off comment to a subscription-based online publication.

*Thiel v. S. Pac. Co*., 328 U.S. 217 (1946): The Court reversed the judgment for the respondent railroad company because the district court should have granted the petitioner passenger's motion to strike the jury panel due to the admitted wholesale exclusion of a large class

of wage earners in disregard of the high standards of jury selection.  To reassert those standards required a new trial by a jury drawn from a panel properly and fairly chosen.  This case concerns jury selection and has nothing to do with implementing a gag order for a one-off statement.

*United States v. Brown*, 218 F.3d 415 (5th Cir. 2000): Order affirmed denying Defendant's motion to modify or vacate gag order on finding the district court properly identified a "substantial likelihood" that the extrajudicial comments of the trial participants would prejudice its ability to conduct fair trials in three related cases at issue.  Here, this case is not analogous to this case.  This is a criminal case, and the gag order was necessary after a public campaign by one of 4 defendants. The Court determined it may hinder the remaining three defendants' ability to have an impartial jury.

*United States v. Scarfo*, 263 F.3d 80 (3d Cir. 2001): The district court's gag order was reversed because the Defendant's former counsel's published comments concerning the use of a new surveillance technique to acquire evidence against the Defendant posed no threat to the fairness of the trial or to the jury pool. This case is a criminal case and concerns multiple public statements. The Court of Appeals reversed the gag order.

From the cases selected by Fox to support its motion for a gag order, it is clear that this motion was filed in bad faith. An attorney certifies that the filing "is not being presented for any improper purpose" and that "the factual contentions have evidentiary support" (Fed. R. Civ. P. 11(b)(1). *Williams v. Elliott*, No. 18-5418, 2022 U.S. Dist. LEXIS 245934, at *1 n.1 (E.D. Pa. July 6, 2022).

///
///
///
///
///
///

V.    **This Writers Non-Relevant Litigation History**:

I am flattered that Fox would waste money and time scrummaging through ECF in search of this writer's case history. Fox's desperation to find anything of value to fill the pages of this motion reveals the true intention of this filing, which is that it was done in bad faith.

As previously stated, this is the second (and not the last) case I have filed against Fox. *Jones v. Fox Rothschild* was contentious.  In *Jones*, Fox implemented the same foolhardy policy of continuing the employment of problematic employees who they knew well before a public filing had engaged in ethically flawed and potentially criminal activity.  In Jones, Fox employee Ian Siminoff attempted to rape my client, Stephanie Jones.  In 90 days, he sent her several unsolicited images of his penis, plus 60 pages of single-spaced text messages and over 100 emails filled with sexually explicit language.  Fox representative Rachelle Bin was provided all of this evidence nine months before Ms. Jones filed.   They did nothing.  The morning the lawsuit was filed, Fox quickly terminated Ian Siminoff and made a clueless statement as if they were caught off-guard by the filing.  They then dragged the case out for three years to only fold and pay Ms. Jones more than they were statutorily required to pay weeks before the start of discovery.

In 3 years, Fox never made a motion, filed a letter, or asked the Court to impose a gag order on this writer for the comments made regarding the documents filed on the docket.  Less than six months after this case was filed, Alka Bahal, a senior Partner and the Chair of Fox Immigration practice, "resigned" after 20+ years of employment.  The email notifying her immigration clients of her resignation was sent five minutes before Fox scrubbed her from their website.

*Hough v. Maraj et al.*, Case No. 1:21-cv-04568: is a current case in the Eastern District of New York.  In *Hough*, my 16-year-old client was kidnapped and brutally raped at knifepoint by Nicki Minaj's husband, Kenneth Petty.  Unlike this case, the Hough lawsuit received considerable media attention.  Nicki Minaj's fans were ruthless and relentless in their attacks and

16

harassment of my client.  Nicki Minaj made several demonstrably false statements regarding my client.  She sent people to my client's home, had random people approach my client's children, and encouraged her fans to make death threats toward my client.

Nicki Minaj's counsel, Judd Burstein[1], was an old-school, aggressive, zealous advocate. He implemented every tactic imaginable to distract, discredit, and frazzle Ms. Hough and this writer. This included making public statements to the press, referring to this writer as a "bottom feeder."

The statements in the filed documents on the docket concerning Nicki Minaj's gang affiliation **Came From Nicki Minaj**! It is not defamation to repeat public statements a person has made about themselves. In her rap songs, Nicki Minaj said she was a gang member. On social media, she posted images of herself throwing up the gang sign of the Makk Baller Brims and ensured we knew what she was doing by tagging "heavy on the Makk" in the post.

Several members of the Makk Baller Brims gang threatened Jennifer Hough.  There are images, tweets, and Instagram video posts of them flashing guns and telling Ms. Hough to come outside.  I had to call law enforcement and comfort my client on multiple occasions because she was having constant suicidal ideations because of Nicki Minaj's actions.

Like Fox and this unfounded motion, Nicki Minaj's counsel filed a baseless motion for sanctions.  As is the case here, the motion was replete with nonsensical, irrelevant claims, which amounted to a dissertation of hurt feelings.  In a 35-page sanction motion, Nicki Minaj's counsel finally raised the conduct he deemed sanctionable on page 29 of the 35-page motion.  The sanctionable actions were: 1. I proceeded with a motion for default (which the Judge in the Minaj

---

[1] In a separate action, Mr. Burstein was sanctioned and ordered to pay $50,000 after threatening to conduct a prostate examination on the financial records of his opposing counsel's client.  It was later reversed by the Second Circuit, citing that he was entitled to be a zealous advocate.

case approved), and 2.  My statements about Mr. Burstein were in response to Mr. Burstein's statements about me.

As is the case here, the motion filed in Hough was made in bad faith, as it was void of any sanctionable action. I apologize to the Court for having to waste its time reading this section of the opposition. Fox is desperate and has presented these unrelated cases to bolster this motion.

VI.   **Conclusion**:
In the end, Fox has not and cannot meet its burden of providing enough facts to support the imposition of a gag order.  They are desperately clinging to a one-off comment made to an online subscription-based publication, Law360.com, which is not open or readily available to the public. No offense to Law360.com, but they don't have many readers outside the legal profession who have heard of or know anything about Law360.com.  There is no way that a one-off comment to Law360.com would somehow taint potential jurors in the Essex County judicial vicinage.

This motion is a desperate attempt to distract from Fox's actions and inactions. If I really cared to litigate this case in the media, I would have accepted the invitations that my clients received from local news stations for interviews. We rejected them all. Truth be told, I don't view this case as worth my time to seek out media attention.

Fox is hot under the collar because they were caught engaging in questionable activities, and Law360.com reported on it.  Fox is not concerned about tainting a jury pool; Fox is concerned about their colleagues and competitors learning about their questionable billing and record-keeping practices and their highly suspicious decision to pay someone that allegedly stole $160,000 worth of goods and cash, an additional $150,000 to keep her from revealing how they created fake service invoices to steal their client's retainer balances.

As stated in the intro, I will voluntarily consent to refrain from discussing Fox with any media outlet concerning nonpublic matters.  I respectfully request that the Court denies Foxs motion, as it is futile.  I thank the Court for its time and consideration of this matter.

Dated: March 13, 2024

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
T.A. Blackburn Law, PLLC
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Tel: 347-342-7432
TBlackburn@TABlackburnlaw.com