**Tyrone Blackburn, ESQ**
**Attorney NJS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Counsel for Plaintiff,* Abuchi Raymond Wealth and Markevich

---

ABUCHI RAYMOND WEALTH, and
STANISLAV MARKEVICH

Plaintiffs,

-against-

FOX ROTHSCHILD LLP;
ALKA BAHAL;
KRISTEN M. AMABILE;
JOHN AND JANE DOES 1-10,
and ABC CORPS. 1-10;

Defendants

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DOCKET NO. 23-3194
<u>Civil Action</u>
**THIRD AMENDED COMPLAINT**
**JURY DEMAND**
.

Plaintiff, Abuchi Raymond Wealth ("Mr. Wealth" or "Plaintiff Wealth"), and Stanislav Markevich ("Mr. Markevich" or "Plaintiff Markevich") by way of Complaint against Defendant's, Fox Rothschild LLP ("Fox"), Alka Bahal ("Bahal"), and Kristen M. Amabile ("Amabile"), hereby alleges and says:

<u>**PARTIES**</u>

1. Mr. Wealth is a black, English-speaking African male who is domiciled in the state of New Jersey.
2. Mr. Markevich is a Caucasian English-speaking male who is domiciled in the state of California.
3. Defendant Fox is a law firm headquartered in Philadelphia, Pennsylvania, with a principal place of business located at 2000 Market Street, 20th Floor, Philadelphia, PA 19103-3222.
4. Defendant Amabile is a criminal domiciled in this District.
5. Defendant Bahal is domiciled in this District.

1

6. During the relevant period, Defendants John and Jane Does 1-10 are unknown individuals and employees who aided and abetted in the commission of conduct complained of herein. They acted within the scope of their employment. Defendants ratified, embraced, and added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

7. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities employed by Plaintiff or aided and abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## JURISDICTION AND VENUE

8. The venue is properly set in Essex County because Fox conducts business there.

9. This Court has personal jurisdiction over Defendants according to and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

     i. The transaction of any business within the state;

     ii. The making of any contract within the state;

     iii. The commission of a tortious act within this state; and

     iv. The ownership, use, or possession of any real estate in this state.

10. From 2020 to the date of this filing, Fox has consistently and purposefully availed itself of the privilege of conducting activities within New Jersey, thus invoking the benefits and protections of New Jersey law.  In return for these benefits and protections, Fox must submit to the burdens of litigation in New Jersey.

11. This litigation arises from or relates to the legal malpractice Plaintiff experienced while living in this District. Fox aimed and directed this malpractice to this District when their authorized agents, Amabile and Bahal (who reside in this District), conspired to steal over $20,000 from Mr. Wealth and caused him to be detained by ICE for over 45 days. This tortious conduct violated United State Federal Rico, New Jersey State Rico, Fraud, and New Jersey Malpractice Laws.

12. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from conduct occurring by Defendants in New Jersey.

## NATURE OF ACTION:

13. This is an action for monetary and declaratory relief to redress the Defendants' violation of the Plaintiffs' immigration rights.  Plaintiffs seek relief for Fraud, Violation Of The NJRICO, Legal Malpractice, and Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity (Violation of Racketeer Influenced and Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)(d)).

14. At all times relevant to this Complaint, Defendant Fox maintained a policy and practice of knowingly and willfully robbing their immigration clients out of their money by fooling them into thinking that their office manager, Kristen Amabile was a licensed attorney.

15. Plaintiff Wealth was required to open credit card accounts to establish good credit to secure a United States Visa under false pretenses.

16. Plaintiffs were encouraged to engage in a fake marriage to secure a United States Visa.

17. Plaintiffs were required to turn over thousands of dollars to Defendant in an effort to secure a United States Visa under false pretenses.


## FACTUAL BACKGROUND

*Plaintiff Wealth*

**Solicitation of Legal Services by Amabile**:

18. Mr. Wealth was on a J-1 education exchange visa in the United States.  He arrived in the United States from Mexico.  Mr. Wealth's J-1 Visa was set to expire on or about August 26, 2020.

19. According to Mr. Wealth, Amabile contacted him in March 2020 to assist with his J-1 visa renewal.

20. Mr. Wealth needed legal assistance with his J-1 Visa renewal and was working with K. Anderson of GPS to assist him with his application.  Time was of the essence, and Mr. Wealth confided in a friend who advised him that he knew an immigration lawyer who worked for a large law firm who could help him with his visa renewal.

21. Upon information and belief, Amabile learned of Mr. Wealth's immigration needs through a discussion with their mutual friend[1].

---

[1] We have intentionally left his name out to protect his privacy as he is not liable for any of the claims raised in this complaint.

22. Amabile initiated contact with Mr. Wealth, introducing herself as an immigration attorney with Fox Rothschild.

23. According to Mr. Wealth, Amabile informed him that her boss, Bahal, is a partner and co-chair of the corporate immigration practice group at Fox.  According to Amabile, they have many connections with Immigration and Customs Enforcement (ICE) and can submit and approve his visa renewal application quickly.

24. Shortly after that, Amabile and Bahal met with Mr. Wealth to discuss Fox's immigration services and to advise him on what they believed would be the best Visa to apply for.

25. Mr. Wealth, not being an expert in the United States Visa and immigration process, trusted Amabile, Fox, and Bahal, expecting them to be transparent about their capabilities and knowledge of US immigration law.

26. Mr. Wealth relatively understood the J-1 Visa process and what was required to qualify for the J-1 Visa renewal.

27. The J-1 classification, as Mr. Wealth learned, is designed for individuals who plan to engage in an approved program for teaching, instructing, lecturing, studying, observing, conducting research, consulting, demonstrating special skills, receiving training, or receiving graduate medical education or training.

28. J-1 Visa Extension Requires the following: The applicant's J-1 visa must be current and valid at the time of the extension application, and their program sponsor must fill out a new DS-2019. In summation, the following documents are required[2]:

    a. Evidence of the necessary financial resources to cover the cost of application fees, tuition (if enrolled in a higher education institution) and living expenses for at least one year (unless the program sponsor is funding the exchange visitor's program and visa)

    b. Certificate of Eligibility for Exchange Visitor Status (Form DS-2019) Valid passport

    c. Arrival/Departure Record (Form I-94)

    d. Proof of J-1 visa health insurance for the visa holder and their J-2 spouse or children

    e. Supporting documentation detailing the reason the extension is needed

    f. Any additional supplementary documentation as requested by the USCIS

---

[2] https://shorelineimmigration.com/student-visas/j-1-visa-extension/

g.  Additional SEVIS fee when applicable

h.  Exchange visitors who wish to apply for an extension of their J-1 visa must notify his or her department administrator at least one or two months prior to the DS-2019 end date. Understandably, the program must either be extended or transferred to another institution before that end date.

29. Mr. Wealth satisfied all of the requirements for the J-1 visa extension:

a.  Mr. Wealth was employed and had the necessary resources to cover the cost of the application fees and living expenses for at least one year,

b.  Mr. Wealth has Certificate of Eligibility for Exchange Visitor Status (Form DS-2019) Valid passport,

c.  Mr. Wealth had a valid Arrival/Departure Record (Form I-94),

d.  Mr. Wealth has proof of J-1 visa health insurance, and

e.  Mr. Wealth had supporting documentation detailing the reason the extension is needed.

30. Mr. Wealth was a soccer teacher who was advancing his education.  During his initial conversation with Amabile, Mr. Wealth informed Amabile and Bahal of this and expressed his desire to simply renew his J-1 Visa.

31. Amabile and Bahal informed Mr. Wealth that they were experts and understood the US Immigration legal system better than he did.  They informed him they had many contacts within USCIS and that the best Visa Application for Mr. Wealth would be the O-1 Visa.

32. Mr. Wealth was not aware of the O-1 Visa and asked Amabile and Bahal to explain what the O-1 Visa was and the requirements he needed to obtain it.

33. Upon information and belief, an O-1 Visa is considered the "Einstein Visa." It is designated for individuals who possess extraordinary ability in the sciences, arts, education, business, or athletics or who have a demonstrated record of extraordinary achievement in the motion picture or television industry.  It has been recognized nationally or internationally for those achievements.

34. According to Mr. Wealth, he was taken aback by the descriptor of the O-1 Visa and expressed his concern that he did not meet the heightened qualifications for the O-1 Visa.

35. Mr. Wealth did not possess extraordinary ability in the sciences, arts, education, business, or athletics.  He could not demonstrate a record of extraordinary achievement in the motion

5

picture or television industry and was not recognized nationally or internationally for those achievements.

36. Based on information and belief, the individuals awarded the O-1 Einstein Visa are David Beckham (international soccer star) and Edson Arantes Do Nascimento, known to the world as Pelé (three-time FIFA World Cup soccer champion).

37. At the time, Amabile and Bahal presented the O-1 Visa as an option to Mr. Wealth. He was a little league soccer coach, a fact that he shared with them as part of his hesitation in applying for the O-1 Visa.

38. Before working as a little league soccer coach, Mr. Wealth worked as an English teacher and part-time little league soccer coach in Mexico, which were additional facts he shared with Amabile and Bahal.

39. As it was becoming more and more apparent that Mr. Wealth had no desire to file for the O-1 Visa, Amabile quickly cut him off and explained that she had 20 years of legal experience as an immigration lawyer and knew what the best Visa was for him to apply for.

40. According to Mr. Wealth, Bahal chimed in and reminded him that she was the Partner and Chair of the immigration department and had been a Partner and Immigration law Chair in a previous law firm, Grotta Glassman and that she had her private immigration law firm for over five years before that. Bahal insisted that she agreed with Amablie and believed the best Visa for Mr. Wealth to go after would be the O-1 Visa.

41. According to Mr. Wealth, at no point did Bahal correct Amabile's statement about her being an immigration attorney in 20 years.

42. According to Mr. Wealth, Amabile and Bahal failed to disclose to him that the cost of the O-1 ($5,000 -$8,000) Visa was significantly more expensive than the cost of the J-1 ($950-$1,400) visa renewal application—an expense that Mr. Wealth was not in a financial position to pay.

43. If they had disclosed to him the difference in cost, he would have rejected their offer to represent him.

44. Despite his hesitations, Mr. Wealth succumbed to the pressure of Bahal and Amabile and agreed to allow their combined 40+ years of experience as immigration attorneys to file the best application to help him obtain his Visa.

**Mr. Wealth Signs Retainer With Amabile, Fox, and Bahal**:

45. Mr. Wealth had the misfortune of retaining the service of Amabile, Bahal, and Fox on or about August 6, 2020.

46. According to the retainer agreement, Mr. Wealth was to pay the fees and costs associated with the O-1 Visa application.

47. At the time, Mr. Wealth did not know that this would violate the O-1 visa application requirements.

48. Initially, Mr. Wealth's employer, Soccer Specific Training, owned by Mike Turtle, was also listed on the retainer agreement issued by Fox, Amabile, and Bahal.

49. The August 6, 2020, retainer agreement was issued to Mr. Turtle and his company to:

> "(1) prepare and file an O-1 nonimmigrant visa petition for Company on behalf of one prospective employee, Raymond Wealth, and (2) general immigration-related counseling, as requested."

50. On August 6, 2020, Defendants acknowledged that Mr. Wealth's Visa expired on August 26, 2020.  Yet, they filed the Form I-129O petition for Nonimmigration Worker: O Classification on January 15, 2021, approximately five months after the expiration of Mr. Wealth's J-1 visa.

51. According to Mr. Wealth, he raised concerns to Amabile about the expiration of his J-1 Visa and asked Amabile if he would be required to leave the United States as his O-1 visa application was being processed.

52. According to Mr. Wealth, Amabile assured him that he did not have to leave the United States because she and Bahal's contacts within USCIS were aware of Mr. Wealth's O-1 Visa application filing and were expediting its approval.

53. At the time Bahal filed Mr. Wealth's Form I-129O, Mr. Wealth was not suffering from an "emergency or unforeseen circumstance" as defined by the United States Citizenship and Immigration Services (USCIS), which would have afforded him a grace period to submit the Form I-120O late.  Missed deadlines equals malpractice.

54. Upon information and belief, Defendants did not provide USCIS with the requisite documents or make the required request to excuse Mr. Wealth's late submission of the **LATE** Form I-129O.   https://www.uscis.gov/newsroom/immigration-relief-in-emergencies-or-unforeseen-circumstances.

55. Upon information and belief, only an employer can file an O-1 petition.  There is no self-petition option for the O-1 classification.  However, self-employment is possible.

56. Mr. Wealth was not self-employed when Bahal submitted his O-1 visa application to USCIS.  He was listed as the sole client on a retainer issued by the defendants on or about August 10, 2020.

57. Based on information and belief, self-employment in the O-1 category is available by using an agent petitioner or a beneficiary-owned entity as a petitioner.  This should not be confused with self-petitioning (in the EB-1A and EB-2 NIW context).

58. Mr. Wealth was slated to pay the fees and costs associated with his O-1 visa application, which violates the O-1 visa application requirements.

59. On or about August 10, 2020, Amabile and Bahal issued a new retainer agreement to Mr. Wealth and Mr. Turtle, where Mr. Turtle and his company, Soccer Specific Training, were removed as signatories that were responsible for paying the cost of Mr. Wealth's Visa and ceased being clients of Fox, Amabile, and Bahal.  This is evidenced by an email from Amabile (From her Fox Rothschild email account) to Mr. Wealth and Mr. Turtle dated August 10, 2020.  (**See Exhibit A**).

60. Based on information and belief, Amabile, Bahal, and Fox were required to inform Mr. Wealth of his options now that they could no longer file for his O-1 visa under Soccer Specific Training or Mr. Turtle.

61. Mr. Turtle and Soccer Specific Training refused to foot the cost for the Visa, which is a requirement to obtain this specific Visa.

62. Amabile, Bahal, and Fox never explained to Mr. Wealth that he no longer qualified for the O-1 Visa as he needed to either be self-employed or that Mr. Wealth required the sponsorship of a company, an individual who represents a company or a company's agent since he was not self-employed.

63. The Court will find the O Nonimmigrant Visa Classifications requirements at the embedded link in footnote 1.  The Court will see that once Mr. Turtle and Soccer Specific Training ceased being a client of the defendants, Mr. Wealth was no longer qualified to apply for the O nonimmigrant visa.

64. As self-proclaimed experts with a combined 40+ years of experience as immigration attorneys, the Defendants knew that Mr. Wealth did not qualify for the O Nonimmigrant Visa when they submitted Mr. Wealth's LATE O-1 Visa application to USCIS.

65. Upon information and belief, Fox, Bahal, and Amabile knowingly committed malpractice against Mr. Wealth and committed immigration fraud against USCIS when they:

    a. Intentionally failed to inform Mr. Wealth that he was no longer qualified for an O-Nonimmigrant Visa after Mr. Turtle and Soccer Specific Training ceased to be Mr. Wealth's sponsor and Defendant clients.  Upon information and belief, they committed this fraudulent act for the sole purpose of pocketing Mr. Wealth's $13,000.

    b. Intentionally failed to inform Mr. Wealth that he needed to be self-employed or have a sponsorship from a company or an agent of a company to be qualified for an O-Nonimmigrant Visa.  Upon information and belief, they committed this fraudulent act for the sole purpose of pocketing Mr. Wealth's $13,000.

    c. Intentionally used Mr. Turtle and Mr. Turtle's company, Soccer Specific Training, as the O-1 sponsor for Mr. Wealth's LATE O-1 visa application, knowing that Mr. Turtle specifically requested to have his name removed from the retainer agreement, as evidenced by Exhibit B when Defendants emailed Mr. Turtle informing him that Mr. Wealth would be solely responsible for the retainer.  Upon information and belief, the defendants committed this fraudulent act for the sole purpose of wrongly billing Mr. Turtle and Soccer Specific Training over $20,000 in legal fees.

        i. As detailed below, Fox and Bahal had a pattern and practice of overbilling and stealing retainer overpayments from their immigration clients.  According to Amabile, this practice has been in place throughout the duration of employment with Fox, which spanned approximately 20+ years.

    d. Intentionally submitted a LATE O-1 visa application for Mr. Wealth to USCIS, where they presented to USCIS a Form I-129O, Petition for a Nonimmigrant Worker: O Classification on behalf of Mr. Wealth, Mr. Turtle, and Mr. Turtles company Soccer Specific Training without Mr. Turtle and Soccer Specific Training's consent.  Upon information and belief, the defendants knew that Mr.

Wealth would not have qualified for the O-1 visa as he did not have the requisite sponsorships, skills, or achievements.  Yet, they used USCIS to process this sham application to fulfill their contractual duties to Mr. Wealth to retain Mr. Wealth's $13,000.

66. Bahal filled out the Department of Homeland Security Form G-28 identifying Bahal as the attorney and Mr. Turtle and Soccer Specific Training as the defendant's client when she knew that Mr. Turtle and Soccer Specific Training or a representative of Mr. Turtles company, Soccer Specific Training, were not funding Mr. Wealth's visa application process.

67. With over Bahal 20 years as an immigration attorney, first as a solo practitioner from January 1999 to March 2004 ("Law Office of Alka Bahal, Esq."), to then working as a "Partner & Chair, Corporate Immigration" from March 2004 to October 2006 ("Grotta, Glassman & Hoffman"), and finally seventeen years as Partner & Co-Chair, Corporate Immigration Practice ("Fox Rothschild LLP"), Bahal knew the I-1290 process like the back of her hand, and intentionally filed an application for Mr. Wealth that she knew: 1.  He did not qualify for, and 2.  He would be rejected for.

68. Upon information and belief and based on Amabile's cross-complaint in the Superior Court of New Jersey Law Division, Morris County, Docket No. Mor-L-1117-22, Bahal engaged in these deceptive practices to coerce clients into untenable immigration processes to run up their bills and/or pocket the balance of their retainers.  Regarding Mr. Wealth, Bahal's sole focus was to obtain Mr. Wealth's $13,000 as it aided in inflating Bahal's client originations and provided her with more revenue for Fox, thereby making Bahal eligible for an even larger year-end bonus and more equity shares.  This is explained in more detail below.


**Mr. Wealth and Amabile**:

69. Mr. Wealth first met Amabile in March 2020.  As stated above, on more than one occasion and to more than one individual, Amabile informed Mr. Wealth that she was an attorney with Fox.

70. Upon information and belief, throughout the duration of his involvement with Fox, Amabile, and Bahal, Mr. Wealth and the following individuals were informed by Amabile

that Amabile is a licensed attorney: Jamie Simcoe, Mike Turtle, Chinedu Nwankwo, Sam Monks, Brendan Madu, Steven Muller, Dave Franco, and Mr. Wealth's former landlord, Carolina.

71. As detailed above, Amabile sent Mr. Wealth two retainer agreements (August 6, 2020, and August 10, 2020) from Fox and Bahal.

72. Mr. Wealth signed the retainer agreement and paid the $13,000 flat rate.

73. Amabile requested Mr. Wealth send her all the required documents to complete the O-1 Visa application.

74. Mr. Wealth obliged, and on or about August 26, 2020, Amabile informed him that Bahal had filed his application.

75. Mr. Wealth later learned through his USCIS decision letter that Amabile, Bahal, and Fox filed his O-1 application on January 15, 2021, five months after he was informed that it had been filed.

76. On or about June 24, 2021, Mr. Wealth received a letter from the USCIS informing him that his visa was denied because he could not meet the heightened standard for an O-1 Visa. As stated above, Mr. Wealth raised doubts concerning his eligibility for the O-1 Visa, and Amabile and Bahal coerced him into pursuing it.

77. The Plaintiff only wanted to apply for a Visa, which he qualified for, the J-1 renewal Visa.

78. The Defendants should have submitted the visa application for which Mr. Wealth was qualified (the J-1 renewal visa) on time.

79. Defendants should have followed up with USCIS to appeal the rejection and provided USCIS with the correct or missing information necessary to supplement the Plaintiff's application.

80. Bahal should have spent more than 6 hours working on the Plaintiff's O-1 visa application instead of directing Amabile to serve as Mr. Wealth's immigration legal counsel. If Bahal had spent more than 6 hours on Mr. Wealth's O-1 Visa application, she would have recognized that Mr. Wealth did not meet the heightened requirements for the O-1 Visa, and therefore, the probability of his application being denied by USCIS was high.

81. Based on information and belief, a competent immigration attorney with as much experience as Bahal would have submitted the J-1 Visa renewal application that Mr.

Wealth originally requested, as opposed to an O-1 Visa, which Mr. Wealth expressed concerns about his qualifications.

**Amabile is being investigated by the Committee On The Unauthorized Practice Of Law**



**Amabile engages in criminal activity**:

82. Based on information and belief, Amabile left Fox around January 2022.

83. Fox and Bahal failed to inform Mr. Wealth or any of Fox and Bahal's other clients that Fox no longer employed Amabile.

a. Plaintiff Markevich was never informed by Fox and Bahal that Amabile was no longer employed with Fox.

84. Fox and Bahal failed to inform Mr. Wealth or any of its other clients that Amabile was terminated because she allegedly stole $160,000 worth of goods and cash.

85. According to the Morris County case, Amabile stole over $80,000.00 from Bahal and Fox through Bahal's employee expense account.

a. This raises the question: How did Amabile, a nonlawyer office administrator, gain access to Bahal's expense account?

b. This also raises the question: How many times over Amabile's 20-year history did Bahal give her blanket permission to use her expense account, and which immigration clients were erroneously billed for these expenses?!

86. In the Morris County case, Bahal sued Amabile to recover the $80,000.00 Amabile "stole." (See Wealth Exhibit B). Bahal did not sue Amabile for the full $160,000, which raises the question of which one of Fox and Bahal's immigration clients was forced to pay the $80,000 bill.

87. As further evidence of Bahai's intention to hide Amabile's thievery from the public and Fox clients, Bahal failed to name the "law firm" in the state of New Jersey, as evidenced in Exhibit B.

LOUIS H. MIRON (014861985)
Attorney at Law
123 North Union Avenue
Suite 103
Cranford, New Jersey 07016
(908) 233-9555
Attorney for Plaintiff Alka Bahal

| | |
|---|---|
| ALKA BAHAL,<br><br>                    Plaintiff,<br><br>          vs.<br><br>KRISTEN M. AMABILE,<br><br>                    Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. MOR-L-    -22<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

Plaintiff Alka Bahal, residing at 9 Sheldon Court, East Hanover, New Jersey, by way of Complaint against Defendant Kristen M. Amabile ("Amabile"), says:

1.    Defendant Amabile is an individual, and upon information and belief, resides at 61 Nicole Drive, Denville, New Jersey.

2.    At all relevant times, Plaintiff and Amabile worked together at a law firm in the State of New Jersey (the "Law Firm").

1



**<u>Kristen Amabile</u>**
**<u>Is A CRIMINAL</u>**

88. On or about October 12, 2022, Amabile was arrested in Denville Township in New Jersey for fraudulently obtaining prescription medication. (See, **Wealth Exhibit C**). These arrests reflect a pattern and practice of Amabile engaging in theft and fraud.

    a. **GAVEL Case No**. 22001356, and

    b. **GAVEL Case No**. 22001459.

89. As evidenced by the Morris County case, it is more probable than not that Amabile was an unwilling victim of Bahal and Fox's Immigration Rico Scheme.

90. As detailed below, at the end of every fiscal year, Bahal and Fox would require Amable, as a part of her employment, to forgo reimbursing Fox Rothschild immigration clients for overpayments made by said clients.

91. Upon information and belief, instead of reimbursing overpayments made by clients, Plaintiff would retain the payment and create bogus invoices at or near the end of the billing year for a flat fee amount equal to the amount of the overpayments.

92. The zero-balance invoice would not be sent to the client, but the funds being held by Plaintiff/Fox Rothschild would be applied to the fictitious/fraudulent invoices.

93. Bahal and Fox were the sole beneficiaries of this fraudulent invoicing scheme.

15

S-2022-000142-1408   10/12/2022 12:53:51 PM   Pg 5 of 7   Trans ID: MCS20221299704

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1408** | **S** | **2022** | **000142** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

**THE STATE OF NEW JERSEY**
*VS.*
**KRISTEN M AMABILE**

DENVILLE TWP MUNICIPAL COURT
1 SAINT MARY'S PLACE
DENVILLE                    NJ  07834-0000
973-625-8300   COUNTY OF: **MORRIS**

ADDRESS:
**61 NICOLE DRIVE**

**DENVILLE                    NJ  07834-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 1 | | 2022-23444 |

COMPLAINANT **DET            Z LANCASTER**
NAME:        1 ST. MARY'S PLACE
             ATTN RECORD BUREAU
             DENVILLE            NJ  07834

DEFENDANT INFORMATION
SEX: **F**  EYE COLOR: **BROWN**    DOB: **12/11/1979**
DRIVER'S LIC. #. **A57004377462792**              DL STATE: **NJ**
SOCIAL SECURITY #: xxx-xx-x377   SBI #:
TELEPHONE #: **917-504-6533  ( C )**
LIVESCAN PCN #:

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed and (2) the defendant is the one who committed it:
On 9/28/22, Denville Police responded to 61 Nicole Drive for the report of an emotionally disturbed person, who was later identified as Kristen M. Amabile. During the on scene investigation, several prescription bill bottles belonging to Anthony Denoia and Kathleen Ancheta were turned over to police by Kristen's husband, George Amabile. The prescription bottles were for Adderall and Xanax and each had been prescribed by Dr. Jacob Leivent. While speaking with Kathleen and Anthony, they stated they were not patients of Dr. Leivent and had not given Kristen permission to use their personal information to obtain the medication. Anthony stated that Kristen had previously asked his permission to use his personal information to obtain Adderoll, however he stated he declined. The pill bottles with Kathleen's name had the address of 61 Nicole Drive, Denville, which was Kristen's address. Dr. Leivent provided screen shots from two phone number stating they were Anthony and Kathleen, asking for prescription refills. Each phone number was confirmed by Kristen's mother, Maria Smith to belong to Kristen. The phone number used to communicate with Dr. Leivent from an actor stating they were Anthony was used to contact Kristen directly. The two most recent Adderoll prescription that were filled for Anthony Denoia were picked up from the Denville CVS but a white BMW which appeared identical to a vehicle that is registered to Kristen and was observed parked in her driveway. Additionally, George stated that Kristen had stated that she was "pretending" to be Kathleen while seeing Dr. Leivent, in order to obtain medication.

**Affidavit of Probable Cause**

**Page 5  of 7**                                    1/1/2017



S-2022-000132-1435   10/28/2022 05:49:49 PM   Pg 5 of 7   Trans ID: MCS20221385888

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | | *THE STATE OF NEW JERSEY* |
|---|---|---|---|---|
| **1435** | **S** | **2022** | **000132** | *VS.* |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | **KRISTEN M AMABILE** |

ROCKAWAY TWP MUNICIPAL COURT
65 MT HOPE RD
ROCKAWAY                NJ  07866-0000
973-627-9000      COUNTY OF: MORRIS

ADDRESS:  61 NICOLE DR

DENVILLE              NJ  07834-0000

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 1 | | 2022-23241 |

COMPLAINANT DET. T     TAFFIN
NAME:    65 MOUNT HOPE RD
          ATTN WARRANTS
          ROCKAWAY         NJ  07866

DEFENDANT INFORMATION
SEX: **F** EYE COLOR: **BROWN**    DOB: **12/11/1979**
DRIVER'S LIC. #. **A57004377462792**           DL STATE:  **NJ**
SOCIAL SECURITY #: xxx-xx-x377   SBI #: **688010H**
TELEPHONE #: **973-886-3827   ( C)**
LIVESCAN PCN #: **143501007548**

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed and (2) the defendant is the one who committed it:

On September 28, 2022 Denville Police Department Officers responded to 61 Nicole Drive in Denville NJ.  Denville PD met with defendant and family members on scene.  Family members on scene provided numerous prescription pill bottles made out to several other unknown people. Through their investigation, it was determined that defendant utilized victim K.A.'s personal information to fraudulently obtain prescriptions from Dr. Jacob Leivent out of Brooklyn NY. Defendant's phone number was utilized to contact Dr. Leivent to request prescriptions to be filled at Randolph Pharmacy.  An unknown female who identified herself as the victim K.A. called Randolph Pharmacy to allow a "driver" to pick up the prescriptions, and a white BMW sedan was observed picking up the prescriptions at the drive through pharmacy window.  A white BMW sedan is registered to defendant and is parked at 61 Nicole Drive in Denville NJ.  The prescription pill bottle with victim's name on it, and the address of 61 Nicole Drive in Denville was recovered by Denville Police Department.  Victim was a client of defendant's at a law firm, Fox Rothchild Law Firm in Morristown NJ which confirmed that defendant had access to victim and other clients personal identifying information.

**Affidavit of Probable Cause**

**Page 5  of 7**                                                                    1/1/2017

94. Amabile's criminal activity did not begin or end with GAVEL Case Nos.  22001356 and 22001459.  With Bahal's permission and assistance, Amabile engaged in the illegal practice of Law in New Jersey.

95. As previously stated, Amabile told everyone associated with Mr. Wealth's O-1 immigration Visa process that she was an Attorney assigned to Mr. Wealth's case.

96. Everyone associated with Mr. Wealth's immigration visa renewal process had no reason to believe that Amabile was not an attorney.  Bahal had several opportunities to collect the record.

97. Based on information and belief, Bahal's pattern and practices involve passing off her responsibilities as an attorney to unlicensed office staff.  **Exhibit B** shows that she then signs off on the staff's work and fraudulently bills her clients for services she never rendered.

**In Addition to Stealing Prescription Drugs,**
**Amabile Engaged In The Illegal Practice of Law**

98. Under N.J.S.A. 2C:21-22, a person is guilty of a crime...if the person knowingly engages in the unauthorized practice of law.

    a. For a defendant to be found guilty of the unauthorized practice of law, the State must prove beyond a reasonable doubt each of the following four elements:

        i. The defendant engaged in the practice of law;

        ii. The defendant knew they were engaged in the practice of law;

        iii. The defendant's conduct was not authorized by law;

        iv. The defendant knew that their conduct was not authorized by law.

    b. The fourth element that the State must prove beyond a reasonable doubt is that the defendant knew their conduct was not authorized by law.

99. Amabile informed the Plaintiffs, their families, and friends that she was an immigration attorney.

100.      Amabile's claims were confirmed through Defendant Fox's billing statement for Mr. Wealth, which clearly showed that Amabile did upwards of 90% of the work on Mr. Wealth's case.

101.      Additionally, as stated above, Amabile represented herself to Mr. Wealth as an attorney in the presence of Bahal, and Bahal never corrected the record.  In fact, after the initial meeting, Bahal disappeared and directed Amabile to perform all of the legal work required to complete Mr. Wealth's visa application.  Bahal never spoke with Mr. Wealth again.

102.    Amabile knew she was engaged in the illegal practice of law, as evidenced by her statements to Mr. Wealth and his family and friends.

103.    Amabile did not have the authority to practice law in New Jersey.  Bahal knew that Amabile did not have the authority to practice law in New Jersey.  Yet, she used Amabile to recruit immigration clients, pose as an attorney, and practice as an immigration lawyer. Bahal would then take for all of the immigration clients Amabile recruited, as it would inflate Bahal client originations and provide more revenue for Fox, making Bahal eligible for a large year-end bonus and more equity shares.

104.    Based on information and belief, Bahal allowed her greed to blind her to her ethical duties as an officer of the court and an attorney in the State of New Jersey.

105.    Bahal even neglected her duties as a shareholder of Fox by implementing and overseeing an immigration RICO scheme that stole from clients and encouraged the illegal and unauthorized practice of law.

**Continuing What She Learned From The Training Provided To Her By Bahal and Fox, Amabile Stole over $20,000 From Mr. Wealth**

106.    Beginning, December 2021, while employed with Fox, Amabile requested that Mr. Wealth provide her with his credit card information because he needed to establish good credit for his visa renewal:









107.     While employed with Fox, and acting in her role as an immigration attorney for Fox, Defendant Amabile charged over $8,000 to Mr. Wealth's credit and debit cards and used her access to Mr. Wealth's social security number to open additional credit cards.

108.     On or about April 29, 2022, ICE detained Mr. Wealth for being out of status due to Amabile, Fox, and Bahal's GROSS negligence and Malpractice.

109.     As detailed above, Mr. Wealth remained in the United States after his Visa expired at the express advice of his" immigration attorney," Amabile.

110.     While ICE detained Mr. Wealth, Amabile broke into his apartment, stole over $11,000.00 in cash and three laptop computers, and used his social security number to open several credit accounts.  Amabile's monetary theft from Mr. Wealth exceeds $20,000.00.

111.     During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, opened several credit cards with Mr. Wealth's Social Security number, and added herself as an authorized user.

112.     During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, hack into his email account, add herself and her phone number to his account, and use that information to make unauthorized charges, changes and withdrawals from Mr. Wealth's bank accounts.

**AMABILE PHONE NUMBER ENDING IN 4298 IS THE SAME NUMBER ADDED TO MR. WEALTH'S SECURITY VERIFICATION WHEN HE WAS IN PRISON**



113.     During Mr. Wealth's detention, Amabile took it upon herself to assume Mr. Wealth's identity, hack into his email account, add herself and her phone number to his investments account, and use that information to make unauthorized charges, changes, and withdrawals.



114.    On or about May 10, 2022, while Mr. Wealth was in prison, Amabile delivered an American Express credit card (ending in 1018) to Mr. Wealth's residence in Toms River, NJ, with her name on it.  (See, **Wealth Exhibit D**).

115.     On or about May 10, 2022, while Mr. Wealth was in prison, Amabile delivered an American Express credit card to Mr. Wealth's residence in Toms River, NJ, with her name on it.  (See, **Wealth Exhibit E**).

116.     On or about May 6, 2022, while Mr. Wealth was in prison, Amabile applied for a Chase Sapphire Reserve credit card.  Chase sent Mr. Wealth a letter informing him that he had been denied a Chase Sapphire Reserve credit card.  (See, **Wealth Exhibit F**).

117.     On the same date, Amabile hacked into Mr. Wealth's email account and pretended to be him to access his apartment and mailbox.  Amabile sent the following email to Mr. Wealth's building manager:



raymondwealthgps@gmail.com
Send email / View profile

**Results**
Filter
All results

Raymond Wealth
Access removal
Sat 6/11
Karolina, please note that as of today 6/11/22 that Kristen Amabile is no longer allowed access to my apartment, property or personal information. Thank you. Raymond Wealth
Inbox

Raymond Wealth
Jamie Simcoe
5/6/2022
Please allow her to access my apartment too please thank you Raymond
Inbox

Raymond Wealth
Authorization confirmation- Raymond wealth
5/6/2022
Dear Karen/Caroline: This is Raymond wealth (apartment 8). Please accept this email as my authorization to allow my representative, kristen amabile, enter my apartment she has my full authority to receive full access including a key. Also, she has m
Inbox

Raymond Wealth
Authorization confirmation- Raymond wealth
5/6/2022
On Fri, May 6, 2022 at 10:37 AM Raymond Wealth <raymondweath@gmail.com> wrote: Dear Karen/Caroline: This is Raymond wealth (apartment 8). Please accept this email as my authorization to allow my representative, kristen amabile, enter my apartme
Inbox

Raymond Wealth
Authorization
5/6/2022
This is Raymond wealth (apartment 8). Please accept this email as my authorization to allow my representative, kristen amabile, enter my apartment she has my full authority to receive full access including a key. Also, she has my full and complete perm
Inbox

**Authorization confirmation- Raymond wealth**

Raymond Wealth <raymondweath@gmail.com>
To:

Cc:                                                          • Jamestowne Village
                                                             • kristenamabile@gmail.com
Fri 5/6/2022 4:48 PM
Dear Karen/Caroline:

This is Raymond wealth (apartment 8).

Please accept this email as my authorization to allow my representative, kristen amabile, enter my apartment she has my full authority to receive full access including a key. Also, she has my full and complete permission to my mailbox. Please make sure that this is noted for her and within your office. Ms amabile is the only person who has my permission and full authorization, no one else has permission but ms amabile. You may reach her at 973-886-3827. I really appreciate your cooperation.

Have a blessed day.

Thanks,
Raymond Wealth

118.    On or about May 13, 2022, while Mr. Wealth was in prison, Amabile applied for a Chase Freedom credit card.  Chase sent Mr. Wealth a letter informing him that he had been denied a Chase Freedom credit card.  (See, **Wealth Exhibit G**).

119.    On or about May 8, 2022, while Mr. Wealth was in prison, he received a letter from American Express informing him that they had to speak with him regarding "security concerns." As a result, American Express declined new charges on Mr. Wealth's account. American Express also advised Mr. Wealth to advise any additional card member that their new charges would be declined.  (See, **Wealth Exhibit H**).

120.     On or about May 20, 2022, while Mr. Wealth was in prison, Mr. Wealth received a letter from American Express National Bank informing him that someone had attempted to open additional deposit accounts in Mr. Wealth's name.  As a result, the bank canceled any applications.  (See Wealth **Exhibit I**).

121.     On or about June 10, 2022, Mr. Wealth was released from ICE Detention.  At that time, he learned that Amabile had been withdrawing money from his checking account to pay for her credit card usage.

**Fox and Bahal Continue To Bill Mr. Turtle and Mr. Turtle's Company Even though Mr. Turtle Was Not Responsible For Paying Fox**:

122.     Fox has consistently sent emails and bills to Mr. Turtle and Soccer Specific Training for services they never provided.  As evidenced by **Exhibit A**, Mr. Turtle, and Soccer Specific Training were never clients of or beneficiaries of services provided by the defendants.

**Amabile Accuses Bahal Of Stealing Clients' Funds**

123.     As part of her cross-complaint in the Morris County case, Amabile accuses Bahal of:

1. The plaintiff (Bahal) had a practice of failing to reimburse Fox Rothschild clients for overpayments made by said clients.

2. Instead of reimbursing overpayments made by clients, Plaintiff would retain the payment and create bogus invoices at or near the end of the billing year for a flat fee amount equal to the amount of the overpayments.

3. The zero-balance invoice would not be sent to the client, but the funds being held by Plaintiff/Fox Rothschild would be applied to the fictitious/fraudulent invoices.

4. Plaintiff and Third-Party Defendant Fox Rothschild were the sole beneficiaries of the fraudulent invoicing scheme.

5. The result of the improper practice was to inflate Plaintiff's client originations/provide more revenue for Fox Rothschild thereby making Plaintiff eligible for an even larger year-end bonus and more equity shares.

6. Plaintiff advised Defendant Amabile that this was standard practice at Fox Rothschild.

7. Plaintiff also had a practice of obtaining reimbursement for fraudulent expenses.

8. Under Fox Rothschild's policy, certain attorneys are permitted to write off client expenses (costs/disbursements) up to a certain dollar amount ("write off authority").

9. Plaintiff was one of the individuals with such write off authority.

10. Amabile did not have such write off authority and gained no benefit from the fraudulent practice.

11. Plaintiff used her write off authority to charge her personal expenses to Fox Rothschild clients, obtain reimbursement from Fox Rothschild for the expenditures and then write off the expenses so the clients would not see the fraudulent expense entries.

12. Because of Plaintiff's comments and prior conduct, Amabile knew that any complaint regarding Bahal's conduct would be futile.  (See, **Wealth Exhibit J**).

*Plaintiff Markevich*

124.    Plaintiff Markevich is a musician, artist, and performer.

125.    On or about December 2016, Plaintiff Markevich was hired to perform at a New Year's party where Amabile was in attendance.

126.    Amabile befriended Plaintiff Markevich at this New Year's party and learned that Plaintiff Markevich was looking to file for a Visa.

127.    On or about January 2017, Amabile contacted Plaintiff Markevich, informing him she was an immigration attorney with Fox Rothschild. She advised him that he may want to consider applying for an O1-B Visa. She would be able to help him with his O1-B visa through Fox if he was interested.

128.    On or about May 2017, Plaintiff Markevich was notified by USCIS that he had been approved for an O1-B visa, which he filed for himself.

129.    From 2017 to 2019, Amabile developed and maintained a "friendship" with Plaintiff Markevich, hiring him to perform at her parties.

130.     On or about November 2019, Plaintiff Markevich filed for an I-485 + i-140 EB-1A Visa.

131.     On or about June 2020, Plaintiff Markevich was notified that he was denied the EB-1A visa.

132.     On or about June 2020, Plaintiff Markevich called Amabile to seek advice on his immigration status, Visa applications, and the next steps he should take to secure a Visa.

133.     Amabile promises Plaintiff Markevich that her law firm, Fox, and her manager, Bahal, will help him secure a visa.

134.     Bahal sets up a teleconference call with Plaintiff Markevich from her Fox account:



135.     After the 2017 meeting, I chose not to retain the Defendants and proceeded to secure the Visa on my own.

136.     In November 2019, Mr. Markevich filed for an I-485 + i-140 EB-1A Visa, and several months later, in the summer of 2020, around June, he was notified that his application was denied.  After the denial, he contacted Amabile to inquire about the next steps that should be taken to secure a Visa.

137.     Amabile assured Mr. Markevich that Fox and her boss, Bahal, would ensure that he got a Visa as they had connections with USCIS and guaranteed that Mr. Markevich would be approved.  Bahal scheduled a call with Mr. Markevich via Zoom to discuss securing a visa.

138.     After the call with Amabile and Bahal, they reported that marriage is the only way for Mr. Markevich to obtain a Visa.  Mr. Markevich was not ok with this resolution and did not want to marry a United States citizen only to secure a Visa.

139.     However, Amabile and Bahal insisted this was his only option.  Mr. Markevich felt defeated at that moment as he had no interest in taking this course of action, no matter how many times Amabile and Bahal insisted this was his only option.

140.     Another critical point is that Amabile, Fox, and Bahal failed to advise Mr. Markevich of all his options regarding his visa application.

### Defendants Encouraged Plaintiff Markevich
### To Commit Immigration Marriage Fraud

141.     As previously stated, Bahal and Amabile advised Plaintiff Markevich to find a citizen, get married, and apply for a visa through marriage.  They informed him that marriage was the "Only Way" for Plaintiff Markevich to get a Visa.

### Pursuant to a Pamphlet From the USCIS, Marriage Fraud is a CRIME!!!



142.    Bahal and Amabile may have committed malpractice by failing to inform Plaintiff Markevich that he was eligible for 245(i) adjustment, which enables certain individuals who are present in the United States who would not normally qualify to apply for adjustment of status in the United States to obtain lawful permanent residence (get a Green Card) regardless of:

    a.  The manner they entered the United States;

    b.  Working in the United States without authorization; or

    c.  Failing to continuously maintain lawful status since entry.

143.    To qualify for this provision, you must be the beneficiary of a labor certification application (Form ETA 750) or immigrant visa petition (Forms I-130, Petition for Alien Relative, or I-140, Immigrant Petition for Alien Worker) filed on or before April 30, 2001. https://www.uscis.gov/green-card/green-card-eligibility/green-card-through-ina-245i-adjustment.

144.    Plaintiff Markevich could have applied for the 245(i) adjustment for which he qualified.

145.    After meeting with Bahal, Amabile, and his then-girlfriend (at the urging of Amabile and Bahal), Plaintiff Markevich did not feel comfortable with the undertone of marrying a United States citizen for the sole purpose of filing for a visa.  He felt uncomfortable with Amabile and Bahal's insistence on the fake marriage and felt he would be in legal jeopardy if he had listened to them.  Amabile and Bahal accelerated their immigration fraud pressure campaign when they emailed Mr. Markevich a document detailing the criteria for a Visa by Marriage.  (See, **Markevich Exhibit A**).



**Fox Rothschild** LLP
ATTORNEYS AT LAW

75 Eisenhower Parkway, Suite 200
Roseland, NJ 07068-1600
Tel 973.992.4800  Fax 973.992.9125
www.foxrothschild.com

**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

## ADJUSTMENT OF STATUS: DOCUMENT CHECKLIST
### PLEASE READ CAREFULLY
### U.S. Citizen Sponsoring Foreign National Spouse

The following evidence is required for a foreign national spouse's application for permanent residency via marriage to a U.S. Citizen.

These documents must be provided for each applicant, as indicated. If the foreign national spouse has children who are applying with him/her, contact us for an appropriate Document Checklist.

All documentation must be provided with a translation, if the original is in a foreign language. (See the last page of this document for information on Translations.)

Check off each item as enclosed. Mark 'N/A' next to the items that do not apply. Any items already marked with a check mark are already on file; you do not need to submit an additional copy.

**A.** <u>Questionnaire</u>: Submit the following completed questionnaire:

   1. Adjustment of Status Questionnaire
    ✓ *Please ensure you have answered ALL questions completely and accurately.*
    ✓ *Once the questionnaire is completed, be sure to click on "Inform Firm" so that we are notified that you have completed it.*
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse)

**B.** <u>Birth Certificate(s)</u>:

   1. Submit a copy of birth certificate(s) or other record(s) of birth.
    ✓ *Birth certificates must be issued by a hospital or government agency.*
    ✓ *If you are unable to provide a birth certificate (i.e. it is unavailable), you will need to provide secondary evidence and/or two notarized affidavits (from individuals who were competent at the time) confirming parentage and date of birth. Send an email to 'immigration@FoxRothschild.com' for additional instructions.*
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse)

**C.** <u>Marriage Certificate</u>:

   1. Submit a copy of properly registered marriage certificate.
    ☐ Marriage Certificate
   2. If either of you were married before, include copies of:
    ☐ (Previous) Marriage Certificate(s)
      ☐ Petitioner (USC)
      ☐ Beneficiary (Foreign National Spouse)
    ☐ Divorce Decree(s) (if applicable)
      ☐ Petitioner (USC)
      ☐ Beneficiary (Foreign National Spouse)

AOS Checklist                    Copyright © 1999-2012, Alka Bahal, Esq., All Rights Reserved        **CONFIDENTIAL/Not for distribution**
Page 1 of 4    Any form of unauthorized reproduction, dissemination, copying, disclosure, modification, distribution and/or publication of information contained in this document is unlawful and strictly prohibited.



**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

    ☐ Death Certificate(s) of previous spouse (if applicable)
        ☐ Petitioner (USC)
        ☐ Beneficiary (Foreign National Spouse)

**D.** <u>**Evidence of Status:**</u>

1. Submit a copy of passport.  (Only pages with writing or stamps need to be copied.)
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse)
2. Submit a copy of Foreign National spouse's Form I-94, Nonimmigrant Arrival/Departure Record, showing admission to the U.S. and current nonimmigrant status.  (i.e. the actual white card in passport).
    ☐ Beneficiary (Foreign National Spouse)
3. Submit copies of all of Foreign National spouse's approval notices (including any later withdrawn).
    ☐ Beneficiary (Foreign National Spouse)
4. Submit a copy of USC spouse's Naturalization Certificate
    • *A naturalization certificate is not necessary if you were born in the U.S.*
    ☐ Petitioner (USC)

**E.** <u>**Evidence of Financial Ability:**</u>

1. Submit copies of tax returns for the most recent filing year and two previous filing years, if filed.
    ✓ Either submit one set of returns, filed jointly OR
    ✓ Two sets of returns filed separately, but showing filing status as married OR
    ✓ Two sets of returns, filed individually (if you were not married during the last tax year)
    ☐ Tax Returns for recent filing year (2015)
    ☐ Tax Return for prior year (2014)
    ☐ Tax Return for previous year (2013)
    ☐ Tax Return for previous year (2012/if 2015 not yet filed)
2. Include a copy of all W-2s for the most recent tax year.
    ☐ Petitioner (USC)
    ☐ Beneficiary (Foreign National Spouse) (if authorized for employment)
3. Include a copy of any 1099 Forms for the most recent tax year.
    ☐ Form 1099 (Number of forms enclosed: _____ )
4. Submit copies of pay stubs for last three pay periods.
    ✓ *Most recent pay stub must not be more than 30 days old at time of filing.*
    ✓ *Copies of direct deposit statements are acceptable.*
    ☐ Petitioner (USC)
5. Submit copies of bank account statements for previous three months.
    ✓ *This should be a joint account; if not joint, please submit a letter explaining why in conjunction with evidence of all bank accounts.*
    ☐ Bank account statements (if not joint, state why: _____
                                                _____ .)
    ☐ If any financial items are not enclosed, please state why: _____

Copyright © 1999-2016, Alka Bahal, Esq., All Rights Reserved   **CONFIDENTIAL/Not for distribution**
Any form of unauthorized reproduction, dissemination, copying, disclosure, modification, distribution and/or publication of information contained in this document is unlawful and strictly prohibited.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

**F.  Evidence of Genuine Marriage**

    1. Documents proving the truthful nature of your marriage

       ✓ This includes any items that prove that you are truly a married couple and hold yourselves out to others as such.  PLEASE NOTE THAT ANY ITEMS YOU SUBMIT TO USCIS IN ORIGINAL WILL BE RETAINED BY USCIS.  If you wish for us to photocopy original documents, please note this on any original items submitted to our office; if not so noted, the original items will be sent to USCIS.

       ✓ Examples of items include:

         ☐ Photographs

         ☐ Photocopies of documents which bear both your names (such a mail addressed to you both at your address, letters or cards addressed to the two of you, etc.)

         ☐ Documents showing joint assets or finances (such as joint credit card statements, joint property ownership, etc.)

**G.  Photographs**\*\*:

    1. Petition for Foreign National Relative:  one (1) each

         ☐ Petitioner (USC) (one)

         ☐ Beneficiary (Foreign National Spouse) (one)

    2. Adjustment of Status Form:  two (2)

         ☐ Beneficiary (Foreign National Spouse) (two)

    3. Employment Authorization Document: *(Work Permit)* two (2)

         ☐ Beneficiary (Foreign National Spouse) (two)

    4. Advanced Parole: *(Travel Document)* two (2)

         ☐ Beneficiary (Foreign National Spouse) (two)

  \* Photographs must be passport style, color photographs taken <u>within 30 days of the filing of your application</u>.  Pictures must be identical, natural color pictures with a plain white or off-white background, be glossy, un-mounted, and un-retouched, showing a full frontal facial position.  Your head should be bare unless you are wearing a headdress as required by a religious order to which you belong.  The photos must be exactly 2x2 inches, with the distance from the top of the head to just below the chin between 1 inch and 1 and 1/8 inches.  The head should be centered in the photo, not be tilted up, down or to the side and it should cover about 50% of the area of the photo.

**H.  Medical Examination**\*:

    1. Submit a medical examination report.

       ✓ *The medical examination must be performed within 30 days of the filing your application(s) by an USCIS authorized physician.*

       ✓ *Contact USCIS' National Customer Service Center's automated system to obtain a list of physician's in your area:* 1-800-375-5283 or https://egov.uscis.gov/crisgwi/go?action-offices.type&OfficeLocator.office_type-CIV

       ✓ If you cannot find a qualified physician authorized to perform immigration examinations in your area, please contact us.

         ☐ Beneficiary (Foreign National Spouse)

  \* We will advise you of the appropriate time to obtain your medical exam(s) and photographs.  *These are time sensitive items; if you do not consult us before obtaining them, you may be required to do them again.*

Copyright © 1999-2016, Alka Bahal, Esq , All Rights Reserved   **CONFIDENTIAL/Not for distribution**
Any form of unauthorized reproduction, dissemination, copying, disclosure, modification, distribution and/or publication of information contained in this document is unlawful and strictly prohibited.



**Alka Bahal, Esq.**
Partner & Co-Chair, Corporate Immigration Practice
973.994.7800 – direct; 973.992.1653 – fax
immigration@foxrothschild.com

**I.   Filing Fees:**

☐ If you (or your spouse) are responsible for the legal or filing fees related to this application, please submit your payment for the filing fees to Fox Rothschild at this time (if you have not done so already).  (If you were required to sign a Fee & Disclosure Agreement in connection with your AOS matters, this may apply to you.)

   ✓ Contact the Corporate Immigration Billing Coordinator at immigration@foxrothschild.com to make payment arrangements (credit cards are accepted).

➤**ADVISORY ON TRAVEL OUTSIDE THE U.S.:** If you or your spouse plans to leave the U.S. to go to any other country, including Canada or Mexico, before a decision is made on your application, it is in your best interest to contact our office before you make plans to leave.

   o  You must be physically present in the United States at the time the AOS application is submitted to USCIS.

   o  **In many cases, leaving the U.S. without advance written permission (advanced parole) will result in automatic termination of your application.  This may be true even if you have a valid nonimmigrant visa (such as an H-1B or H-4) in your passport.  Once you are granted an EAD (Employment Authorization Document), you may be taken out of visa status.**

   o  Also, you and your spouse may experience difficulty upon returning to the U.S. if you do not have written permission to reenter after the application has been submitted.  We will not be responsible for the invalidation of a pending application resulting from your or your spouse's unauthorized departure from the United States.

⊛*If you have failed to maintain non-immigrant status at any time while in the US, even through no fault of your own or due to a technicality, please inform our office immediately.*

It is your responsibility to notify our offices **immediately** *in writing* **of any changes in address, work location, phone number(s), etc.**  (You may email your updated contact information [and status inquiries] to: immigration@foxrothschild.com.)

<u>Information on English Translations</u>

ALL foreign language documents should be submitted with certified translations.  Anyone not a party to the instant applications who is competent in reading and writing both the foreign language and English may perform the translation of foreign language documents.  If you are unable to locate an individual to perform the translations for you, please contact the Firm to arrange for a professional translation (at an additional cost).

The translator must certify that she/he is competent to translate and that the translation is accurate.  The certification format should include the certifier's name, signature, address, and date of certification.  The certification statement should appear on translated document, usually in the lower right hand corner; two suggested formats are:

**Translator Certification**

I, _____, hereby affirm that I can read and write in English and _____.  I swear that the above

translation is a true and accurate representation of the attached foreign language document entitled

_____.

   Signature: _____ Date: _____

   Print Name: _____

   Address: _____

**Certification by Translator**

I, _____, certify that I am fluent (conversant) in the English and _____ language(s), and that the

above/attached document is an accurate _____ translation of the document attached entitled _____.

   Signature _____ Date _____

   Typed Name _____

   Address: _____

Copyright © 1999-2016, Alka Bahal, Esq., All Rights Reserved
Any form of unauthorized reproduction, dissemination, copying, disclosure, modification, distribution and/or publication of information contained in this document is unlawful and strictly prohibited.  **CONFIDENTIAL/Not for distribution**

**O1-B Visa Reinstatement**

146.     On or about October 15, 2021, Amabile called Plaintiff Markevich and informed
him that she had a "special connect" named Alan D. Bersin from the US Department of
Homeland Security.  Amabile informed Plaintiff Markevich that she could file an O1-B
reinstatement and EB1-A together, and the only expenses Plaintiff Markevich would be
responsible for were the filing fees of $460.00 and $1465.00.

147.     Plaintiff Markevich was happy to hear that there was an alternative solution to
obtain a Visa, so he contacted a friend to borrow the money.

148.     Plaintiff Markevich borrowed the money and sent it to Amabile via Zelle.

149.     Plaintiff Markevich believed Zelle was secure as Kristen Amabile was represented
by her law firm, and Amabile was a lawyer looking out for his best interest.

150.     Amabile made this demand with a sense of immediate urgency, saying, "Send
money to me TODAY, I drop off at FedEx, it's urgent."

151.     Plaintiff Markevich was under the impression that Zelle and cash were appropriate platforms and modes of payment for Defendant's legal representation, as Amabile was still employed with Fox.  Bahal never informed him of any other way to compensate Defendants for their services, and Fox negligently failed to provide the necessary oversight of Amabile and Bahal's actions.

152.     Amabile pocketed Plaintiffs money, and never applied for the Visa.

**Plaintiff Markevich Discovers That He Was Scammed**

153.     On or about March 2022, Russia invaded Ukraine; Plaintiff Markevich's dad is in Ukraine.

154.     Plaintiff Markevich expressed his concerns to Amabile, and Amabile promised that she could easily get his father to safety.

155.     Amabile claimed that she, Fox, and Bahal could help Plaintiff Markevich's father to enter the US without a visa through that same "special contact, named Alan."

156.     Amabile guaranteed that Plaintiff Markevich's father could enter the US without a visa due to some waiver the US government implemented for Ukrainian refugees.  At the time, Plaintiff Markevich was desperate and would do anything.

157.     Plaintiff Markevich believed Amabile so much that he purchased a ticket for his dad to JFK after having his dad flee Ukraine via Poland.

158.     Plaintiff Markevich's father went to the airport in Warsaw, Poland.  Plaintiff Markevich called Amabile.

159.     Plaintiff Markevich contacted Kristen to find out his father's next steps in the process, but there was no answer.

160.     Plaintiff Markevich attempted several more times, but there was no response.

161.     Angry by this delay and desperate to ensure his father's safety, Plaintiff Markevich contacted Amabile's friend to see if her friend could assist.

162.     The morning of the flight, Plaintiff Markevich could not reach Amabile.  His dad was standing at the terminal gate with 15 minutes remaining to board, and he felt helpless.

163.     Plaintiff Markevich was in LA, and Amabile was in New Jersey, and she refused to answer his calls.  Plaintiff Markevich had to reach out to her friend on Facebook Messenger again, and finally, she answered, and Amabile called him.

164.     When Amabile called Plaintiff Markevich, she showed no sympathy and left him alone to figure out how he would help his father.

165.     With only 15 minutes left to board the flight, Plaintiff Markevich's dad was stranded in Poland.  He was rejected at the airport and unable to board his flight to JFK.

166.     At that point, Plaintiff Markevich began to suspect that Defendants were complete frauds.

167.     On or about March 2022, Plaintiff Markevich confronted Amabile and demanded to receive his case number for the applications the defendants allegedly "filed" with USCIS.

168.     Amabile became "outraged" by Plaintiff Markevich's demand and refused to give him any info.

169.     Amabile kept repeating that she was not home, she was depressed, and she needed to find the documents Plaintiff Markevich requested.

170.     Amabile said her former assistant, "Yun," filed all his documents with USCIS on or about May 2022.

171.     Plaintiff Markevich was initially confused but recalled that Fox employee Yun Pearson had emailed him about his O1-b and Eb-1A Visa applications.

172.     However, Plaintiff Markevich never received the requested documentation.







173.    Plaintiff Markevich later realized that Amabile, Fox, and Bahal had never submitted his visa application.

174.    Plaintiff Markevich called Yun Pearson at her new job and asked her if anything had ever been filed on his behalf.  Yun confirmed that nothing had ever been filed.

175.    Amabile, Fox, and Bahal fooled Plaintiff Markevich into thinking that they were a legitimate law firm and legitimate lawyers.  They stole his money, built up his hopes, and abandoned him when he was at his lowest.

176.    Plaintiff Markevich confronted Amabile again, explicitly asking her to return all his money or admit that the Defendants fraudulently stole it.  Amabile refused.



**Alka Bahal**
**AIDED AND ABETTED AMABILE'S**
**CRIMINAL ACTIVITIES**

177.    Bahal was the Co-Chair of Fox's Corporate Immigration Practice beginning in October 2006 when the firm acquired Grotta, Glassman & Hoffman.  While at Grotta, Glassman & Hoffman, Bahal was the Partner & Chair of Corporate Immigration.  Bahal conveniently "resigned" from Fox in December 2023 after the Plaintiffs filed their lawsuit exposing the immigration Rico scheme she implemented at Fox as Co-Chair of Fox's Corporate Immigration Practice.

178.     Bahal never met, spoke with, or engaged with Mr. Wealth throughout her representation of him, except for his initial encounter, as detailed above.  After their initial meeting, Bahal allowed Amabile to manage the relationship and represent Mr. Wealth.

179.     As evidenced above, Bahal engaged with Plaintiff Markevich via Zoom and allowed Amabile to manage the relationship and represent Plaintiff Markevich.

180.     Bahal rarely or never checked in with either of the Plaintiffs and allowed Amabile and Yun (in the case of Plaintiff Markevich) to manage the Plaintiff's Visa filing process.

181.     According to Mr. Wealth's itemized monthly billing from Fox, Bahal worked approximately 6.6 hours on Mr. Wealth's Visa application.  In contrast, Amabile worked approximately 56.05 hours.

182.     Plaintiff Markevich never received a bill from the Defendants, but he was required to issue thousands of dollars in payments to them via Zelle and other methods.

183.     Bahal abandoned her responsibility as counsel to the Plaintiffs and placed their visa application, freedom, well-being, and finances at risk by allowing her co-conspirator and authorized agent, Amabile, to victimize them.

184.     Based on information and belief, over 20 years, Bahal created an Immigration RICO enterprise within Fox by using Amabile, Yun, Ali Brodie (the new Co-Chair of Fox's Immigration Practice), Catherine Wadhwani (the Co-Chair of Fox's Immigration Practice), and Brian Frey (collectively, "Immigration RICO collective") to aid in the origination of clients, overbilling of those clients, and the theft of those clients retainers and/or assets through a sophisticated scheme of voodoo accounting, and deceptive billing.

185.     Based on information and belief, Bahal and the Immigration RICO collective used their positions at Fox, a national law firm with over 900 attorneys, to fool unwitting immigration clients into trusting them.

186.     Upon information and belief, Bahal and the Immigration RICO collective used Fox's letterhead, email accounts, documents, and support staff (paralegals and secretaries) to carry out their criminal enterprise of securing and defrauding immigration clients out of their assets in exchange for phantom immigration services.

187.     Based on information and belief, Fox and its senior management, Thomas Paradise and Rachelle M. Bin, knew or should have known of Bahal and the Immigration RICO collective's criminal enterprise.  However, Paradise and Bin intentionally turned a blind

eye to them.  As of December 2022, Bin had the last opportunity to rectify these actions, but she rejected it.

188.        As a result of Bin and Paradise's negligence, Bahal and the Immigration RICO collective were allowed to use Fox resources, such as paralegal Yun Pearson, and telecommunication resources, such as teleconferences, to defraud the Plaintiffs, and a possible collective of other immigration clients.

**Thomas Paradise**

189.        On or about April 12, 2022, Mr. Wealth emailed Thomas "Tom" Paradise ("Paradise") about the legal malpractice committed by Fox and Bahal.

190.        Paradise blatantly ignored Mr. Wealth's concerns.

191.        Upon information and belief, Paradise consciously decided not to inform or warn the Immigration clients of Fox, to whom Bahal provided legal services, about the theft and criminal enterprise Bahal was running.

192.        Plaintiff Markevich NEVER received a call or notice from Tom Paradise or any member of Fox's management warning him of Amabile and Bahal's criminal activities.

193.        By June 29, 2022, Tom Paradise knew or should have known that Bahal had sued Amabile in New Jersey state court for stealing $80,000 from Bahal and Fox. *Alka Bahal v. Kristen M. Amabile*, Docket No. MRS-L-001117-22.

194.        At that point, Tom Paradise, as General Counsel of Fox, had a duty and obligation to complete an audit of all the client files that Amabile worked on, notify them of Amabile's criminal activities, and warn them to monitor their finances, and immigration status and applications, and to inquire if any of them experienced any suspicious activity from Amabile or Bahal.  As it pertains to Plaintiff Markevich, Paradise failed his duty to warn.

195.        Paradise intentionally failed to terminate Bahal after discovering that Bahal intentionally failed her duty as "Co-Chair, Corporate Immigration Practice" when she failed to submit Mr. Wealth's immigration renewal application correctly and on time and when Bahal failed to warn Mr. Wealth that Amabile was terminated from Fox for theft of over $80,000.00.

196.        Paradise intentionally failed to terminate Bahal after discovering that Bahal allowed Amabile to pose as a licensed immigration attorney, use Fox's human capital and resources

to aid in her illegal practice of law, and, upon information and belief, personally profited and pocketed the monies paid to Amabile via Zelle, wire transfer, and cash by immigration clients, such as the Plaintiffs.

197.     On or about April 12, 2022, Mr. Wealth sent the following email to Mr. Paradise:

"Good afternoon, sir. I am coming to you as I was told by someone in your accounting department you were the contact person who handles issues with attorneys' misconduct. In this case, that Attorney is Alka Bahal. She is the most unethical and worst attorney I have ever encountered; her behavior is unprecedented, and she needs to be stopped so she doesn't mishandle anyone else's case in the same manner in which she mishandled mine.

My name is Raymond Wealth, as it stands now, I am a client (your firm client # 321560) of the firm (although I have expressed my imminent desire to close out my file with Alka Bahal, as a result of her unethical and fraudulent representation (she failed to file my case before my visa expired and filed it late – this resulted in placing me 'out of status,' and then she maliciously tried to cover it up and lied about it, this is just a few examples of the misconduct at the hands of Ms. Bahal. Further to the case-related problems, she then also billed me for her mistakes and incorrectly charged me hourly time for my case, which was (as stated in the engagement letter) a FLAT FEE (not hourly billing). This is outrageous and unfair; I am at a loss for words and was told by your collections team to contact you with my situation, and I am hoping that we can resolve this amicably and without further contact or dealings with Ms. Bahal. I respectfully, sir, refuse to have any further contact with her as I do not trust her. The only reason I am giving you the opportunity to make this right is the team members that worked on my case (Kristen Amabile - the only one who knew what she was doing and who unfortunately was not the person who filed my case, and Angelica Flores-Valencia, a paralegal who was very nice) I highly regard and respect, but unfortunately, I learned they are no longer with Fox Rothschild.

Accordingly, I am asking for your assistance with 1) the invoices – Ms. Bahal continued to ignore my lack of visa status, which she created by not filing my case on time, and to add further insult, continued to threaten me on bills that were not correctly invoiced (despite the agreement on our arrangement). Her total disregard for my case and lack of visa status, along with the major problems that she, in fact, created by making severe mistakes and mishandling and lied about it, then invoiced me erroneously for her poorly handled representation. This is unacceptable, and I am seeking to resolve this amicably with you first, however, if we cannot resolve this to which I am satisfied with a fair resolution, I will consider litigation and report her to the bar (which truthfully, I should do but out of fairness and my good nature, I am allowing your firm a chance to make this right).

Ms. Bahal to make a deal with me (dismissing the real issues here and not addressing the fact that she incorrectly billed me in the first place). Truly this has been an ongoing nightmare for me and for my prospective employer. Just to shed light on my case, I am considered a world-famous soccer player and have played on famous teams all over the world. I am highly educated and possess many degrees, along with having several sports

teams and organizations in the United States, all who begged me to come and work for them. I state this to demonstrate that I have been treated like I am a nobody who does not deserve the time of day from Ms. Bahal, and its sad and unfortunate.

**Issues with my case**:

- I retained Fox Rothschild on August 1, 2020 (see engagement letter attached).
- My visa status was set to expire on August 26, 2020; I retained Ms. Bahal to prepare and file my new O-1 petition prior to my visa expiration 8/26/2020 so that there were no gaps in my visa status (and Ms. Bahal knew and was aware of this visa expiration).
- Ms. Bahal 'claimed' she timely filed my O-1 visa with USCIS prior to my visa expiration (prior to 8/26/2020) to avoid illegal presence in the U.S., but in fact, she did NOT file it timely, she filed my O-1 visa AFTER my visa expired.
- Ms. Bahal made several attempts to conceal and cover up the fact that she did not timely file my case by 'blaming' Fedex carrier, and on another occasion, she blamed the USCIS mailroom for 'misplacing' my case, but clearly, if she had tracked the original package which was as I understand sent via Fedex, wouldn't she have known if she did or did not timely file it and confirm that the case was in fact received? Unfortunately, she did not track it, and I have evidence to show that she clearly lied to cover up her tracks furthermore, it was never filed before the expiration to begin with.  This is unacceptable and misconduct. I retained fox/Alka to file my case by a deadline for which she did not and then lied about and tried to conceal.
- Ms. Bahal claimed she 'allegedly timely filed the petition' – taking no responsibility whatsoever and putting me OUT OF STATUS because of her failure to timely file my case.

Her carelessness was even further revealed because she billed me incorrectly "hourly" seven (7) months later (see invoice Number 2706165 dated March 2021). Here is a time entry (in red below) of the Ms. Bahal's 9/02/20 invoice entry which CLEARLY CONFIRMS SHE 'FILED THE CASE LATE ON 9/2/20' (MY VISA EXPIRED ON 8/26/20) which resulted in putting me out of 'legal status' AND my entire immigration case in serious jeopardy.

09/02/20 BAHAL RECEIPT AND REVIEW OF SIGNED FORMS AND DOCUMENTS SUBMITTED TO SUPPORT PETITION; **OVERSEE AND FINALIZE O-1 FILING**/FINAL 0.6

- Ms. Bahal had over a month from the time we retained her to the time my visa expired to prepare it and meet the deadline, which she promised was not an issue at the time. Clearly, she either forgot or just didn't care. Either way, she recklessly handled my case.
- Had her conduct and lack of timely filing my case (and poorly prepared petition itself) been handled by ANY OTHER immigration attorney, I am quite certain I would be in a very different boat right now. And to further fuel the fire, she did not take ownership or responsibility for it, she instead lied and blamed everyone else but herself (what type of attorney does this? What type of attorney makes it her practice of not tracking a visa petition delivery to confirm USCIS actually received the petition? What type of attorney bills the client for a severe mistake they made on the case and then haunts them to pay that bill? Would you pay a bill for time an

attorney spent mishandling and lying to cover her tracks? Anyone with half a brain would know otherwise.

- Although your firm has a well-respected reputation, from my experience, which is why I retained Fox in the first place, Ms. Bahal should not be associated with Fox if they want to keep that good reputation because my situation alone speaks for itself.

- To add further insult, I only learned about this mistake because I received the incorrectly billed invoices, which is evidence to show she mishandled the entire matter, she is that careless, and although she tried to cover her tracks, she forgot to cover it entirely otherwise she would not have sent me the proof to show what I suspected, her lack of adherence to a deadline, one which puts my entire life in jeopardy.

**Billing Issues**:

d. The agreement (from August 2020) was for a one-time FLAT fee of 13,000 and was agreed to incorporate all legal fees (including an RFE, if issued) for the entire case). Ms. Bahal did not adhere to this arrangement and billed hourly for invoices.

e. I am not paying for mistakes your partner conducted and put me out of status as a result of, I am not paying for bills that were billed hourly instead of flat fee as agreed to in the engagement letter.

f. I am also disputing all invoices entirely (the case was denied) I will only pay for the filing fees which was already paid, and I am hereby requesting, as a show of good faith and to resolve this without further burden to me, a refund of any monies paid over and above the USCIS filing fees immediately. I think this is the least you can do, and it is fair and just given the above-described circumstances.

g. Additionally, I am asking for my file to be officially closed and transferred to me directly to my home address with a tracking number (and not sent by Ms Bahal as I **don't trust her to send anything ever again to me or for me)**.


**Raymond Wealth**
**160 James Street Building 14, Apt 8**
**Toms River, NJ 08753**


Please also note that despite my several requests and the engagement letter written by your firm/Ms. Bahal, ALL my Bills were sent to the **wrong person at the wrong address**, they were to be sent as agreed in the engagement letter to me, Raymond Wealth. NOT TO Mike Turtle (see below in yellow of the engagement letter under "Fees Due Now"

It is our understanding that Mr. Raymond Wealth, the beneficiary, will be responsible for all legal fees and costs incurred per the Fee Schedule below. It is often our practice to require clients to make payments which are credited against fees and costs to be incurred. At this stage, we require a pre-payment of $13,000 towards the flat legal fee for the for O-1 visa; USCIS Filing fees, including Premium Processing Service (expedited USCIS processing), are separate and not included for the flat (Form I-129 & Form I-907) USCIS Filing. If you wish to pay by credit card, please follow this link: http://www.foxrothschild.com/payment-portal/. Refer to reference code: 999999.00003 to

ensure proper application to your matter. If you have any questions about submitting your payment, contact Sandra Mordecai at 973-994-7802.

It is incredibly appalling that Ms. Bahal had the nerve to deceive me and my potential employer, SST, and yet had the audacity to offer me 'a discount' at your firms fiscal year end in her snippy (one of many) emails (see below email from Ms. Bahal dated March 29, 2022).

Just to add one last item to the 'case issue list' to date she has not made any attempt to assist me with my case further, she did not even inform me it was denied or try to refer me in any direction to help me. In fact, I had to reach out to her to ask her what was going on. It is truly unbelievable. She is a liability and should not be allowed to hurt or represent anyone else because if she does to others what she did to me, that would be a tragic mistake.
I have never in my entire life endured such disgusting and unprofessional treatment especially at the hand of someone who was 'representing me'. Please help me resolve this so I can take my file and retain another attorney who hopefully God willing can undo what Ms. Bahal did. Thank you in advance for your anticipated cooperation and assistance. I appreciate your time and look forward to hearing from you soon."

198.     Paradise responded to the email above with the following:

"Dear Mr. Wealth:
Thank you for bringing your concerns to me in the below email.  I will look into this and respond fully once I have conducted my review of the matter.  Please note that Ms. Bahal is out of the office this week and part of next week.  As such, it may be a few days before I can speak with her about your concerns.
On behalf of the Firm, I am sorry to hear that you are not satisfied with the legal services received, and we will endeavor to correct any shortcomings by our firm that are discovered during our review of your matter.
In the meantime, please direct all further communications to my attention.
I look forward to speaking with you."

### Paradise did not follow up with Mr. Wealth.

199.     Paradise did not "endeavor to correct any shortcomings" (and there were many).

200.     Paradise did not investigate Mr. Wealth's concerns. If he had, he would have discovered that Bahal committed several acts of legal malpractice when she advised Plaintiff Wealth to apply for an O-1 Visa when she knew he did not qualify for it.

201.     He could have discovered that Bahal would overbilled Fox Immigration clients to avoid paying back the balance of their retainer.

202.     He could have discovered that Bahal allowed Amabile to present herself as an attorney to Fox's immigration clients.

203.     Upon information and belief, within two weeks of sending the email, ICE was miraculously tipped off that Mr. Wealth was out of status, resulting in Mr. Wealth's arrest and detention.

204.     As previously stated, Mr. Wealth was out of status and remained in the US after his visa expired because the defendants informed him that they had contacts within USCIS, and those contacts would ensure that Mr. Wealth did not have to leave the United States.

205.     The proximity between Mr. Wealth's sending this April 12, 2022, email to Paradise and his arrest and detention by ICE on April 29, 2022, removes all doubt that Paradise, Fox, Bahal, and Amabile reported Mr. Wealth to ICE.

## Paradise Rubberstamped Bahal and Amabile's Immigration RICO Enterprise

206.     Through counsel, Mr. Wealth informed Paradise about the criminal activities visited upon him by Amabile and Bahal.

207.     Once again, Paradise chose to put profits over people and continued to put ALL of Fox's immigration clients at risk by maintaining Bahal's employment and failing to warn Fox's immigration clients about Amabile and Bahal's criminality.

208.     Upon learning that Amabile, an individual employed on his watch, was illegally posing as a licensed attorney to Fox's immigration clients and had stolen $80,000.00 from Fox, over $10,000 from Plaintiff Markevich, and over $20,000.00 from Plaintiff Wealth, Paradise chose NOT to do the decent and sensible thing, which would have been to reimburse Mr. Wealth for his losses and to investigate and warn the other potential victims of Amabile and Bahal that Amabile is not a licensed attorney.

209.     Due to Fox, Amabile, and Bahai's malpractice, Mr. Wealth was out of status with USCIS and was left exposed and susceptible to deportation.

## Mr. Wealth Was Arrested By ICE

210.     On or about April 29, 2022, Mr. Wealth was arrested by ICE.

211.     According to the Department of Homeland Security Notice to Appear, Mr. Wealth was arrested based on the following allegations:

a.  not a citizen or national of the United States;
b.  a native of NIGERIA and a citizen of MEXICO;

c. Were admitted to the United States in Los Angeles, CA, on or about March 14, 2019, as a nonimmigrant (Jl);

d. Remained in the United States beyond the duration of your stay without authorization from the Immigration and Naturalization Service or its successor, the Department of Homeland Security.

---

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: 11/14/1987

Event No: MLN2204000173

In removal proceedings under section 240 of the Immigration and Nationality Act:
Subject ID: 377082265

File No: 216 429 732

In the Matter of:

Respondent: ABUCHI RAYMOND WEALTH                                                    currently residing at:

555 Geo Drive Phillipsburg,PENNSYLVANIA, 16866

(Number, street, city, state and ZIP code)                                 (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of NIGERIA and a citizen of MEXICO;

3. You were admitted to the United States at Los Angeles, CA on or about March 14, 2019 as a nonimmigrant (J1);

4. You remained in the United States beyond the duration of your stay without authorization from the Immigration and Naturalization Service or its successor the Department of Homeland Security.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:     ☐ 8CFR 208.30     ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

801 W SUPERIOR AVE. SUITE 13-100 Cleveland OH 44113. EOIR Cleveland, OH
(Complete Address of Immigration Court, including Room Number, if any)

on   May 13, 2022   at   9:00 AM   to show why you should not be removed from the United States based on the
(Date)          (Time)

charge(s) set forth above.                                          RBS TSYPIS - SDDO
                                                        (Signature and Title of Issuing Officer) (Sign in ink)

Date:   April 29, 2022                                    Mt. Laurel, New Jersey
                                                              (City and State)

---

212.      Based on the preceding, it was charged that Mr. Wealth was subject to removal from the United States according to the following provision(s) of law:

a. Section 237(a) (1) (B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section l0l (a) (15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

213.     Bahal could have filed an emergency application for Mr. Wealth after receiving his rejection letter, requested or petitioned for a reconsideration of the decision, supplemented her late filing with additional information that USCIS required, and refiled using the proper visa application.

214.     The only reason Mr. Wealth was in the United States after the expiration of his visa was that he detrimentally relied upon the legal advice of the defendants.

**<u>PARADISE and FOX HAVE THE NERVE TO CONTINUE TO PURSUE MR. WEALTH FOR A $20,000 IMMIGRATION LEGAL FEES</u>**

215.     After failing miserably to secure the relevant information from Mr. Wealth for his Visa renewal application, Fox and Paradise have the gall to continuously send Mr. Wealth a $22,000.00 invoice for legal services[3].

216.     The first of these bills was sent to Mr. Wealth on or about March 18, 2022.

---

[3]As of the date of this filing, Fox, Paradise, and Bahal continue to send Mr. Wealth an invoice or $22,000.00 worth of legal services.

 **Fox Rothschild** LLP
ATTORNEYS AT LAW

2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
T: 215.299.2000  F: 215.299.2150
www.foxrothschild.com

Jessica Grillone
Direct Dial: (215) 299-2165
Email Address: jgrillone@foxrothschild.com

March 18, 2022

RAYMOND WEALTH

███████████████████

Via Mail and Email: rwealth27@gmail.com

Re:    SOCCER SPECIFIC TRAINING INC. (File No. 321560)
       Outstanding Balance in the Amount of $21,981.46

Dear Mr. Weatlh,

Our records indicate that payment of our fee in the amount of $21,981.46 for professional services
rendered in the above referenced file is seriously overdue.

I have enclosed a current summary of account and ask that you see that the sum is paid promptly.  For
your convenience, I have provided a self-addressed return envelope for you to remit your payment.

Please feel free to call me at (215) 299-2165 if you have any questions regarding this matter.  Otherwise,
I request that payment be received in our Accounts Receivable Department within one week of the date
of this letter.

Sincerely,

Jessica Grillone
Collections/Client Relations Coordinator

Enclosure(s)

cc:    Alka Bahal, Esq.
       Justine Botial, Director of Collections

A Pennsylvania Limited Liability Partnership

132008396.1        California   Colorado   Connecticut   Delaware   District of Columbia   Florida   Illinois
                   Minnesota   Nevada   New Jersey   New York   Pennsylvania   Texas   Washington

**FOX ROTHSCHILD LLP**
ATTORNEYS AT LAW
2000 MARKET STREET, 20TH FLOOR
PHILADELPHIA, PA 19103-3222

Summary of Account as of March 18, 2022



**Client: 321560 - SOCCER SPECIFIC TRAINING INC.**

In accordance with our firm's policy, all invoices are due upon presentation.  This is simply a summary of your account with respect to open invoices and is provided for payment of your account balance. If you need a copy of the invoice(s) referenced below, please contact Jessica Grillone at (215) 299-2165 or jgrillone@foxrothschild.com.

| Invoice | Date | 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | > 90 Days | Total |
|---|---|---|---|---|---|---|
| **Matter ID: 321560.00001** | **GENERAL IMMIGRATION COUNSELING - 2021** | | | | | |
| 2706165 | 3/3/2021 | | | | $3,911.09 | $3,911.09 |
| Matter Total | | | | | | **$3,911.09** |
| **Matter ID: 321560.00002** | **RAYMOND WEALTH (O-1)** | | | | | |
| 2827638 | 9/17/2021 | | | | $51.00 | $51.00 |
| Matter Total | | | | | | **$51.00** |
| **Matter ID: 321560.00003** | **RAYMOND WEALTH (RFE ON O-1)** | | | | | |
| 2756301 | 5/20/2021 | | | | $2,425.00 | $2,425.00 |
| 2794833 | 7/29/2021 | | | | $15,594.37 | $15,594.37 |
| Matter Total | | | | | | **$18,019.37** |
| **Total Due** | | | | | | **$21,981.46** |

We would appreciate if you would forward prompt payment of any invoice(s) that are outstanding.
Thank you for your prompt attention to this matter.

Client #321560 - Page 1 of 2

13. The most recent bill was sent to Mr. Wealth and Mr. Turtle on or about March 3, 2023.



FOX ROTHSCHILD LLP
ATTORNEYS AT LAW
2000 MARKET STREET, 20TH FLOOR
PHILADELPHIA, PA 19103-3222

Summary of Account as of March 3, 2023
Billing Attorney: 1543

RAYMOND WEALTH
SOCCER SPECIFIC TRAINING (SST)

Client: 321560 - SOCCER SPECIFIC TRAINING INC.

As we approach our March 31st fiscal year-end, we request that you remit payment upon receipt of this summary of account.

We appreciate your assistance and extend our gratitude for your ongoing business.

| Invoice | Date | 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | > 90 Days | Total |
|---------|------|-------------|--------------|--------------|-----------|-------|
| **Matter ID: 321560.00001** | **GENERAL IMMIGRATION COUNSELING - 2021** | | | | $3,911.09 | $3,911.09 |
| 2706165 | 3/3/2021 | | | | | $3,911.09 |
| **Matter Total** | | | | | | |
| **Matter ID: 321560.00002** | **RAYMOND WEALTH (O-1)** | | | | $51.00 | $51.00 |
| 2827638 | 9/17/2021 | | | | | $51.00 |
| **Matter Total** | | | | | | |
| **Matter ID: 321560.00003** | **RAYMOND WEALTH (RFE ON O-1)** | | | | $2,425.00 | $2,425.00 |
| 2756301 | 5/20/2021 | | | | $15,594.37 | $15,594.37 |
| 2794833 | 7/29/2021 | | | | | $18,019.37 |
| **Matter Total** | | | | | | |
| **Total Due** | | | | | | $21,981.46 |

This is simply a summary of your account with respect to open invoices through February 28, 2023 and is provided for payment of your account. If you need a copy of the invoice(s) referenced above, please contact Samnang "Sam" Tieng at 215-444-7234 or stieng@foxrothschild.com.

For your convenience, we have enclosed a self-addressed envelope and would appreciate if you would forward prompt payment of any invoice(s) that is (are) outstanding.

Thank you for your prompt attention to this matter.

Client #321560 - Page 1 of 2

217.     To say that this action on the part of the defendants is tone-deaf and disgraceful is an understatement.  It is more reflective of Defendant Fox and Paradise's desire to put profits over people, to put dollars of decency, and to double down on their dirty deeds at the expense of their immigration clients.

**Fox Is Vicariously Liable For the Actions of their Agents Amabile and Bahal**

218.       [T]he doctrine of respondeat superior recognizes a vicarious liability principle pursuant to which a master will be held liable in certain cases for the wrongful acts of his servants or employees." *Carter v. Reynolds*, 175 N.J. 402, 408, 815 A.2d 460 (2003). "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment. " *Meyer v. Holley*, 537 U.S. 280, 285, 123 S. Ct. 824, 154 L. Ed. 2d 753 (2003). The *Restatement (Second) of Agency* §219(1) (Am. Law. Inst. 1958), which our Court has cited favorably, *Carter*, 175 N.J. at 408-09, states that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Russo v. Creations by Stefano*, No. A-0663-18T1, 2020 N.J. Super. Unpub. LEXIS 1615, at *12-13 (Super. Ct. App. Div. Aug. 20, 2020).

219.       Here, there is no doubt, as evidenced by the email and text messages, in the Plaintiff's possession that Bahal and Amabile acted in the scope of their authority and employment when they harmed the Plaintiff's.

220.       According to the countersuit filed by Amabile against Bahal, Bahal essentially operated an Immigration RICO Enterprise, routinely stealing money from many clients within Fox's immigration unit.

**Fox and Bahal Decades-Long Immigration RICO Enterprise**

221.       Each Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

222.       Plaintiffs and Defendants Amabile and Bahal are "persons" within the meaning of 18 U.S.C. § 1961(3).

223.       Fox Rothschild constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4) (the "Enterprise").

224.       Defendants Amabile and Bahal conducted and participated in the conduct of Fox Rothschild's affairs through a pattern of racketeering activity.

225.       The Enterprise engages in interstate commerce, and its activities affect interstate commerce, including because the Enterprise represents individuals outside of the State of New Jersey and because its activities affect, and directly impact, the ability of Plaintiffs and others similarly situated to live and work in the United States, including in States

outside of New Jersey.  In addition, Defendants used interstate mail to perpetrate the scheme.

### Defendants' Scheme

226.　　To induce Plaintiffs to hire them, Defendants misrepresented their services to Plaintiffs and misrepresented Amabile as a licensed immigration attorney.  Defendants told the Plaintiffs that their attorneys, Bahal and Amabile, would prepare affirmative applications for them to receive immigration benefits in the form of work authorization and/or legal permanent residency in the United States.  Defendants did not disclose that they intended to cause Plaintiffs to be placed in adversarial removal proceedings by failing to file their applications in a timely manner and/or encouraging them to file for immigration visas they knew the Plaintiffs were not qualified for.  Defendants did not intend to, and could not, provide the services and or outcomes from the services they promised because no such affirmative immigration relief exists for immigrants with Plaintiff's qualifications, and there was no basis for Defendants to believe it would exist.

227.　　Contrary to Defendants' representations to Plaintiffs, Defendants intended to, and did, submit-not affirmative applications for work authorization or legal permanent residency based on the criteria identified.

228.　　Defendants' racketeering activities caused the individual Plaintiffs collective financial injury of at least $50,000, the amount they paid to Defendants in justified reliance on Defendants' misrepresentations and omissions, and the amount they have had to pay for new counsel as a result of Defendants' actions, including additional legal costs.  But for Defendants' conduct, Plaintiffs could have utilized these resources for other purposes.

### Affirmative Applications

229.　　An affirmative application involves a noncitizen applicant making an election to petition the United States Citizenship and Immigration Services ("USCIS") through a "non-adversarial" process for an immigration benefit.  Individuals may file an affirmative application even if they are not in adversarial removal proceedings.  O-1, O1-b, and Eb-1A Visas are just one of several different types of immigration benefits for which individuals can affirmatively apply and, if successful, be granted lawful status.

230.     One way that a noncitizen may be placed in removal proceedings is if USCIS does not grant an affirmative application and the noncitizen does not have other lawful status or is not on valid parole.

<u>Initial Meetings</u>

231.     Defendants' fraud and deception began with their first meetings with their prospective clients.  Their interaction with Defendants generally proceeded as follows:

    a.  Plaintiffs briefly met with Defendants or their agents and truthfully answered any questions Defendants asked them.

    b.  During these meetings, and on most occasions before Plaintiffs paid Defendants any money, Defendants or their agents represented to Plaintiffs that they were eligible for O-1, O1-b, and Eb-1A Visas.

    c.  Generally, at the first or subsequent meeting, Defendants instructed Plaintiffs to sign several documents written in English that Defendants told them were necessary to apply for lawful permanent residency.  Defendants did not explain the contents of or translate these documents into the native languages of Plaintiff Wealth (Spanish and Igbo) or Plaintiff Markevich (Ukrainian).

    d.  Defendants generally also refused to answer questions from Plaintiffs about their applications.  When Plaintiffs asked questions about their applications, Defendants generally became angry or curt, often yelling at Plaintiffs or using profanities.  Instead of addressing Plaintiffs' questions, Defendants typically instructed Plaintiffs to trust them because they were attorneys.

    e.  Defendants misrepresented the nature of the applications they offered to submit for Plaintiffs and their assurances that Plaintiffs were qualified for those applications.

    f.  Defendants charged Plaintiff's fees, generally in varying-sized installments.  Amabile often demanded payments in a frantic fashion through conversations with plaintiffs and plaintiffs' Friends and family members.  During subsequent times, Defendants asked Plaintiffs to make additional payments through billing receipts, text messages, and letters through the us postal mail.  Plaintiffs made these additional payments based on the representation that Defendants would submit an affirmative application under O-1, O1-b, and Eb-1A Visas.

232.     The Defendants Immigration Scheme functions through a flat-out misrepresentation of the services Defendants could and planned to provide.  It is not a matter of Defendants providing unsound legal advice or underestimating the risk of the process represented to Plaintiffs.  The misrepresentations were the means by which Defendants induced Plaintiffs to hire and pay them.  If Defendants had disclosed to Plaintiffs that there was no affirmative application for benefits based on the eligibility criteria Defendants described and that they intended to file boilerplate O-1, O1-b, and Eb-1A Visas applications, Plaintiffs would have sought legal representation elsewhere without paying any fee to Amabile, Bahal, and Fox.  Additionally, Amabile is not and was not an attorney at the time she presented herself as such in front of Bahal to Mr. Wealth and when she made that claim to Plaintiff Markevich and his girlfriend at the time.  The plaintiffs detrimentally relied upon Amabiles claim that she is a licensed attorney because they felt that Amabile had the knowledge, training, and skill set to represent their interests.

233.     Before first visiting Defendants, Plaintiff Wealth visited another immigration law firm that he had seen advertised on television.  The lawyer Mr. Wealth met with at the law firm informed Mr. Wealth that he could seek lawful renewal of his J-1 Visa.  They discussed other options, such as the O- Visas and Mr. Wealth was informed by this law firm that he would not qualify for the O Visa and his best bet would be to apply for the J-1 Visa renewal.  Mr. Wealth considered retaining this firm but asked if he could meet with Amabile first since she had contacted him, and they had a date set for him to meet with Bahal.

234.     When Mr. Wealth met with Defendant Amabile and Bahal, however, Defendant Amabile and Bahal told him that he was eligible for the O-1 Visa and that, unlike the other law firms, they have connections within USCIS who could get his application approved quickly.  Defendant Amabile and Bahal did not disclose that Mr. Wealth would not qualify for the O-1 Visa.

<u>Defendants' Continued Misrepresentations</u>

235.     Plaintiffs routinely questioned whether the filing of their applications completed and filed.  Amabile would often assure them that yes, their applications were filed when she knew no such filing had occurred.  In the case of Mr. Wealth, Amabile and Bahal filed

his application 5 months after they initially informed him that his application had been filed. This resulted in a late out of time filing.

236.     On the other hand, Plaintiff Markevich did not have his applications filed at all. Amabile notified him that his applications were filed in a timely manner, and his father's asylum application to the United States was also filed, only to learn the opposite was true when his father appeared at the airport in Poland and was rejected because Amabile had lied.

### Pattern of Racketeering Activity

237.     At all times relevant and in violation of l8 U.S.C. § l962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined in RICO, l8 U.S.C. § l96l(5), by virtue of the conduct described herein.

238.     Defendants furthered the O-1, O1-b, and Eb-1A Visas application scheme through, among other illegal activities, engaging in fraud and swindles (hereafter "mail fraud") under l8 U.S.C. § l34l and fraud and misuse of visas, permits, and other documents (hereafter "visa fraud") under l8 U.S.C. § l546.

<u>Mail Fraud</u>

239.     Defendants engaged in mail fraud because they used the interstate mail or caused the interstate mail to be used for the purpose of furthering and executing the O-1, O1-b, and Eb-1A Visas application schemes.

240.     Examples of mail fraud include mailings of O-1, O1-b, and Eb-1A Visas applications between 2006 and 2023 from Fox Rothschilds Law Firm in New New Jersey and Pennsylvania to the USCIS Service Center in Vermont, located at 75 Lower Welden Street in St Albans City, and are set forth below.

241.     In addition, the defendants used mail as the primary method of communication with the plaintiffs. This included mailing letters to the Plaintiffs when the Defendants billed them for their services and when they had an update on their cases.

242.     Defendants omitted from these mailings that they intended to overbill Plaintiffs and pocket the balance of their retainers or that the Plaintiffs were not qualified for the O-1, O1-b, and Eb-1A Visas defendants guaranteed them they would secure.

243.     Defendants' use of the mail was incident to an essential part of the scheme to defraud, namely to deceive and/or defraud Plaintiffs into paying and continuing to pay Defendants for a non-existent affirmative immigration benefit.

244.     Plaintiffs relied on Defendants' fraudulent explanation of a non-existent affirmative immigration benefit in paying Defendants through their agent Amabile for purported legal services.

Visa Fraud

245.     Defendants engaged in visa fraud because they knowingly presented O-1, O1-b, and Eb-1A visa applications to USCIS, which contained false statements and/or did not contain any reasonable basis in law or fact.

246.     Examples of visa fraud include signing the attestation swearing that the following statements were true when, in fact, one or both statements were not: (l) Defendants filed the O-1, O1-b, and Eb-1A Visa applications at the request of Plaintiffs; and (2) Defendants read the completed O-1, O1-b, and Eb-1A Visa application to the applicant in his or her native language or a language he or she understood for verification.  Defendants swore to these attestations, knowing that they were not all true.

247.     In Mr. Wealth's application, Defendant Bahal, without informing Plaintiff Wealth that Defendants were filing an O-1 Visa application attesting to the fact that Mr. Wealth was being sponsored, and without reviewing the application with Plaintiff Wealth in English, Spanish, or Igbo, signed the preparer attestation that provides:

> I declare that I have prepared this application at the request of the [Plaintiff], that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. l324c and/or criminal penalties under l8 U.S.C. l546(a).

248.     In addition, Defendants knowingly prepared and submitted O-1, O1-b, and Eb-1A Visa applications on behalf of Plaintiffs without regard to the truth or falsity of the information contained therein and intentionally mailed those O-1, O1-b, and Eb-1A Visa applications to the USCIS Service Center in Vermont.

<u>Intent and Pattern</u>

249.     Defendants each participated in the immigration fraud Scheme knowingly, willfully, and with a specific intent to defraud Plaintiffs.

250.     Defendants induced Plaintiffs to pay them by knowingly misrepresenting Amabile as a licensed immigration attorney, misleading them to believe that they were qualified for the O-1, O1-b, and Eb-1A Visas, and the fact that they had inside connections and contacts within USCIS who can guarantee their visa applications would be approved.

251.     This misrepresentation capitalized on the significant time delay in USCIS' processing of O-1, O1-b, and Eb-1A Visa applications, which Defendants knew and believed would delay Plaintiffs from ever discovering the nature of the fraud that had been perpetrated on them or from acting on that fraud once it was discovered.  Expressly, Defendants capitalized on the facts that (l) Plaintiffs' receipt of Amabile's initial assurances that their applications were timely submitted, and Bahal and Fox's contacts within USCIS would guarantee their application's successful processing, gave Plaintiffs the false impression that their case was on track and (2) a change in USCIS policy due to the 2020 general election, the covid-19 pandemic, and the significant backlog in USCIS processing Visa applications, would delay Plaintiffs' discovery of the fraud that had been perpetrated on them and the actual nature of the applications that Defendants had filed on their behalf during that period.  In addition, even if uncovered, Defendants knew and believed that Plaintiffs were unlikely to fire Defendants or report the fraud out of fear that, among other things, they would be out of time and would face removal proceedings without any counsel, which would significantly increase the likelihood that they would be ordered removed.

252.     At the least, Defendants were consciously reckless in representing that the O-1, O1-b, and Eb-1A Visa applications were affirmative forms of immigration relief and failing to explain the nature of the applications they were actually filing on Plaintiffs' behalf, specifically that the Plaintiffs were not qualified for the applications would result in Plaintiffs being put in removal proceedings.

253.     The Enterprise, as well as each Defendant, received monetary benefits from defrauding and exploiting Plaintiffs.  These benefits were primarily in the form of payments received, increased referrals, and overall increased profits and income generated from the illegitimate immigration fraud scheme.  Plaintiffs were injured in the amount that

they were induced to pay Defendants based on Defendants' false representations, as well as all of the out-of-pocket costs they incurred as a result of having to pay other lawyers to correct Defendants' mistakes.

254.    Defendants' conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because Defendants, through interstate commerce, committed multiple related acts of mail and/or visa fraud.

255.    The predicate acts were not isolated events but were related acts aimed at the common purpose and goal of defrauding Plaintiffs for profit.  The predicate acts involved the same or similar methods of commission.  They involve Defendants' knowing and purposeful misrepresentations to Plaintiffs about some or all of the following: (i) the services Defendants intended to provide to Plaintiffs, (ii) the existence of an affirmative immigration benefit based on Plaintiffs qualifications for the O-1, O1-b, and Eb-1A Visas, (iii) Plaintiffs' eligibility for work authorization and lawful permanent residency and the requirements for qualifying for these benefits, (iv) the context in which Defendants' contacts within the USCIS guaranteed that plaintiffs Visa applications would be approved, and the fact that defendants contacts had the power to guaranteed the approval of Plaintiffs O-1, O1-b, and Eb-1A Visas applications, (v) the type of application Defendants intended to, and did, file on behalf of Plaintiffs, (vi) the fact that Plaintiffs were quoted one price and then was over billed, (vii) the fact that Defendants presented Amabile as a licensed immigration attorney, and (viii) the risks and purpose of the applications Defendants actually intended to, and did, file on Plaintiffs' behalf.  The predicate acts also involved the Defendants' filing of O-1, O1-b, and Eb-1A Visas applications on behalf of Plaintiffs with the false preparer attestations, Defendants' filing of the applications, including the same boilerplate language without regard to the truth or falsity of the information contained therein, and Defendants' filing of O-1, O1-b, and Eb-1A Visas applications to further and conceal the scheme.

256.    Defendants' activities amounted to a common course of action with a similar pattern and purpose: to defraud large numbers of similarly situated victims frequently over a period of at least 17 years, the duration of Bahals' employment as the Co-Chair of Fox's immigration practice.

257.     Defendants hold themselves and Fox Rothschilds Firm out to the community as experienced immigration law practitioners, possessing the skills and knowledge to assist clients in obtaining immigration benefits.  The predicate acts were Defendants' regular way of operating Fox Rothschilds Law Firm, such that the scale of the harm caused by Defendants goes beyond the Plaintiffs named herein.

258.     In fact, as detailed above, Defendant Bahal implemented a pattern and practice within the Immigration Law Practice to overbill the immigration clients, to create fake expense reports for these clients to zero out the balance of their retainers, and to secure origination of prospective clients at all costs, even if she could not provide the appropriate services for those clients, or in the case of Mr. Turtle, using a prospective clients initial inquiry to boost her origination to increase her partnership bonus at years end.

259.     Examples of this is:

   a.  Based on information and belief, Fox immigration customers initialed WP, and EH was overbilled by Fox.  They demanded an audit of their files, and Bahal and her co-conspirators, Ali Brodie, Catherine Wadhwani, and Brian Frey, worked in concert to cover up the theft that had been committed in these client accounts.


<u>The RICO Conspiracy</u>

260.     Through the Enterprise, Defendants conspired to commit fraud and carry out the Immigration RICO Scheme to defraud Plaintiffs as set forth herein.

261.     Defendants knowingly agreed to the overall objective of the conspiracy to profit by taking advantage of immigrants and agreed to commit mail fraud and visa fraud in furtherance of that scheme.

262.     The scheme's goal was to steal clients' funds, illegally retain client retainer balances, create false invoices and zero out clients' accounts, intentionally apply for visas they know their clients do not qualify for the sole purpose of overbilling, lie to their clients about filing submissions, and present non-lawyers as lawyers.

263.     Based on information and belief, the Defendants' conspiracy includes members of the Enterprise, as well as various unknown employees and agents of Defendants Fox's Law Firm (Ali Brodie, Catherine Wadhwani, and Brian Frey).

264.     Defendants knowingly and willingly combined, conspired, confederated, and agreed together and with others to violate l8 U.S.C. § l962(c) and conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity.

265.     Defendants have engaged in overt acts in furtherance of the conspiracy, including engaging in or supporting each other in engaging in a pattern of racketeering activity that involves conduct that constitutes mail fraud under l8 U.S.C. § l34l and visa fraud under l8 U.S.C. § l546.

266.     Defendants have engaged in other overt acts in furtherance of the conspiracy, including making false and misleading representations to Plaintiffs and otherwise participating in the daily operations of the Enterprise.

267.     Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the Immigration Fraud RICO Scheme.

268.     Defendants' conduct constitutes a conspiracy to violate l8 U.S.C. § l962(c).

269.     Furthermore, upon information and belief, Defendants knowingly and willfully conspired to conceal the Immigration Fraud Rico Scheme, as evidenced by Tom Paradise paying Amabile $150,000 in exchange for Amabile not filing a CEPA lawsuit against Fox where she would reveal the names of clients who were victims of the Immigration Fraud RICO scheme, as well as clients who had their retainer balances stolen, and whom were overbilled.

270.     Plaintiffs exercised reasonable diligence in attempting to uncover Defendants' fraud by confronting Defendants about their activities and misrepresentations, seeking out additional information from other sources, and/or firing Fox, and hiring competent counsel elsewhere.  When confronted by Plaintiffs about the misrepresentations, Defendants became dismissive and angry with Plaintiffs, ignored Plaintiffs, and misled Plaintiffs in order to conceal the Immigration Fraud RICO Scheme.

271.     Plaintiffs were only able to discover the fraudulent nature of the Immigration Fraud RICO Scheme with assistance from unaffiliated attorneys and when they received rejection notices in the mail from USCIS.

<u>Injuries suffered by Plaintiffs</u>

272.     As a direct and proximate result of Defendants' racketeering activities and violations of l8 U.S.C. § l962(c) and (d), Plaintiffs have been injured in their business or property in that they have collectively been defrauded out of thousands of dollars in payments to Defendants and, in some cases, subsequently incurred legal costs to defend against referral to removal proceedings and/or removal proceedings initiated, in either case, as a direct result of Defendants' late submissions or non-submission of their visa applications on Plaintiffs' behalf as part of Defendants' fraud.  For Plaintiffs, who are members of low-income families, the loss of this money has been economically devastating.

273.     Plaintiffs' injuries were a direct, proximate, and reasonably foreseeable result of Defendants' violations of l8 U.S.C. § l962(c) and (d).  According to l8 U.S.C. § l964(c) and (d), Plaintiffs are entitled to recover treble damages plus costs and attorney's fees from Defendants.

## **COUNT ONE**

### **Fraud**
### **(Amabile, Bahal, and Fox)**

274.     Plaintiffs repeat the allegations outlined in all previous paragraphs of this Complaint as if they were outlined in full herein.

275.     As respondeat superior, Fox is 100% liable for Amabile and Bahal's actions, as they were acting in their capacities as Fox employees when they committed the acts detailed below. Fox failed to adequately monitor, warn, or supervise Amabile and Bahal's actions.

276.     The elements of fraud in the inducement are a misrepresentation of material fact, knowledge, or belief by the defendant of its falsity, intent that the other party relies on the misrepresentation, and reasonable reliance thereon by the other party. Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990). Fraud in the inducement does not differ materially from common-law fraud, as it provides a cognizable basis for equitable relief in the event a false promise induced reliance. See Lipsit v. Leonard, 64 N.J. 276, 283, 315 A.2d 25 (1974). Longmuir v. Kickin' It, No. A-0422-18T2, 2020 N.J. Super.  Unpub. LEXIS 707, at *6 (Super. Ct. App. Div. April 21, 2020).

<u>Misrepresentation of Material Fact</u>:

277.    On or about March 2020, Amabile called Mr. Wealth on the phone and informed him that she was an immigration attorney with the law firm Fox Rothschild and was referred to him by a mutual friend.

278.    Later on that year, towards the end of July 2020, Amabile presented herself as an immigration attorney with Fox Rothschild to Mike Turtle in the presence of Plaintiff Wealth, informing him that she would be handling the day-to-day activities of his O-1 Visa application.

279.    In 2022, Plaintiff presented herself as an immigration attorney with Fox Rothschild to Mr. Wealth's friend, Jamie Simcoe.   This presentation was in connection with Mr. Wealth's detention by ICE.  (**See attached**).

280.    On or about April 29, 2022, Amabile presented herself as an immigration attorney with the law firm Fox Rothschild to Mr. Wealth's friends Jaclyn and Steven Muller. (**see attached**).

281.    On or about January 2017, Amabile befriended Plaintiff Markevich at this New Year's party and learned that Plaintiff Markevich was looking to file for a Visa.

282.    On or about January 2017, Amabile contacted Plaintiff Markevich, informing him that she was an immigration attorney with Fox Rothschild and advised him that he may want to consider applying for an O1-B Visa and would be able to help him with his O1-B visa through her firm, Fox Rothschild if he was interested.

283.    As detailed above, Bahal and Fox allowed Amabile to operate mainly on Mr. Wealth's immigration renewal application.  At no time did Bahal or any other licensed attorney for Fox reach out to Mr. Wealth to inform him that Amabile was not a licensed attorney.

284.    A search of New Jersey State Bar attorney registration showed that Amabile is not a licensed attorney and knew her claims were false when she made them to the Plaintiffs.

285.    As detailed above, Bahal and Fox allowed Amabile to operate mainly on Mr. Markevich's immigration application. At no time did Bahal or any other licensed attorney for Fox contact Mr. Markevich to inform him that Amabile was not a licensed attorney.

286.    These false claims by Amabile occurred in New Jersey to both Plaintiffs. Regarding Mr. Wealth, she did so in the presence of Bahal who did not correct her.  Bahal

encouraged Plaintiff Wealth to listen to Amabile and informed him that Amabile is knowledgeable and well-experienced in the area of immigration law and that she would handle the day-to-day operation of his application for the O-1 Visa. This occurred on or about June 2020 when he was introduced to Bahal.

287.      Additionally, when Bahal had a call with Mr. Wealth and Amabile, she co-signed Amabile's claim that they had connections within USCIS that could guarantee Plaintiff Wealth's O-1 visa application to be approved.  This occurred on or about June 2020.

288.      Bahal also informed Plaintiff Wealth that he was qualified for the O-1 Visa, even though she knew that He was not qualified because he informed her that he did not meet the heightened visa criteria. Bahal said she had 20+ years of experience as an immigration attorney and could guarantee that he was qualified and would be approved.

289.      An objectionably reasonable person in the Plaintiff's position would believe the person who is presenting themselves as an immigration attorney is an actual immigration attorney.

290.      As stated above, on or about October 15, 2021, Amabile called Plaintiff Markevich and informed him that she had a "special connect" named Alan D. Bersin from the US Department of Homeland Security.  Amabile informed Plaintiff Markevich that she could file an O1-B reinstatement and EB1-A together, and the only expenses Plaintiff Markevich would be responsible for were the filing fees of $460.00 and $1465.00.

291.      Plaintiff Markevich was happy to hear that there was an alternative solution to obtain a Visa, so he contacted a friend to borrow the money.

292.      Plaintiff Markevich borrowed the money and sent it to Amabile via Zelle.

293.      Plaintiff Markevich believed Zelle was secure as Kristen Amabile was represented by her law firm, and Amabile was a lawyer looking out for his best interest.

294.      Amabile made this demand with a sense of immediate urgency, saying, "Send money to me TODAY, I drop off at FedEx, it's urgent."

295.     Plaintiff Markevich was under the impression that Zelle and cash were appropriate platforms and modes of payment for Defendant's legal representation, as Amabile was still employed with Fox.  Bahal never informed him of any other way to compensate Defendants for their services, and Fox negligently failed to provide the necessary oversight of Amabile and Bahal's actions.

296.     Amabile pocketed Plaintiff Markevichs money, and never applied for the Visa.

297.     As stated above, on or about December 1, 2021, while employed with Fox, Amabile requested that Mr. Wealth provide her with his credit card information because he needed to establish good credit for his visa renewal:





298.    While employed with Fox, and acting in her role as an immigration attorney for
Fox, Defendant Amabile charged over $8,000 to Mr. Wealth's credit and debit cards and
used her access to Mr. Wealth's social security number to open additional credit cards.

The Defendants Knew Their Representation That Amabile Was a Licensed Attorney In the State
of New Jersey Was False, Amabile Knew Her Representation That Plaintiff Wealth Needed To
Give her His Credit And Debit Cards To Get Approved For A Visa Was False, Amabile Knew
That She Did Not Have Contacts In USCIS To Ensure Plaintiffs Visa's Would Be Approved,
Amabile Knew That She Had No Intention To Apply For Mr. Markevich's Visa, Amabile Knew
That She Had No Intention To Get Mr. Markevich's Dad To The United's States From Poland:

299.    Here, Amabile knew that her representation as a licensed attorney in the State of
New Jersey was false when it was made to Plaintiffs.  Amabile is not a registered, licensed
attorney in New Jersey.

300.    This is even more true because the Plaintiffs received letters from the Committee
On The Unauthorized Practice Of Law informing them that an investigation of Amabile
had been opened for her illegal practice of law.

301.    Amabile used the fact that Bahal and Fox allowed her to be client-facing and allowed her to execute the immigration applications to defraud the unwitting immigration clients of the fact that she is NOT a licensed attorney.

302.    Bahal and Fox knew or should have known that Amabile was falsely presenting herself as a licensed attorney in the State of New Jersey.  Amabile used Fox and Amabile's Zoom and email platforms to set up meetings and to transact business with Plaintiffs.

303.    As evidenced through text conversations between the Plaintiffs and Ms. Amabile on Fox's company-issued phone, emails, and other communications between the Plaintiffs and Amabile, it was clear that Amabile represented herself as a licensed attorney to the Plaintiffs.

304.    Bahal and Fox could have easily discovered this by checking their email sent folders and the zoom call logs and ended Amabile's fraudulent acts.

305.    Bahal knew that Mr. Wealth was not qualified for the O-1 Visa. Yet she guaranteed his acceptance and led him to believe that she had connections within USCIS who could ensure his visa application's approval.

306.    Bahal also led Mr. Wealth to believe that Amabile was an expert attorney in Immigration law, as she trusted her to handle the day-to-day operations of Plaintiff Wealth's O-1 Visa application.

<u>Plaintiffs Detrimentally Relied On Defendants Promise</u>:

307.    Here, the Plaintiffs are citizens of foreign countries.

308.    Plaintiffs are not accustomed to or aware of the requirements of being a licensed attorney in the State of New Jersey.

309.    The Plaintiffs detrimentally relied upon Fox's representation through Amabile, Bahal that Fox is a reputable, responsible law firm that would protect Plaintiffs interest and apply for their Visa applications.  Plaintiffs relied on Bahal, Amabile, and Fox to be honest and truthful in their representations to them.  Bahal, Amabile, and Fox intentionally deceived the Plaintiffs for the sole purpose of getting them to pay more than $13,000.00 and $20,000, respectively, for sham legal services provided to them by a criminal who posed as a licensed attorney.

310.    Regarding Mr. Wealth, Plaintiff is not an expert in the US Visa application process. Plaintiff relied on Bahal to inform him of the best visa to apply for and her assertions that

Plaintiff was qualified for the O-1 Visa and the fact that she guaranteed he would be approved due to her 20+ years of experience and the purported connections Amabile bragged that they had within USCIS who will guarantee that his application would be approved.

311.    Plaintiff Wealth had no reason to believe that Bahal did not have the power to secure him the O-1 Visa even though he did not possess the extradentary skill necessary for the visa.

312.    The plaintiff's Detrimental Reliance was Reasonable.

313.    Here, as previously stated, Plaintiff's detrimental reliance was reasonable because they were unwitting clients presented with a set of facts that were not corrected by Bahal or Fox when they knew or should have known about Amabile's actions.

314.    Plaintiffs were harmed because they lost thousands of dollars and either had an inadequate visa application submitted on their behalf or never had a visa application submitted at all.  They then had to spend additional money to hire competent immigration attorneys to assist them in correcting the Visa application errors made by the Defendants.

315.    Plaintiffs request damages as required for fraud under the New Jersey statute.

**WHEREFORE,** the Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

     a.  Awarding compensatory damages;
     b.  Awarding punitive damages;
     c.  Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;
     d.  Awarding prejudgment interest to the extent permitted by law; and
     e.  Awarding such other and further relief as to this Court may seem proper.

## COUNT TWO
## Violation Of The NJRICO
### (Plaintiff Wealth against Fox, Amabile and Bahal; Plaintiff Markevich Against Amabile)

316.    Plaintiffs repeat the allegations outlined in all previous paragraphs of this Complaint as if they were outlined in full herein.

317.    As respondent superior, Fox is 100% liable for Amabile and Bahal's actions. They were acting in their capacities as Fox employees when they committed the acts detailed below. Fox failed to adequately monitor, warn, or supervise Amabile and Bahal's actions alleging violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act

("NJRICO"), which Plaintiffs bring on behalf of themselves, are asserted against Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10.

318.     Chapter 41 of New Jersey's Criminal Code, Title 2C, is titled "Racketeering," commonly called "NJRICO."

319.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 are each a "person," as that term is defined by N.J.S.A. § 2C:41-1(b) to include "any individual or entity or enterprise as defined herein holding or capable of holding a legal or beneficial interest in property."

320.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, acting together and individually, were engaged in "trade or commerce" as that term is defined by N.J.S.A. § 2C:41-1(h) to include "all economic activity involving or relating to any commodity or *service*."

321.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, acting together and collectively, comprised and continue to comprise an "enterprise," as that term is defined by N.J.S.A. § 2C:41-1(c) to include "any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities."

322.     In the alternative, Defendant Fox, which is a business entity, constituted an "enterprise" as that term is defined by N.J.S.A. § 2C:41-1(c) (quoted above).

323.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 violated N.J.S.A. § 2C:41-2(c) by engaging in the following prohibited activities: Defendants Amabile, and Bahal, being persons who were employed by or associated with Defendant Fox, an enterprise, conducted or participated, directly or indirectly, in the conduct of that Enterprise's affairs through a pattern of racketeering activity.

324.     In the alternative, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, all being persons who were employed by or associated with Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10, which constituted an association-in-fact enterprise, conducted, or participated, directly or

indirectly, in the conduct of that Enterprise's affairs through a pattern of racketeering activity.

325.     At all times relevant to this action, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 engaged in a pattern of racketeering activity, as defined by N.J.S.A. § 2C:41-1(d), by:

   a.   Engaging in at least two incidents of racketeering conduct, both of which have occurred on an ongoing basis during the past 17 years and will continue to occur, and,

   b.   engaging in criminal conduct with the same or similar purposes, results, participants, victims, or methods of commission or is otherwise interrelated by distinguishing characteristics and is not isolated incidents.

326.     Precisely, Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10 committed the following racketeering activities, as enumerated in N.J.S.A. § 2C:41-1(a)(1):

   a.   Theft and all crimes defined in Chapter 20 of Title 2C of the New Jersey Statutes, specifically Theft by Deception, in violation of N.J.S.A. § 2C:20-4, and Theft by Failure to Make a Required Disposition of Property Received, in violation of N.J.S.A. § 2C:20-9, by:

      i.   Stealing Plaintiff Wealth and Markevich's funds,

      ii.  illegally retaining client's retainer balances,

      iii. creating false invoices and zeroing out clients' accounts,

      iv.  intentionally applying for VISA's they know their clients do not qualify for the sole purpose of overbilling,

      v.   lying to their clients about filing submissions, and

      vi.  presenting non lawyers as lawyers.

   b.   Upon information and belief, Defendants' conspiracy includes members of the Enterprise, as well as various unknown employees and agents of Defendants Fox's Law Firm: Ali Brodie, Catherine Wadhwani, and Brian Frey.

   c.   Defendants stole over $20,000.00 from Plaintiff Wealth for legal services that were never rendered.   On or about August 2020, Plaintiff Wealth paid Fox for an

immediate and timely submission of his O-1 Visa application, which Bahal and Amabile guaranteed he would secure.

d.  Amabile informed him that the application was submitted in a timely manner. It was not. In fact, his application was not submitted until five months later.

e.  Amabile and Bahals' guarantee of his O-1 Visa approval was not true, as Mr. Wealth's application was rejected.

f.  Amabile and Bahal misrepresented that they had "contacts" within USCIS that would guarantee Mr. Wealth's Visa approval.

g.  Amabile stole over $20,000.00 from Plaintiff Markevich for legal services that were never rendered.  As detailed above, Plaintiff Markevich paid Amabile thousands of dollars to bring his father to America from Poland.

h.  Amabile guaranteed that her connections within USCIS would get his father here. Plaintiff Markevich relied on those guarantees, and his father arrived at the airport in Poland only to discover that he had no visa to board the plane and travel to the United States.

i.  Amabile required Plaintiff Wealth to open credit card accounts in Amabile's name for Amabile's sole benefit.  Running up the charges on those credit cards and requiring Plaintiffs to incur the cost without compensation or reimbursement for the sole benefit of Amabile.

j.  Purposely obtaining money by way of credit by deception or threat; specifically: (A) by deception, by purposely misinforming Plaintiff Wealth that they were required to establish "good credit" to secure the renewal of their  Visa, and/or (B) by threat, by retaliating against Plaintiffs when they complained about the credit card fraud charges, as well as the legal malpractice committed by Bahal, and Fox that resulted in an "anonymous" tip to ICE that Plaintiff was out of status.

k.  Amabile purposely obtained money by way of CashApp, Venmo, and wire transfers by deception or threat; specifically: (A) by deception, by purposely misinforming Plaintiffs that they were required to "Pay Now" to secure the renewal of their  Visa because Amabile and Bahal has a contact in USCIS that would get their visa fast, and/or (B) by threat, by retaliating against Plaintiffs when they complained about the fraud, as well as the legal malpractice committed by Bahal, Amabile, and Fox

that resulted in Plaintiffs being out of status.  In the case of Plaintiff Markevich, they encouraged him to enter into a fake marriage to secure a green card or visa.

l.  Forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes, specifically Money Laundering, in violation of N.J.S.A. § 2C:21-25(a), (b), and (c), by:

   i.  Transporting or possessing property known or which a reasonable person would believe to be derived from criminal activity, specifically forged credit card applications which were opened in Mr. Wealth's name by Amabile while Mr. Wealth was in prison; fake filing deadlines and emergencies expressed to Mr. Markevich which required him to make instant deposits and wire transfers of thousands of dollars at a time into the accounts of Amabile, and/or

   ii.  Engaging in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity, explicitly using stolen credit cards acquired in the name of Mr. Wealth by Amabile or using stolen funds that were wired to Amabile but were earmarked for Mr. Markevichs visa applications and to get his father to the United States:

      1.  With the intent to facilitate or promote criminal activity or

      2.  Knowing that the transaction is designed in whole or in part: (a) to conceal or disguise the nature, location, source, ownership, or control of the property derived from criminal activity; or (b) to avoid a transaction reporting requirement under the laws of this State or any other state or of the United States; and/or

      3.  Directing, organizing, financing, planning, managing, supervising, or controlling the transportation of or transactions in the property known or which a reasonable person would believe to be derived from criminal activity, explicitly applying for, securing, and using stolen credit cards in the name of Mr. Wealth, and misusing wired funds sent by Mr. Markevich and procured by Amabile;

      4.  All laundered funds were re-invested into Fox, Amabile, and Bahal, concealed as legitimate revenue or profits, and/or extracted by Defendants for personal use.

327.     This is emblematic of Fox and Bahal's modus operandi.  As stated above, Bahal would run up the bill on her clients so as not to refund unused retainers.

328.     Additionally, Defendants committed the following racketeering activities, as enumerated under N.J.S.A. § 2C:41-1(a)(2), conduct defined as "racketeering activity" under Title 18, U.S.C. § 1961(1)(B), including:

    a.  Mail Fraud, in violation of 18 U.S.C. § 1341, by having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to execute such scheme or artifice or attempt so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.  As alleged in this Complaint, Defendants and/or persons acting on their behalf used the mail to (1) purposely submit records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth to which they were not entitled and/or to purposely not use those funds for their intended purpose, and/or (2) causing Plaintiffs and Defendants to be mailed credit card bills and other credit-related records that misstated the intended beneficiary, debtor, and card user.

    b.  Wire fraud, in violation of 18 U.S.C. § 1343, by having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.  As alleged in this Complaint, Defendants and/or persons acting on their behalf used interstate wire facilities, including the Internet, to (1) purposely submit records containing false statements and certifications to financial institutions and/or credit card companies to

fraudulently obtain funds from and in the name of Mr. Markevich to which they were not entitled and/or to purposely not use those funds for their intended purpose, and/or (2) causing Plaintiffs and Defendants to be mailed checks, cash, and other records that misstated the intended beneficiary, debtor, and user.

c.  Visa Fraud: Defendants engaged in visa fraud because they knowingly presented O-1, O1-b, and Eb-1A Visas applications to USCIS, which contained false statements and/or did not contain any reasonable basis in law or fact. Examples of visa fraud include signing the attestation swearing that the following statements were true when, in fact, one or both statements were not: (1) Defendants filed the O-1, O1-b, and Eb-1A Visa applications at the request of Plaintiffs; and (2) Defendants read the completed O-1, O1-b, and Eb-1A Visa application to the applicant in his or her native language or a language he or she understood for verification. Defendants swore to these attestations, knowing that they were not all true. In Mr. Wealth's application, Defendant Bahal, without informing Plaintiff Wealth that Defendants were filing an O-1 Visa application attesting to the fact that Mr. Wealth was being sponsored, and without reviewing the application with Plaintiff Wealth in English, Spanish, or Igbo, signed the preparer attestation that provides: "I declare that I have prepared this application at the request of the [Plaintiff], that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on Form I-589 may also subject me to civil penalties under 8 U.S.C. l324c and/or criminal penalties under l8 U.S.C. l546(a)." In addition, Defendants knowingly prepared and submitted O-1, O1-b, and Eb-1A Visa applications on behalf of Plaintiffs without regard to the truth or falsity of the information contained therein and intentionally mailed those O-1, O1-b, and Eb-1A Visa applications to the USCIS Service Center in Vermont.

d.  Bank fraud, in violation of 18 U.S.C. § 1344, by knowingly executing or attempting to execute a scheme to defraud a financial institution or to obtain any of the moneys,

funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.  As alleged in this Complaint, Defendants and/or persons acting on their behalf committed bank fraud by (1) purposely submitting records containing false statements and certifications to financial institutions and/or credit card companies to fraudulently obtain credit cards in the name of Mr. Wealth, and by frequently procuring wire transfers across state lines from Mr. Markevich whom lived in California, to which they were not entitled and/or to purposely not use those funds for their intended purpose,  and/or (2) causing Plaintiffs and Defendants to be mailed cash, credit cards and other records that misstated the intended beneficiary, debtor, and user.

329.    Plaintiffs have been damaged in their business or property because Defendants violated N.J.S.A. § 2C:41-2, and, therefore, they are entitled to recover the damages and other remedies enumerated therein.

330.    Defendants' acts or omissions were actuated by actual malice and/or a willful and wanton disregard for the consequences suffered by the Plaintiffs and/or with knowledge of a high degree of probability of harm to the Plaintiffs and reckless indifference to the consequences of their acts or omissions.

331.    Compensatory damages alone will be insufficient to deter such conduct in the future.

332.    Plaintiffs are, therefore, entitled to punitive and exemplary damages.

**WHEREFORE,** Plaintiffs request that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

    a. Granting Plaintiffs statutory, common law, and punitive damages, and applicable pre-and post-judgment interest, in full recompense for their damages;[4]

    b. Entering judgment according to the declaratory relief sought;

    c. Granting Plaintiffs such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

    d. Granting Plaintiffs an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, considering the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

---

[4] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

## COUNT THREE
### Legal Malpractice
### (Plaintiff Wealth against Defendant Fox and Bahal
### Under New Jersey Common Knowledge Doctrine)

333.     Plaintiff Wealth repeats and realleges the preceding paragraphs as if fully set forth herein.

334.     As respondent superior, Fox is 100% liable for the actions of Amabile and Bahal as they were acting in their capacities as Fox employees when they committed the acts detailed below.   Fox failed to adequately monitor, warn, or supervise the actions of Amabile and Bahal.

335.     As the Supreme Court has explained, the "common knowledge" doctrine presents an exception to this requirement:

336.     Under the common knowledge doctrine, however, a malpractice case against a licensed professional may present triable issues without resorting to the testimony of an expert.  In such a case, the jury itself can supply the applicable standard of care and thus prevent the necessity for expert testimony.  The trial of such a case is essentially no different from an ordinary negligence case.  Nevertheless, it is an unusual professional malpractice case in which the common knowledge doctrine can be invoked.

337.     The basic postulate for the application of the common knowledge doctrine in a malpractice action is that the issue of negligence is not related to a technical matter peculiarly within the knowledge of the licensed practitioner.  The most appropriate application of the common knowledge doctrine involves situations where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.  [*Rosenberg v. Cahill*, 99 N.J. 318, 325-26, 492 A.2d 371 (1985) (internal citations and quotation marks omitted).]

338.     Expert testimony is therefore not required when the common knowledge of the jury "is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts." *Estate of Chin v. St. Barnabas Med.  Ctr.*, 160 N.J. 454, 469, 734 A.2d 778 (1999).  "The effect of applying this doctrine is to allow the jury to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Sanzari v. Rosenfeld*, 34 N.J. 128, 141, 167 A.2d 625 (1961). "In other words, application of the doctrine

transforms the case into an ordinary negligence case where . . . the jury, from its fund of common knowledge, assays the feasibility of possible precautions which the defendant might have taken to avoid injury to the plaintiff." *Id.* at 141-42. Application of the doctrine is limited to "'where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.'" *Kelly v. Berlin*, 300 N.J. Super. 256, 266, 692 A.2d 552 (App. Div. 1997) (quoting *Rosenberg, supra*, 99 N.J. at 325). *Atkin v. Bridgeway, Inc*., No. A-4272-12T1, 2014 N.J. Super. Unpub. LEXIS 2125, at *10-11 (Super. Ct. App. Div. August 29, 2014).

339. New Jersey courts have found that no expert testimony and, therefore, no affidavit of merit was required when an attorney failed to cite any legal authority in support of his client's claim, failed to submit a brief, and misrepresented the State of the case, *Sommers v. McKinney,* 287 N.J. Super. 1, 670 A.2d 99, 104 (N.J. Super. Ct. App. Div. 1996), or when an attorney failed to file an action within the controlling statute of limitations, *see Brizak v. Needle,* 239 N.J. Super. 415, 571 A.2d 975, 983-84 (N.J. Super. Ct. App. Div.), *certif. denied,* 584 A.2d 230 (1990). *FTC v. Hope Now Modifications, LLC*, No. 09-1204 (JBS/JS), 2010 U.S. Dist. LEXIS 75922, at *17-18 (D.N.J. July 27, 2010).

340. As detailed above, Bahal and Fox's malpractice is evident and apparent. Bahal missed a filing deadline for Plaintiff Wealth. Bahal misinformed Plaintiff Wealth about his eligibility for the O-1 Visa when he raised concerns about his eligibility. Bahal allowed Amabile to present herself to Mr. Wealth as a licensed immigration attorney, but she never corrected the claim. She doubled down on Amabile's immigration attorney lie by praising Amabile for her knowledge and experience in immigration law, and informing Mr. Wealth that Amabile will be handling his application for the O-1 Visa. She never corrected Mr. Wealth's misconception about Amabile being a licensed immigration attorney, and she never ensured that his Visa applications were processed timely or correctly. Finally, Bahal misinformed Mr. Wealth when she told him that he would be better off applying for the O-1 Visa instead of the J-1 renewal Visa.

341. As detailed above, Mr. Wealth has all of the qualifications for the J-1 Visa extension/renewal, and no qualifications for the O-1 Visa. The Cost of the J-1 Visa renewal

would have been no more than $600.00, yet defendants forced Plaintiff to lose over $13,000, and an additional $10,000 to correct the errors and bad advice of Defendants.

342.  Additionally, Bahal lied on Plaintiff Wealth's visa application when she knew that Mr. Turtle or Mr. Turtle's company was not financially sponsoring Plaintiff Wealth for the Visa.

343.  As a result, the plaintiff's immigration status was compromised.

344.  ICE detained Mr. Wealth for being out of status. As detailed above, Mr. Wealth raised concerns about being out of status if his application was not filed on time. Amabile informed him that the defendant's contacts inside USCIS would handle his application process and ensure that he would not be out of status.

345.  Mr. Wealth was forced to stay in prison against his will for 45 days, where he was physically assaulted, threatened, and psychologically traumatized.

346.  While in prison, Mr. Wealth was financially harmed by Bahal and Fox's authorized agent Amabile, who, upon information and belief, was working in concert with Bahal.

347.  While engaged with Amabile, Mr. Markevich sent her thousands of dollars to aid him and his father with visa applications that were never submitted.  Upon information and belief, Amabile pocketed Mr. Markevich's money.

**WHEREFORE,** Plaintiffs demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted.

    a. Awarding compensatory damages;
    b. Awarding punitive damages;
    c. Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;
    d. Awarding prejudgment interest to the extent permitted by law; and
    e. Awarding such other and further relief as to this Court may seem proper.

## <u>COUNT FOUR</u>
### Conduct and participate in a
### RICO Enterprise Through a Pattern of Racketeering Activity
### (Violation of Racketeer Influenced and
### Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)-(d))

348.  Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein. Specifically, the RICO section above.

349.  As respondeat superior, Fox is 100% liable for Amabile and Bahal's actions. They were acting in their capacities as Fox employees when they committed the acts detailed below. Fox failed to adequately monitor, warn, or supervise Amabile and Bahal's actions.

350.     Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants Amabile, Bahal, Fox, JOHN DOES 1-10, and ABC CORPORATIONS 1-10.

351.     Section 1962(a) makes it:

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.
18 U.S.C. § 1962(a).

352.     Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. §1962(c).

353.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

354.     Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

355.     Beginning before the class period and continuing to this day, Defendants have unlawfully increased their profits by making fraudulent claims that undocumented immigrants in the United States can increase their chances of securing a Visa by opening credit card accounts (and adding individual defendants as authorized users) to establish good credit – when they do not.  Amabile to Plaintiff Wealth (see attached Visa credit card applications).

356.     Beginning before the class period and continuing to this day, Defendant Amabile has unlawfully increased her profits by making fraudulent claims to undocumented immigrants in the United States that wire transfer thousands of dollars to her would increase their chances of obtaining a visa for them and their loved ones overseas.

     a.   By informing them that the quickest way to secure a visa or green card is to engage in a fake marriage – when it is illegal.  Amabile, Bahal and Fox to Plaintiff Markevich.

357.     The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other co-conspirators (Ali Brodie, Catherine Wadhwani, and Brian Frey). That association was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out a mail and wire fraud scheme to acquire a credit card, bank card, and retail store charge card accounts to help undocumented immigrants "establish good credit" in an effort to increase their chances to secure a Visa when their true goal was to deceive the undocumented immigrants into thinking good credit is necessary to secure an American Visa when, in fact, good credit is not a pre-requisite to secure a Visa, and requiring the Defendant's undocumented immigrant clients to add defendants as an authorized user on said credit cards, was definitely not a pre-requisite to secure a Visa as well.

358.     The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other unnamed co-conspirators. That association, in fact, was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out mail and wire fraud schemes to acquire money from undocumented immigrants in an effort to increase their chances of securing a Visa when their true goal was to deceive the undocumented immigrants into thinking it was necessary to wire thousands of dollars to defendants to secure an American Visa when, in fact, spending thousands of dollars is not a pre-requisite to secure a Visa.

359.     The members of the RICO enterprise all share a common purpose: to enrich themselves at the expense of their immigration clients by maximizing Defendants' revenues through fraudulent means. As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiffs, including by making false representations that claim that undocumented immigrants in the United States, such as Plaintiffs, can increase their chances of securing a Visa by opening credit card accounts and adding individual defendants as authorized users to establish good credit, which Defendants would not have done but for the existence of the scheme.

360.     The members of the RICO enterprise all share a common purpose: to enrich themselves at the expense of their immigration clients by maximizing Defendants' revenues through fraudulent means. As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiffs, including by making false representations that claim that undocumented immigrants in the United States, such as Plaintiffs, can increase their chances of securing a Visa by paying an American citizen to marry them for the sole purpose of securing a visa or a green card, also plaintiffs can increase their chances of securing a Visa by wiring thousands of dollars to defendants, which Defendants would not have done but for the existence of the scheme.

361.     Based on information and belief, this RICO enterprise has existed for 17 years, reflecting the duration of Bahal's employment with Fox. The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

362.     The enterprise was characterized by the Defendants' pattern of false representations and omissions made by Bahal, Amabile, and other current and former members of the Defendants' immigration law team to Defendant's immigration law consumers/clients. Some of these employees include Ali Brodie, Catherine Wadhwani, and Brian Frey.  These false representations and omissions were designed to induce Defendants' immigration clients to open credit cards, charge cards, bank cards, retail store charge cards, and bank accounts to establish "good credit" so they can qualify for a United States Visa.  It induced these clients to pay large retainers for immigration services many did not qualify for.  As part of this scheme, Defendants required the immigration clients to add them as authorized users to these credit accounts.  Encouraging immigration clients to pay American citizens to marry them so they could acquire a visa through a fake marriage.  Force immigration clients to pay defendants thousands of dollars through wire transfers for Visa applications that Defendants never submitted.  This pattern of false representations was disseminated to potential immigration clients of Defendants who reside in New Jersey and around the country by Defendants based in New Jersey under the direction and on behalf of Defendants in New Jersey.  The dissemination typically was done using interstate telephone wires and interstate electronic mail.

363.	The true nature of Defendants' scheme was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiffs and other unwitting immigration clients.

364.	Defendants profited from the enterprise, and the Plaintiffs suffered because the enterprise significantly increased the cost of the Plaintiff's immigration application by over $40,000.00, which was unnecessary.  It even resulted in Plaintiff Wealth spending 45 Days in prison after Defendants failed to submit Plaintiff Wealth's immigration application on time.  Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mail and interstate wires to sell the illusion that Bahal, Fox, and Amabile are competent, ethical, and honest immigration lawyers when nothing could be further from the truth. Defendants provided their immigration clients/consumers with this misrepresentative information, including via email all over interstate wireline communications systems, and obtaining retainer deposits, contingency fees, and hourly revenue via wire transfers, documents, and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to Plaintiffs, as described throughout.

365.	The defendants' scheme was reasonably calculated to deceive the Plaintiffs, international immigrants of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the effectiveness of worthless credit card purchases, charges, and wire transfers that did not, would not, and could not lead to securing a United States Visa.  Plaintiffs would not have opened over four credit cards, wired thousands of dollars, nor would he have given Defendant access to his bank accounts but for the illegal racketeering scheme operated by Defendants.

366.	Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiffs, and each participated in the enterprise as follows:

   a.	Defendant Fox directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing and marketing scores of immigration services that are marketed to innocent, unassuming undocumented immigrants who are vulnerable and in seek of a United States Visa. Throughout the relevant period, Defendant Fox oversaw the activities

of Defendant Bahal and Defendant Amabile (collectively, "Individual Defendants"). Defendant Fox has an ethical obligation as respondent superior to supervise the actions and activities of the individual defendants. Defendant Fox failed miserably to do so. Individual defendants relied on the mail to distribute advertisements to secure immigration clients whom they would promise United States Visa. These advertisements originated from and were sent from Defendant Fox's offices in the state of New Jersey to consumers in New Jersey and around the country, relying on the mail to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from the immigration clients.

b. In connection with Defendants acting from New Jersey, these Defendants used the mail and interstate wires to disseminate immigration marketing materials, immigration VISA applicants, and to use those immigration clients' private protected information to apply for American Express, Chase Sapphire, retail store credit card accounts, and to open bank accounts. Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

c. Defendant Amabile directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as the administrator of the immigration department of Fox to exercise complete dominion and control over Fox's immigration legal department such that Fox's immigration legal department are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form of Fox's immigration legal department, including with response to the United States Department of Immigration Enforcement, Plaintiffs, Plaintiff's family and friends, and through the marketing, advertisement, promotion, and distribution of marketing materials for Fox's immigration legal department. Throughout the relevant period, Amabile oversaw the dissemination of Defendants' fraudulent advertising from their offices in New Jersey to potential consumers in New Jersey and around the country, relying on the mail, email, and phone calls to distribute and interstate wires to disseminate the misleading information described herein as well as to receive

profits from any new immigration client which may come of it.  Amabile, acting from New Jersey, used the mail, email, phone calls, and interstate wires to acquire thousands of dollars, apply for American Express, Chase Sapphire, and retail store credit card accounts, and open bank accounts in the name of Plaintiffs and other Fox immigration clients to further her goals of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

d.   Defendant Bahal directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as the co-chair of the immigration department of Fox to exercise complete dominion and control over Fox's immigration legal department such that Fox's immigration legal department are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form of Fox's immigration legal department, including with response to the United States Department of Immigration Enforcement, Plaintiffs, Plaintiff's family, and friends, and through the marketing, advertisement, promotion, and distribution of marketing materials for Fox's immigration legal department. Throughout the relevant period, Bahal oversaw the dissemination of Defendants' fraudulent advertising from their offices in New Jersey to potential consumers in New Jersey and around the country, relying on the mail, email, and phone calls to distribute and interstate wires to disseminate the misleading information described herein as well as to receive profits from any new immigration client which may come of it.  Bahal, acting from New Jersey, used the mail, email, phone calls, and interstate wires to acquire thousands of dollars, apply for American Express, Chase Sapphire, and retail store credit card accounts, and open bank accounts in the name of Plaintiffs and other Fox immigration clients to further her goals of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

e.   Defendant Fox directs, controls, and participates in the enterprise's activities in various ways as set forth herein, including as the employer and respondent superior

of Amabile and Bahal and all employees of Defendant Fox's immigration law department. Throughout the relevant period, Fox's Management, spearheaded by Tom Paradise, oversaw the marketing and soliciting of potential immigration clients from Fox's Headquarters in Pennsylvania to consumers in New Jersey, Pennsylvania, New York, and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the credit card fraud and theft visited upon Plaintiffs, as well as, other immigration clients of Fox.  Acting from Pennsylvania, Fox's Management used the mail and interstate wires to apply for American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff and Fox's immigration clients out of their money.  Each of these acts was undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

367.     During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

368.     Beginning at an exact date unknown to Plaintiffs, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

369.     The acts set below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs for the benefit of Defendants.  Each Racketeering Act involved the same or similar methods of commission and participants.

370.     The Defendants' business would not have succeeded without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering.

371.     The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiffs to retain them as immigration

counsel and to open credit cards and bank accounts in the Plaintiff's name and add Defendant's as authorized users.

372.     The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiffs to retain them as immigration counsel and to have them wire thousands of dollars to secure Visas when in fact no visa applications were ever submitted, or they applied for Visa applications which they knew they did not qualify for.

373.     The defendants' wrongful conduct has caused injury to Plaintiffs, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiffs and the public.

374.     Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

375.     To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail, visa, and wire fraud.

376.     Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiff.  The defendants' mail, visa, and wire fraud were the proximate causes of the injuries suffered by the plaintiffs.

**Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

377.     Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs out of money, in reliance on the mail.  Defendants committed these acts with the intent to defraud Plaintiffs.

378.     Defendants used the mail to execute the fraudulent scheme herein.  (see above).

379.     Specifically, Defendants agreed to each of the acts of mail fraud described throughout this Complaint. In addition, Defendant Amabile agreed to rely on the mail to secure wire frauds, cash payments from Plaintiff Markevich, who lives in California, American Express, Chase Sapphire, and retail store credit card accounts, and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiff's and Fox's immigration clients out of their money.

380.     In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed credit card applications, letters, marketing materials, advertisements, agreements and other matters in depositories and by removing or causing to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

381.     Defendants could not have furthered their fraud without the use of the mail. For example, Defendants sought to acquire wire transfers, cash payments, American Express, Chase Sapphire, and retail store credit card accounts and to open bank accounts in the name of Plaintiff and other Fox immigration clients to further Fox's goal of robbing Plaintiffs and Fox's immigration clients out of their money.  Defendant Amabile relied on mail to deliver the credit and bank cards described herein to accomplish these acts.  Defendant Fox relied on the mail to distribute misleading advertisements to various states, including New Jersey.

**Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

382.     Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs out of money in reliance on interstate wires.  Defendants committed these acts with the intent to defraud Plaintiffs.

383.     Specifically, Defendants agreed to each of the acts of wire fraud described throughout this Complaint. In addition, Defendants agreed to rely on interstate wires to disseminate funds and to make purchases with the fraudulently acquired wire transfers, money transfers, credit cards, and bank cards via search engines and other online platforms to further their collective goal of robbing Plaintiffs and Defendant Fox's other immigration clients. Defendants knew that these online purchases were illegally made.

384.     Additionally, Defendants agreed that Defendants should facilitate these fraudulent purchases over interstate wires in furtherance of the fraud. Retailers nationwide executed Defendants' orders and purchases via their online platforms.

385.     In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually

or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

386.     Defendants could not have furthered their fraud without the ability to use telecommunications to share information with clients and retailers nationwide. Because Defendants needed to communicate with clients and retailers around the country, using interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable

387.     Plaintiffs have been damaged in their business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, he is entitled to recover the damages and other remedies enumerated therein.

388.     Defendants' acts or omissions were actuated by actual malice and/or a willful and wanton disregard for the consequences suffered by the Plaintiffs and/or with knowledge of a high degree of probability of harm to the Plaintiffs and reckless indifference to the consequences of their acts or omissions.

389.     As detailed above, according to Amabile's counter Complaint about Bahal and Fox, there are a number of other victims of Fox's Rico enterprise, as Bahal had a pattern and practice of overbilling and illegally retaining the retainer agreements for clients they owed.

390.     Compensatory damages alone will be insufficient to deter such conduct in the future.

391.     Plaintiffs are, therefore, entitled to punitive and exemplary damages.

**WHEREFORE,** Plaintiffs requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:
   a. Granting Plaintiffs statutory, common law, and punitive damages, and applicable pre-and post-judgment interest, in full recompense for their damages;[5]
   b. Entering judgment according to the declaratory relief sought;
   c. Granting Plaintiffs such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and
   d. Granting Plaintiffs an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

---

[5] Damages shall include, but not be limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

    a.  For past, present, and future general damages in an amount to be determined at trial;

    b.  For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

    c.  Any appropriate statutory damages;

    d.  For costs of suit;

    e.  For interest as allowed by law;

    f.  For attorney's fees; and

    g.  For such other and further relief as the Court may deem proper.


Dated: August 11, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.


## JURY DEMAND

According to R. 4:35-1, Plaintiff hereby demands a trial by jury as to all issues.

Dated: August 11, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.


## DEMAND FOR INSURANCE

According to R. 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in their action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: August 11, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.


## DESIGNATION OF TRIAL COUNSEL

According to R. 4:25-4, TYRONE A. BLACKBURN, ESQ. is hereby designated trial counsel.

Dated: August 11, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## CERTIFICATION

According to R. 4:5-1, the undersigned certifies that the matter in controversy is not the subject of any other action pending in any other court or a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, and all known, necessary parties have been joined in their action.

Dated: August 11, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents, and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. You are directed from this point forward to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This

96

includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this letter's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: August 11, 2024
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.